20 U.S.C. § 4402. Assistance in development of American Indian, Alaska Native, and Native Hawaiian culture and art.

23 U.S.C. § 101. Assistance provided for public roads under the program for federal aid for highways.

25 U.S.C. § 472a. Included as a "tribal organization" in applying Indian preference laws.

25 U.S.C. § 1452.* The Indian Financing Act of 1974.

25 U.S.C. § 1603.* The Indian Health Care Amendments of 1980.

25 U.S.C. § 1622. Eligibility of tribal organizations for health care grants and contracts.

25 U.S.C. §§ 2011 and 2019*. Establishing a new national Indian education system.

25 U.S.C. § 2401. Indian alcohol and substance abuse prevention and treatment.

26 U.S.C. § 4225. Exemption of articles manufactured or produced by Indians.

29 U.S.C. § 706.* Provision of vocational rehabilitation and other rehabilitation services.

29 U.S.C. § 1671. Employment and training programs for Native Americans and migrant and seasonal farm workers.

31 U.S.C. § 7501.* The single audit requirement for state and local governments.

42 U.S.C. § 628.* HHS payments to Indian tribal organizations for child welfare services.

42 U.S.C. § 1471. USDA financial assistance for farm housing.

42 U.S.C. § 2991b.* HHS financial assistance for Native American projects under the HHS Native American Program, administered by ANA.

42 U.S.C. § 2992c. HHS programs for Native Americans.

42 U.S.C. § 3002.* HHS programs for older Americans.

42 U.S.C. § 5061. HHS programs for administration and coordination of domestic volunteer services.

42 U.S.C. § 5122. Provision of federal assistance to other levels of government for disaster relief.

42 U.S.C. §§ 5302 and 5318. Assistance in providing public facilities under the Housing and Urban Development Act of 1968.

42 U.S.C. § 6707. Grants for public works projects.

42 U.S.C. § 6723. Assistance under anti-recession provisions for public works employment.

42 U.S.C. § 6903. Assistance in the planning and administration of solid waste disposal.

42 U.S.C. § 8802. Assistance in the development of biomass energy and alcohol fuels.

42 U.S.C. § 9601.* Special programs and assistance relating to hazardous substance releases, liability and compensation.

42 U.S.C. § 10101. Assistance in handling nuclear waste.

42 U.S.C. § 11472.* Set-asides to assist in education, training, and community services for the homeless.

In 1980 when Congress addressed the subsistence needs of Alaska Natives and rural residents in Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA), Pub. L. No. 96-487, 94 Stat. 2371, it found and declared that: "in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents." 94 Stat. 2422.

In 1987, citing its "plenary authority" over Indian affairs, Congress enacted extensive amendments to ANCSA.[121] Section 15 of the amendments provided that: "Alaska Natives shall remain eligible for all Federal Indian programs on the same basis as other Native Americans." 43 U.S.C. § 1626(d). While the congressional reports give no explanation for section 15,[122] the plain meaning of the provision is that Alaska Natives are to be

---

[121] Alaska Native Claims Settlement Act Amendments of 1987, Pub. L. No. 100-241, § 2(9), 101 Stat. 1788, 1789 (1988) (1991 Amendments).

[122] S. Rep. No. 201, 100th Cong., 1st Sess. (1987).

treated on the same basis as Indians in the rest of the United States for all federal program purposes.

B. Analysis

1. Treatment of Native Villages by Congress

From the foregoing historical review, several points are clear. First, Alaska Natives are aboriginal Americans who lived in organized societies prior to European contact and governed themselves. Like other Native Americans, the Alaska Natives migrated across the land bridge from Asia. Some Alaska Native groups are closely related ethnologically to tribes in the contiguous 48 states. Second, prior to the beginning of this century, the special legal status of Alaska Natives was unclear. During this period, territorial law was frequently made applicable to Natives on the same terms as to non-Natives. Third, although Natives continued to be subject to territorial law and are today subject to State law for many purposes, a degree of consensus on their legal status developed in the 20th Century. By the time of enactment of the IRA, the preponderant opinion was that Alaska Natives were subject to the same legal principles as Indians in the contiguous 48 states, and had the same powers and attributes as other Indian tribes, except to the extent limited or preempted by Congress.

When he was confronted with an inquiry as to the status of Alaska Natives more than 60 years ago, Solicitor Finney suggested:

> Reference to the provisions of certain acts will give a definite idea of the extent to which the natives of Alaska have been recognized by the Congress as well as show the similarity of their treatment to that accorded the Indians of the United States.

53 I.D. 593, 596. Part III.A.5, supra.

His conclusion was that Alaska Natives are "all wards of the Nation and are treated in material respects the same as are the aboriginal tribes of the United States." Id. at 595.

The logic of Solicitor Finney's approach was sound. Where questions have developed as to whether a particular group of Indian descendants exists as an Indian tribe, the courts have generally deferred to political branches, i.e., Congress and the Executive.[123] The Supreme Court established this principle of

---

123 See James v. Department of Health and Human Services, 824 F.2d 1132, 1138; Cogo v. Central Council of Tlingit & Haida Indians, 465 F. Supp. 1286, 1289 (D. Alaska 1979). Cf. Mashpee Tribe v. Town of Mashpee, 447 F. Supp. 940 (D. Mass. 1978), aff'd

judicial deference to the political branches when it considered whether Federal Indian liquor laws applied to a Saginaw Chippewa Indian of Michigan. The Court concluded:

> In reference to all matters of this kind [tribal status], it is the rule of this court to follow the action of the executive and other political departments of the government, whose more special duty is to determine such affairs. If by them those Indians are recognized as a tribe, this court must do the same.

United States v. Holliday, 70 U.S. (3 Wall.) 407, 419 (1865).

The continuing validity of this principle today was reaffirmed in the 1982 version of Felix Cohen's Handbook of Federal Indian Law. Although pointing out that Congress may not arbitrarily designate a body of people as a tribe,[124] the revision states, "judicial deference to the findings of tribal existence is still mandated by the extensive nature of congressional power in the field."[125]

Congress applied a Federal Indian statute (the Trade and Intercourse Act) in Alaska as early as 1873. Early in this century several statutes treated Alaska Natives on a basis parallel to the treatment of Native Americans in the contiguous 48 states. The Alaska Amendment to the IRA authorized organization of Native groups as tribes. Most recently, and perhaps most importantly, Congress has repeatedly defined the term "tribe" to include Alaska Native groups, usually villages. Although Congress has not, with the sole exception of the Metlakatla Indian Community, explicitly designated specific groups as tribes, the pervasive inclusion of Alaska Native groups as "tribes" must be viewed as reflecting congressional determination that there are tribal groups in Alaska.

What constitutes a tribe in the contiguous 48 states is sometimes a difficult question. So also is it in Alaska. The history of Alaska is unique, but so is that of California, New Mexico and Oklahoma. While the Department's position with regard to the existence of tribes in Alaska may have vacillated between 1867 and the opening decades of this century, it is clear that for the last half century, Congress and the Department have dealt with Alaska Natives as though there were tribes in Alaska. The fact that the Congress and the Department may not have dealt with all

---

sub nom., Mashpee Tribe v. New Seabury Corp., 592 F.2d 575 (1st Cir. 1979), cert. denied, 444 U.S. 866 (1979).

124 1982 Cohen, supra n. 8, at 5, citing United States v. Sandoval, 231 U.S. 28 (1913).

125 Id. at 3.

Alaska Natives as tribes at all times prior to the 1930's did not preclude it from dealing with them as tribes subsequently. City of Sault Ste. Marie v. Andrus, 532 F. Supp. 157, 161 (D.D.C. 1980).

In the summer of 1990, Congress enacted legislation directing the establishment of the "Joint Federal-State Commission on Policies and Programs Affecting Alaska Natives." Act of August 18, 1990, Pub. L. No. 101-379, § 12, 104 Stat. 473, 478-83. That Commission has a broad mandate to review public policies affecting Alaska Natives. When the Commission completes its work and files its recommendations, Congress may revisit how it deals with Alaska Native villages. For now, we cannot say that Alaska Native villages are not tribes for purposes of federal law. We do not mean to conclude that every Native village is an Indian tribe.[126] Which specific Alaska Native villages are tribes is a factual determination beyond the scope of this opinion.

2. Arguments Against Finding Tribes

Before turning to a more detailed discussion of ANCSA and its implications for the scope of governmental powers the Native villages may have, we will consider the arguments which have been raised with regard to the tribal status of Native villages. The Attorney General of Alaska has suggested that there may not be "tribes" in Alaska.[127] This position is supported by the Alaska Supreme Court's decision in Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988), and by some academic writers.[128] In reaching our conclusion that there are tribes for purposes of Federal Indian law, we have carefully considered these arguments. Although the arguments are effectively presented and supported by citations of authority, we do not find that they provide a basis to disregard prior Solicitor's opinions or the recent treatment by the Congress of Native villages as tribes.

---

126 Cf. Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548, 552, 556 (9th Cir. 1991)(Venetie II)(finding that the present-day Native villages of Venetie and Fort Yukon were tribes for purposes of federal court jurisdiction, 28 U.S.C. § 1362, but not necessarily tribes with inherent sovereignty over domestic relations and child custody).

127 Letters of May 20 and October 17, 1992, from Charles E. Cole, Attorney General, State of Alaska, to the Solicitor.

128 Comment, Alaska Native Sovereignty: The Limits of the Tribe-Indian Country Test, 17 Cornell International Law Review 375, 394-395 (1984); Comment, Alaskan Native Indian Villages: The Question of Sovereign Rights, 28 Santa Clara L. Rev. 875 (1988).

The key arguments against tribal status, and our analysis of each, are as follows:

1. Native organization is not "tribal".

As early as the Alaska district court's In re Sah Quah decision, it was argued that Native organization is "essentially patriarchal, and not tribal." 31 F. 327, 329 (D. Alaska 1886). In Stevens Village, 757 P.2d at 35, the Alaska Supreme Court found that "the village rather than the ethnological tribe has been the central unit of organization."[129]

Unfortunately, there is no commonly accepted definition of the term "Indian Tribe," either by statute or from other generally accepted sources.[130] The Supreme Court in 1901 defined an Indian tribe simply as a "body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." Montoya v. United States, 180 U.S. 261, 266 (1901). In retrospect, that definition appears to be overly simplistic.[131] However, what is significant is that the United States has not relied on ethnological unity in determining what is a "tribe." As Felix Cohen summarized the problem:

> The term "tribe" is commonly used in two senses, an ethnological sense and a political sense. It is important to distinguish between the two meanings of the term. Groups that consist of several ethnological

---

[129] Citing Atkinson v. Haldane, 569 P.2d 151 (Alaska 1977) (a wrongful death action in which the Alaska Supreme Court found that the Metlakatla Indian Community of the Annette Islands Reserve was entitled to sovereign immunity notwithstanding that the Community was composed of descendants of Tsimshian Indians who had migrated from British Columbia following a Christian missionary in the late 1880's).

[130] 1982 Cohen, supra n. 8, at 3-5.

[131] The decision set a liberal standard for what constitutes a tribe. The case involved the question of whether a group of Chiricahua, Mescalero and Southern Apache Indians constituted a tribe or band within the meaning of the Indian Depredations Act of 1891, 26 Stat. 851. The Court found that at the time of the depredations the military had been conducting operations against a group identified by name as Victoria's band for "two years or more." Under the statute, if Victoria's group constituted a band under the Act, as the Court ultimately held, their depredations were acts of war and the United States was not liable for damages.

