Like the decision to utilize corporations rather than village entities as the vehicle for the land claims settlement, the choice to do away with the reservation system was one proposed and endorsed by the Native leadership relatively early on. The possibility of getting the executive branch to create more reservations under authority of section 2 of the Alaska Amendment to the IRA, 25 U.S.C. § 473a, had been considered and rejected by the Native leadership as a possible alternative to settlement legislation before the first land claims bill was even introduced.[229] Reservations were viewed with disfavor because land held in trust by the United States could not be leased, developed, or sold without government permission.[230] The reservation model was viewed by the Native leadership as incompatible with maximum economic self-determination.

The Alaska Federation of Natives (AFN), from the time of its inception in 1966, had as a primary goal the enactment of federal legislation to protect Native land rights by some mechanism other than by placing large tracts into trust status. Towards that end the original AFN-supported bill, introduced in 1967, would have authorized the grant to the Natives of complete title to an unspecified acreage.[231] In contrast, the original bill endorsed by the Department of Interior was criticized by Native spokesmen because it called for the Federal Government to hold the land in trust for the villages.[232] Alaska Natives and the Land, the October 1968 report prepared for the Congress by the Federal Field Committee for Development Planning in Alaska, clearly delineated these two approaches to management of lands and other forms of compensation to be given to the Natives in exchange for extinguishment of their more extensive land claims.[233] The two choices under consideration were the grant of assets in trust or the direct transfer of assets to the beneficiary groups themselves. As we have seen, the final decision was to reject the trust model and, in the words of the ANCSA section 2(b) declaration of policy, to settle the Natives' land claims "without creating a reservation system or lengthy wardship or trusteeship."

---

229 Arnold, supra n. 14, at 106.

230 Id. at 106.

231 Section 4(b) of S. 2690, 90th Cong., 1st Sess. (1967). It would also have given Native villages the option of receiving land in trust status.

232 Section 3(e) of S. 1964, 90th Cong. 1st Sess. (1967). See Arnold, supra n. 14, at 119; Alaska Natives and the Land, supra n. 17, at 532, 546.

233 Alaska Natives and the Land, supra n. 17, at 546.

Tracing the development of the reservation revocation provision of ANCSA down through the claims settlement bills introduced before three successive Congresses reveals relatively little relevant evolution. The chief variations resolved by the final enactment concerned the means of putting the villages located on the revoked reserves on at least equal footing with the substantial majority of other villages in terms of land and money benefits to be received as a result of the settlement. The final legislative solution, of course, gave the newly formed Village Corporations for villages on former reserves the option of either: (1) taking fee title to both the surface and subsurface estate of their former reserve, without sharing in the distribution of cash from the Alaska Native Fund; or else (2) participating fully in the settlement scheme as if no reserve had ever been created for their village in the first place. 43 U.S.C. § 1618(b).

c. Encouragement of Local Government Through State-Chartered Municipalities

One additional feature of the Settlement Act of particular relevance to issues of Alaska Native governmental authority is the provision which ultimately became section 14(c)(3), 43 U.S.C. § 1613(c)(3). That section imposes an obligation on each Village Corporation to reconvey certain acreage to a Municipal Corporation in the Native Village, or to the State of Alaska in trust for any Municipal Corporation which might be organized in the future.

The Conference Committee Report indicates that section 14(c)(3) as enacted was drawn from S. 35, the Senate passed bill. S. Conf. Rep. No. 581, supra at 43. No reconveyance to a state-chartered municipality would have been necessary under H.R. 10367 as it passed the House, because section 12 of that bill would have made the Municipal Corporations themselves the direct recipients of the federal land conveyances to villages. However, the Conference Committee which crafted the final version of ANCSA rejected the idea of making state-chartered municipal governments the organizational recipients of the land claims settlement precisely because the claims being extinguished were Native claims, and municipalities could not be formed or maintained even temporarily as exclusively Native institutions.[234]

In light of the nature of the surrounding reconveyance provisions, section 14(c)(3) can be seen in context as part of the general effort to protect or accommodate not only the land

---

[234] Explaining the new provision requiring formation of Village Corporations, the committee highlighted "the restriction of membership in the Village Corporations to Natives, rather than all residents." S. Conf. Rep. No. 581, supra at 39.

rights of Alaska Natives, but those of other users and claimants as well.[235] Nonetheless, concern for the land ownership needs of local governments did differ to some degree from that expressed in regard to other land occupants granted reconveyance rights under section 14(c), in that municipal entitlements were not limited to land already in use. Under section 14(c)(3), each state-chartered municipality, or the State in trust on its behalf, was also granted the right to "as much additional land as is necessary for community expansion . . . and other foreseeable community needs." Satisfaction of this entitlement was enforced by a sizeable minimum acreage reconveyance requirement of 1280 acres, or two square miles.[236]

In the context of a settlement scheme granting exclusively Native-owned Village Corporations extensive surface estate, and mandating their selection of core townships,[237] which comprised the land in and immediately surrounding each village, it is unsurprising that such protections would be provided for local government. Indeed, even though ANCSA section 14(c)(3), 43 U.S.C. § 1613(c)(3), only appeared in its final form as part of the conference committee rewrite on the eve of passage, its provisions were basically consistent with the declared legislative purposes that the settlement be accomplished "without establishing any permanent racially defined institutions." 43 U.S.C. § 1601(b).

---

[235] Section 14(c) also required the Village Corporation to convey to any Native or non-Native occupant, without consideration, title to the surface estate in the tract occupied as of December 18, 1971, as a primary place of residence or business, or as a subsistence campsite, or as a headquarters for reindeer husbandry. 43 U.S.C. § 1613(c)(1). Nonprofit organizations also had certain rights to a reconveyance from the Village Corporation of the surface estate in any tract they occupied on December 18, 1971. 43 U.S.C. § 1613(c)(2).

[236] The mandatory 1280 acre reconveyance requirement was later amended by § 1405 of ANILCA to permit a lesser quantity of land to be transferred if the Village Corporation and the Municipal Corporation or the State in trust could agree in writing on such an acreage reduction. Pub. L. No. 96-487, § 1405, 94 Stat. 2494.

[237] The actual land tenure situation in improved Village sites of roughly one-half of the Native Villages was complicated by withdrawals and conveyances for federal townsites under the Acts of March 3, 1891, 26 Stat. 1099, and May 25, 1926, 44 Stat. 629, formerly codified at 43 U.S.C. §§ 732-736, repealed with a savings clause by §§ 701 and 703 of the Federal Land Policy Management Act (FLPMA) of October 21, 1976, 90 Stat. 2744, 2789-90. The existence and effect of the townsites established under those authorities was not addressed in ANCSA.

Moreover, the concern for municipal government interests reflected in ANCSA section 14(c)(3) is also fully consistent with the congressionally declared policy that:

> [N]o provision of this Act shall replace or diminish any right, privilege, or obligation of Natives as citizens of the United States or of Alaska, or relieve, replace, or diminish any obligation of the United States or of the State or [sic] Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska.

43 U.S.C. § 1601(c)(3).

Clearly, municipal government is a major institution by which the State of Alaska protects and promotes the rights and welfare of Natives as citizens of Alaska, and just as clearly, Congress took pains in ANCSA section 14(c)(3) to avoid diminishing the effectiveness of that institution.

Further indication of congressional support for State-chartered municipal government is found in the explicit provisos in ANCSA Section 21(d):

> Provided, that municipal taxes, local real property taxes, or local assessments may be imposed upon leased or developed real property within the jurisdiction of any governmental unit under the laws of the State: Provided further, That easements, rights-of-way, leaseholds, and similar interests in such real property may be taxed in accordance with State or local law.

43 U.S.C. § 1620(d).

Clearly, Congress took care in ANCSA to accommodate the interests of State-chartered local governments, which it must surely have recognized as local governments of and for Native people, as well as others, in the Native communities dealt with as Native Villages under ANCSA.

d. Amendments

i. Numerous Technical Adjustments to a Novel and Complex Statute

In the twenty-one years since the December 18, 1971, passage of ANCSA, there has been extensive litigation over its

provisions,[238] and Congress has also enacted myriad technical amendments. In general, these amendments have dealt with specific problems encountered by the Natives, the State or the Department of the Interior as they worked to implement the original statutory scheme. By and large the amendments proposed and enacted were the product of the continuing oversight role Congress assumed due to the novel and complex approach that was adopted in ANCSA to deal with the settlement of the Alaska Natives' land claims.

Many amendments dealt with land selection and entitlement questions arising out of a wide variety of unique circumstances encountered by particular Native Corporations. General considerations of equity and practicality, along with other case-by-case factors, have led the Congress to enact amendments affecting the situations of specific Native Corporations on frequent occasions.[239] While some of these provisions absorbed a good deal of legislative attention, none fundamentally altered the overall settlement scheme in any relevant way. No reservations were re-established, and none of the benefits of the

---

[238] See, e.g., Sealaska Corporation v. Roberts, 428 F. Supp. 1254 (D. Alaska 1977) (§ 5, enrollment); Alaska Public Easement Defense Fund v. Andrus, 435 F. Supp. 664 (D. Alaska 1977) (§ 17(b), location, nature and extent of public easements reserved across ANCSA conveyances); United States v. Atlantic Richfield Co., 435 F. Supp. 1009 (D. Alaska 1977), aff'd, 612 F.2d 1132 (9th Cir.), cert. denied, 449 U.S. 888 (1980) (§ 4, extinguishment of aboriginal claims); Chugach Natives, Inc. v. Doyon, Ltd., 588 F.2d 723 (9th Cir. 1978) (§ 7(i), revenue sharing among corporations; surface-subsurface estate distinction). Indeed, Congress has on more than one occasion cited the extraordinary cost and burden of such litigation, and the delays in implementing the Act to which it contributed, in explaining the need for subsequent amendments. See, e.g., § 2(3) of the 1991 Amendments, Pub. L. No. 100-241, 101 Stat. 1788 ("frequent and costly litigation ha[s] delayed implementation of the settlement and diminished its value"); S. Rep. No. 201, 100th Cong., 1st Sess. 20, ("the inordinate and prohibitively expensive amount of litigation engendered by the settlement"); S. Rep. No. 413, 96th Cong., 2d Sess. 237 ("Because there have been unanticipated delays in the conveyance of lands to Native Corporations, the 20-year tax moratorium originally proposed by Congress on undeveloped lands has become much less meaningful.").

[239] See, e.g., §§ 9, 10, 11, 12, 14, 15 and 16 of Pub. L. No. 94-204, 89 Stat. 1145; §§ 1 and 3-5 of Pub. L. No. 94-456, 90 Stat. 1934; § 2 and 3 of Pub. L. No. 95-178, 91 Stat. 1369; §§ 1 and 2 of Pub. L. No. 96-55, 94 Stat. 947; §§ 1415-1436, Pub. L. No. 96-487, 94 Stat. 2371; and §§ 13, 15 and 17-21, Pub. L. No. 102-415, 106 Stat. 2112.

settlement were redirected specifically to Native villages as villages.

Congress also enacted a variety of amendments of more general applicability, either to clarify ambiguous provisions of ANCSA, or to respond to unanticipated problems encountered during the implementation process. Issues dealt with by amendments included enrollment,[240] securities law,[241] the cash settlement,[242] and taxation,[243] among others. As already noted with respect to the special provisions affecting only a single Native Corporation, none of these provisions of more general applicability evince any purpose to alter the fundamental scheme established by the Congress in the original 1971 Settlement Act. If anything, Congress took pains to avoid any contrary interpretation. For example, in a section relating to the status of funds in the Alaska Native Fund, the following proviso was included:

> Provided, That nothing in this section shall be construed to create or terminate any trust relationship between the United States and any corporation or indi-

---

[240] Section 1 of Pub. L. No. 94-204 established a second enrollment period for those who had missed the deadline in 43 U.S.C. § 1604, with the proviso that new enrollments would not affect the allocation of benefits among corporations. 89 Stat. 1145.