> tribes, sometimes speaking different languages, have been recognized as single tribes for administrative and political purposes . . . Likewise what is a single tribe, from the ethnological standpoint, may sometimes be divided into a number of independent tribes in the political sense.[132]

There is great variety in what is considered a "tribe" in the contiguous 48 states. The tribes vary from the large Navajo Nation with several hundred thousand members and a huge reservation to small rancherias of two dozen members and only small parcels of land.[133] Some bands of Indians may have had little or no tribal organization while others were highly organized. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 664 (1979). Groups that were not historically Indian tribes have been considered tribes for purposes of federal law. For example, the Supreme Court found that the Mississippi Choctaws, a community of half-blood Choctaw Indians descendants, was a tribe for purposes of federal law even though they were not historically an Indian tribe. United States v. John, 437 U.S. 634, 650 n.20 (1978).[134] In other instances, consolidated or confederated tribes consisting of several ethnological tribes have been treated as a single entity even though they may even speak different languages.[135]

In 1974, the District Court for the Western District of Washington decided that several "unrecognized" tribes were successors to treaty tribes and had maintained a tribal structure. Thus, they, as well as the recognized tribes which were either plaintiffs or represented by the United States in the suit, were entitled to the protection of the United States and, if they could demonstrate that they had self-regulating capacity, they could exercise their off-reservation treaty fishing rights free of state regulation. United States v. Washington, 384 F. Supp. 312 (W.D. Wash. 1974) ("Boldt decision"), aff'd, 520 F.2d 676 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976). On the

---

132 1942 Cohen, supra n. 8, at 268. Accord 1982 Cohen, supra n. 8, at 3-6.

133 The Cabazon Band of Mission Indians, for example, had only 25 enrolled members at the time of the Supreme Court's decision in California v. Cabazon Band of Mission Indians, 408 U.S. 202, 204 n.1 (1987).

134 Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408 (1989) (fourteen distinct bands considered a tribe).

135 1982 Cohen, supra n. 8, at 6; 1942 Cohen, supra n. 8, at 268.

other coast, the First Circuit Court of Appeals affirmed the district court's holding that the United States could not refuse to consider the Passamaquoddy Tribe's request that the United States sue the State of Maine to recover tribal lands conveyed by the State in violation of the Indian Trade and Nonintercourse Act, 25 U.S.C. § 177, simply because the United States did not "recognize" the tribe. The United States had admitted that the tribe existed as an Indian tribe in the historical sense. Joint Tribal Council of Passamaquoddy Tribe v. Morton, 388 F. Supp. 649 (D. Me.), aff'd, 528 F.2d 370 (1st Cir. 1975).

These decisions encouraged a number of requests to the Department by groups of Indian descendants wanting to be recognized as Indian tribes. The Department responded by developing for the first time standardized procedures for determining that a group of Indian descendants was entitled to be acknowledged to exist as an Indian tribe.[136]

Since the late 1970's and the development of the Department's regulations, courts have clarified that a tribe need not have acquired or maintained a tribal structure that never existed. In addition, they have clarified that neither change, adaptation nor a degree of assimilation, which the courts viewed as inevitable, destroyed the tribal status or meant the abandonment of the tribal community. United States v. Washington, 641 F.2d 1368, 1373-74 (9th Cir. 1981), cert. denied, 454 U.S. 1143 (1982).

Support for the view that Alaska Native groups are not tribes has been found in Secretary Ickes' statement in his letter on the Alaska Amendment to the IRA that, "Indian tribes do not exist in Alaska in the same sense as in [the] continental United States." Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988) (citing H.R. Rep. No. 2244, at 4). Read in context, this statement was not intended to suggest that there were not tribes in Alaska. In the two sentences immediately following the statement, Secretary Ickes says that the IRA defines "tribe" as referring to groups of Indians residing on a

---

[136] 43 Fed. Reg. 39361 (1978). The regulations require that groups of Indian descendants petitioning for acknowledgment as Indian tribes establish, among other things: (a) facts establishing that the group has been identified from historical times until the present on a substantially continuous basis, as "American Indian," or "aboriginal"; (b) evidence that a substantial portion of the group inhabits a specific area or lives in a community viewed as American Indian and distinct from others in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area; and (c) facts which establish that the petitioner has maintained tribal political influence or other authority over its members. 25 C.F.R. § 87.7.

reservation and that there are few reservations in Alaska. Therefore, Secretary Ickes concludes, designation of reservations is necessary to define "tribes" for IRA purposes. H.R. Rep. No. 2244, 74th Cong., 2d Sess. 4 (1936). Clearly, in this context, Secretary Ickes' statement was no more than a technical comment on the nature of village organization.

This view of Secretary Ickes' statement is confirmed by his subsequent discussion of the status of Native groups in a 1945 opinion on the claims of three villages in Southeast Alaska to fishing rights. He found that the villages were "Indian communities organized along tribal lines and have been traditionally recognized as such by the Indians, by scientific observers, and by administrative authorities."[137] More specifically, the Secretary concluded that:

> [T]he forms of tribal organizations in Alaska differ somewhat from the forms of tribal organizations which are most prevalent in the States (though not from the forms of tribal organizations utilized by the coast Indians of Washington, who are culturally similar to the Tlingit and Haida Indians). There are, however, Indian village groups in the United States proper, e.g., the New Mexico Pueblos, the California Rancherias, and the [Creek] tribal towns, which have all been considered tribal organizations for purposes of Federal jurisdiction.
>
> It is clear, therefore, that native tribes exist in Alaska.[138]

The similarity of Alaska Natives to Indian groups in the contiguous 48 states which the Secretary noted in his 1945 decision reflects the greater understanding of the distinctions between Indian groups that first began to emerge at the time of the IRA. Prior to the IRA, statutes commonly referred simply to "Indians" or an "Indian tribe."[139] The IRA, however, defines

---

137 Decision of July 27, 1945, reprinted in S. Rep. No. 1366, Repeal Act Authorizing Secretary of Interior to Create Indian Reservations in Alaska: Hearings on S. 2037 and S.J. Res. 162 Before the Senate Subcomm. of the Committee on Interior and Insular Affairs, 80th Cong., 2d Sess. 435 (1948) (1948 Hearings).

138 Id. at 442-43.

139 See, e.g., 25 U.S.C. § 13 (the Act of November 2, 1921, commonly called the Snyder Act, providing for assistance for Indians throughout the United States) and 25 U.S.C. § 81 (R.S. 2103, requiring approval of any contract with any Indian tribe).

"tribe" to include: "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation." 25 U.S.C. § 479.

As with Secretary Ickes' statement, much emphasis has been placed on the statement in the House report on the Alaska Amendment referring to "the peculiar nontribal organization under which Alaska Indians operate" and on the provision of the amendment allowing Alaska Native groups to organize on the basis of "a common bond of occupation, or association, or residence within a well-defined neighborhood, community or rural district." Stevens Village, supra at 39-40. Again, as with Secretary Ickes' statement, these must be viewed in context. As our historical summary shows, although Alaska Natives were recognized as subject to general Indian law principles, and there had been some dealings with groups, the absence of treaties and a pervasive reservation system meant that there had been no formal definition of Native groups. In applying the IRA to Alaska, it was therefore necessary to craft an approach to defining the specific groups with which the Federal Government would deal. The "common bond" provision did this.[140]

2. The United States did not enter treaties with Alaska Natives.

Many Indian tribes were initially recognized by the United States through the treaty process.[141] The absence of treaties with Alaska groups is not dispositive of their tribal status, however. See Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 388 F. Supp. at 655-57, aff'd, 528 F.2d at 376-79. As pointed out in the historical summary, Congress ended treaty making in 1871, only four years after the acquisition of Alaska. Based on this fact, the Ninth Circuit's decision in United States v. Nagle, 191 F.2d 141 (9th Cir. 1911), found the absence of treaties irrelevant to determining the tribal status of Tlingits under Federal Indian law.

This is not to say that the existence of treaties is not significant. In the years immediately following the IRA, the Department was compelled to consider extensively what groups constituted "tribes" or "bands" because a showing that the group seeking to reorganize under the IRA constituted a tribe or band

---

140 This is not to say that every group organized under the "common bond" provision constitutes a "tribe" that can exercise inherent sovereign powers in addition to those powers delegated by Congress. Organization under the Alaska Amendment to the IRA has been held not to constitute conclusive evidence of historic tribal status. Stevens Village, 757 P.2d 32, 40 (Alaska 1988); Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548 (9th Cir. 1991).

141 1982 Cohen, supra n. 8, at 3-4.

was a prerequisite to holding an election on a proposed constitution pursuant to section 16.[142] From the Department's experience in implementing the IRA, Cohen distilled five criteria which were relied on singly or jointly to support a finding that a group constituted a "tribe" or "band."[143] One of the factors was the existence of a treaty. However, the existence of a treaty is not essential. Indeed, courts have rejected the notion that tribes which had not been the subject of some specific act of recognition, such as a federal treaty or a statute naming the tribe, were therefore unrecognized as tribes for the purpose of federal statutes and programs. As the First Circuit Court of Appeals stated in Joint Tribal Council of the Passamaquoddy Tribe v. Morton:

> No one in this proceeding has challenged the Tribe's identity as a tribe in the ordinary sense. Moreover, there is no evidence that the absence of federal dealings was or is based on doubts as to the genuineness of the Passamaquoddies' tribal status, apart, that is from the simple act of recognition. Under such circumstances, the absence of specific federal recognition in and of itself provides little basis for concluding that the Passamaquoddies are not a "tribe" [within the meaning of] the [Nonintercourse] Act.

528 F.2d at 378.

The absence of treaties has not prevented the Pueblos of New Mexico or the Indians of California from being recognized and dealt with as Indian tribes. It was 23 years between the time the United States acquired the territory of New Mexico pursuant

---

[142] 1942 Cohen, supra n. 8, at 270-71.

[143] The factors are:

a. That the group has had treaty relations with the United States.
b. That the group has been denominated a tribe by act of Congress or Executive order.
c. That the group has been treated as having collective rights in tribal lands or funds, even though not expressly designated a tribe.
d. That the group has been treated as a tribe or band by other Indian tribes.
e. That the group has exercised political authority over its members, through a tribal council or other governmental forms.

Id. at 271.

to the Treaty of Guadalupe Hidalgo, 9 Stat. 922, and the end of the President's treaty making authority. However, no treaties were ever negotiated with any of the Pueblos.[144] Treaties were negotiated with California Indians, but none were ever ratified.[145]

In short, the United States has dealt, and continues to deal, with many Indian tribal groups which do not have treaties with the United States. Some tribes with which it had treaties have evolved into new entities and some have ceased to exist as distinct political entities.[146] It would be arbitrary to now impose the existence of treaty relations with the United States as a prerequisite for dealing with Alaska Natives villages as tribes.

3. Alaska Natives have consistently been subject to territorial and state law.

It cannot be denied that Alaska Natives have been subject to territorial and state law for many purposes. We are not persuaded, however, that the subjection of Alaska Natives to territorial or state law divests them of their status as tribes.

In 1978, the Supreme Court considered whether the United States had jurisdiction under the Major Crimes Act to prosecute a member of the Mississippi Band of Choctaw Indians for assault on lands belonging to the tribe. The State argued that the United States did not have jurisdiction because the State had exercised jurisdiction over the Choctaws and their lands. The Court assumed for purposes of the argument that there had been times when Mississippi's exercise of jurisdiction over the Choctaw lands had gone unchallenged but found that fact did not divest the Federal Government of its authority over them. United States v. John, 437 U.S. 634, 652-53 (1978); see also United States v. South Dakota, 665 F.2d 837 (8th Cir. 1981), cert. denied, 459 U.S. 823 (1982). Similarly, the Passamaquoddy and Penobscot Tribes of Maine were subjected to complete state jurisdiction yet

---

144 1942 Cohen, supra n. 8, at 387.