[241] Section 3 of Pub. L. No. 94-204, which added a new section to ANCSA, codified at 43 U.S.C. § 1625, temporarily exempting ANCSA corporations from certain federal securities laws, was further amended by section 14 of the 1991 Amendments, 101 Stat. 1811. Section 6 of Pub. L. No. 94-204 added a provision codified at 43 U.S.C. § 1627, governing Native Corporation mergers.

[242] Pub. L. No. 93-153, 87 Stat. 591, accelerated receipt of funds by Native Corporations "in view of the delay in construction of the pipeline," and amended ANCSA § 9 to adjust for the change.

[243] Section 541 of Pub. L. No. 95-600, 94 Stat. 2887, added several new subsections to ANCSA § 21, specifying details relating to tax treatment of various types of corporate income and expenses. ANILCA §§ 904, 1407 and 1408, at 94 Stat. 2434 and 2495-2496 further amended tax-related provisions of ANCSA § 21, and § 12(b) of Pub. L. No. 100-241, 101 Stat. 1810 (the 1991 Amendments) further amended ANCSA §§ 21(a) and 21(j), relating to the tax treatment of Alaska Native Fund distributions and Native Corporation homesite programs.

vidual entitled to receive benefits under the Settlement Act.[244]

The two aspects of the original 1971 settlement scheme most relevant to our analysis, which Congress has substantially modified are: (1) the provisions relating to maintenance of Native control of their corporations; and (2) the provisions relating to protection of the Native land base created by ANCSA.

ii. Stock Alienability Provisions Modified to Allow Preservation of Native Control

Under sections 7(h) and 8(c) of the original Act, Native Regional and Village Corporation stock, initially issued only to enrolled Natives was, subject to certain limited exceptions, inalienable. 43 U.S.C. §§ 1606(h) and 1607(c). Sale, pledge, execution, assignment, or other transfer of the stock, other than upon death, or pursuant to a court decree of separation, divorce or child support, was prohibited. In addition, any non-Native who acquired stock by a permissible means did not also acquire the voting rights which such stock would otherwise carry. However, under the terms of the original Act, and in keeping with the stated objective of section 2(b) not to "establish . . . any permanent racially defined institutions, rights, privileges, or obligations," the restrictions on stock alienation and non-Native voting were to expire on January 1, 1992. 43 U.S.C. § 1606. This fact was a source of concern to Native corporations and their shareholders alike. There was a fear that with the potential loss of Native stock ownership, Natives were at risk of indirectly losing control and ownership of corporate[245] lands and resources viewed as crucial to both their economic advancement and continued access to subsistence resources.

---

[244] Pub. L. No. 94-204, § 5, 89 Stat. 1147-1148. See also substantially identical language included in § 2 of the same statute, which established an escrow account for revenues received by the Federal Government with respect to lands withdrawn for selection and conveyance to Native Corporations. 89 Stat. 1146. Congress has also included analogous language in amendments relating to the land entitlements of particular Native Corporations. See, e.g., Pub. L. No. 94-456, § 1, 90 Stat. 1934, relating to Chilkat Indian Village, and ANILCA §§ 1430(f)(4), 94 Stat. 2532-33, relating to Chugach Natives, Incorporated.

[245] Of course, Native Corporation lands had been subject to voluntary and involuntary disposal from the day they were first conveyed, without any restrictions, or requirements of federal review or approval. See further discussion in Part IV.C.2.d.i., infra.

In response to this concern, Congress revisited the issue in 1980, and included amendments to the original scheme in section 1401 of the ANILCA. Section 1401 amended section 7(b) of ANCSA to give Native Corporations significant new tools which they could use to defend against the perceived threat of loss of corporate control by Native shareholders. Specifically, section 1401 authorized Native Corporations to amend their Articles of Incorporation prior to December 18, 1991, upon the affirmative vote of a majority of voting shares outstanding, to permanently preclude exercise of voting rights by stockholders who were neither Natives nor descendants of Natives. It also allowed amendments to a corporation's Articles of Incorporation which would grant the corporation and a stockholder's immediate family a first right to purchase his stock prior to any form of voluntary or involuntary transfer.

However, the opportunity presented by section 1401 was not widely utilized in the years following its 1980 passage, and the question of preserving Native corporate control again became a focus of attention in connection with congressional consideration of the 1991 Amendments, which were ultimately enacted as the "Alaska Native Claims Settlement Act Amendments of 1987," Pub. L. No. 100-241, 101 Stat. 1788 (1991 Amendments). Relevant portions of the congressional findings and declaration of policy, at section 2, provide as follows:

> (4) Natives have differing opinions as to whether the Native Corporation, as originally structured by the Alaska Native Claims Settlement Act, is well adapted to the reality of life in Native villages and to the continuation of traditional Native cultural values;
>
> (5) to ensure the continued success of the settlement and to guarantee Natives continued participation in decisions affecting their rights and property, the Alaska Native Claims Settlement Act must be amended to enable the shareholders of each Native Corporation to structure the further implementation of the settlement in light of their particular circumstances and needs;
>
> (6) among other things, the shareholders of each Native Corporation must be permitted to decide--
> (A) when restrictions on alienation of stock issued as part of the settlement should be terminated, and
> (B) whether Natives born after December 18, 1971, should participate in the settlement;
>
> (7) by granting the shareholders of each Native Corporation options to structure the further implementation of the settlement, Congress is not expressing an opinion on the manner in which such

shareholders choose to balance individual rights and communal rights.

43 U.S.C. § 1601 note.

A detailed review of the extensive substantive rewrite of the stock-related provisions of ANCSA, enacted as sections 4 through 9 of the 1991 Amendments is not required, but it should be noted that they are indeed essentially consistent with the above-quoted declared statutory policy. Section 4 of the 1991 Amendments allows for the issuance of additional stock to Natives born after ANCSA was passed, or over the age of 65, or eligible but not enrolled pursuant to the enrollment provisions of ANCSA. 43 U.S.C. § 1606(g). Section 5 creates another exception to the restrictions on stock alienability to permit stockholders to make inter vivos transfers to certain relatives, and section 6 extends the amended provisions of ANCSA sections 7(g), (h) and (o) to Village Corporations, Urban Corporations, and Group Corporations. 43 U.S.C. §§ 1606(g), 1607(c).

But the most salient change effected by the amendments was the change in the duration of alienability restrictions on Native Corporation stock. Instead of merely permitting individual Native Corporations to extend the alienability restrictions on their own stock, as ANILCA section 1401 had done, section 8 of the 1991 Amendments provided that such restrictions would automatically continue indefinitely, unless and until a Native Corporation might choose to act affirmatively to amend its Articles of Incorporation to provide otherwise.[246] Procedures for consideration of amendments to Articles of Incorporation, and special rules governing dissenter's rights were also set forth in sections 7 and 9 of the 1991 Amendments. 43 U.S.C. §§ 1629b, 1629d.

Thus, the 1991 Amendments do in effect represent a reversal of Congress' original plan for a scheduled expiration of the uniquely Native character of the corporations formed pursuant to ANCSA. However, they do not disturb the original 1971 scheme under which benefits of the land claims settlement devolved upon corporations organized under state law, rather than Native governmental entities. The 1991 Amendments, for all the specialized rules and corporate reorganization options they may prescribe or authorize, do not alter the character of Native Corporations as non-governmental business organizations.

---

[246] 43 U.S.C. §§ 1629c(a) and (b). An exception to this so-called "opt-out" procedure, which applied to most Native Corporations under 43 U.S.C. § 1629c(b), was made for the Bristol Bay and Aleut Regions and their Village Corporations. 43 U.S.C. § 1629c(d).

### iii. Provisions for Protection of the Native Land Base

Under ANCSA, lands, including former reserves, were conveyed to Native Corporations and others in fee simple status, not in trust or restricted status. The primary original limitation to this approach was the provision for a transitional 20-year moratorium on property taxation of undeveloped ANCSA lands. ANCSA § 21(d), 43 U.S.C. § 1620(d). As it did with the original temporary provisions relating to the corporate control issue, Congress has seen fit through a series of statutory amendments to broaden the scope and extend the period of applicability of special federal protections for Native Corporation land.

The first such amendment, relating to the original limited property tax moratorium, was section 904 of ANILCA, which merely altered the beginning date of the twenty-year tax exempt period from the December 18, 1971 date of passage of ANCSA, to a date twenty years after vesting of title or conveyance of the particular undeveloped parcel. 43 U.S.C. § 1620(d). However, ANILCA also provided the opportunity for Native Corporations and other ANCSA land recipients to obtain a much more extensive package of protections for their fee lands. The Alaska Land Bank provisions enacted as section 907 of ANILCA permitted a landowner to obtain additional immunities for its undeveloped lands by entering into a cooperative management agreement with federal or state land management agencies holding adjacent lands, subject to certain specified terms placing significant limitations on the landowners' use of covered lands for a period of ten years. 43 U.S.C. § 1636. In exchange, said lands were to enjoy, in addition to a tax exemption, immunities from adverse possession, or judicial enforcement of judgments, so long as they were included in the Land Bank Program. 43 U.S.C. § 1636(c).

In practice, the ANILCA Land Bank Program proved difficult to implement, with only two agreements executed by 1987.[247] As a result, Congress elected to provide a simpler mechanism for achieving the same ends in the 1991 Amendments. Instead of requiring the negotiation and execution of a Land Bank Agreement to trigger the available protections, Congress broadened them somewhat[248] and made them automatically applicable to all

---

[247] S. Rep. No. 201, 100th Cong., 1st Sess. 36 (1987).

[248] Generally, the number of categories of possible creditors' rights from which undeveloped ANCSA lands are protected was increased to explicitly include bankruptcy and other insolvency laws, and involuntary corporate dissolutions. A change in the wording of the tax exemption clause was also made. Where the 1980 ANILCA version had protected against real property taxes and assessments by "the United States, the State, or any political

undeveloped ANCSA lands not leased or sold to third parties, with or without a Land Bank Agreement, and also without regard to whether they were reconveyed to a Settlement Trust.

Section 10 of the 1991 Amendments, authorizing a state-chartered Settlement Trust option, was enacted "[t]o accommodate the desire of certain Native Corporations to transfer a portion of their assets out of the corporate form."[249] This Settlement Trust option simply permits an ANCSA corporation to convey assets, not including subsurface estate, to a trust established and administered in accordance with state law, "to promote the health, education, and welfare of its beneficiaries and preserve the heritage and culture of Natives." 43 U.S.C. § 1629e. It does not provide additional federal statutory protections for ANCSA corporation assets, but does explicitly authorize the utilization of state trust law mechanisms to insulate transferred assets from most claims which might be asserted against the property of the transferor Native Corporation if still in the corporation's hands.

This Settlement Trust option was not included in the bill that originally passed the House in both 1986 and 1987.[250] Instead, it was inserted in the Senate as a substitute for a provision, approved twice by the House, but dropped from the final bill, which would have authorized transfer of ANCSA Native Corporation assets to so-called "qualified transfer entities" (QTE's). As a means of assuring preservation of Native land ownership, section 7 of the House-passed bills[251] authorized the Native Corporations to transfer some of their lands to QTE's without complying with those provisions of Alaska corporate law which require shareholder action when a corporation transfers all or substantially all of its assets, and which recognize dissenter's rights. The idea was that the corporations could protect their assets by using this provision to transfer their land or some of it to an IRA or

---

subdivision of the State," the clause in the 1991 Amendments provide for exemption from "real property taxes by any government entity." 43 U.S.C. § 1636(d)(1)(A)(ii).