145 S. Rep. No. 441, 102d Cong., 2d Sess. 3 (1992) relating to Advisory Council on California Indian Policy Act of 1992, Pub. L. No. 102-416, 106 Stat. 2131.

146 Interestingly, while the existence of a treaty is not essential, we should also note that the existence of a treaty is not dispositive either. Once a group has had a treaty with the United States, the existence of that treaty does not, in and of itself, establish a presumption that the treaty group continues to exist as a tribe. United States v. Washington, 641 F.2d 1368, 1374 (9th Cir. 1981), cert. denied, 454 U.S. 1143 (1982).

did not lose their status as tribes. Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 388 F. Supp. at 652, aff'd, 528 F.2d at 372, 374, 378.

Oklahoma, like Alaska, has a unique history. While substantial land in Oklahoma is still owned by Indian tribes and individual Indians, Indian reservations similar to those in other states have disappeared. Yet, the Tenth Circuit Court of Appeals found that lands still held by the Creek Nation in fee and used for a bingo operation were beyond state regulation. Indian Country, U.S.A., Inc. v. Oklahoma Tax Comm'n, 829 F.2d 967 (10th Cir. 1987). The court found that the fact that the State had previously exercised jurisdiction over the lands without challenge was not inconsistent with continued tribal authority.

Even when Congress has permitted states to assert jurisdiction over Indian lands or tribal members within Indian country, that alone has not meant that Congress was revoking recognition or declining to recognize the Indian tribes and members affected. If anything, it reinforces Congress' recognition of the continued existence of tribes, even while it may seek to adjust jurisdictional authority for particular and usually limited purposes.[147]

There is no clearer example of a tribe being subjected to state jurisdiction than when the federal relationship with the tribe is terminated. Typically, although termination statutes revoked Secretarial powers and responsibilities under tribal constitutions, the acts did not expressly terminate the governmental authority of the tribes involved.[148] In 1979 the Ninth Circuit had occasion to consider the effects of the Klamath Termination Act, 25 U.S.C. §§ 564-564x, on the hunting and

---

147 Public Law 280, discussed supra at n. 102, provides examples of both broad and limited grants to states of authority within Indian country. In that statute, Congress granted to certain states broad criminal, but only very limited civil jurisdiction over Indian country. Yet it cannot reasonably be suggested that Public Law 280 constitutes an expression of congressional intent not to recognize the tribal status of tribes existing in Public Law 280 states. See Bryan v. Itasca County, 426 U.S. 373 (1976); California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987).

148 Indeed, the acts commonly provided "such termination shall not affect the power of the tribe to take any action under its constitution and bylaws that is consistent with this subchapter without the participation of the Secretary or other officer of the United States," 25 U.S.C. §§ 758(b) (Utah Paiute tribes), 704 (60 Western Oregon tribes) and 723 (Alabama and Coushatta Indians of Texas).

fishing rights of members of the Klamath Tribe. The Act provided in part:

> Upon removal of Federal restrictions on the property of the tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed by the United States for Indians because of their status as Indians and, except as otherwise provided in this Act, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and <u>the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.</u>

25 U.S.C. § 564q(a) (emphasis added). The Ninth Circuit found, however, that:

> Although the [Klamath Termination] Act terminated federal supervision over trust and restricted property of the Klamath Indians, disposed of federally owned property, and terminated federal services to the Indians, it specifically contemplated the continuing existence of the Klamath Tribe. It did not affect the power of the tribe to take any action under its constitution and bylaws consistent with the Act. § 564r. The Klamaths still maintain a tribal constitution and tribal government, which among other things establishes criteria for membership in the Tribe. The tribal roll created by the Act was for purposes of determining who should share in the resulting distribution of property. <u>Kimball I</u> [<u>Kimball v. Callahan</u>, 493 F.2d 564 (9th Cir.), <u>cert. denied</u>, 419 U.S. 1019 (1974)] held that the Act did not abrogate tribal treaty rights of hunting, fishing, and trapping. Neither did the Act affect the sovereign authority of the Tribe to regulate the exercise of those rights.

<u>Kimball v. Callahan</u>, 590 F.2d 768, 775-76 (9th Cir.), <u>cert. denied</u>, 444 U.S. 826 (1979) (<u>Kimball II</u>) (footnotes omitted).

In short, the fact that a state has exercised jurisdiction over a tribe does not mean that a group of Indians is not a tribe or has ceased to exist as a tribe for purposes of federal law. We recognize that the exercise by a state of jurisdiction over a tribe may, among other factors, contribute to a voluntary or forced abandonment of tribal relations. If the members of a tribe have not maintained tribal relations, they will cease to be

a tribe regardless of the reasons. Mashpee Tribe v. Town of Mashpee, 447 F. Supp. 940 (D. Mass. 1978), aff'd sub nom., Mashpee Tribe v. New Seabury Corp., 592 F.2d 575 (1st Cir.), cert. denied, 444 U.S. 866 (1979). However, the mere exercise of state jurisdiction does not in itself cause that result.

3. Which Villages are Tribes

It is not necessary for resolution of the question that you have asked to determine specifically which Native villages in Alaska are tribes.[149] However, a brief address to this point is necessary. Some Native leaders and other commenters have expressed concern that our opinion may threaten continued participation of Native villages in the programs of the BIA, the Indian Health Service and other federal agencies. Presumably, the concern is that, if some Native villages are not tribes, their participation in federal programs would be open to question.[150] To address these comments, as well as to provide guidance to the BIA and other agencies in administration of programs in Alaska, we turn briefly to the question of the number of tribes in Alaska.

There is an argument that Congress has recognized the existence of specific Native villages as tribes. This argument starts with the definition of "Native village" in ANCSA section 3(c). 43

[149] See supra p. 1.

[150] The principal constitutional basis for Indian affairs legislation is the Constitution's Commerce Clause, which empowers Congress "[t]o regulate commerce with foreign nations, and among the several States, and with Indian tribes." U.S. Const. art. I, § 8, cl. 3 (emphasis added). 1982 Cohen, supra n. 8, at 208; McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 172 n. 2 (1973); United States v. Antelope, 430 U.S. 461, 645 (1977); United States v. Holliday, 70 U.S. (3 Wall.) 407, 419 (1865). This clause provides broad authority for congressional action and has been a basis for sustaining federal laws singling out Indians as a class against claims that they violate the equal protection standard of the Fifth Amendment. In Morton v. Mancari, 417 U.S. 535 (1974), the Supreme Court upheld the Indian preference law, 25 U.S.C. § 472, against an equal protection challenge, finding that the preference was not "racial," but was rather based on the political relationship of the United States to tribes. In United States v. Antelope, 430 U.S. 641 (1977), the Court upheld the prosecution of an Indian under the Major Crimes Act, 18 U.S.C. § 1153, on the same basis. However, a necessary corollary to these decisions is that the authority of Congress to deal specially with Indians outside of the context of the relationship with tribes has limits. See United States v. Mazurie, 419 U.S. 556 (1975); United States v. Sandoval, 231 U.S. 28 (1913).

U.S.C. § 1602(c). This definition makes reference to lists appearing in sections 11 and 16, which identify 215 Native villages. 43 U.S.C. §§ 1610, 1615. ANCSA made provision for the Department to add or delete Native villages from the section 11 list using specific criteria. In implementing ANCSA, the Department made additions to and deletions from the section 11 list, producing a modified list. A number of post-ANCSA statutes have included Alaska Native villages within the definition of "tribe" by reference to the ANCSA definition of "Native village." These latter statutes arguably are a congressional determination that Native villages on the modified ANCSA list are tribes.

The counter-argument is that Congress has not been consistent in its inclusion of Alaska Native entities in definitions of "tribe." The statutes discussed and listed above use a variety of formulations in defining what is a "tribe" in Alaska. The repeated inclusion of Alaska Native entities as tribes establishes that Congress believes that there are tribes in Alaska. However, it also may be argued that the variety of definitions used by Congress forecloses a finding that Congress has recognized any specific entity as a tribe.

While we do not express a final conclusion on which of these arguments is better, we do believe that there is sufficient merit to the first argument for the BIA and other agencies to proceed in the administration of programs on the presumption that Native villages listed on the modified ANCSA list are tribes. Should new or additional information indicate that any particular entity does not, in fact, meet the accepted criteria for a tribe, the BIA is not compelled to continue to deal with the entity as a tribe.[151] Similarly, should it become apparent that an entity, although once a tribe, has ceased to maintain tribal relations, for whatever reason, BIA may cease to treat it as a tribe.[152]

---

[151] The BIA has adopted substantive standards for determining whether a group of Indian descendants is a tribe based on the Department's experience with issues of tribal existence during the mid-1970's. 43 Fed. Reg. 39361 codified at 25 C.F.R. Part 83 (1992). The regulations currently apply to all groups in the continental United States, including those in Alaska. 25 C.F.R. § 83.1(n) (1992). Although a question has been raised whether the acknowledgment process (but not the substantive standards) is appropriate for Alaska, 53 Fed. Reg. 52832 (1988), the proposed revised acknowledgment regulations would still apply in Alaska. 56 Fed. Reg. 47320 (1991).

[152] If some entities are found under appropriate procedures not to qualify as tribes, the continued participation of individual members of these entities in programs is not necessarily at risk. The Supreme Court has upheld special treatment "[a]s long as the special treatment can be tied rationally to the fulfillment of

We now turn to Part IV to discuss the question of village jurisdiction over land and nonmembers.

## IV. VILLAGE GOVERNMENTAL JURISDICTION OVER LAND AND NONMEMBERS

### A. Native Land Claims

#### 1. Early Land Claims

The Russians did not introduce a system of land ownership to Alaska or significantly interfere with aboriginal use of the land.[153] When news of the sale of Alaska to the United States

---

Congress' unique obligation toward the Indians . . . ." Morton v. Mancari, 417 U.S. at 555 (emphasis added). See also Delaware Tribal Business Comm. v. Weeks, 430 U.S. 73 (1977); 1982 Cohen, supra n. 8, at 654-58. We believe that, on this basis, continued participation of individual Alaska Natives in programs for which they are eligible would generally be upheld. Cf. 25 C.F.R. § 83.9(j).

In a January 30, 1989 letter to Chairman Daniel K. Inouye of the Senate Select Committee on Indian Affairs, Thomas M. Boyd, the Assistant Attorney General, Office of Legislative Affairs, argued that language in a statute and implementing regulations of the Department of Education that give a preference to certain classifications of persons, including Alaska Natives, was unconstitutional under Mancari because they were not clearly predicated on tribal membership. We believe that this letter does not correctly read the Mancari "rationally tied" standard and that it does not give adequate consideration to the Supreme Court's decision in United States v. John, 437 U.S. 634 (1978), which upheld the constitutionality of the Indian Reorganization Act's definition of "Indian," 25 U.S.C. § 479, which includes both members of tribes and "all other persons of one-half or more Indian blood."

We should also note the issue that, as mentioned at supra at n. 120, some statutes include within the definition of "tribe" Alaska entities that are clearly not tribes, usually the ANCSA Village and Regional Corporations. For example, the Indian Self-Determination Act includes the Corporations as tribes eligible to contract to operate federal programs and to receive grants under the Act. 25 U.S.C. § 450b(b). Because the starting point for organization of the Corporations and the settlement of aboriginal claims was the Native villages, inclusion of the Corporations in the Self-Determination Act can be said to be tied rationally to Congress' constitutional authority.