249 ANCSA § 39(b), 43 U.S.C. § 1629e(b), added by § 10 of the 1991 Amendments, Pub. L. No. 100-241, 101 Stat. 1804-06.

250 S. Rep. No. 201, 100th Cong., 1st. Sess. 35 (1987).

251 H.R. 4162, 99th Cong., 2d Sess. (1986); H.R. 278, 100th Cong., 1st Sess. (1987).

traditional Native village council possessing immunities under general principles of Federal Indian law.[252]

During the hearings leading to the 1991 Amendments, a great deal of the testimony was related to concerns over the possible existence of Indian country in Alaska and the existence of village governmental powers.[253] Ultimately, Congress expressly declined to address the issue. The congressional findings and declaration of policy section of the 1991 Amendments provided that no provision shall:

> [C]onfer on, or deny to, any Native organization any degree of sovereign governmental authority over lands (including management, or regulation of the taking, of fish and wildlife) or persons in Alaska . . . .[254]

In commenting on this provision in the section-by-section analysis of its report, the Senate Committee on Energy and Natural Resources stated:

> Although this section is largely self-explanatory, the Committee is aware that there is a controversy in Alaska over the issue of Native sovereignty; i.e., whether there are tribal entities in Alaska . . . that can exercise governmental authority over lands and individuals in Alaska. . . .
>
> The finding set forth in section 2(8)(C) of the Committee reported bill states and reiterates, that neither the amendments nor any action taken pursuant to the 1991 amendments affect the sovereignty controversy one way or the other. It is the Committee's clear intent that this bill leave parties in the sovereignty issue, in exactly the same status as if the amendments were not enacted.
>
> This is an issue which should be left to the courts in interpreting applicable law and that these amendments

---

[252] See Alaska Native Claims Settlement Act: Hearings Before the House Interior and Insular Affairs Committee, 99th Cong., 1st Sess. 229, 264 (1985). These QTE provisions resulted in considerable debate over whether they would enhance the Natives' argument that there was Indian country in Alaska, and enhance the arguments for Native sovereignty contrary to Congress' desire to remain neutral on the issue. See also, infra n. 293.

[253] Id.

[254] Section 2(8)(B), 101 Stat. 1789; 43 U.S.C. § 1601 note.

> should play no substantive or procedural role in such court decisions.

S. Rep. No. 201, 100th Cong., 1st. Sess. 23 (1987).

Given the debate over the possible governmental powers of the villages which had occurred during the hearings, Congress left nothing to chance in case its findings and declaration of policy were not sufficiently clear. In section 17 of the 1991 Amendments, Congress added a disclaimer to further emphasize its intended neutrality on the issue of Native village powers by providing in part that:

> (a) No provision of this Act (the Alaska Native Claims Settlement Act Amendments of 1987), exercise of authority pursuant to this Act, or change made by, or pursuant to, this Act in the status of land shall be construed to validate or invalidate or in any way affect--
>
> (1) any assertion that a Native organization (including a federally recognized tribe, traditional Native council, or Native council organized pursuant to the Act of June 18, 1934 (48 Stat. 987), as amended) has or does not have governmental authority over lands (including management of, or regulation of the taking of, fish and wildlife) or persons within the boundaries of the State of Alaska, or
>
> (2) any assertion that Indian country (as defined by 18 U.S.C. 1151 or any other authority) exists or does not exist within the boundaries of the State of Alaska.[255]

Pub. L. No. 101-241, § 17, 101 Stat. 1788, 1814, 43 U.S.C. § 1601 note.

C. Analysis

Having set out the history and key provisions of ANCSA, we now turn to the question of the effect of the statutory scheme adopted in this novel statute on the governmental powers of Native villages. We consider, first, whether ANCSA constituted a termination statute that forecloses the exercise of all governmental powers by Native villages. We then consider the effect of ANCSA on village governmental jurisdiction over land and nonmembers.

1. ANCSA as Termination Legislation

---

255 See also S. Rep. No. 201, 100th Cong., 1st. Sess. 41 (1987).

The unprecedented approach and structure of ANCSA has led some to characterize ANCSA as "termination" legislation that forecloses the exercise of governmental jurisdiction by Native villages. In his concurring opinion in the Alaska Supreme Court's recent decision in Nenana Fuel Co. v. Native Village of Venetie, 834 P.2d 1229, 1234 (Alaska 1992), Justice Daniel Moore concludes that "Congress expressly pronounced in its 1971 enactment of ANCSA that no Native Alaska group other than the Metlakatla Indian community of the Annette Island Reserve may be entitled to sovereign tribal status." Id. at 1238.

To evaluate this view, it is appropriate to compare ANCSA with the termination legislation enacted during the so-called termination era of the 1950's and the 1960's. This legislation involved a comprehensive and fundamental approach to ending the relationship between the United States and specific tribes. The experience of this legislation was clearly fresh at the time ANCSA was considered. The last termination act was passed in 1962, only five years before the first versions of ANCSA were introduced in Congress. Terminations under previously enacted legislation occurred as late as 1970. The first legislation restoring a terminated tribe was not enacted until 1973.[256]

a. Termination Legislation

On August 1, 1953, Congress adopted House Concurrent Resolution 108, declaring as congressional policy the termination of federal control and supervision over Indian tribes and the freeing of tribes and their members "from all disabilities and limitations specially applicable to Indians." 67 Stat. B132. Individual acts were then passed to implement this policy.[257]

The individual acts followed a fairly standard pattern.[258] Incident to termination, Congress typically provided for fundamental changes in land ownership, requiring sale of tribal land previously held in trust by the United States or transfer of the land to a private trust or state corporation. The federal trust relationship was ended for most purposes. Tribes and their individual members were made subject to state jurisdiction for

---

[256] 1982 Cohen, supra n.8, at 811-18. For a more detailed history and analysis of termination legislation, see C. Wilkinson & E. Biggs, The Evolution of Termination Policy, 5 Am. Indian L. Rev. 139 (1977).

[257] Fourteen such termination statutes were enacted involving approximately 100 tribes, bands and California rancherias. 1982 Cohen, supra n. 8, at 811.

[258] These standard provisions are summarized in 1982 Cohen, supra n. 8, at 812-13.

most purposes. Eligibility for special federal services for tribes and tribal members was ended.

Procedurally, termination statutes called for preparation of a final tribal roll and a termination plan to govern implementation of the termination. After a vote of tribal members for the termination plan, the federal-tribal relationship was proclaimed ended by Secretarial proclamation.[259]

The following operative provisions of the Paiute Termination Act, which terminated four bands of Paiute Indians in Utah, are typical of 1950's termination statutes:

> Upon removal of Federal restrictions on the property of each tribe and individual members thereof, the Secretary shall publish in the Federal Register a proclamation declaring that the Federal trust relationship to the affairs of the tribe and its members has terminated. Thereafter individual members of the tribe shall not be entitled to any of the services performed for Indians because of their status as Indians, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the members of the tribe, and the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction.
>
> * * *
>
> Effective on the date of the proclamation provided for in [this Act], all powers of the Secretary or other officer of the United States to take, review or approve any action under the constitution and bylaws of the tribe are terminated. Any powers conferred upon the tribe by such constitution which are inconsistent with the provisions of [this Act] are terminated. . . .

25 U.S.C. §§ 757, 758(b).

b. ANCSA

ANCSA does parallel termination statutes in significant respects. Because of Alaska's unique history, most of the land title affected by the statute was not held in trust. However, as discussed above, all reservations (save the Annette Islands Reserve) were revoked and all aboriginal claims to land were extinguished. The land provided to the Natives as part of the settlement was provided to Village and Regional Corporations

---

[259] Id.

chartered under state law and subject to state jurisdiction for most purposes. Federal responsibility for and supervision of the corporations provided in ANCSA was minimal, indirect and of limited duration.

However, key elements of a 1950's termination statute were not included in ANCSA. ANCSA did not provide for a termination plan, a vote by members on termination, or a Secretarial proclamation of termination. Eligibility of Native groups and individual natives for federal services was not ended. The Secretary's authority over then-existing IRA entities was not ended and the Secretary's authority to issue new constitutions or charters under the IRA was not repealed.

c. ANCSA Legislative History

The legislative history of ANCSA confirms that it cannot be regarded as a termination statute of the kind enacted in the 1950's. One of the bills considered in the 91st Congress, S. 1830, contained language proposing to terminate federal services to Alaska Natives, if not the entirety of the special Native-federal relationship. Section 4 of the bill provided in part:

> (b)(1) The Secretary is authorized and directed, together with other appropriate agencies of the United States Government, promptly to initiate a study and to develop programs for the orderly transition of education, health, welfare, and <u>other responsibilities</u> for the Alaska Native people from the United States to the State of Alaska. <u>Within five years from the date of enactment of this Act, the United States shall cease to provide services to any citizen of Alaska solely on the basis of his racial or ethnic background</u>. . . .

116 Cong. Rec. 24408 (1970) (emphasis added).

When S. 1830 was considered on the Senate floor, Senator Harris offered an amendment to strike this provision. His amendment triggered debate over whether the bill was a termination act.[260] The debate came shortly after President Nixon's 1970 policy statement renouncing the policy of termination and calling for self-determination for all Indian people.[261] One side of the

---

[260] 116 Cong. Rec. 24216, 24220-27, 24234-35 and 24378-82 (1970).

[261] President's Message to Congress Transmitting Recommendations for Indian Policy, 6 <u>Weekly Comp. Pres. Doc.</u> 894-905 (July 8, 1970); H.R. Doc. No. 363, 91st Cong., 2d Sess. (1970).

Senate debate focused on whether this provision of the Act rendered it a termination statute. The other side of the debate emphasized that the statute as a whole represented a new approach to the Federal Government's relations with its Indian wards, characterizing the bill as one which provided for self-determination. Toward the close of the floor debates on the entire bill, Senator Allott stated:

> Therefore, the underlying concept of the bill is largely one of self-determination by the Natives, but beyond that, it also includes a type of termination of the Federal trustee obligation and assumption of part of those obligations by the State of Alaska.

116 Cong. Rec. 24404 (1970). Senator Harris' amendment was defeated and the language providing for the termination of services remained in the bill as finally passed by the Senate.[262]

When settlement legislation was introduced by Senators Jackson, Gravel and Stevens in the 92d Congress as S. 35, it again contained the termination of services provision.[263] However, when S. 35 went to the Senate floor, it had been revised and the provision for automatic termination of BIA services was no longer included. On November 1, 1971, addressing his colleagues on S. 35, Senator Harris stated that he had opposed the legislation the year before because of the provision for termination of services, that "that matter had been substantially altered" and that there had been substantial improvement toward self-determination. 117 Cong. Rec. 38445 (1970).

Although ANCSA as enacted contained no provision for termination of services, one provision related to the proposed termination did remain. In section 4(b)(1) of S. 1830 and the original S. 35, the automatic termination of services provision was linked to a requirement that the Secretary in cooperation with other agencies, study and develop programs for the orderly transition of responsibility for the programs from the United States to the State. Section 2(c) of the statute as enacted carried forward this thought. It directs the Secretary, together with all other appropriate agencies:

> to make a <u>study of all Federal programs</u> primarily designed to benefit Native people and to report back to

---

262 116 Cong. Rec. 24382 (1970). Because no bill passed the House of Representatives, the Senate-passed bill did not become law.

263 <u>Alaska Native Land Claims: Hearings on S. 35 and S. 835 Before the Senate Comm. on Interior and Insular Affairs</u>, 92d Cong., 1st Sess. 265-66 (1971).

> the Congress with his recommendations for the future management and operation of these programs within three years of the date of enactment of the Act.