[153] Section III.A.2, supra.

reached the Natives, objections to the transaction were raised and there was talk of armed resistance to the "Boston men."[154]

A Treasury Department agent reported in 1869 that the objections did not arise from "any special feeling of hostility" to Americans. Indeed, he found that the Natives were satisfied with the prices paid for furs by American traders. Their objections, he reported, were due to the fact that "their fathers originally owned all of the country" and were merely allowing the Russians to occupy it for the conduct of trade. The Natives asserted that the Russians did not have the right to sell the territory, "except with the intention of giving them the proceeds."[155]

Both the Treaty of Cession[156] and the 1884 Organic Act[157] recognized the existence of these claims and Senator Harrison, the sponsor of the Organic Act, expressed hope that they would be promptly resolved.[158] The vehicle for this resolution was to be the commission provided for in section 12 of the Act. 23 Stat. 24, 27. The commission would study the Natives' situation and report on what land should be reserved for their use. A commission report was submitted to the Secretary of the Interior on June 30, 1885. It dealt only with the Natives of southeastern Alaska. It recommended that the Natives be granted title to the land they actually used and occupied for homes and gardens and be secured in the use of their fishing sites. The land was otherwise recommended to be open for white settlement and exploitation.[159] No action was taken on this report.[160] Rather,

---

[154] H.H. Bancroft, History of Alaska, 1730-1885 609 (1886). Because most Native dealings had been with whalers sailing out of Boston, Americans generally were referred to as "Boston men."

[155] C. Bryant, Report on Alaska, in S. Exec. Doc. No. 32, 41st Cong., 2d Sess. 14 (1869).

[156] Section III.A.2, supra.

[157] Section III.A.3, supra.

[158] 15 Cong. Rec. 531 (1884).

[159] The commission's report is summarized and portions quoted in Tlingit and Haida Indians of Alaska v. United States, 147 Ct. Cl. 315, 336-37, 414-15 (1959).

[160] The brevity and limited scope of the report were criticized at the time. Governor Swineford, on first arriving in Alaska in late 1885, wrote that the report "fails to show that [the Commission's] duties have been more than in very small part performed." Report of the Secretary of the Interior, Message and Documents, Vol. II, 923 (1885). See also, E. Gruening, The State

as discussed above, several subsequent statutes repeated the Organic Act's preservation of the status quo.

During the early administration of the land laws in Alaska, the Department acted to protect from non-Native entry lands actually occupied by Natives. In 1897, the Department refused to approve a townsite that included a waterway actually used by a Native village as a source of fresh water for domestic use and consumption. 24 I.D. 312 (1897). In 1898, the Department required exclusion from a claim of a trail used by Natives to obtain access from their village to a harbor site. 26 I.D. 512 (1898).[161] However, protection was generally limited only to permanent villages and other areas actually and visibly occupied and improved by Natives, and not to broader areas that Natives had aboriginally used for hunting, fishing and gathering.[162]

Throughout the 1890's and into the 20th Century, various protests concerning rights in land were made by Natives to the Secretary of the Interior, the President and Congress. These protests received little, if any, response.[163]

The extension of the allotment laws to Natives in 1906 was viewed by some as a vehicle to provide Natives title to land,[164] but relatively few Natives took advantage of it. Through 1960, only 80 allotments were sought.[165] Ernest Gruening says this was due to lack of appropriations for implementation of the law.[166] However, a more persistent problem was that allotments of 160 acres were not particularly suited to the subsistence based

---

of Alaska 356 (1954) (Gruening, Alaska).

161 Both this opinion and the 1897 opinion were prepared under the supervision of Willis Van Devanter, then the Assistant Attorney General for the Interior Department and later a Justice of the Supreme Court. In 1913, the title of Assistant Attorney General was changed to Solicitor. A result in accord with these opinions was reached in Johnson v. Pacific Coast S.S. Co., 2 Alaska 224 (D. Alaska 1904).

162 Tlingit and Haida Indians of Alaska v. United States, 147 Ct. Cl. 315, 336-40 (1959).

163 Id. at 426-37.

164 Gruening, Alaska, supra n. 160, at 362.

165 Alaska Natives and the Land, supra n. 17, at 435. See also, Land Use in Alaska, Preliminary Report, Advisory Committee on Land Use and Subcommittees to Alaska Planning Council 50 (1938).

166 Gruening, Alaska, supra n.160, at 362.

communities of Alaska, many of them semi-nomadic.[167] A 1962 Department of the Interior task force observed that "[h]omestead laws designed for farmers who live and work upon the same piece of ground, and through cultivation of the soil . . . are scarcely suitable for hunters who live in villages often far removed from the land upon which they seek their quarry."[168]

As the non-Native population of Alaska increased, encroachments on land occupied and used by Natives increased and the problem of Native land claims became more pressing.[169] By the Census of 1900, non-Natives constituted a majority of the population of Alaska.[170] In 1915, a group of Athabascan chiefs and headmen met in Fairbanks with Delegate James Wickersham to discuss protection of their lands against settlement by others. Delegate Wickersham offered an option of homesteads or creation of reservations. The chiefs told him that neither option was acceptable. Homesteads would separate community members and did not account for the fact that Natives lived at many different places throughout the year. Reservations too were viewed as unduly restrictive. "[W]e wish to stay perfectly free just as we are now and go about just the same as now . . . ," one chief said.[171]

Delegate Wickersham promised to report the Athabascans' concerns to Washington, but nothing came of the matter. The 1926 Native Townsite Act made available to Natives restricted deeds to surveyed townsite lots. But, like the Homestead Act, this legislation failed to address the broader issue of claims related to subsistence use of the land.[172]

---

167 Alaska Natives and the Land, supra n. 17, at 435; Naske & Slotnick, supra n. 24, at 199-200.

168 Report to the Secretary of the Interior by the Task Force on Alaska Native Affairs 62 (Dec. 28, 1962).

169 Arnold, supra n. 14, at 72-79.

170 Id. at 71. The Native population in 1900 was 29,536 against a non-Native population of 34,056. The non-Native population peaked in 1910 and then declined in the wake of the end of the gold rushes, before beginning a sharp climb in the 1930's. By 1960, the Native population was 43,081 and the non-Native population 250,461. Id. In 1990, the totals were 85,698 and 464,345. 1990 Census of Population, General Population Characteristics, Alaska (May 1992).

171 Arnold, supra n. 14, at 81-82; Naske & Slotnick, supra n. 24, at 199-200.

172 Report to the Secretary of the Interior by the Task Force on Alaska Native Affairs 60-62 (Dec. 28, 1962).

2. Proposed Repeal of the Alaska Amendment to the IRA

As was discussed earlier, some proponents of the Alaska Amendment to the IRA viewed the creation of IRA reservations as a solution to Native land claims.[173] However, the establishment of the first six IRA reservations in Alaska generated intense opposition from non-Natives in Alaska. Of particular concern was the Venetie Reservation, which totalled 1.4 million acres. What startled Alaskans, Ernest Gruening wrote, was that these were "announced to be only the first of one hundred similar reservations from which all but local native residents would be excluded."[174] Reservations on this scale would, many non-Natives feared, stifle economic development. Concern was expressed that mining and other activities would be precluded "except on payment for the privilege to resident natives" and that the fishing and canning industries could be crippled by Native claims to exclusive fishing rights.[175]

In 1948 an effort was made in Congress to repeal the applicability of the IRA to Alaska and to rescind the reservations established pursuant to the Act. Lengthy hearings were held early in the year on two measures, Senate Joint Resolution 162 and S. 2037.[176] Senate Joint Resolution 162 asserted that the United States had never recognized rights of Alaska Natives based on use and occupancy, that the Secretary of the Interior had established a number of reservations and was considering a number of additional ones, and that the inclusion of vast areas of land within Indian reservations was retarding settlement and development of Alaska. The Joint Resolution proposed to rescind the Secretarial Orders establishing reservations under the IRA and to repeal section 2 of the Act of May 1, 1936, which gave the Secretary authority to establish IRA reservations in Alaska.[177]

The provisions of S. 2037 were broader. That bill proposed to transfer all duties, powers and functions of the Secretary of the Interior and Commissioner of Indian Affairs to the Alaska Territorial Government. Section 4 of the bill would have deleted the language of section 13 of the IRA that made certain provisions of the IRA applicable to Alaska, amended section 19 of

---

173 Section III.A.5, supra.

174 Gruening, Alaska, supra n. 160, at 367.

175 Id. at 367-68. Accord, reprinted in 1948 Hearings, supra n. 137, at 453.

176 1948 Hearings, supra n. 137.

177 S. Rep. No. 1366, 80th Cong., 2d Sess. (1948).

the IRA to delete the inclusion of Eskimos and other aboriginal peoples of Alaska from the definition of "Indian," and repealed the 1936 Alaska Amendment in its entirety.

In letters to the Senate Interior Committee, Secretary Krug opposed both proposals.[178] The IRA reservations, he wrote, were in areas used by the Natives "since time immemorial" and "constitute the economic bases for native life." He further stated:

> The exploitation and spoliation of some of the ancestral hunting, fishing, and trapping grounds of the natives by nonnatives have already worked a hardship on many of the native groups and seriously jeopardized their economic situation. Unless the natives are protected in their occupancy and use of these ancestral areas and are permitted to establish their local governments, the virtual destruction of these people is the almost sure result. They must be assisted in their efforts to become self-supporting and to combat the introduction of intoxicating liquor within the native communities.[179]

Secretary Krug also recalled the circumstances of the adoption of the Alaska Amendment to the IRA. A purpose of the amendment, he pointed out, was to fulfill the "moral and legal" obligation to the Natives arising from the 1884 Organic Act. A repeal of the Alaska Amendment would "repudiate" the commitment to fulfill this obligation.[180]

Proponents of the legislation in testimony before the Committee disputed Krug's position. R.E. Robertson, an attorney representing the Juneau Chamber of Commerce, testified that he had made an extensive study of aboriginal claims and had concluded that "no aboriginal rights existed, that none had existed under the Russian regime [and] that if any had existed . . . they would have been abolished by the Treaty of Cession." If the rights were not terminated by the Treaty, he said, they were extinguished by "nonrecognition of them by the Congress . .

---

178 Letter of February 18, 1948 to Senator Hugh Butler, re: S.J. Res. 162; Letter of February 19, 1948 to Senator Hugh Butler, re: S. 2037, reprinted in 1948 Hearings, supra n. 137, at 3-5.

179 Letter of February 18, 1948 to Senator Hugh Butler, reprinted in 1948 Hearings, supra n. 137, at 3.

180 Id. at 3-4.

. and abandonment by the Indians or by adverse use and possession for many years either by the Indians or private individuals."[181]

Felix Cohen, who had recently left federal service, appeared in support of Secretary Krug. He said, "[I]n the case of the Alaska Indians we have more than a moral obligation, we have a legal obligation." The idea of reservations in Alaska "as being a menace suddenly created out of the brain of Harold Ickes or myself or some other disagreeable individual, does not take sufficient account of the actual history."[182]

Assistant Secretary William Warne, who then supervised the Indian Office, rebutted the argument that reservations would impede development of the Territory. He recalled the long history of Native land claims. It took 17 years after acquisition of Alaska for Congress to first address Native land rights, he said. Congress then dealt with them by providing simply that they should not be disturbed until Congress addressed them in further legislation. Another 62 years elapsed before Congress, in the Alaska Amendment, authorized the Secretary of the Interior "to mark out and protect Indian land titles." During the 12 years that have passed since the Amendment, the Department has been "continually beset by pleas for delay." Further delay, Mr. Warne said, was not in the interest of Alaska's development:

> [P]ostponing action on these issues is also postponing the clarification of Alaskan land titles and thus postponing the settlement and industrial development of Alaska. If that is the case, then either the Congress or the Interior Department is going to have to choose between facing the brickbats that any solution of this problem will draw, on one hand, and, on the other, leaving a vital segment of our national frontier undeveloped and almost uninhabited.[183]

No action was taken on S. 2037. In mid-June, the Senate adopted Senate Joint Resolution 162, but only after significantly amending it. The amendments deleted the provision which would have rescinded the Secretarial Orders establishing reservations under the IRA, reworded the provision relating to the repeal of section 2 of the Alaska Amendment, and added a provision authorizing the Secretary to issue patents to appropriate "native

---

181 Id. at 353. Robertson later represented the defendant in United States v. Libby, McNeil & Libby, 107 F. Supp. 697 (D. Alaska 1952), in which the Hydaburg IRA reserve was held to have been improperly established.