43 U.S.C. § 1601(c) (emphasis added). Thus, in the Act as finally passed, the Senate proposal for a study of programs to be followed by automatic termination of services had been replaced by a provision directing the Secretary to make a program study, to be followed by recommendations for "future management and operation" of programs for Natives.[264]

A report in response to section 2(c) was submitted in 1975.[265] However, the report was only a factual report. It contained no recommendations. No immediate congressional action was taken on the report.[266] When Congress enacted the 1991 Amendments it included a provision explicitly calling for the continued provision of services. 43 U.S.C. § 1626(d).

d. Effect of ANCSA

---

264 The study of the status of Natives provided for in § 23 of ANCSA similarly can be viewed as presaging further congressional consideration of the relationship of the United States to Alaska Natives. 43 U.S.C. § 1622.

265 Secretary Morton by letter of April 22, 1975 submitted to Congress a four-volume report entitled 2(c) Report: Federal Programs and Alaska Natives.

266 One instance in which Congress did later act specifically to discontinue a program for the benefit of Alaska Natives involved the BIA general assistance program, authorized by the Snyder Act, 25 U.S.C. § 13, and administered in the early 1980's under 25 C.F.R. § 20.21. Congress first attempted to cut-off funds for the program in Alaska in committee report language associated with the FY 1982 Interior and Related Agencies Appropriations Act, Pub. L. No. 97-100, 95 Stat. 1399 (1981). H.R. Rep. No. 315, 97th Cong., 1st Sess. 17 (1981). This cut-off was enjoined in Wilson v. Watt, 703 F.2d 395 (9th Cir. 1983). In bill language in the FY 1985 Interior and Related Agencies Appropriations Act, Congress terminated for that year the BIA general assistance program in Alaska. Pub. L. No. 98-473, 98 Stat. 1848. Identical provisions were included in the Interior Appropriations Acts for FY 1986 (Pub. L. No. 99-190, 99 Stat. 1235); FY 1987 (Pub. L. No. 99-591, 100 Stat. 3341-256); FY 1988 (Pub. L. No. 100-202, 101 Stat. 1329-228) and FY 1989 (Pub. L. No. 100-446, 102 Stat. 1794). The provision was dropped in FY 1990, H.R. Rep. No. 120, 101st Cong., 1st Sess. 53-54 (1989); S. Rep. No. 85, 101st Cong., 1st Sess. 45 (1989) and BIA general assistance was reinstated in Alaska.

As we have discussed earlier,[267] the classic termination statutes were held not to have terminated the tribal existence of the tribes involved. Court decisions also concluded that 1950's termination legislation did not terminate tribal rights and privileges not expressly addressed in the legislation, such as the treaty hunting and fishing rights of the Menominee and Klamath Tribes.[268] Against this background, we cannot conclude that ANCSA, which is a less complete address to the Federal-Native-State relationship, can be construed as completely extinguishing the sovereign powers of Native villages that are tribes. At a minimum, it is clear that ANCSA did not affect the retained governmental powers of these tribes to determine membership and to regulate internal tribal relations.[269] They may also exercise powers delegated to them by Congress, such as authority under the Indian Child Welfare Act. 25 U.S.C. §§ 1901-1963.[270] However, ANCSA contains a very complete address to the issue of land. We now turn to consideration of the effect of ANCSA on native village jurisdiction over land and nonmembers.

2. Jurisdiction over Land and Nonmembers after ANCSA

Although we have concluded that ANCSA did not terminate the political government-to-government relationship between the Federal Government and those entities that may qualify as tribes in Alaska, ANCSA did reflect a new approach on an unprecedented scale in defining the relationship between Alaska Natives and the Federal Government. Most significantly, the land and money assets provided in exchange for the extinguishment of Native claims were distributed not to the existing Native organizations, but to entirely new, state-chartered corporate organizations. With the exception of the Annette Islands Reserve for the Metlakatla Indian Community, ANCSA revoked all Native reservations in Alaska. 43 U.S.C. § 1618(a). With only two exceptions, even where there was an existing beneficial interest in reservation lands, the interest in the land was conveyed to

---

267 Part III.B, supra.

268 Menominee Tribe of Indians v. United States, 391 U.S. 404 (1968); Kimball v. Callahan, 590 F.2d 768 (9th Cir.), cert. denied, 444 U.S. 826 (1979) (Callahan II) (Klamath Tribe). See also, United States v. Felter, 752 F.2d 1505 (10th Cir. 1985) (Mixed-Blood Utes).

269 See Native Village of Venetie I.R.A. Council v. Alaska, 944 F.2d 548 (9th Cir. 1991) (Venetie II).

270 See In re Matter of J.M. DOB 02/04/84, 718 P.2d 150 (Alaska 1986) (Kaltag Village Council vested with exclusive jurisdiction as "tribal court" over matter of custody of Indian child).

the newly state-chartered Native Corporations rather than existing IRA or traditional Native village organizations.[271]

We must therefore consider whether the terms of this newly defined relationship are such that the status of the Natives under it has implications for the scope of their powers. We conclude that ANCSA largely controls in determining whether any territory still exists over which Alaska villages might exercise governmental powers. We also conclude that, notwithstanding the potential that Indian country still exists in Alaska in certain limited cases, Congress has left little or no room for tribes in Alaska to exercise governmental authority over land or nonmembers.

We begin our examination by discussing the general principles of Indian law that form the backdrop for our specific inquiry into the effect of ANCSA on Native village powers in Alaska.

a. The Territorial Component of Tribal Powers Generally

The Supreme Court has recognized that "there is a significant territorial component to tribal power." Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 142 (1982); see White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 142 (1980) (Indian tribes retain attributes of sovereignty over both their members and their territory). Generally speaking, the Court has relied upon the concept of "Indian country" to define those territorial boundaries. Indian tribes are "invested with the right of self-government and jurisdiction over the persons and property within the limits of the territory they occupy, except so far as that jurisdiction has been restrained and abridged by treaty or act of Congress." Merrion, 455 U.S. at 140 (quoting 1879 Senate Judiciary Committee report). Within the limitations that Congress has imposed, "Indian tribes within 'Indian country' . . . possess[] attributes of sovereignty over both their members and their territory." Merrion, 455 U.S. at 140 (quoting United States v. Mazurie, 419 U.S. 544, 557 (1975)).

---

271 Because ANCSA did not revoke the Annette Islands Reserve, the Metlakatla Indian Community's beneficial title interest remained unchanged. Although ANCSA did revoke the reservation for the Natives of the Village of Klukwan, the reservation lands were not conveyed to the ANCSA corporation for the Village of Klukwan. Instead, Klukwan became a special case during ANCSA's implementation when Congress amended § 16 of ANCSA in 1976 by adding § 16(d), 43 U.S.C. § 1615(d). As a result, the IRA-chartered "Chilkat Indian Village," organized in 1941 by the Natives of Klukwan, ended up holding fee title to the 897.4 acres of its prior statutory reservation.

In order to address the question of "the nature and scope of so-called governmental powers over lands and non-members that a Native village can exercise after ANCSA,"[272] we examine whether, after ANCSA, there is any Indian country in the State of Alaska, and if so, whether Congress has imposed limitations on the sovereign authority of whatever tribes may exist in the State to exercise tribal powers within that Indian country.

In Indian Country, U.S.A. v. Oklahoma Tax Comm'n, 829 F.2d 967 (10th Cir. 1987), cert. denied, 478 U.S. 1218 (1988), the court summarized the significance of determining whether lands are Indian country:

> Although [18 U.S.C.] section 1151 by its terms defines Indian country for purposes of determining federal criminal jurisdiction, the classification generally applies to questions of both civil and criminal jurisdiction. . . . Numerous cases confirm the principle that the Indian country classification is the benchmark for approaching the allocation of federal, tribal, and state authority with respect to Indians and Indian lands. . . . We note that the Supreme Court of Oklahoma has also recognized the importance of this classification:
>
> > The touchstone for allocating authority among the various governments has been the concept of "Indian Country," a legal term delineating the territorial boundaries of federal, state and tribal jurisdiction. Historically, the conduct of Indians and interests in Indian property within Indian Country have been matters of federal and tribal concern. Outside Indian Country, state jurisdiction has obtained.

Indian Country, U.S.A. v. Oklahoma Tax Comm'n, 829 F.2d at 973 (emphasis added) (quoting Ahboah v. Housing Auth. of the Kiowa Tribe, 660 P.2d 625, 627 (Okla. 1983)) (other citations omitted); see DeCoteau v. District County Court, 420 U.S. 425, 427 n.2 (1975); California v. Cabazon Band of Mission Indians, 480 U.S. 202, 207 n.5 (1987); see also Alaska v. Native Village of Venetie, 856 F.2d 1384, 1390 (9th Cir. 1988) (Venetie I).

In general, lands not falling within the classification of Indian country are subject to state jurisdiction. Tribes and tribal members going outside the boundaries of Indian country generally are subject to state jurisdiction, though such state jurisdiction may still be limited. See Mescalero Apache Tribe v. Jones, 411 U.S. 147, 148-49 (1973) (off-reservation tribal activity: state

---

[272] See supra p. 1.

could impose gross receipts tax on tribal enterprise, but state could not impose compensating use tax on tribal property). Within Indian country, the Federal Government and tribes generally have primary authority.[273]

Once the threshold determination is made whether the particular lands involved are properly classified as Indian country, the analysis must proceed from the above-stated general principles concerning tribal, federal, and state jurisdiction to the specific facts and law applicable to the particular situation to determine whether Congress has acted to alter the general principles. For example, in Public Law 280, Congress granted to certain states the authority to exercise broad criminal and limited civil jurisdiction over Indians within Indian country. Bryan v. Itasca County, 426 U.S. 373 (1976); California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987). In 1958, Congress extended Public Law 280 to Alaska. Act of Aug. 8, 1958, Pub. L. No. 8[illegible] [illegible]5, 72 Stat. 545 (codified as amended at 18 U.S.C. § 1162 [illegible] U.S.C. § 1360).[274]

### [illegible]. Indian Country and Alaska

Having discussed the general relevance of the concept, we now turn to the language of the statute. In 1948, Congress defined "Indian country" as follows:

---

[273] For cases illustrating some of these jurisdictional principles in the Alaska context, compare the companion cases of Metlakatla Indian Community v. Egan, 369 U.S. 45 (1962) (upholding the Federal Government's authority to permit state-prohibited fish traps within the boundaries of the Annette Islands Reserve) and Organized Village of Kake v. Egan, 369 U.S. 60 (1962) (upholding the application of state fish trap laws to off-reservation Indian fishing).

[274] Other examples illustrating that state law is not always excluded from Indian country include Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163 (1989) (permitting state taxation of nonmember lessee) and County of Yakima v. Yakima Indian Nation, 112 S. Ct. 638 (1992) (permitting state taxation of certain Indian fee lands). Conversely, tribal jurisdiction within Indian country is not absolute, and has been limited in certain instances. See, e.g., Montana v. United States, 450 U.S. 544 (1981) (tribe could not regulate nonmember hunting and fishing on individual nonmember and state-owned lands); Brendale v. Confederated Tribes and Bands of the Yakima Indian Nation, 492 U.S. 408 (1989) (tribe could zone certain nonmember fee lands on the reservation, but lacked jurisdiction over other nonmember fee lands).

> Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any <u>Indian reservation</u> under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all <u>dependent Indian communities</u> within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all <u>Indian allotments</u>, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (emphasis added).[275]

We will address in turn each of the three categories of Indian country, and the relevance of each to Alaska.

c. Reservations

The term "Indian reservation" generally refers to the territory or specific lands that "Congress intended to reserve for a tribe and over which Congress intended primary jurisdiction to rest in the federal and tribal governments." <u>Indian Country, U.S.A.</u>, 829 F.2d at 973. Where formal reservation boundaries exist, all lands within those boundaries are Indian country. 18 U.S.C. § 1151(a); <u>see</u> <u>Seymour v. Superintendent</u>, 368 U.S. 351 (1962). However, no formal designation is required. In the absence of a formal reservation boundary, lands held in trust for the benefit of a tribe qualify as Indian country because they have been "validly set apart for the use of the Indians as such, under the superintendence of the Government." <u>Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma</u>, 111 S. Ct. 905, 910 (1991); <u>see</u> <u>United States v. John</u>, 437 U.S. 634 (1978). Even when the boundaries of a reservation may have been disestablished, lands remaining in Indian ownership, including tribal fee lands, remain Indian country when there is no clear evidence that Congress intended to divest such lands of their Indian country status. <u>Indian Country, U.S.A.</u>, 829 F.2d at 973-75 & n.3 (Creek tribal fee lands held to be Indian country).

In our view, it is beyond question that no reservations exist in Alaska, with the single exception of the Annette Islands Reserve. In section 19 of ANCSA, 43 U.S.C. § 1618, Congress expressly and

---

[275] With the exception of a 1949 amendment, 63 Stat. 94, inserting the special exception for §§ 1154 and 1156 (Indian country is defined more narrowly for purposes of Indian liquor laws than for other purposes), Congress has not changed the 1948 definition.

completel[illegible] revoked all existing reservations in Alaska except the Annette Islands Reserve for the Metlakatla Indian Community in Southeast Alaska.[276] The statutory language satisfies the requirement that Congress explicitly and clearly evince its intent to revoke or diminish reservation boundaries. See Solem v. Bartlett, 465 U.S. 463, 470 (1984). Furthermore, except for the Annette Islands Reserve and a few small and isolated parcels, [illegible]he Uni[illegible]d States h[illegible]s no lands in trust for the benefit of an [illegible]laska [illegible]tive village.[277]

We recognize that some statutes and regulations do include ANCSA Native Corporation lands, as well as the former reservations of some tribes in the contiguous 48 states, within their definitions

276 The Secretary's prospective authority to create Indian reservations in Alaska eventually was also expressly revoked in the Federal Land Policy and Management Act of 1976 (FLPMA), Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792 (repealing section 2 of the Act of May 1, 1936, 49 Stat. 1250 (formerly 25 U.S.C. § 496)).

In 1978, the Acting Solicitor accepted the conclusion of the Associate Solicitor, Division of Indian Affairs, that although § 5 of the IRA, 25 U.S.C. § 465 (authority to acquire lands in trust for Indians), was not repealed with respect to Alaska, in light of the clear expression of congressional intent in ANCSA not to create trusteeship or a reservation system, it would be an abuse of discretion for the Secretary to acquire lands in trust in Alaska for the Natives of Venetie and Arctic Village. Letter to Donald Wright, Agent, Native Village of Venetie Tribal Government from the Acting Solicitor, Sept. 20, 1978 (enclosing Memorandum to the Assistant Secretary - Indian Affairs from the Associate Solicitor, Division of Indian Affairs, Sept. 15, 1978).

277 During the 1940's and 1950's, the Government acquired by purchase, and took title in trust to, cannery properties in three Southeast Alaska communities. The BIA has not viewed trust title to these parcels as having been revoked by ANCSA § 19, 43 U.S.C. § 1618, and these lands have not been conveyed to the local Village Corporations under ANCSA § 16, 43 U.S.C. § 1615. BIA views these as valid existing rights under ANCSA § 14(g), 43 U.S.C. § 1613(g). In one case, Kake, both the Department of the Interior and Congress have accepted as fact that the United States holds trust title to the lands. 124 Cong. Rec. 33468 (1978) (remarks of Sen. Stevens and letter, dated September 13, 1978, from Assistant Secretary Gerard to Rep. Morris Udall). Beneficial title to these trust lands is still held by the IRA community and/or association as follows: Angoon (13.24 acres); Kake (15.9 acres); Klawock (1.91 acres).

of reservations for purposes of specific programs.[278] However, in light of the clear congressional expression in ANCSA, we conclude that these limited cases do not evince congressional intent to classify these lands as reservations for general jurisdictional purposes, and are confined to their specific terms.[279]

d. Dependent Indian Communities

A more complex issue is whether there may be lands in Alaska that form a jurisdictional Indian country enclave because they constitute "dependent Indian communities." Although there are tribal fee lands, Native townsites, and Native Corporation lands in Alaska, all of which have some Indian character and some of which fall within the protection of certain federal laws, we conclude that the nature of Native land tenure in Alaska after ANCSA leaves little if any room for finding the existence of a dependent Indian community for purposes of classifying lands as Indian country. Our conclusion is not stated in absolute terms because the test for a dependent Indian community is a highly fact-specific and functional one, resting on a number of variables. Nevertheless, in our view, tribal fee lands, so-called Native townsites, and Native Corporation lands, generally

---

278 Examples include 25 U.S.C. § 1452(d) (Indian Financing Act); 29 U.S.C. § 750(c) (Indian Vocational Rehabilitation Services); 42 U.S.C. § 2992c(2) (Native American Economic Opportunity Programs); 25 C.F.R. § 101.1(h) (Indian Revolving Loan Fund) and § 103.1(h) (Indian Loan Guaranty, Insurance, and Interest Subsidy Program); 34 C.F.R. § 361.1(c)(2) (Vocational Rehabilitation Services); 42 C.F.R. § 36.10 (Indian Health Service Programs); and 48 C.F.R. § 352.270-3(b)(2) (Indian Preference).

279 In § 2(g) of ANCSA, Congress specified for what purposes ANCSA lands are to be considered "in trust" or as "reservation" lands. As described in the conference report:

> Subsection 2(g) of the conference report is to be strictly construed and the conference committee does not intend that lands granted to Natives under this Act be considered "Indian reservation" lands for purposes other than those specified in this Act. The lands granted by this Act are not "in trust" and the Native villages are not Indian "reservations."

S. Conf. Rep. No. 581, 92d Cong., 1st Sess. 40 (1971).

speaking, will not qualify as Indian country, as that term is used in 18 U.S.C. § 1151(b).[280]

The phrase "dependent Indian community" is a term of art which, like the term "reservation," reflects congressional intent to classify as Indian country certain lands intended for the use, occupancy, and special federal protection of dependent Indians, over which federal and tribal authority remain primary. The phrase was included within the definition of Indian country to ensure that certain lands not formally designated as a reservation, nor held in trust by the United States, nor even technically reserved by treaty or statute, would nevertheless have Indian country status.

Section 1151(b) essentially codified the results reached and the phrase adopted by the Supreme Court in United States v. Sandoval, 231 U.S. 28 (1913) and United States v. McGowan, 302 U.S. 535 (1938). In Sandoval, the Court held that Pueblo fee lands are Indian country because the Federal Government "regarded and treated the Pueblos of New Mexico as dependent communities entitled to its aid and protection." Sandoval, 231 U.S. at 47. In McGowan, the Court held that the Reno Indian Colony, the lands of which were held in trust by the United States but not designated a reservation, was nevertheless Indian country.[281]

In light of the willingness of the Supreme Court to treat tribal trust lands as reservation lands under section 1151(a), notwithstanding the lack of formal designation, see Potawatomi, 111 S. Ct. 905, it is apparent that the distinction between sections 1151(a) and 1151(b) is not always clear. One court has observed that, at least with respect to classifying lands as Indian country, "Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap." Blatchford v. Gonzales, 100

[280] As we discuss below, while the lands within the boundaries of a so-called Native townsite would not constitute a dependent Indian community simply by virtue of their Native townsite status, individual Native townsite lots issued in restricted fee to Alaska Natives in some communities may qualify as Indian country under § 1151(c). As discussed supra n. 71, at least one court has held that there is no distinction between so-called Native and non-Native townsites.

[281] The Reno Indian Colony lands were purchased by the United States to provide lands for needy Indians scattered over the State of Nevada. United States v. McGowan, 302 U.S. 535, 537 (1938). Thus, it was neither a reservation in the formal sense of the word, nor was it set aside for a particular historic tribe or tribes.

N.M. 333, 335, 670 P.2d 944, 946 (1983).[282] In each case, the "crucial consideration [is] whether such lands have been set apart for the use, occupancy and protection of dependent Indian peoples." Weddell v. Meierhenry, 636 F.2d 211, 213 (8th Cir. 1980) (citations omitted).

In Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir. 1988) (Venetie I), the Ninth Circuit summarized a number of factors that have been developed to determine whether a dependent Indian community exists:

> In [United States v.] Martine, [442 F.2d 1022 (10th Cir. 1971)] the Tenth Circuit approved a three-pronged analysis, considering:
>
> 1) the nature of the area;
> 2) the relationship of the area inhabitants to Indian tribes and the federal government; and,
> 3) the established practice of government agencies toward that area.
>
> 442 F.2d at 1023.
>
> In [United States v.] South Dakota, [665 F.2d 837 (8th Cir. 1981), cert. denied, 459 U.S. 823 (1982)] the Eighth Circuit applied a more extensive analysis, including the Martine considerations as well as:
>
> 1) the degree of federal ownership of and control over the area;
> 2) the degree of cohesiveness of the area inhabitants; and,
> 3) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.
>
> 665 F.2d at 839.

Venetie I, 856 F.2d at 1391.

In Martine, the court held that certain unrestricted Navajo tribal fee lands, purchased with tribal money, were Indian

---

[282] In Blatchford, the New Mexico Supreme Court held that the Yah-Ta-Hey community, located approximately two miles from the Navajo reservation, was not a dependent Indian community. The land at issue was the site of a non-Indian owned "Indian trading post" and other businesses, and was owned in fee title. Notwithstanding the fact that 60 to 70 percent of the community was Indian and was within a "checkerboard" area near the Navajo reservation, the court, relying on McGowan and referring to the factors identified in United States v. Martine, 442 F.2d 1022 (10th Cir. 1971), concluded that the community was not Indian country. Blatchford, 670 P.2d at 949.

country.[283] The lands were located in a checkerboard area[284] known as the Ramah community near to but outside the boundaries of the Navajo reservation. Based on an examination of the above-cited elements, the court concluded that the area in question was a dependent Indian community. The court made specific mention of the testimony of law enforcement officers and Bureau of Indian Affairs officials as supporting the trial court's conclusion that the lands were Indian country. Martine, 442 F.2d at 1023-24.[285]

In South Dakota, the court held that a tribal housing project located within the original boundaries of the disestablished Lake Traverse Indian Reservation on land held by the United States in trust for the tribe was a dependent Indian community and therefore Indian country. While the decision is useful because of the court's identification of relevant factors for finding a dependent Indian community, we note that in light of Potawatomi, the trust status of the land probably would now be considered a dispositive factor. In fact, the United States contended in South Dakota that the housing project was Indian country under section 1151(a), but the court declined to reach that argument because of its determination under section 1151(b). South Dakota, 665 F.2d at 841 n.9.

It is worth reiterating here that the above factors have been developed by the courts to ascertain the congressional intent underlying the phrase "dependent Indian community." The ultimate question in each case is whether the particular facts and circumstances fit within the congressional scheme intended to protect certain areas under federal and usually tribal control. In that respect, we repeat the guiding principle that Indian country comprises those lands that Congress intended, as a general matter, to be beyond the jurisdictional reach of the state and subject to the primary jurisdiction of the Federal Government and tribes, even though those lands are geographically within the boundaries of a state.

---

[283] 25 U.S.C. § 635(b) provides congressional consent for the Navajo Tribe to alienate fee lands, notwithstanding any other provision of law.

[284] A checkerboard area is an area generally on or near an existing or former reservation in which Indian and non-Indian owned lands are interspersed.

[285] It is also worth noting that the Ramah community has a clear history as a distinct and cohesive Indian community associated with the Navajo reservation. Cf. Ramah Navajo School Bd. v. Bureau of Revenue, 458 U.S. 832 (1981) (striking down as preempted New Mexico's tax on gross receipts received by non-Indian construction company from Ramah Navajo School Board).