182 Id. at 540, 544.

183 1948 Hearings, supra n. 137, at 41-42.

tribes and villages or individuals for lands actually possessed, used or occupied for town sites, villages, smoke houses, gardens, burial grounds, or missionary stations." 94 Cong. Rec. 9097 (1948). The House took up the Joint Resolution in the early hours of Sunday, June 20, but deferred consideration of it until another time because of the early hour. 94 Cong. Rec. 9348 (1948). The House never returned to the matter.

3. Land Claims in Court

Despite the failure of the IRA repeal legislation, the resolution of Native land rights through IRA reservations, as foreseen by Assistant Secretary Warne, did not materialize. Numerous reservation applications remained before the Department.[184] However, only one additional reservation was established and its establishment was later invalidated.[185] Further, the status of the first six IRA reservations was undermined in litigation concerning the exclusivity of Native fishing rights within one of the reserves.[186]

This left the issue of the rights of Natives to land uncertain and the subject of further litigation. In Miller v. United States, 159 F.2d 997 (9th Cir. 1947), the Ninth Circuit held that the Treaty of Cession had extinguished "original Indian title" in Alaska, but that individual Tlingit Indians had a compensable interest in lands taken by condemnation because the 1884 Organic Act constituted congressional recognition of their title as "individual" Indians. However, in Tee-Hit-Ton Indians v. United States, 348 U.S. 272, reh'g denied, 348 U.S. 965 (1955), the Supreme Court took a different approach.

---

[184] Alaska Natives and the Land, supra n. 17, at 443, 446.

[185] A reserve at Hydaburg was established on November 30, 1949. Its establishment was invalidated in United States v. Libby, McNeil and Libby, 107 F. Supp. 697 (D. Alaska 1952). Two other reserves (Barrow and Shungnak-Kobuk) were preliminarily established at the same time as Hydaburg, but these were revoked after votes of disapproval in village elections. Alaska Natives and the Land, supra n. 17, at 443.

[186] Hynes v. Grimes Packing Co., 337 U.S. 86 (1949). This case is analyzed in detail in Case, supra n. 50, at 101-11. Native support for reservations, which was hardly unanimous in the first instance, also appears to have waned. In 1962, a Departmental task force found Indians, Eskimos and Aleuts "generally opposed to having reservations." Report to the Secretary of the Interior by the Task Force on Alaska Native Affairs 57 (1962).

Tee-Hit-Ton was an inverse condemnation action by a clan of the Tlingit Tribe. The clan sought compensation for timber taken by the United States from lands it claimed. The Court found that the clan's use of the land in question was "like the use of [land] by the nomadic tribes of the States Indians" and that its claim was "wholly tribal." Id. at 287-88. This conclusion did not, however, give rise to a right to compensation. Aboriginal title, the Court said, is "a right of occupancy which the sovereign grants and protects against intrusion by third parties," but is not a compensable property right unless specifically recognized as such by Congress. Such title "may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to compensate the Indians." Id. at 279 (citing Johnson v. McIntosh, 21 U.S. (8 Wheat.) 542 (1823)).

Because of its conclusion, it was unnecessary for the Court to consider whether the Treaty of Cession had extinguished aboriginal title. However, it was necessary to address the 1884 Act to determine whether the Act provided the requisite congressional recognition to convert "mere Indian title" to a compensable possessory interest. The Court said that it had carefully examined the Act and its legislative history and that "it clearly appears that what was intended was merely to retain the status quo until further congressional or judicial action was taken." Id. at 277-79.

Justice Douglas, joined by Chief Justice Warren and Justice Frankfurter, dissented. Based on his own review of the legislative history of the 1884 Act, Douglas concluded that the Act recognized the Natives' title to their lands. "What those lands were was not known. Where they were located, what were their metes and bounds was also unknown . . . . But all agreed that the Indians were to keep them, wherever they lay." Id. at 292-94.

The issue of aboriginal title and the Treaty of Cession was revisited by the Court of Claims in Tlingit and Haida Indians of Alaska v. United States, 177 F. Supp. 452, 147 Ct. Cl. 315 (1959). A special 1935 jurisdictional statute authorized "all those Indians of the whole or mixed blood of the Tlingit and Haida Tribes" to bring suit for damages for taking by the United States of lands or other tribal or community property rights. Act of June 19, 1935, § 2, 49 Stat. 388. After lengthy delays, the Tlingit and Haida brought suit in 1947.[187] The case was tried in the mid-1950's and a decision issued by the Court of Claims on liability in 1959. The court held that the United

---

[187] The period for the Tlingit and Haida to bring the case was twice extended. Act of June 5, 1942, 56 Stat. 232; Act of June 4, 1945, 59 Stat. 231.

States had taken over 18 million acres of land aboriginally used and occupied by the Tlingit and Haida in southeastern Alaska, 147 Ct. Cl. at 340-41. The court rejected the argument that aboriginal title was extinguished by Article VI of the Treaty of Cession, in which Russia had warranted that Alaska was "free of any reservations, privileges, franchises, grants or possessions." The court adopted a finding of its trial commissioner that the warranty went only to claims of the Russian government, the Russian American Company and other commercial enterprises. Id. at 334, 385-88.[188]

4. The Statehood Act

Alaska's first statehood bill was introduced in 1916 by Alaska Delegate James Wickersham, who as a district court judge had authored the early 20th Century decisions on the status of Alaska Natives. At this time, however, the people of Alaska were largely disinterested in statehood, and Congress took no action on the bill.[189] Alaska's rapid economic development and population growth during World War II, however, brought renewed interest in Alaska Statehood.[190] Statehood bills were before Congress almost continuously from 1943 until Statehood was achieved in 1958. After World War II, Alaska's strategic position and security value in the Cold War with the Soviet Union generated support for Alaska Statehood among members of Congress. In 1950, a statehood bill passed for the first time in the United States House of Representatives. The Senate Interior and Insular Affairs Committee revised the bill and reported it favorably, but the measure did not pass the Senate. The Korean War halted debate on Alaska Statehood, which did not resume until 1952. On April 4, 1954, the Senate passed a combined Alaska-Hawaii Statehood measure, with no like action from the House.[191]

---

188 A money judgment for the taking found in the 1959 decision was not rendered until 1968. Tlingit and Haida Indians of Alaska v. United States, 389 F.2d 778 (Ct. Cl. 1968).

189 Naske & Slotnick, supra n. 24, at 136.

190 Id. at 143-45.

191 Naske, supra n. 42, at 67-79, 95-126. For a detailed inside account of the statehood movement, see E. Gruening, The Battle for Alaska Statehood (1967). Mr. Gruening was Director of the Division of Territories and Island Possessions, U.S. Department of the Interior, for 5 years before his appointment as Governor of the Territory of Alaska in 1939. Mr. Gruening served as Governor until 1953. In 1956 he was elected a provisional Senator and in 1959, after Alaska became a state, a Senator. He served until 1969.

In 1955, the people of Alaska held a constitutional convention, partly to impress Congress with the Territory's political maturity and partly to win public support for Alaska Statehood. A convention of 55 delegates met for the first time on November 8, 1955. On February 5, 1956, the delegates signed a newly drafted Alaska Constitution, which was approved by the people of Alaska in April 1956, by a vote of 17,447 to 8,180.[192] The final push in Congress for Alaska Statehood began in March 1957. On July 1, 1958, Congress passed the Alaska Statehood Act.[193] Alaska joined the Union on January 3, 1959.

Throughout consideration of Alaska Statehood during the 1950's, proponents of Statehood sought to separate the question of Native land claims from the issue of whether Alaska should be a state. In hearings in 1950, Governor Gruening was asked if he regarded the matter of Indian title as important. He replied:

> I think it is of great importance; I think it should be disposed of, but I doubt whether the statehood bill is the place to do it. It is a Federal matter, after all, and will be decided by the Federal Government whether Alaska is a State or a Territory, and I think you will needlessly complicate the statehood bill if you put it in there.[194]

Robert Atwood, editor and publisher of the Anchorage Times, echoed this view:

> The Indians, with their aboriginal rights, are a Federal problem. We have no control over it, and we cannot dispose of it, and we have nothing to say about it. Whatever happens to Alaska, it will still be a Federal problem.[195]

---

[192] Naske, supra n. 42, at 131-47.

[193] Act of July 7, 1958, Pub. L. No. 85-508, 72 Stat. 339, amended by Act of June 25, 1959, Pub. L. No. 86-70, 73 Stat. 141.

[194] Alaska Statehood: Hearings on H.R. 331 and S. 2036 Before the Senate Committee on Interior and Insular Affairs, 81st Cong., 2nd Sess. 351-52 (1950).

[195] Id. at 293. Other participants in the hearing expressed similar views, e.g., Delegate E.L. Bartlett, id. at 149; Democratic Committeewoman Essie R. Dale, id. at 261-62. See also, statement of Mildred R. Hermann, Secretary, Alaska Statehood Commission, Statehood for Alaska: Hearings on H.R. 20, H.R. 207, H.R. 1746, H.R. 2684, H.R. 2982, and H.R. 1916, Before the Subcommittee on Territories and Insular Possessions of the House Committee on Interior and Insular Affairs, 83rd Cong., 1st

In 1955, Congressman Clair Engle expressed the same position:

> We do not want to get into a discussion of what the ultimate decision as to those rights should be, because it is not in the framework of the bill.
>
> * * *
>
> We do not undertake to define them, and when we undertake to define those rights, we actually undertake to define the Indian and Eskimo problem in Alaska. We want to leave that undecided, without prejudice and without adding to it. We do not have to decide it, and we should not, in [this] legislation, try to decide it.[196]

The implementation of this position is found in section 4 of the Statehood Act. 72 Stat. 339. Section 4 contains three interrelated provisions addressing Native claims. It provides first that by accepting Statehood, Alaska disclaims any right to Native lands or other property:

> As a compact with the United States the State and its people do agree and declare that they forever disclaim . . . all right and title to . . . any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts, (hereinafter called natives) or is held by the United States in trust for such natives; that all such lands or other property (including fishing rights), the right or title to which may be held by said natives or is held by the United States in trust for said natives, shall be and remain under the absolute jurisdiction and control of the United States until disposed of under its authority, except to such extent as the Congress has prescribed or may hereafter prescribe, and except when held by individual natives in fee without restriction on alienation . . . .

---

Sess. 195-96 (1953).