As the Ninth Circuit noted after reviewing the Indian country cases: "the ultimate conclusion as to whether an Indian community is Indian country is quite factually dependent." Venetie I, 856 F.2d at 1391.[286] In his "tentative decision" in Alyeska Pipeline Service Company v. Kluti Kaah Native Village of Copper Center, No. A87-201 Civil, slip op. at 43-45 (D. Alaska, January 17, 1992), Judge Holland recognized that the title to the land in question was held by an ANCSA corporation but found that determining whether the land was Indian country required a complex factual inquiry. As a result he denied the plaintiffs' motion for summary judgment. He found that title was only one factor, albeit a significant one, in determining whether the land was Indian country.[287]

We need not decide here whether title may be a dispositive factor. After consideration of the tests summarized in Venetie I, we have concluded that Native Corporation lands and village-owned fee lands in Alaska do not as a general rule qualify as dependent Indian communities. We acknowledge, as pointed out by the Native American Rights Fund (NARF), one of the groups offering comments in connection with this opinion, that there are many Natives in Alaska who receive federal Indian program services, and who may thus be characterized in certain respects as "dependent" Indians or Native peoples, and that villages qualifying as tribes are "domestic dependent nations" as are tribes in the contiguous 48 states.[288] We also accept, for

---

[286] In Venetie I, the State brought an action in federal court to enjoin the village from attempting to enforce a five percent gross receipts tax on a state contractor who was building a public high school in the village. The ANCSA Village Corporations for Venetie and Arctic Village had voted to take their former reservation in fee pursuant to § 19(b) of ANCSA. The Corporations subsequently transferred their interest to the IRA-organized Native Village of Venetie.

[287] This case arose when the Kluti Kaah Village Council enacted a property tax ordinance which by its terms applies to that portion of the Trans-Alaska Oil Pipeline passing through Native Corporation lands. Alyeska, the owners' agent for management of the pipeline, brought suit in federal court, seeking to enjoin enforcement of the taxation ordinance on the grounds, inter alia, that the Village Council was not an Indian tribe with sovereign taxing authority, and that it had no territorial jurisdiction over the pipeline.

[288] We have considered the arguments presented by NARF, reflected in letters submitted to this office, which attached NARF's brief filed in Alaska v. Native Village of Venetie, No. F 87-51 Civ. (D. Alaska) (Opposition to Plaintiffs' Renewed Motion for Summary Judgment), and its draft brief prepared in connection

purposes of this review, that many Alaska Natives live in cohesive Native communities. But cf. Martine, 442 F.2d at 1024 ("The mere presence of a group of Indians in a particular area would undoubtedly not suffice."). We even recognize that in some respects Native Corporation lands in Alaska have been set aside for the Natives, although not "under federal superintendence" as that phrase is understood in determining Indian country.[289] Nevertheless, Congress has treated ANCSA lands in a dispositive way. Our evaluation of all the factors, particularly in light of ANCSA's disposition of lands in Alaska for Natives, and the resulting nature of the land title, leads us to conclude that ANCSA lands, whether currently held by Native Corporations or by tribes, do not constitute dependent Indian communities, and that a contrary conclusion would be inconsistent with the ANCSA scheme.

i. Alaska Native Corporation Lands

In light of Congress' express revocation in ANCSA of Indian reservations in Alaska and the clearly evinced intent not to create a reservation system, we are unable to conclude that the lands that Congress provided for Alaska Native Corporations as part of the settlement constitute dependent Indian communities and thus Indian country. In both legal and practical effect, classifying Native Corporation lands as Indian country would create huge jurisdictional enclaves, presumptively outside the reach of state jurisdiction (except as provided by Congress), set aside for primary federal and tribal jurisdiction. Such a result, in our view, is inconsistent with the will of Congress expressed in ANCSA, notwithstanding Congress' willingness for

---

with Alyeska Pipeline Service Co. v. Kluti Kaah Native Village, No. A87-201 Civil (D. Alaska). NARF contends that lands occupied by a tribe are Indian country by definition, regardless of ownership status. We are not persuaded that the ownership status of land can be so easily dismissed, nor that tribal occupancy, even when combined with tribal ownership, necessarily creates Indian country. This seems particularly true with respect to ANCSA lands, because in ANCSA Congress so clearly revoked tribal reservation boundaries and disposed of the lands to entities other than the tribes.

289 Given the effect of the federal townsite laws, and the reconveyance provisions of ANCSA § 14(c), it is clear that few Native communities are physically located on Native Corporation-owned lands, but given ANCSA's dispositive treatment of these lands, even the presence of such communities on Corporation lands would not alter our conclusion.

limited purposes to treat ANCSA lands as distinct or to afford limited special protection to ANCSA corporations.[290]

Congress created a comprehensive system under ANCSA which did not assert any permanent or even long term federal supervisory control over the land owned or occupied by Native Corporations. Instead, such land has been patented to state-chartered corporations in fee pursuant to ANCSA. The substantive provisions of ANCSA as enacted in 1971 set a schedule for a 20-year transition, at the end of which the Native Corporation stock would be freely alienable, Native Corporation lands could be subject to state taxation, and other federal protections removed.

At the same time, even in 1971, Congress specifically contemplated that adjustments might be necessary and appropriate along the way in order to fulfill the Act's declared intent to effect a settlement "in conformity with the real economic and social needs of Natives." ANCSA § 2(b). Section 23 of ANCSA required annual reports that would be culminated by a 1985 Report. In other words, in 1971 Congress reserved the possibility of continued federal supervision over the settlement, which it exercised to some extent in ANILCA in 1980, and in the 1991 Amendments. Such subsequent adjustments, of course, were constrained by whatever property rights had already vested pursuant to the original Act. Recognizing that Congress provided for continued federal oversight, we nevertheless are not convinced that by reserving and exercising a limited continuing federal role in adjusting and effectuating the settlement, Congress intended to create the type of federal superintendence similar to that exercised over reservations or dependent Indian communities, or that Congress intended that the ANCSA lands would at some point be impressed with the status of Indian country.

This congressional declaration of policy and accompanying statutory scheme completely preclude any finding that under ANCSA, Congress somehow created a trust relationship between the

---

[290] Examples of these limited forms of special treatment or protection include: the continued extension of federal forest fire protection services under ANCSA § 21(e), 43 U.S.C. § 1620(e); provision of technical assistance to Native Corporations under § 313 of the National Indian Forest Resources Management Act of 1990, Pub. L. No. 101-630, 104 Stat. 4040, 25 U.S.C. § 3112; the several provisions of ANCSA affording special tax treatment collected in § 21, 43 U.S.C. § 1620, and amendments thereto; and the land bank and settlement trust options afforded respectively by the provisions of ANILCA § 907, 43 U.S.C. § 1636 and ANCSA, as amended by the 1991 Amendments, 43 U.S.C. § 1629e. Both the existence and narrowly targeted focus of these special provisions undercut any argument that the basic thrust of ANCSA has been redirected.

Federal Government and these Native Corporations with respect to their lands.[291] In the absence of such a relationship, there is no basis for concluding that ANCSA corporate landholdings are *per se* dependent Indian communities simply by virtue of their Native Corporation ownership or their relationship to a Native land claims settlement.

In the 1991 Amendments, Congress did provide substantial automatic protections for undeveloped Native Corporation lands, including open-ended blanket exemptions from adverse possession, real property taxes, satisfaction of debts or judgments, or involuntary corporate dissolutions. 43 U.S.C. § 1636(d). In addition, Congress authorized Native Corporations to establish settlement trusts, in order to obtain additional state-law protection for certain assets, including stock and some categories of undeveloped lands. 43 U.S.C. § 1629e. While these expanded statutory protections reflect continuing congressional interest in protecting the resources granted to the Natives under ANCSA, they fall short of evincing any congressional intent that these Native Corporation fee lands be considered Indian country.[292]

The settlement trust provision permits a Native Corporation to convey assets (including stock or beneficial interests therein) to a settlement trust in accordance with the laws of the State of Alaska. 43 U.S.C. § 1629e. However, invoking or retaining the settlement trust protections is left to the free choice of the Native Corporations, not the Federal Government, and as indicated, the trusts involved are governed by Alaska law.[293]

---

[291] *See* *Cape Fox Corp. v. United States*, 456 F. Supp. 784, 799 (D. Alaska 1978); *see also* H.R. Rep. No. 523, 92d Cong., 1st Sess. (1971); S. Rep. No. 405, 92d Cong., 1st Sess. (1971); and *Governor's Task Force*, *supra* n. 48, at 128-34.

[292] See *supra* pp. 104-105 for a discussion of the 1991 Amendments and the congressional disclaimer precluding use of the legislation to either support or refute claims of Native governmental authority in Alaska.

[293] In choosing state law settlement trusts as a vehicle for providing additional protection to Native Corporation lands, Congress rejected an earlier proposal that would have authorized Native Corporations to transfer some of their lands to "qualified transferee entities" (QTE's). The QTE proposal would have created a wholly federal scheme, and would have permitted transfer of lands to IRA or traditional Native villages. See *Alaska Native Claims Settlement Act: Hearings Before the House Interior and Insular Affairs Committee*, 99th Cong., 1st Sess. 229, 264 (1985). Considérable debate ensued over whether the QTE provisions, which could be viewed as similar to a more

Having granted lands to Native Corporations responsible only to their shareholders and the State, the Federal Government no longer exercises the kind of control and superintendence that led to the findings of dependent Indian communities in Sandoval and McGowan. The present relationship between ANCSA-conveyed Native landholdings and the Federal Government, particularly in light of the express language in ANCSA rejecting lengthy wardship or trusteeship, cannot be characterized as a guardianship or as related to a trust. Because Native Corporations have complete freedom to control their lands, those lands and the Natives located on them cannot be regarded as dependent Indian communities as that term has been understood. It would be anomalous to conclude that Native Corporation lands are the jurisdictional equivalent of reservations, when Congress specifically abolished reservations and designed a comprehensive system of landholdings purposely intended not to be the functional equivalent of reservations. Nor do any of the many and in some cases substantial amendments to the original ANCSA blueprint signal a significant modification or a reversal of the original 1971 Act's effect in this regard.

We do not discount nor minimize Congress' continuing interest and involvement in the affairs of the Native Corporations, but we cannot conclude that the lands conveyed to Native Corporations under ANCSA became, by virtue of that fact, Indian country. Simply put, we do not believe that Congress, in ANCSA or in subsequent legislation, has expressed an intent that Native Corporation lands be classified as Indian country, or has treated

---

conventional Federal Indian law form of Indian land protection, would enhance the Natives' argument that the corporation lands were Indian country. See Alaska Native Claims Settlement Act: Hearings on H.R. 4162 Before the House Interior and Insular Affairs Committee, 99th Cong., 2d Sess. 137-78, 189-246 (1985); Amendments to the Alaska Native Claims Settlement Act and the Alaska National Interest Lands Conservation Act and to Establish a Memorial in D.C.: Hearings on S. 2065 (and other bills) Before the Subcommittee on Public Lands, Reserved Water, and Resource Conservation, Senate Energy and Natural Resources Committee, 99th Cong., 2d Sess. 184-96, 223-48, 307-32 (1986); Alaska Native Claims Settlement Act Amendment of 1987: Hearings on S. 1145 and H.R. 278 Before the Senate Subcommittee on Public Lands, National Parks, and Forests, Senate Energy and Natural Resources Committee, 100th Cong., 1st Sess. 151, 157, 165, 249-59 (1987). Shortly before the 1991 Amendments were finalized, the QTE provisions were replaced with the settlement trust option. Particularly in light of Congress' selection of state-chartered settlement trusts over the federal QTE provisions, we are not convinced that this additional Native land protection is analogous to the type of federal protection contemplated in the definition of dependent Indian communities.

these lands and areas in the manner contemplated in the factors summarized in Venetie I.[294]

ii. Village Fee Lands

At least two ANCSA corporations that held former reservation lands have conveyed those lands to a traditional Native entity. See Venetie I, 856 F.2d 1384. In another case, lands not formerly held as a reservation were conveyed to a traditional Native entity. Act of October 20, 1978, Pub. L. No. 95-487, 92 Stat. 1635 (conveyance of lands to Village of Kake in unrestricted fee title).[295] Other villages apparently have acquired or may acquire lands in fee from Village Corporations.