[196] Hawaii-Alaska Statehood: Hearings Before the Committee on Interior and Insular Affairs, House of Representatives on H.R. 2535 and H.R. 2536, Bills "To Enable the People of Hawaii and Alaska Each to Form a Constitution and State Government and to be Admitted into the Union on Equal Footing with the Original States, and Related Bills H.R. 49, H.R. 185, H.R. 187, H.R. 248, H.R. 511, H.R. 555, and H.R. 2531, 84th Cong. 1st Sess. 130 (1955).

AR00205

It also provides that land taken in trust by the United States for Natives shall be free from state taxation:

> And provided further, That no taxes shall be imposed by said State upon any lands or other property now owned or hereinafter acquired by the United States or which, as hereinafter set forth, may belong to said natives, except to such extent as Congress has prescribed or may hereinafter prescribe, and except when held by individual natives in fee without restrictions on alienation.

However, the third provision makes clear that neither of the other provisions is to be construed as recognizing Native land claims:

> Provided, That nothing contained in this Act shall recognize, deny, enlarge, impair, or otherwise affect any claim against the United States, and any such claim shall be governed by the laws of the United States applicable thereto; and nothing in this act is intended or shall be construed as a finding, interpretation, or construction by the Congress that any law applicable thereto authorizes, establishes, or confirms the validity or invalidity of any such claim, and the determination of the applicability or effect of any law to any such claim shall be unaffected by anything in this Act . . . .

The House Committee Report stated that the section 4 disclaimer applies to "any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts, or is held by the United States in trust for them." The report stated that the purpose of the disclaimer was to provide "that no attempt will be made to deal with the legal merits of the indigenous rights but to leave the matter in status quo for either future legislative action or judicial determination." H.R. Rep. 624, 85th Cong., 1st Sess. 19 (1957).

In 1962, the Supreme Court held that, based on the legislative history of the Statehood Act, section 4 was intended to "preserve the status quo with respect to aboriginal and possessory Indian claims, so that statehood should neither extinguish them nor recognize them as compensable." Kake v. Egan, 369 U.S. 60, 65 (1962).

5. Move Toward Settlement

The 1958 passage of the Alaska Statehood Act, even though it explicitly purported to preserve the status quo, set in motion forces which finally brought the issue of Native land claims to a head. Chief among these forces, at least initially, was the

Native peoples' opposition to the State of Alaska's selection under the Statehood Act of lands that the Native people clearly regarded as being subject to their use, occupancy and claims of right.[197] The Statehood Act granted the State the right to select and receive title to approximately 105 million of Alaska's 375 million acres, and conflicts between state selections and specific Native claims began to arise almost as soon as the State began to make its selections. Spurred to action by the threatened transfer of lands they regarded as their own, Native villages and regional groups began to organize, and to more actively assert their claims. They filed administrative protests against specific state selections with the Department of the Interior, and also submitted broader claims to the geographic areas as to which they claimed federal protection for their use and occupancy. Eventually these claims practically blanketed the State.[198]

By the mid-1960's the issue of Native land rights had become a serious obstacle to most land transfers, and to land-related economic development. In the face of Native protests Secretary Udall in 1966 announced a moratorium pending congressional settlement of Native land claims, applicable to all dispositions of federal lands in Alaska, including the award to the State of title to lands it had selected, as well as federal oil and gas lease sales.[199] The State responded by filing suit to overturn the discretionary moratorium and to compel conveyance of Statehood Act selections, but a trial court decision in the State's favor was reversed in Alaska v. Udall, 420 F.2d 938 (9th Cir. 1969), cert. denied, 397 U.S. 1076 (1970). The Ninth Circuit concluded its decision reversing and remanding the case with the following observation:

---

197 Arnold, supra n. 14, at 100-03.

198 Alaska Natives and the Land, supra n. 17, at 537, placed the total acreage claimed at about 340 million acres as of 1968, some of which consisted of overlapping claims. Arnold, supra n. 14, at 119, cited a figure of 380 million acres (with the difference presumably reflecting later additional claims), a total which exceeds the entire area of the State (as a result of overlapping or conflicting claims of neighboring groups).

199 Simasko, Alaska Land Problems, 10 National Institute for Petroleum Landmen 333, 350-51 (SW Legal Foundation 1969). No official order was issued for the land freeze. Instead, Secretary Udall, utilizing his discretionary authority, ordered the federal land offices in Alaska to discontinue the issuance of oil and gas leases, patents under the Homestead Act or Small Tract Act, processing of State of Alaska land selections, and other dispositions. The action was effective the third week of October 1966. Id.

> In view of the pendency in Congress of proposed legislation which, if enacted, would probably resolve all or most of the issues involved in this complex litigation, the district court may, in the exercise of this discretion, hold the trial in abeyance for a reasonable period of time.

Id. at 940. While that litigation was pending, Secretary Udall, as one of his last acts in office, formalized the federal "land freeze" with the issuance of Public Land Order 4582 on January 17, 1969.[200] In addition to obstructing selection of land by the State and others, this freeze had the effect of blocking issuance of a right-of-way for construction of the Trans-Alaska Pipeline. Anxious to move forward with the pipeline oil companies joined the Natives and the State in calling for a legislative resolution of the Alaska Native land claims question.[201]

Meanwhile, as the early settlement bills were introduced, beginning in 1967, and the House and Senate Committees on Interior and Insular Affairs began to consider them, relevant developments continued apace back in Alaska under existing federal and state legislative authorities. Two were particularly noteworthy. First, in anticipation of the possible repeal of the Native Allotment Act, a flood of applications poured into the Interior Department.[202] Secondly, an increasing number of Native villages organized as municipal governments under provisions of state law.[203]

---

[200] 34 Fed. Reg. 1025 (1969). The order was amended to postpone the expiration of the period of withdrawal by PLO 4962, 35 Fed. Reg. 18874 (1970) (signed by Acting Secretary Fred J. Russell), and PLO 5081, 36 Fed. Reg. 12017 (1971) (signed by Secretary Rogers C.B. Morton).

[201] Arnold, supra n. 14, at 123.

[202] Only 80 allotments were issued between 1906 and 1960. Alaska Natives and the Land, supra n. 17, at 435. By the time ANCSA was passed on December 18, 1971, over 9,000 applications had been submitted to the Department of the Interior.

[203] 1967 figures reported to Congress in Alaska Natives and the Land, supra n. 17, at 47, indicated that 21 predominantly Native places were organized under state law only, another 21 under both state law and the IRA, 38 under the IRA only, and that 98 villages were "governed by councils without formal legal status." According to state records, the number of villages incorporated under state law basically doubled between 1968 and the time ANCSA was passed on December 18, 1971, although the substantial majority of villages were then, and roughly half today still

As Alaska Natives organized to press their land claims during the 1960's, considerable thought was given to the best means of protecting Native lands.[204] With the experience of the Tlingit and Haida claims litigation[205] fresh in their minds, Native leaders and others soon rejected the idea of depending on the courts to protect their lands. Not only had the claims litigation taken a long time, but the compensation recovered was viewed as inadequate.[206] Furthermore, Natives recognized the Court of Claims had no authority to grant legal title to Native lands.[207] Thus, a comprehensive legislative solution became the preferred approach.

The developments leading up to enactment of ANCSA, just described in the most abbreviated fashion, comprise in fact a subject matter of sufficient complexity to justify book-length treatment. Indeed, several authors have undertaken such an effort, although each has understandably brought a different perspective and emphasis to the subject.[208] But such a detailed consideration is beyond the scope of this discussion. Instead, our further

---

remain, unincorporated under state law.

204 Arnold, supra n. 14, at 106, 114.

205 The original jurisdictional statute was enacted in 1935, 49 Stat. 388, but damages were not recovered until more than three decades later. Tlingit & Haida Indians of Alaska v. United States, 177 F. Supp. 452, 147 Ct. Cl. 315 (Ct. Cl. 1959) (viability); 389 F.2d 778 (Ct. Cl. 1968) (damages).

206 See, e.g., Alaska Native Land Claims: Hearings on S. 2906 and Related Bills Before the Senate Committee on Interior and Insular Affairs, 90th Cong., 2d Sess. 345-46 (1968) (statement of John Borbridge, Jr., President of the Tlingit and Haida Central Council) (1968 hearings).

207 In fact, the first settlement bills proposed in 1967, H.R. 1964 and H.R. 11164, 90th Cong., 1st Sess., would have given the Court of Claims jurisdiction to award land title as well as money, but the 1968 bill developed by a state-sponsored task force with important Native input, as well as all subsequent proposals, abandoned the idea of a judicial solution as far too time-consuming. Id. at 64-65, 79 (testimony of Willie Hensley).

208 See, e.g., Gallagher, Hugh, Etok: A Story of Eskimo Power (1974); Berry, Mary Clay, The Alaska Pipeline: The Politics of Oil and Native Land Claims (1975); Groh, Clifford John, Oil, Money, Land, and Power: The Passage of the Alaska Native Claims Settlement Act of 1971 (unpublished manuscript, in the collection of the BLM Alaska Resources Library, 1976); and Arnold, supra n. 14.

discussion will emphasize primarily those selected aspects of the statute which have the greatest relevance to the subject of Native governmental powers. In particular, clues to congressional intent will be sought by tracing the development of the congressional findings and declaration of policy, the provisions making corporations established under state law the post-settlement landholding entities, the legislative revocation of existing reservations, and the statutory provisions assuring a land base to state-incorporated municipal governments.

B. Alaska Native Claims Settlement Act

1. Overview

ANCSA as enacted was first and foremost an aboriginal land claims settlement. ANCSA § 2(d), 43 U.S.C. § 1601(d). After a century of postponing the question, or authorizing partial and incomplete solutions, Congress finally did its best to face and resolve the Alaska Native land claims issue in a single, comprehensive and conclusive legislative package. The bare bones of the settlement transaction were straight forward enough. The Act provided for extinguishment of all claims by Alaska Native groups based on aboriginal title. ANCSA § 4, 43 U.S.C. § 1603. In exchange, the Natives were granted full legal title to approximately 44 million acres of land intended to be located, by and large, near their Native villages. ANCSA §§ 12, 14, 16, 19, 43 U.S.C. §§ 1611, 1613, 1615, 1618. Additionally, Natives were to be paid cash compensation of $962.5 million for the extinguishment of all aboriginal land claims. ANCSA §§ 6, 9, 43 U.S.C. §§ 1605, 1608.

Of course, the statutory settlement structure was far more complex than a simple swap of uncertain claims for land and money. This statutory complexity is a reflection of the scope and difficulty of the task Congress confronted in accommodating in some fashion the needs and interests of a whole variety of groups.[209] Section 2 set forth the congressional findings and a declaration of policy, portions of which will be considered in more detail below. The most often cited subsection of that declaration amounted to a legislative description of some of the policy goals Congress was seeking to advance through enactment of ANCSA:

> [T]he settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, without litigation, with maximum participation by Natives in decisions affecting

---

[209] Congressman Udall noted: "[i]f we serve here another 20 years, I do not think we will ever deal with a more complicated piece of legislation." 117 Cong. Rec. 46786 (1971).

> their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges or to the legislation establishing special relationships between the United States Government and the State of Alaska;

ANCSA § 2(b), 43 U.S.C. § 1601(b).

Section 3 provided definitions for key terms, including "Native village":

> "Native village" means any tribe, band, clan, group, village, community or association in Alaska listed in sections 11 and 16 of this Act, or which meets the requirements of this Act, and which the Secretary determines was, on the 1970 census enumeration date (as shown by the census or other evidence satisfactory to the Secretary, who shall make findings of fact in each instance), composed of twenty-five or more Natives;

ANCSA § 3(d), 43 U.S.C. § 1602(d).