Without a co-existing reservation system or tribal trust lands creating federal jurisdictional enclaves for tribes in Alaska, we are not convinced that the mere acquisition of lands in fee by a Native village confers upon such lands the status of Indian country. Indian country depends primarily upon congressional, not tribal, intent. The ANCSA statutory scheme simply does not permit tribes to create Indian country in Alaska by unilateral action, nor by virtue of such tribal ownership to impose federal restrictions on the land that Congress in ANCSA sought to avoid. The declaration against a reservation system, implemented by the 1971 Act and undiluted by any subsequent amendments, is simply too strong to square with the proposition that tribes in Alaska

---

[294] We also note that ANCSA § 14(c)(3), 43 U.S.C. § 1613(c)(3), requires each Village Corporation to convey lands of a specified quantity and character to the Municipal Corporation in the Native village, or to the State in trust for any Municipal Corporation established in the future. Although Congress rejected the option of making state-chartered municipalities the vehicle for the land claims settlement, and did not require Native villages to incorporate as political subdivisions of the State, it did make substantial and universally applicable provisions for state-chartered municipal governments to acquire title to lands in Native villages. In contrast, except as discussed supra p. 84, ANCSA contains no provision making land available to any other local governmental entities for either proprietary or governmental purposes. Such a scheme, while not necessarily dispositive with respect to tribal jurisdiction, appears inconsistent with any congressional intent that the Federal Government and tribes, and not municipal governments, would exercise primary jurisdiction over the lands and territory in and immediately surrounding Native villages.

[295] See 124 Cong. Rec. 32880 (1978) (adoption by House); 124 Cong. Rec. 33467-69 (1978) (consideration and adoption by Senate).

can create unilaterally what Congress sought so clearly to avoid.[296]

iii. Village-Owned Townsite Lands

There is one unique category of non-ANCSA village fee lands, for which the Indian country question is more difficult. In the past several years, unoccupied lands within federal townsites have been conveyed in fee to 27 Native villages. These 27 villages are not incorporated as state law municipalities. In Aleknagik Natives Ltd. v. United States, 886 F.2d 237 (9th Cir. 1989), the court of appeals affirmed the district court's order requiring the federal townsite trustee to convey to the Native villages of Port Graham and English Bay title to the unoccupied townsite lands in those communities. The decision in effect overruled the Department of the Interior's prior refusal to convey unoccupied townsite lands to any entity other than a municipality organized under state law. As a result of this case, and the townsite trustee's compliance with the decision, the Federal Government has conveyed varying amounts of land in fee to 27 Native villages.

These townsite lands differ significantly from lands owned by ANCSA corporations, or even Native Corporation lands conveyed in fee to an IRA entity or traditional village council. In contrast to those cases, these townsite lands have been conveyed, pursuant to federal law, directly to Native villages in the capacity of local governments. While the townsite statutes do not explicitly refer to Native local governments, and are not properly

---

[296] Our conclusion is consistent with the 1978 Acting Solicitor's conclusion discussed supra n. 276, that in light of Congress' clearly expressed intent in ANCSA, it would be an abuse of discretion for the Secretary to take lands in trust for Venetie and Arctic Village. To now conclude that the villages, by acquiring lands in fee, could essentially accomplish on their own what the Secretary cannot, is a proposition we cannot accept. See also 25 C.F.R. § 151.1 (BIA land acquisition regulations exclude Alaska, except for Metlakatla); 45 Fed. Reg. 62034 (same; "the Alaska Native Claims Settlement Act does not contemplate further acquisition of land in trust status, or the holding of land in such status, with the exception of . . . Metlakatla").

This is not to say that the acquisition of lands in fee by an IRA entity is without some legally significant consequences. See, e.g., In re 1981, 1982, 1983, 1984 and 1985 Delinquent Property Taxes, 780 P.2d 363 (Alaska 1989) (§ 16 of IRA barred City of Nome from foreclosing on lands owned by the IRA-organized Nome Eskimo Community, without its consent).

considered to be "Indian legislation,"[297] the fact remains that titles to these townsite lands in 27 villages are now owned by those villages as villages.

With respect to these non-ANCSA lands, we believe the extent of village governmental powers will depend upon the particular status of the village itself and upon a fact-specific inquiry into whether the area at issue qualifies as a dependent Indian community and thus Indian country. Congress simply did not address this specific situation in ANCSA. The outcome would depend upon the particular history of the village, specific applicable statutes, and general principles of Indian law.

e. Native Allotments

With respect to Alaska Native allotments, we conclude that they do fall within the statutory definition of Indian country. However, we also conclude that while Native allotments are Indian country for purposes of federal protection and jurisdiction, it does not necessarily follow that allotments are subject to tribal jurisdiction.

The language of section 1151(c) includes as Indian country "all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same" (emphasis added). Based upon the plain language of the statute, the court decisions interpreting section 1151(c), and an examination of the Alaska Native Allotment Act, we conclude that Alaska Native allotments are Indian country. Nevertheless, although we conclude that these allotments are Indian country for purposes of federal authority and protection, for the most part we are not persuaded that Congress intended Alaska Native villages to exercise governmental powers over these lands. Alaska Native allotments appear to be an exception to the general rule that the territorial basis for tribal authority coincides with the federal Indian country status of lands. See Native Village of Venetie IRA Council v. Alaska, 944 F.2d 548, 558 n.12 (9th Cir. 1991) (Venetie II).

i. Indian Allotments as Indian Country

Indian allotments were included within the definition of Indian country based on the Supreme Court's decision in United States v. Pelican, 232 U.S. 442 (1914). See reviser's note to 18 U.S.C. § 1151. In Pelican, the Court held that a trust allotment carved out of an existing reservation continued to be Indian country because it continued to be validly set apart for the use of Indians under the superintendence of the Government.

---

[297] See supra n. 71.

In the contiguous 48 states, Congress used two principle forms in creating Indian allotments: trust allotments and restricted fee allotments. In United States v. Ramsey, 271 U.S. 467 (1926), the Supreme Court rejected any distinction between the two types of allotments with respect to their Indian country status. The Court concluded that a restricted fee patent allotment carved out of the Osage Indian reservation "remained Indian lands set apart for Indians under governmental care." Id. at 471. The Court stated:

> [I]t would be quite unreasonable to attribute to Congress an intention to extend the protection of the criminal law to an Indian upon a trust allotment and withhold it from one upon a restricted allotment; and we find nothing in the nature of the subject matter or in the words of the statute which would justify us in applying the term Indian country to one and not to the other.

Id. at 471-72.[298]

Indian allotments that were not carved out of existing Indian reservations also have been held to be Indian country. In In re Carmen's Petition, 165 F. Supp. 942 (N.D. Cal.), aff'd, 270 F.2d 809 (9th Cir.), cert. denied, 361 U.S. 934 (1958), the court held that a public domain trust allotment was Indian country and thus

---

298 See Heckman v. United States, 224 U.S. 413, 437 (1912) (federal guardianship continues over restricted fee Indian lands; "national interest" not to be expressed in terms of property, or limited to assertion of rights incident to ownership of reversion or "to the holding of a technical title in trust"); State v. Burnett, 671 P.2d 1165, 1166-67 (Okla. Cr. 1983) (restricted fee allotment held to be Indian country).

In United States v. Sands, 968 F.2d 1058 (10th Cir. 1992), petition for cert. filed, No. 92-6105 (U.S. Oct. 5, 1992), the Tenth Circuit concluded that a restricted fee allotment in the former territory of the Five Civilized Tribes in Oklahoma was Indian country, noting that "[b]y 1948, when § 1151 was enacted, 'Indian country' included both trust allotments and restricted fee allotments." Id. at 1062. In Sands, following defendant's conviction, the United States contended before the court of appeals that the United States lacks jurisdiction because the particularly unique history of the former Indian territory in present-day Oklahoma evinces congressional intent that restricted fee allotments of the Five Civilized Tribes not be treated as Indian country. Obviously, the fact that trust allotments and restricted fee allotments in general fall within the definition of Indian country would not preclude Congress from treating certain allotments differently.

subject to federal jurisdiction. In that case, California asserted that the public domain allotment was not Indian country because it had not been carved out of an existing reservation, as was the case in United States v. Pelican, 232 U.S. 442 (1914),[299] and was not land to which an underlying "Indian title" remained. The district court, affirmed by the Ninth Circuit, squarely rejected these assertions:

> Respondent interprets the Pelican decision to mean that an allotment to be Indian Country must have been made from lands which were previously Indian Country. But this is an unduly restricted view of that decision.
>
> * * *
>
> In Pelican, the reservation from which the allotment was made had itself been created out of the public domain rather than from land which had previously been in Indian possession. . . . Since all Indian allotments, regardless of their source, are maintained under the same type of Governmental supervision, either by holding title in trust for the allottee or by restricting alienation, there is no logical reason for making the application of protective criminal statutes dependent upon the source of the allotment.

In re Carmen's Petition, 165 F. Supp. at 946 (emphasis added). Based on the above considerations, we conclude that the language of section 1151(c) indeed encompasses Alaska Native allotments while they remain in restricted status.[300]

While the Indian country status of allotments provides the statutory basis for the exercise of federal jurisdiction, it does not necessarily follow that all Indian allotments are subject to tribal jurisdiction. Because of the distinct history of certain off-reservation allotments, we believe that whether an individual allotment is subject to tribal jurisdiction depends upon a

---

[299] In United States v. Pelican, 232 U.S. 442 (1914), the Court determined that an Indian allotment was Indian country, even though it was within a reservation area restored to the public domain, which the Court appears to have presumed was no longer within the reservation's boundaries. The Court concluded that the same considerations apply to allotments as to other Indian lands in determining whether they are Indian country--whether the lands "had been validly set apart for the use of the Indians as such, under the superintendence of the Government." Id. at 449.

[300] Of course, because Alaska is a Public Law 280 state, it has broad criminal and limited civil jurisdiction over Indian country.

particularized inquiry into the relevant statutes and circumstances surrounding the creation of the allotment.

For example, various statutes enacted by Congress during the allotment era permitted certain Indians to acquire homesteads on the public lands. The Act of March 3, 1875, § 15, 18 Stat. 402, 420, permitted an Indian born in the United States, "who has abandoned, or may hereafter abandon, his tribal relations," to obtain a homestead under the Homestead Act of 1862, 12 Stat. 392.[301] The Indian homestead was restricted for a period of five years from the date of issuance of a fee patent. The Indian Homestead Act of 1884 also permitted Indians to avail themselves of the homestead laws of the United States, with the special provision that 25-year trust patents would issue. Act of July 4, 1884, 23 Stat. 76, 96. In United States v. Jackson, 280 U.S. 183 (1930), the Supreme Court held that restricted Indian homestead allotments carry the same federal rights and privileges as other Indian allotments, upholding the authority of the Secretary to extend the trust period for a restricted Indian homestead pursuant to 25 U.S.C. § 391.

While we are unaware of any court decisions addressing the question, it is our view that an assertion of tribal jurisdiction over an Indian homestead allotment obtained by an Indian who had abandoned tribal relations would fail. In such a case, it seems unlikely that there would be any indication of congressional intent to permit such jurisdiction, and there would be no original tribal nexus to support such jurisdiction over the allotment.