Native villages and regional organizations were in some respects the true parties to the settlement, in that it was their assertion of land claims that had helped to prompt the settlement, and their locations which determined what lands would be conveyed to Native Corporations under the statutory scheme. However, the only active role assigned to the Native villages in the implementation of ANCSA was to organize Village Corporations as a prelude to receiving lands or benefits under the Act. ANCSA § 8(a), 43 U.S.C. § 1607(a).

Provisions dealing with the organizational structure of the settlement included section 5, 43 U.S.C. § 1604, establishing an enrollment scheme, and sections 7, 8, and 14(h), 43 U.S.C. §§ 1606, 1607 and 1613(h), providing for Native Regional, Village, Urban and Group Corporations. Twelve Regional Corporations, to be formed pursuant to state law, were provided for in section 7 (along with the possibility, eventually realized, for the creation of a 13th region), and the organization of Village Corporations was required by section 8. The roughly 200 villages entitled to benefits under the Act were to be those which were determined to be eligible under section 11(b), including the ten villages automatically eligible under section 16. 43 U.S.C. §§ 1610(b), 1615. Native groups of less than 25 residents, and Natives residing in four named urban centers were also authorized to incorporate and receive benefits under the Act pursuant to sections 14(h)(2) and (3). 43 U.S.C. § 1613(h)(2) and (3).

implications of this corporate structure will be more fully examined below.

The basic monetary aspects of the settlement were set forth in sections 6, 7, and 9. Section 6 established the Alaska Native Fund and provided for federal appropriations of $462.5 million to it over an 11 year period. 43 U.S.C. § 1605. Section 7 specified the distribution scheme for this money. 43 U.S.C. § 1606. This scheme involved varying payments to different categories of enrolled Native Regional Corporation shareholders, payments to Village Corporations for their corporate use and shareholder distributions, and retention of funds by individual Regional Corporations. Section 7(i) contained a unique requirement for mandatory sharing among the Regional Corporations of revenues from timber resources and subsurface estate. 43 U.S.C. § 1606(i). The other source of funds for payment into the Alaska Native Fund was established in section 9, which required the State and Federal governments to pay a 2% royalty and 2% of rentals and bonuses under leases and sales of minerals until the cumulative payments from such sources reached $500 million. 43 U.S.C. § 1608.

Other miscellaneous financial matters were addressed elsewhere in ANCSA, including provisions to deal with audits, attorney and consultant fees, and taxation, ANCSA §§ 7(o), 20, and 21, 43 U.S.C. §§ 1606(o), 1619, and 1620, but perhaps the most elaborate and important aspect of the Act was its treatment of land ownership issues. Of the approximately 44 million acres granted to Alaska Natives, the surface estate in 22 million acres was to be divided among the Village Corporations for Native villages identified in section 11. ANCSA §§ 12(a) and (b), 43 U.S.C. §§ 1611(a) and (b).[210] Almost 16 million more acres of surface and subsurface estate were to be divided among the 12 Regional Corporations, according to a formula which in practice resulted in six of the twelve receiving the entire 16 million acres of surface and subsurface estate. ANCSA § 12(c), 43 U.S.C. § 1611(c).[211] All 12 Regional Corporations received the

---

[210] Each section 11 Village Corporation's total acreage entitlement depended on: (1) its enrolled population, which determined its total acreage entitlement by application of a sliding scale set forth in section 14(a), 43 U.S.C. § 1613(a), which ranged between 3 and 7 townships (69,120 to 161,280 acres); and (2) to a lesser extent, equitable allocation decisions made by its Regional Corporation in consideration of historic use, subsistence needs, and population of the villages within its Region.

[211] Doyon, Ltd., received over half of the 16 million acres, and Arctic Slope Regional Corporation roughly a quarter, with the remainder divided among Cook Inlet Region, Inc., NANA Corp.,

subsurface estate in lands conveyed to Village Corporations within their region.

For their land entitlement under ANCSA, the Village Corporations had to select the township or townships in which the village was located (the so-called "core townships"), plus additional contiguous acreage. 43 U.S.C. §§ 1611(a)(1)-(2). The surface estate of the selected lands was to be patented in fee to these new Village Corporations, subject to valid existing rights. Congress specifically decided not to transfer any of the benefits of the settlement under ANCSA to any traditional Native entities, including those previously organized under the IRA, even though the settlement extinguished all aboriginal land claims, including any aboriginal hunting and fishing rights. 43 U.S.C. § 1603. Instead, the benefits of the settlement went to the state-chartered Village Corporations, which were completely distinct legal entities from the traditional or federally-organized IRA village entities. Even the traditional villages' core townships were patented to the new ANCSA corporate entities.[212]

Other provisions of the land settlement included the variety of special categories of conveyance entitlement established by section 14(h), including cemetery sites and historic places, Native Groups, Urban Corporations, primary places of residence, and allotments approved in the first four years following ANCSA's passage. 43 U.S.C. § 1613(h). Two million acres were initially set aside to meet entitlements in those categories, with any unconveyed acreage eventually to be allocated to the Regional Corporations on the basis of population in accordance with section 14(h)(8). Special provision was also made in section 16, 43 U.S.C. § 1615, for ten villages in Southeast Alaska, which were given reduced acreage entitlements, each amounting to a single township, in light of their already having been at least indirect recipients of the funds appropriated to satisfy the judgment awarded by the Court of Claims in Tlingit & Haida Indians of Alaska v. United States, 389 F.2d 778 (Ct. Cl. 1968).

Also relating to the subject of land were ANCSA sections 18 and 19, which respectively repealed the 1906 Native Allotment Act and revoked all but one of the reservations that had been established in the State by various means between 1891 and 1943. 43 U.S.C. §§ 1617 and 1618. Under section 19, the Village Corporation formed by each village located within a revoked reserve had the option of taking full surface and subsurface title to its former reserve in lieu of the surface estate acreage to which it would

---

Ahtna, Inc., and Chugach Natives, Inc. Arnold, supra n. 14, at 259.

212 See discussion of Alaska Native Townsite Act, infra nn. 237, 306, 307.

otherwise have been entitled. 43 U.S.C. § 1618. The acreage transferred to the seven villages,[213] located on five reserves, that did elect to take title to their former reserves amounted to roughly 3.7 million acres, which were conveyed in lieu of land and cash under the otherwise applicable provisions of the statute.[214]

Another important aspect of ANCSA was creation of the statutory structure by which Congress sought to reconcile the Natives' land claims with those of other potential land claimants, both private and public. This legislative reconciliation is expressed through three basic statutory mechanisms. First, the conflicts between Native claims and the State of Alaska's land selection rights under the Statehood Act were resolved both as to location and priority. Under ANCSA, neither Village nor Regional Corporations were given as much freedom as the State enjoyed to select public domain land anywhere in the State on the basis of its economic value or other criteria, without regard to its location. Instead, the areas available for Native Corporation selections were limited to those locations withdrawn by Congress or the Secretary. ANCSA §§ 11(a), 16(a), 43 U.S.C. §§ 1610(a), 1615(a). Each Village Corporation, however, was entitled to select up to 69,120 acres of land within its withdrawal area which had been previously selected by, but not yet patented to, the State. ANCSA §§ 11(a)(2), 12(a), 43 U.S.C. §§ 1610(a)(2), 1611(a).

A second major accommodation of third party interests in land incorporated into ANCSA was that represented by the reconveyance obligations imposed on Village Corporations pursuant to section 14(c). 43 U.S.C. § 1613(c). This section established the rights of Native and non-Native residents, business operators, subsistence campsite users, reindeer herders, nonprofit corporations, Municipal Corporations, and the government agencies operating airports to receive reconveyance of lands which they

---

[213] The seven were Venetie, Arctic Village, Tetlin, Gamble, Savoonga, Elim and Klukwan. In Klukwan's case, a subsequent amendment to ANCSA allowed the Village Corporation to belatedly select land under § 16, and thereby in effect side-stepped an original election made by Klukwan under § 19. See § 9 of the Act of January 2, 1976, Pub. L. No. 94-204, adding subsection (d) to 43 U.S.C. § 1615; and § 1 of the Act of October 4, 1976, Pub. L. No. 94-456, amending the newly-added subsection 16(d).

[214] A special appropriation of $100,000 to each of the corporations which opted out of the cash portion of the claims settlement by their election to take full surface and subsurface title to their former reservations under ANCSA § 19 was subsequently enacted as § 14 of the Act of January 2, 1976, Pub. L. No. 94-204, 89 Stat. 1154.

actually occupied. Section 14(c)(3) entitled a Municipal Corporation to a reconveyance of title to improved lands, appropriate rights-of-way, and lands for community expansion and other foreseeable community uses. 43 U.S.C. § 1613(c)(3).

Finally, provisions such as ANCSA sections 14(g) and 22(b) and (c) were inserted in the Act to assure that the Native Corporations' selections would not be construed to invalidate prior claims validly initiated under other laws. 43 U.S.C. §§ 1613(g) and 1621(b) and (c). Among these were over 9000 Native allotment applications filed prior to ANCSA's passage. ANCSA § 18, 43 U.S.C. § 1617.

ANCSA also provided for submission of a number of reports. Section 2(c) required the Secretary of the Interior to prepare and submit to Congress within 3 years a study of all federal programs designed to benefit Alaska Natives. 43 U.S.C. § 1601(c). Section 23 called for the Secretary to submit annual reports on the implementation of the Act through 1984 to be culminated in 1985 with a report on the status of the Natives and Native groups in Alaska, and a summary of actions taken under the Act. 43 U.S.C. § 1622. In addition, sections 7(o) and 8(c) required annual audit reports from the Native Village and Regional Corporations. 43 U.S.C. §§ 1606(o) and 1607(c).

2. Key Provisions

a. Use of Newly-Created Corporate Entities as the Vehicles for Implementing the Settlement

One of ANCSA's most significant departures from the government's past practice in resolving Indian or Native land claims was the choice made to deliver compensation and land title to corporate entities organized under state law, rather than directly to, or in trust for the benefit of, traditional tribal groups. Sections 7(d) and 8(a) required the incorporation of Regional and Village Corporations, and sections 14(h)(2) and (3) allowed for

incorporation of Native Groups[215] and of Urban Corporations for Native residents of four named cities,[216] all for the purpose of receiving the land title and other benefits to be conveyed under the Act.

ANCSA as enacted was the result of a substantial rewrite by the members of the Conference Committee. As they explained in their Joint Statement:

> The language agreed upon by the managers is the result of long and careful consideration of the House passed bill and the Senate's amendment in the nature of a substitute to the House passed bill. The House bill and the Senate amendment were in major respects substantially different and the conference report -- the compromise between the two measures -- is in some respects different from the measures passed by the House and the Senate. The conference report is the final product of nine days of meetings by the conference committee since November 30, 1971.
>
> * * *
>
> The conference report reflects a willingness on the part of the individual conferees after careful study of the issues involved to concur in the clear necessity for adoption of a _settlement package_, while reserving the right of all Members of Congress to debate further, at another time and in connection with other legislation, their individual views on some of the specific policies which are of necessity incorporated in this complex omnibus settlement.

S. Conf. Rep. No. 581, 92d Cong., 1st Sess. 34 (1971) (emphasis in original).

---

[215] A Native Group is "any tribe, band, clan, village, community, or village association of Natives in Alaska composed of less than twenty-five Natives, who comprise a majority of the residents of the locality." ANCSA § 2(d), 43 U.S.C. § 1602(d).