Public domain allotments obtained pursuant to section 4 of the 1887 General Allotment Act, 25 U.S.C. §§ 334, 336, differ from the homestead allotments in that Indians applying for such allotments must demonstrate membership or entitlement to membership in a recognized Indian tribe. 43 C.F.R. § 2531.1(a); see Regulations Governing Indian Allotments on the Public Domain Under Section 4, Act of February 8, 1887, as amended, 46 L.D. 344 (1918) ("applicant is required to show that he is a recognized member of an Indian tribe or is entitled to be so recognized").

Without addressing or deciding the possible scope of tribal jurisdiction over public domain allotments in the contiguous 48, we conclude that allotments issued pursuant to the Alaska Native Allotment Act are more similar to homestead act allotments rather than tribal-affiliation public domain allotments, and that particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village

---

[301] Repealed by FLPMA, Pub. L. No. 94-579, § 702, 90 Stat. 2743, 2787 (1976).

claiming territorial jurisdiction over an Alaska Native allotment.

ii. Alaska Native Allotments

Most allotments in Alaska have been issued pursuant to the Alaska Native Allotment Act of 1906,[302] although there are a few allotments issued under the General Allotment Act.[303] Although Alaska Native allotments are held in fee by the allottee subject to restrictions against alienation, we have already noted that the distinction between restricted fee and trust allotments is not significant for our purposes.[304]

A number of facts, however, do distinguish Alaska Native allotments from most allotments in the contiguous 48. First, the statute does not make tribal membership a criteria for receiving an allotment, probably because in 1906, Congress was not considering the Alaska Native allotments in a tribal context. This makes Alaska Native allotments more like Indian homestead allotments, rather than those issued pursuant to the General Allotment Act or other tribe-specific allotment acts.[305] Second,

---

302 Act of May 17, 1906, Pub. L. No. 59-171, 34 Stat. 197, as amended by Act of August 2, 1956, Pub. L. No. 84-931, 70 Stat. 954. The 1906 Act was repealed, with a savings clause for applications pending on December 18, 1971, by ANCSA § 18(a), 43 U.S.C. § 1617(a). The repealer does not purport to alter the status of Alaska Native allotments.

303 See United States v. Clarke, 445 U.S. 253 (1980).

304 Because the possible distinctions between restricted fee and trust allotment forms are not significant in our context, it is also not significant that the Interior Department initially viewed the Alaska Native Allotment Act as providing for trust allotments. See Charlie George, 44 L.D. 113 (1965); Status of Alaskan Natives, 53 I.D. 593, 602 (1932) (Solicitor's Opinion) (allotment creates reservation of land for allottee but title remains in the United States). In 1980, the Interior Board of Land Appeals overruled Charlie George and concluded instead that Alaska Native allotments were held in restricted fee title. State of Alaska, 45 IBLA 318 (1980). Regardless of the form of title, this Department consistently has taken the position that general federal statutes and Departmental regulations applicable to trust and restricted Indian property also apply to Native allotments and restricted Native townsite lots in Alaska.

305 The Solicitor's Opinion, Status of Alaskan Natives, 53 I.D. 593, 602 (1932), also analogized Alaska Native allotments to public domain allotments issued pursuant to § 4 of the General Allotment Act of 1887, 25 U.S.C. § 334, 336. While they are

Alaska Native allotments were not carved out of any reservation. While we consider this factor insignificant for federal jurisdictional purposes, we believe it has at least some significance in determining questions of tribal authority. Third, the statute specifically provides that the allotment "shall be deemed the homestead of the allottee and his heirs." Again, while not a controlling factor as such, the language makes the Alaska Native Allotment Act appear more similar to a general Indian homestead act rather than a tribal or reservation related allotment act.

We wish to make clear that Alaska Native allotments, like other Indian allotments, remain under federal superintendency and subject to federal protection while in restricted status. Thus, we conclude that Congress has not divested the Federal Government of its jurisdictional authority over such lands, and they are Indian country.

However, after examining the statute and circumstances related to Alaska allotments, we are not convinced that any specific villages or groups can claim jurisdictional authority over allotment parcels. As we noted above, particularly in the absence of a tribal territorial base (e.g., a reservation), there is little or no basis for an Alaska village claiming territorial jurisdiction over an Alaska Native allotment.

iii. Individual Native Townsite Lots

One other category of individual Native landholdings in restricted status is that of Native restricted fee townsite lots. It is our understanding that there are over 3,800 of these lots. To a limited extent, deeds to individual townsite lots are still being issued to Natives subject to statutory restrictions on alienation, pursuant to the former 43 U.S.C. § 733.[306] In People of South Naknek v. Bristol Bay Borough, 466 F. Supp. 870 (D. Alaska 1979), the court held that for purposes of federal court jurisdiction, the restricted Native townsite lots have the same status as allotments.

Our analysis and conclusions concerning potential tribal jurisdiction over these lots are the same as those set forth

---

indeed analogous in many respects, § 4 allotments did require tribal affiliation, which conceivably provides a basis for tribal jurisdiction. Of course, we express no opinion concerning tribal jurisdiction over § 4 public domain allotments.

[306] 43 U.S.C. § 733 was repealed in 1976 by FLPMA § 703(a), Pub. L. No. 94-579, 90 Stat. 2743, 2790. Only applicants who can establish entitlement based on occupancy commenced prior to the enactment of FLPMA are eligible for a deed.

above with respect to Native allotments, with one possible exception. If individual restricted townsite lots properly are treated as allotments for purposes of section 1151, they would be Indian country. Those restricted lots located in one of the 27 Native villages receiving fee title to unoccupied townsite lots could conceivably be affected if the village qualifies as a tribe and if the area qualifies as a dependent Indian community. Even so, an assertion of tribal jurisdiction over individual restricted lots would be doubtful if there were no clear tribal nexus to the individual restricted lands.[307]

f. Authority over Nonmembers After ANCSA

We have previously established that there is a significant territorial component to tribal powers. In effect, by abolishing previously-existing reservations and avoiding federal trusteeship over Native lands, Congress largely removed a territorial base over which entities in Alaska qualifying as tribes could assert jurisdiction. Furthermore, except for the uncertainty surrounding some village-owned townsite lands, in the limited cases in which Indian country may still exist in Alaska for purposes of federal jurisdiction and protection, we are not convinced that Congress has in practical and legal effect left room for the exercise of tribal jurisdiction over land.

Our disposition of the issue of jurisdiction over land also resolves in large measure the question of the extent of tribal governmental authority over nonmembers. Indian tribes are possessed of sovereignty over "their members and their territory." Montana v. United States, 450 U.S. 544, 563 (1981). Without a tribal territory, tribal governmental power is limited to authority over members, unless Congress has clearly authorized the exercise of tribal power over nonmembers.[308] Absent such congressional consent, we conclude that Alaska tribes without territories are also wi out power over nonmembers.

---

[307] If the area is not a dependent Indian community, we are not convinced that a village that qualifies as a tribe could assert jurisdiction over individually owned restricted townsite lots. Even if the lots are Indian country for federal jurisdictional purposes, the village would lack a distinctly tribal territorial base related to the lots, from which to assert extended jurisdiction over discreet individual Native-owned parcels. Nothing in the townsite laws even remotely suggests that the individual restricted lots issued to Natives could, by themselves, constitute any sort of tribal territorial base.

[308] For example, the Indian Child Welfare Act, discussed supra pp. 43-44, gives force and effect to tribal court child custody proceedings, and may affect nonmembers claiming parental or custody rights to an Indian child.

V. CONCLUSION

This opinion has been one of the most difficult to prepare during my tenure at the Department of the Interior. We hope the research into the history, law and government policy toward Native Alaskans will be beneficial to all who are dealing with jurisdictional questions, whether they agree with the conclusions or not. The issues surrounding jurisdiction and governmental power are complex and easily susceptible to misinterpretation. In this opinion, we have provided the answer to the specific question posed by the Secretary: whether Alaska Native villages exercise jurisdiction over lands and nonmembers. In posing this issue, the Secretary made clear that he did not intend to revisit the unique relationship of the Federal Government to the Natives. That policy is sound in light of this legal review.

We have spent considerable time on the status of Native villages and the ongoing federal relationship with them to avoid any misapprehension that this opinion is intended to answer the question of whether or not the ongoing provision of federal benefits to Natives and federal recognition of Native villages is appropriate. In our view, Congress and the Executive Branch have been clear and consistent in their inclusion of Alaska Natives as eligible for benefits provided under a number of statutes passed to benefit Indian tribes and their members. Thus, we have stated that it would be improper to conclude that no Native village in Alaska could qualify as a federally recognized tribe.

However, this opinion does conclude that, even if certain Native villages qualify as tribes for purposes of federal law, Congress clearly limited Native village exercise of sovereign jurisdiction over lands and nonmembers in a decisive fashion. The statutory scheme established in ANCSA precludes the treatment of lands received under that Act as Indian country. The purposes of ANCSA to develop state chartered business entities and to avoid the establishment of any permanent reservation system, trusteeship or other racially based institutions would be frustrated by a determination that enclaves of federal and tribal jurisdiction continue to exist.

I understand the significant impact of this decision. To conclude that areas are not Indian country greatly limits the powers those Native villages may exercise with respect to the establishment of courts, police powers and other sovereign attributes that attach to jurisdiction over land. Yet, this opinion reflects what we believe is the best reading of the law.

Our decision on this matter is very much based on what Congress did in ANCSA, and subsequent amendments and other legislation do not change this conclusion. As noted in the body of the opinion, the exercise of Congress' authority over Indian Affairs is broad. Should the outcome of this opinion be at variance with what

lawmakers believe is the proper view of Native village jurisdiction, Congress is free to legislate again in this area to provide certainty.

In summary:

1. We have rejected the notion that there are no tribes in Alaska. Which Native villages are tribes is a fact-specific determination beyond the scope of this Opinion. See Part III.B.

2. ANCSA is not a termination statute. It did not terminate tribes or the provision of federal services to Alaska Native individuals or entities. Congress and the Executive Branch have consistently extended to Alaska Natives benefits provided to Indian tribes and their members in the contiguous 48 states. See Part IV.C.1.

3. There is a territorial component to tribal power. Whether a Native village has governmental powers over lands and nonmembers depends, as a threshold matter, upon the existence of Indian country. See Part IV.C.2.a.

4. ANCSA reflected a new approach in defining the relationship between Alaska Natives and the federal government. ANCSA largely controls the determination whether any territory exists over which Alaska Native villages might exercise governmental powers. Congress has left virtually no room under ANCSA for Native villages in Alaska to exercise governmental power over lands and nonmembers. See Part IV.C.2.

5. Native Corporation lands in Alaska do not qualify as Indian country. See Part IV.C.2.b.ii.

6. ANCSA does not permit Native villages to create Indian country in Alaska by unilateral action. Native village acquisition of former ANCSA land will not impose federal superintendence over the land that Congress in ANCSA sought to avoid. See Part IV.C.2.b.iv.

7. The extent of Native village governmental powers over village-owned townsite lands will depend upon the status of the village itself and upon a fact-specific inquiry as to whether the village is a dependent Indian community. See Part IV.C.2.b.v.

8. Although an Alaska Native allotment constitutes Indian country, there is little or no basis for a Native village to claim territorial jurisdiction over an allotment. See Part IV.C.2.c.i.

9. Although individually owned restricted Native townsite lots may constitute Indian country, there is little or no basis for a

Native village to claim territorial jurisdiction over the lots. See Part IV.C.2.c.iii.

Tom Sansonetti

Thomas L. Sansonetti
Solicitor

I concur: Frank A. Bracken
Frank A. Bracken
Acting Secretary

Date: January 14, 1993