[216] In contrast to Regional and Village Corporations which were entitled to direct and indirect distributions of cash from the Alaska Native Fund pursuant to §§ 6 and 7(j)-(m), only land conveyances to the Native Groups and the named Urban Corporations were originally authorized. Special one time cash grants to the §§ 14(h)(2) and 14(h)(3) entities were later authorized by amendment. Pub. L. No. 96-487, § 1413, 94 Stat. 2498 and Pub. L. No. 94-204, § 14(a), 89 Stat. 1154.

In particular, the final congressional decision to confer the land and other benefits of the settlement exclusively on state-chartered corporations was the result of a compromise between the approaches in the Senate and House passed bills:

> The Conferees retained the provisions of the House bill providing for twelve Regional Corporations and a Village Corporation for each Native Village, but made one addition and one modification. The addition is the option of the Natives who are not permanent residents of Alaska to organize a 13th Regional Corporation which will receive and administer their share of the $962,500,000 grant. <u>The modification is the restriction of membership in the Village Corporations to Natives, rather than all residents</u>.

<u>Id.</u> at 39 (emphasis added).

The above report language in a sense understates the difference between the House and Senate bills. Section 12 of the House-passed bill, H.R. 10367, called for conveyance of lands and other benefits to "any native village . . . which is an incorporated native village," and section 3(h) defined "incorporated native village" as one "incorporated as a governmental unit under the laws of the State of Alaska." Thus, under the House version, the Village Corporations would have been multi-racial institutions from the day of their formation. In contrast, section 15 of S. 35, the more complex Senate bill, provided for conveyance of lands to Village Corporations, defined in section 3(o) as "organized under the laws of the State of Alaska to hold, invest, manage and distribute lands, property, funds, and other rights and assets for and on behalf of a Native Village." That ANCSA as enacted adopts the Senate's approach is confirmed by the Conference Report, which explains that section 8, 43 U.S.C. § 1607, of ANCSA:

> [W]as drawn from section 11 of the Senate amendment. The House bill provided for land and revenue grants to units of municipal government, or to Village Corporations. Under the conference report, before any lands may be granted an eligible village must organize as a non-profit or business for profit corporation to hold title to lands.

<u>Id.</u> at 42.

Over the five year period that settlement bills were before the Congress, a number of different organizational entities or institutions had been proposed as vehicles for the settlement, but the corporate model utilized in the final enactment came under consideration fairly early in the legislative process, and eventually prevailed. The earliest bills would have allowed a

very broad and inclusive range of organizational entities to assert claims, or receive title.[217] The original 1967 administration bills[218] provided for the grant "to each tribe, band, clan, village, community or group of natives in Alaska" of title to its village site and other lands used and occupied by the group, with group membership to be determined by the Secretary. The Natives' bills[219] authorized claims by "any tribe, band, village, community, association or other identifiable group of Indians, Aleuts or Eskimos of Alaska, resident in Alaska, including identifiable groups of residents of a locality." Both these original formulations were certainly inclusive enough to allow for granting land title directly to IRA and traditional village councils, and few would question the proposition that Congress could have made such governmental entities the vehicle for the settlement. In ANCSA, Congress did not choose to do so.

Instead, beginning with the various bills introduced in 1968, conferring the benefits of the settlement on some sort of incorporated entity was a common theme.[220] It appears to have been a consensus point reached by a Governor's Task Force formed in late 1967, which included substantial Native representation.[221] The bill developed by the Task Force, S. 2906, 90th Cong., 1st Sess., was one of the first to include the corporate concept. Both reports and witness testimony offered to the Senate Committee on Interior and Insular Affairs in a February 1968 hearing reflected a basic endorsement of such an approach.[222] A draft of the Task Force Commentary explained the new approach as follows:

---

[217] Section 1(c) of S. 2690, 90th Cong., 1st Sess., for example, defined a claimant as "any tribe, band, village, community, association, or other identifiable group of Indians, Aleuts, or Eskimos of Alaska, resident in Alaska, including identifiable groups of residents of a locality." Section 3(a) of S. 1964, 90th Cong., 1st Sess., contains similar language.

[218] The identification of S. 1964 and S. 3586 as administration bills comes from the "Comparative Analysis of Land Claims Settlement Proposals" prepared by the Federal Field Committee as a supplement to Alaska Natives and the Land, supra n. 17, at 6.

[219] This characterization of S. 2020 and S. 2690 is stated in Alaska Natives and the Land, supra n. 17, at 7.

[220] Arnold, supra n.14, at 153.

[221] Id. at 119-20.

[222] See generally, 1968 Hearings, supra n. 206.

> The aim of this chapter is to establish a form of business corporation by which the native beneficiaries of the state and federal acts can engage in business enterprise under conditions of modern commercial and corporate law.
>
> The basic model is the general business corporation contemplated by existing Alaska law, which in turn is based on the Model Business Corporation Act. A number of sections then alter this basic form so that certain safeguards are provided against the dissipation of native assets, and so that the benefits of the corporate assets, for several generations to come, will be made available only to proper native beneficiaries. There are also provisions whereby there can be distributions of assets to natives under conditions not normally encountered in an ordinary business corporation.
>
> * * *
>
> The Task Force views this chapter as embodying the best current thought on how native businesses should be conducted. It would place these enterprises on a modern and businesslike footing, but would permit these corporations to serve native group needs adequately.[223]

Some insight as to the Natives' reasons for supporting such an approach can be gleaned from the testimony presented to the Senate Committee, which reflected a desire on the part of Native spokesmen for economic self-determination, and in particular to be freed from the heavy hand of BIA supervision of their economic activities.[224] By the time passage had become a realistic pros-

---

223 Task Force Commentary Draft of February 24, 1968, reprinted in 1968 Hearings, supra n. 206, at 109-10.

224 For example, Willie Hensley, chairman of both the Alaska Federation of Natives Land Claims Task Force, and the task force appointed by the Governor, reported the view of the Governor's Task Force that "the use of the corporate form would enable the village and regional groups to participate in the modern economy." Statement of William L. Hensley, reprinted in 1968 Hearings, supra n. 206, at 65. See also the remarks of Byron I. Mallott, then AFN Second Vice-President:

> [T]he native people have arrived at the point where we can pick up the reins, as it were, and move forward and make these corporate provisions in Senate Bill 2906 work to the betterment of Alaska natives.

pect, the concept that some sort of entity incorporated under state law would be the settlement vehicle was a common feature of all the bills.[225] In the intermediate stage, some bills provided for village councils to exercise the villages' land selection rights,[226] although title was then to be conveyed to corporate entities, but by the final year of consideration both the House and Senate versions that were taken to conference provided for

---

1968 Hearings, supra n. 206, at 52 and his prepared statement as well:

> The corporate provisions of S. 20906 [sic] providing for the establishment of village, regional corporations, and a statewide corporation owned and operated solely by, and for the betterment of Alaska's natives-I submit will, if make reality, be one of the most significant development stories in Alaska's history. With this opportunity the natives will prove conclusively their worth as productive citizens both to the State of Alaska and to the Nation. Freed of their own volition and by their accomplishments, from dependency upon the Government, the native of Alaska will be able to take his rightful place in this Nation and the Government will be freed from this haunting responsibility in a nation of plenty.

Id. at 55.

[225] Some of the earlier bills allowed either incorporation under the IRA or under state corporation law. Section 11(a) of the October 21, 1971 version of S. 35, 92d Congress, 1st Sess., the primary bill developed by Senator Jackson's Interior Committee in 1971, provided for organization of villages as nonprofit membership corporations under Alaska law. ANCSA itself as eventually passed, wound up allowing incorporation of a village as either "a business for profit or nonprofit corporation," 43 U.S.C. § 1607(a). None of the villages went the non-profit route because they were advised that such an organizational form would present corporate law obstacles to the distribution of dividends to their members. Arnold, supra n. 14, at 198.

[226] Section 11 of the October 2, 1969 version of S. 1830, 91st Cong., 1st Sess., for example, provided for exercise of selection rights by a recognized village governing body, but § 12(b) provided that lands could only be conveyed when "such village organizes as a corporation, or otherwise qualifies to own real property."

entities incorporated under state law to both select and receive title to the lands to be conveyed.[227]

The corporate mechanism was fully consistent with relevant parts of the section 2(b) policy declaration, which stated that:

> [T]he settlement should be accomplished . . . in conformity with the real economic and social needs of Natives, . . . with maximum participation by Natives in decisions affecting their rights and property, without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges . . . .

43 U.S.C. § 1601(b).

ANCSA's requirement that villages incorporate under state law thus reflects a rejection of both an immediate commitment to non-Native institutions, such as H.R. 10367 would have required, and a rejection of the idea of utilizing pre-existing Native institutions as the organizational vehicles for the settlement.

However, the approach adopted in ANCSA was clearly a transitional one. The corporations, exclusively Native-owned at the time of their initial organization, were not required to remain so. Although corporate control was to be vested exclusively in Native shareholders for the first 20 years, section 7(h) of the original Act provided that voting stock would become freely alienable at the end of that period, and expiration of the original partial exemptions from state and local real property taxation after 20 years was also provided for in section 21(d). 43 U.S.C. § 1620(d).

b. Revocation of Reservations

A total of 23 reserves created between 1891 and 1943 were still in existence in 1971, two established by statute, six pursuant to the IRA, and the remainder by Executive Order.[228] In total these

---

[227] Section 11 of S. 35, 92d Cong., 1st Sess., dictated that non-profit membership corporations be organized under Alaska law; § 12 of H.R. 10367, 92d Cong., 1st Sess., required villages to incorporate as governmental units under state law.

[228] Arnold, supra n. 14, at 106; Alaska Natives and the Land, supra n. 17, at 438 and 443-46; see generally Case, supra n. 50, at 83-129.

reserves encompassed a little over four million acres, or slightly more than one percent of the land in Alaska.

With one exception, section 19(a) of ANCSA revoked all of these reserves:

> Notwithstanding any other provisions of law, and except where inconsistent with the provisions of this Act, the various reserves set aside by legislation or by Executive or Secretarial Order for Native use or for administration of Native affairs, including those created under the Act of May 31, 1898 (52 Stat. 593), are hereby revoked subject to any valid existing rights of non-Natives. This section shall not apply to the Annette Island Reserve established by the Act of March 3, 1891 (26 Stat. 1101) and no person enrolled in the Metlakatla Indian community of the Annette Island Reserve shall be eligible for benefits under this Act.

43 U.S.C. § 1618(a).

ANCSA's legislative history confirms the evident statutory intent that after enactment there was to be no reservation or trust relationship between the United States and Alaska Native groups with respect to ANCSA lands, such as exists between the government and many Indian tribes in other states. The Joint Statement of the Conference Committee makes the point in unmistakable terms that "lands granted to Natives under this Act [are not to be] considered 'Indian reservation' lands for purposes other than those specified in this Act. The lands granted by this Act are not 'in trust' and the Native villages are not Indian 'reservations.'" S. Conf. Rep. No. 581, 92nd Cong., 1st Sess. 40 (1971). The same point had been emphasized in the final House Report:

> The [ANCSA] bill does not establish any trust relationship between the Federal Government and the Natives. The regional corporations and the village corporations will be organized under State law, and will not be subject to Federal supervision except to the limited extent specifically provided in the bill. All conveyances will be in fee -- not in trust.

H.R. Rep. No. 523, 92nd Cong., 1st Sess. 9 (1971).

There were no relevant differences between the Senate and House bills on this crucial point. As enacted, section 19 comes primarily from the House-passed bill rather than the more complex Senate version. S. Conf. Rep. No. 581, <u>supra</u>. But the House and Senate bills and the final Conference Committee version all had in common an unambiguous rejection of the reservation system or any categories of trust or restricted land.