Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51 and that copies of 4 TAC 41.2 may be obtained from the central office of the TAHC at 2105 Kramer Lane, Austin, TX 78758, or from area offices, which are listed in local Texas telephone directories, or from the TAHC's Internet homepage (www.tahc.state.tx.us/). Finally, § 72.5 would inform the reader that copies may also be inspected at APHIS' offices in Riverdale, MD, or at the Office of the Federal Register in Washington, DC.

**Executive Order 12866 and Regulatory Flexibility Act**

This proposed rule has been reviewed under Executive Order 12866. The rule has been determined to be not significant for the purposes of Executive Order 12866 and, therefore, has not been reviewed by the Office of Management and Budget.

This proposed rule would amend the Texas (splenetic) fever in cattle regulations to incorporate by reference *the description of fever tick eradication* areas contained in the Texas Administrative Code. Incorporating the TAHC's description of fever tick eradication areas by reference rather than continuing to reproduce the description in our regulations would eliminate the need for APHIS to maintain an up-to-date description of the quarantined area in Texas and reduce the volume of material included in our regulations, while continuing to provide for the treatment and inspection of cattle moved from the tick eradication area in Texas.

Our proposal to incorporate the description of fever tick eradication areas in Texas contained in the Texas Administrative Code is not expected to have an economic impact on any entities, large or small, because the description of Texas' tick eradication areas, which are defined and established by the TAHC, have merely been reproduced in APHIS' regulations in part 72. There would be no change in the quarantined area in Texas as a result of its description being removed from part 72, so no livestock or property owners in Texas would be affected by this proposed rule.

Under these circumstances, the Administrator of the Animal and Plant *Health Inspection Service* has determined that this action would not have a significant economic impact on a substantial number of small entities.

**Executive Order 12372**

This program/activity is listed in the Catalog of Federal Domestic Assistance under No. 10.025 and is subject to Executive Order 12372, which requires

intergovernmental consultation with *State* and local officials. (*See* 7 CFR part 3015, subpart V.)

**Executive Order 12988**

This proposed rule has been reviewed under Executive Order 12988, Civil Justice Reform. If this proposed rule is adopted: (1) All State and local laws and regulations that are in conflict with this rule will be preempted; (2) no retroactive effect will be given to this rule; and (3) administrative proceedings will not be required before parties may file suit in court challenging this rule.

**Paperwork Reduction Act**

This rule contains no new information collection or recordkeeping requirements under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

**Regulatory Reform**

This action is part of the President's Regulatory Reform Initiative, which, *among other things,* directs agencies to remove obsolete and unnecessary regulations and to find less burdensome ways to achieve regulatory goals.

**List of Subjects in 9 CFR Part 72**

Animal diseases, Cattle, Quarantine, Transportation.

Accordingly, we are proposing to amend 9 CFR part 72 as follows:

**PART 72—TEXAS (SPLENETIC) FEVER IN CATTLE**

1. The authority citation for part 72 would continue to read as follows:

**Authority:** 21 U.S.C. 111–113, 115, 117, 120, 121, 123–126, 134b, and 134f; 7 CFR 2.22, 2.80, and 371.2(d).

2. Section 72.5 would be revised to read as follows:

**§ 72.5  Area quarantined in Texas.**

The area quarantined in Texas is the permanent quarantined area described *in the regulations of the Texas Animal* Health Commission (TAHC) in § 41.2 of title 4, part II, of the Texas Administrative Code (4 TAC 41.2), which is incorporated by reference. This incorporation by reference was approved by the Director of the Federal Register in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. Copies may be obtained from the TAHC at 2105 Kramer Lane, Austin, TX 78758, and from area offices of the TAHC, which are listed in local Texas telephone directories. The TAHC also maintains a copy of its regulations on its Internet homepage at http:// www.tahc.state.tx.us/. Copies may be inspected at the Animal and Plant

Health Inspection Service, Veterinary Services, Emergency Programs, Suite 3B08, 4700 River Road, Riverdale, MD, or at the Office of the Federal Register, 800 North Capitol Street, NW., suite 700, Washington, DC.

Done in Washington, DC, this 6th day of April 1999.

**Joan M. Arnoldi,**

*Acting Administrator, Animal and Plant Health Inspection Service.*

[FR Doc. 99–9007 Filed 4–9–99; 8:45 am]

**BILLING CODE 3410–34–P**

---

**DEPARTMENT OF THE INTERIOR**

*Bureau of Indian Affairs*

**25 CFR Part 151**

**RIN 1076–AD90**

**Acquisition of Title to Land in Trust**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Proposed rule.

**SUMMARY:** On September 18, 1980, we issued the first regulations governing the exercise of the Secretary of the Interior's authority to accept title to land in the name of the United States to be held in trust for the benefit of Indian tribes and individual Indians (*i.e.,* to "take land into trust"). These regulations have not undergone substantial revision since their adoption. We now propose to amend these regulations to make clearer that we will follow a process that is somewhat different, and we will apply a standard which is somewhat more demanding when a land-into-trust application involves title to lands which are located outside the boundaries of a reservation ("off-reservation lands"). In contrast, when the application involves lands located inside the boundaries of a reservation ("on-reservation lands"), we will apply a process and a standard which reflect a presumption in favor of acquisition of trust title to those lands. In addition, the proposed rule sets out the process we will use to comply with a mandate from Congress directing us to use our administrative procedures to place a particular tract of land into trust. Finally, the proposed rule establishes a framework in which a tribe without a reservation can establish a geographic boundary within which it may acquire land under the on-reservation provisions of the regulation.

**DATES:** Send comments before July 12, 1999.

**ADDRESSES:** If you wish to comment, you may submit your comments by any

one of several methods. See SUPPLEMENTARY INFORMATION section.

**FOR FURTHER INFORMATION CONTACT:** Terry Virden, Director, Office of Trust Responsibilities, Bureau of Indian Affairs, MS–4513, Main Interior Building, 1849 C Street, NW, Washington, DC 20240; by telephone at (202) 208–5831; or by telefax at (202) 219–1065.

**SUPPLEMENTARY INFORMATION:**

**General Comments**

You may mail comments to the Office of Trust Responsibilities, Bureau of Indian Affairs, 1849 C Street, NW, MS–4513–MIB, Washington, DC 20240.

**Electronic Access and Filing**

You may also comment via the Internet to [land__comments@ios.doi.gov]. Please submit Internet comments as an ASCII file avoiding the use of special characters and any form of encryption. Please also include "Attn: 1076–AD90"

and your name and return address in your Internet message. If you do not receive a confirmation from the system that we have received your Internet message, contact the Office of Trust Responsibilities directly at (202) 208–5831.

Finally, you may hand-deliver comments to the Office of Trust Responsibilities, Bureau of Indian Affairs, 1849 C Street, N.W., MS–4513–MIB, Washington, D.C. 20240.

Our practice is to make comments, including the names and addresses of persons commenting, available for public review during regular business hours. Persons commenting as private individuals may request that we withhold their home address from the rulemaking record, which we will honor to the extent allowable by law. There may also be circumstances in which we would withhold from the rulemaking record a commenter's identity, as allowable by law. If you wish us to withhold your name and/or address, you must state this prominently at the

beginning of your comment. We will not consider anonymous comments. Comments from organizations or businesses, and from individuals identifying themselves as representatives or officials of organizations or businesses, will be available for public inspection in their entirety.

**Specific Comments on Information Collection Aspects of the Rulemaking**

Indian tribes and individuals must submit the information required under §§ 151.4, 151.9, 151.12, 151.15, and 151.18 to acquire land into trust, and 151.26 for approval of Tribal Acquisition Plans. We will use the information in making a determination on an application to take land into trust. The applicant must respond to this request to obtain a benefit. This table represents our estimate of the burden hours for reporting information collection under each section of this proposed rule.

| Citation 25 CFR 151 | Information | Average number of hours | Average number per year | Annual burden hours |
|---|---|---|---|---|
| 151.4—For all applications ........ | Submit completed written request as specified in sections 151.9, .12, and .15. | 4–8 | 6,941 | 28,635 |
| 151.9—For on reservation acquisitions. | Applicants must submit: ................................................................. | 4 | 95%=6,594 | 26,376 |
| | (a) Copy of authority ................................................................. | | | |
| | (b) Explanation of need .............................................................. | | | |
| | (c) Explanation of ownership status (Tribe) ............................... | | | |
| | (d) Explanation of ownership status (Individual) ........................ | | | |
| | (e) Title Insurance .................................................................... | | | |
| | (f) Documentation for NEPA ...................................................... | | | |
| 151.12—For off reservation acquisitions. | Applicants must submit: ................................................................. | 8 | 4%=278 | 2,224 |
| | (a) Copy of authority ................................................................. | | | |
| | (b) Explanation of need .............................................................. | | | |
| | (c) Description of proposed use ................................................. | | | |
| | (d) Description of location of land ............................................. | | | |
| | (e) Description of effect on state & political subdivisions ............ | | | |
| | (f) Description of jurisdictional issues ....................................... | | | |
| | (g) Title Insurance .................................................................... | | | |
| | (h) Documentation for NEPA ...................................................... | | | |
| | (i) Documentation that individual's request meets 151.13 ............ | | | |
| 151.15—For mandatory acquisitions. | Applicants must submit: ................................................................. | .5 | 1%=69 | [2] 35 |
| | (a) Copy of authority ................................................................. | | | |
| | (b) Title Insurance .................................................................... | | | |
| | (c) Additional information upon request ...................................... | | | |
| 151.18—For Tribal Land Acquisition Plans (TLAP). | Applicants must submit: ................................................................. | 8 | .05%=325 | [3] 2,600 |
| | (a) Copy of authority ................................................................. | | | |
| | (b) Copy of tribal documents to establish TLAP ........................... | | | |
| | (c) Summary of purposes & goals ............................................... | | | |
| | (d) Summary of tribe's history ................................................... | | | |
| | (e) Description of TLAP ............................................................. | | | |
| | (f) Location of Rights-of-Way .................................................... | | | |
| | (g) Description of effect on State & political subdivisions ............ | | | |
| | (h) Description of jurisdictional & land use issues ....................... | | | |
| 151.26—Recordkeeping ............. | Maintaining each case file .............................................................. | ([1]) | 6,941 | 578 |

[1] 5 minutes=⅟₁₂ hour.
[2] Rounded.
[3] Not included in total burden hours.

We invite your comments as to:      (1) Whether the collection of information is necessary for the proper      performance of the functions of the

Bureau, including whether the information will have practical utility;

(2) The accuracy of the Bureau's estimate of the burden of the collection of information, including the validity of the methodology and assumptions used;

(3) The quality, utility, and clarity of the information to be collected; and

(4) How to minimize the burden of the collection of information on those who are to respond, including the use of appropriate automated electronic, mechanical, or other forms of information technology.

Your comments regarding the burden estimate or any other aspect of this information collection should be sent to: Attention: Desk Officer for the Interior Department, Office of Information and Regulatory Affairs, Office of Management and Budget, Docket Library, Room 10102, 725 17th Street, NW, Washington DC 20503. Please note that OMB has up to 60 days to approve or disapprove the information collection but may respond after 30 days; therefore, public comments should be submitted to OMB within 30 days in order to assure their maximum consideration. Comments should also be sent to the Bureau of Indian Affairs, Office of Trust Responsibilities, 1849 C Street, NW, MS–4513–MIB, Washington, DC 20240.

**Introduction and Summary**

Congress has given the Secretary of the Interior discretionary authority to acquire title to land to be held in trust by the United States for the benefit of Indian tribes and individual Indians. Acquiring such title is commonly referred to as "taking land into trust." General statutory authority giving the Secretary discretion to acquire trust title to land is found in Section 5 of the Indian Reorganization Act of 1934 (the IRA), 25 U.S.C. 465:

The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to land, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land to Indians.

Occasionally, Congress enacts other legislation granting the Secretary authority to take land into trust for some specific purpose. We refer to acquisitions of trust title under the IRA, and under other specialized statutes that grant discretionary authority to the Secretary, as "discretionary acquisitions of title."

The regulations proposed here would restructure how we review proposed discretionary acquisitions of title. We believe this restructuring will facilitate land-into-trust decisions which better reflect the modern-day needs and concerns of tribes, individual Indians, and surrounding non-Indian communities. Specifically, the proposed regulation sets forth an application process and review criteria which is more demanding when the land at issue is located outside the boundaries of an existing reservation or outside a Secretarially-approved Tribal Land Acquisition Area (collectively, "off-reservation acquisitions"), but which is less demanding when the land is located inside the boundaries of an existing reservation or inside a Secretarially-approved Tribal Land Acquisition Area (collectively, "on-reservation acquisitions"). In other words, the proposed regulations would make the application process easier for on-reservation acquisitions, while conversely requiring a more detailed analysis of a greater number of criteria for off-reservation acquisitions.

The purpose of creating these differing processes and criteria is two-fold. First, we intend to better carry out our responsibility to assist tribes in reestablishing ownership of, and jurisdiction over, land located within their own reservations. Second, we also intend to create a framework that adequately addresses the particular concerns that non-Indian governments have about the ramifications of placing off-reservation land into trust.

In addition, the proposed regulations delineate the procedure by which we process mandatory acquisitions of title. Mandatory acquisitions of title are trust acquisitions which Congress, by explicit statutory direction, requires the Secretary to accept through the administrative process. In other words, mandatory acquisitions are those which Congress has directed the Secretary to complete by removing any discretion in the administrative decision-making process. (Mandatory acquisitions of title are distinguishable from legislative transfers of title. Legislative transfers of title are those in which Congress directly places a parcel of land in trust, thereby removing the need for any administrative action to effectuate the transfer of title into trust status.)

Finally, the proposed regulations address the unique difficulties encountered by tribes which do not have reservations by including new provisions which set out a process by which those tribes may benefit from the on-reservation provisions of this regulation. In this process, a tribe without a reservation can designate a "Tribal Land Acquisition Area" in which it plans to acquire land. If the tribe obtains Secretarial approval of its Tribal Land Acquisition Area, the tribe will be able to apply to have title to the lands located within the Tribal Land Acquisition Area taken into trust under the on-reservations provisions of this regulation.

**Discretionary Acquisitions On-Reservation**

The General Allotment Act of 1887, 25 U.S.C. 331 et seq., authorized the division, and distribution to individuals, of lands located within the boundaries of most Indian reservations across the country. This allotment policy was based in part on the theory that fee ownership of land would improve the economic condition of Indians, which at the time was acknowledged to be very poor. Unfortunately, in practice the primary beneficiaries of the Allotment Act were land speculators who quickly acquired large portions of land within Indian reservations, often at prices well below market value. Institute for Government Research, The Problem of Indian Administration 460–462 (L. Meriam, ed.) (Johnson Reprint Corporation 1971) (1928) (Meriam Report).

Implementation of the Allotment Act resulted in the alienation of as much as 90 million acres of land originally reserved to tribes by treaties and Executive Orders. Felix S. Cohen, Handbook of Federal Indian Law 138 (Michie Company) (1982 ed.) (Cohen). The loss of these tribal lands was catastrophic and generally is regarded by historians and others as being responsible for a precipitous decline in the economic, cultural, social and physical health of tribes and their members. E.g., Charles F. Wilkinson, American Indians, Time and the Law 19–21 (Yale University Press 1987). To combat this downward spiral, in 1934 Congress passed the Indian Reorganization Act (IRA). Comment, Tribal Self-Government and Indian Reorganization Act of 1934, 70 Mich. L. Rev. 955, 960 (1972). One of the primary goals of the IRA was the restoration to tribal ownership of allotted land within existing reservations. See, Readjustment of Indian Affairs, Hearing before the Committee on Indian Affairs, 73d Cong. 2nd Sess. on H.R. 7902, at 16–1; Cohen, supra at 147. Although the IRA authorized appropriation to the Department of the Interior of two million dollars a year for land acquisition, since 1934 only $5.5 million has been appropriated by Congress for that purpose, all of it before 1950. Cohen at 150, note 51.

In the modern era tribes have taken full responsibility for rebuilding their reservation land bases, purchasing land from willing sellers and then applying to the Secretary to request that the land be taken into trust. Yet to date, less than eight percent of lands lost through allotment have been returned to tribal ownership. Cohen at 138. BIA's Annual Report for Indian Lands, 1996. Indeed, most applications requesting that we take land into trust have involved relatively small amounts of land. For example, in 1996 (the latest year for which data is available), the average amount of land involved in an application to take land in trust was about 30 acres. BIA's Annual Report for Indian Lands, 1996.

The proposed regulations are intended to promote the health and welfare of tribes and their members by better facilitating the restoration of on-reservation Indian lands into trust status. For example, the on-reservation provisions of the regulation provide that the tribe's stated need for the land will be accorded additional weight in recognition of the tribe's reasonable expectation that it benefit from the lands originally promised to it by treaty or Executive Order. For the same reason, because lands within reservation boundaries are subject to tribal governmental jurisdiction, the portion of the proposed rule governing on-reservation acquisitions does not specifically require submission of information concerning impacts on non-Indian communities, although State and local governments may comment on these impacts if they so desire. (In which case, the tribe will be given a copy of the comments and a reasonable amount of time in which to respond.)

**Discretionary Acquisitions Off-Reservation**

Congressional adoption of the land acquisition provisions of the IRA was based in part on Congress' understanding that the decimation of the tribal land base had resulted in substantial economic hardship for Indian tribes and their members. Hence, the regulations implementing the IRA anticipate the potential need for tribal trust land for economic development outside the boundaries of a reservation, particularly in situations in which a tribe's reservation is isolated or otherwise remote from centers of economic activity.

The acquisition of title by the United States in off-reservation circumstances can, however, have significant ramifications for local non-Indian communities. In particular, important jurisdictional matters (e.g., those involving law enforcement, land use planning, public education, and maintenance of utilities and roads) can become blurred. The effects of off-reservation acquisitions are in contrast to those caused by on-reservation acquisitions, as the effects of on-reservation acquisitions are just incremental additions to an already established set of circumstances, and not marked by the establishment of a new sovereign or jurisdictional presence.

For this reason, the proposed rule requires tribes wishing to take off-reservation land into trust to submit a substantial amount of information about how the proposed acquisition would impact the surrounding non-Indian community, and about how the tribe would address that impact. Requiring submission of this detailed information helps ensure that the concerns of local non-Indian governments are identified, reviewed and evaluated in our decision-making process.

Unlike the regulations currently in effect, the proposed regulations do not treat applications concerning land which is adjacent (contiguous) to a reservation as if the land were located on-reservation. Rather, applications concerning adjacent parcels are to be treated as off-reservation acquisitions, and will be subject to the same process and local non-Indian government consultation as are applications concerning other off-reservation lands. Of particular note is that we will require consultation with the state and local non-Indian governments in the state in which the adjacent land is located (even if the main body of the reservation lies across a state line).

The proposed regulation, however, would continue our policy (as articulated in the existing regulations) of giving greater weight to the tribe's need (vis-a-vis the objections of the local non-Indian community) the closer the land is to the tribe's reservation. Thus, the stated need for land adjacent to a reservation will be given greater weight in the context of the off-reservation criteria. In addition, tribal applicants wishing to conduct gaming on a parcel adjacent to land which has held reservation status since October 17, 1988 will continue to benefit from the "contiguity exception" mandated by Congress in the Indian Gaming Regulatory Act (IGRA) Section 20 requirements. (See 25 U.S.C. 2719(a)(1).)

The IRA land acquisition provisions authorize us to take off-reservation land into trust for the benefit of individual Indians. However, as a matter of general policy, we will approve applications from individual Indians for title to land located outside the boundaries of a reservation only under certain limited circumstances, in our discretion. For example, we will continue to accept title to interests in off-reservation land for the purpose of consolidating fractioned ownership of such land. Additionally, we will continue to accept title to lands purchased with funds obtained as the result of the voluntary sale of non-taxable Indian lands to any State, county, or municipality, or as the result of condemnation of such property by a State, county, or municipality, under 25 U.S.C. 409a.

*Off-Reservation Acquisitions and Indian Gaming*

If a tribe intends to use off-reservation land for gaming purposes, it must comply with the applicable requirements of Section 20 of the Indian Gaming Regulatory Act, 25 U.S.C. 2719 (IGRA) before gaming may occur on that land. In most cases, compliance with Section 20 of IGRA requires additional consultation with local non-Indian governments, a determination by the Secretary that the acquisition is "in the best interest of the tribe and not detrimental to the surrounding community," and a concurrence in that determination from the Governor of the State in which the land is located. Id.

If a tribe applies under these regulations to have title acquired in trust for a non-gaming purpose, and then at a later date decides that it would like to conduct gaming on that parcel, it will be authorized to engage in such gaming only if it complies with the requirements of Section 20 of IGRA. In other words, to game on a parcel of trust land acquired after October 17, 1988 (i.e., the date of passage of IGRA), the tribe must submit to the same Section 20 analysis and obtain the same gubernatorial consent as would have been required if the parcel were originally taken into trust for the purpose of gaming.

*Discretionary Acquisitions in Alaska*

Both the current and the proposed regulations bar the acquisition of trust title in land in Alaska, unless an application for such acquisition is presented by the Metlakatla Indian Community or one of its members. (The lands of the Metlakatla Indian Community comprise the only Native land in Alaska currently designated as a "reservation" by the federal government.) The regulatory bar to acquisition of title in trust in Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian Affairs ("Trust Land for the Natives of Venetie

and Arctic Village," September 15, 1978), which concluded that the Alaska Native Claims Settlement Act (ANCSA) precluded the Secretary from taking land into trust for Natives in Alaska (again, except for Metlakatla).

Although that opinion has not been withdrawn or overruled, we recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA (*see* relevant IRA provision at 25 U.S.C. 473a). *See also* the Petition of Chilkoot Indian Association, Native Village of Larsen Bay, and Kenaitze Indian Tribe, requesting the Department to undertake a rulemaking to remove the prohibition on taking land in trust in Alaska (60 FR 1956 (1995). However, even if it were held that the Secretary retained authority to take land in trust in Alaska, whether to exercise that authority remains in the sound discretion of the Secretary.

In recent years blue-ribbon commissions and working groups (such as the State of Alaska's Rural Governance Commission) have been formed to address various related issues concerning tribal governments and Native lands in Alaska and to address such issues in the wake of the decision in *Alaska* v. *Native Village of Venetie Tribal Government,* 522 U.S. 520, 118 S. Ct. 948 (1998). In that decision, the court held that former Native Corporation lands owned in fee simple by the Native Village of Venetie Tribal Government were not validly set apart for the use of Indians as such, nor were they under the superintendence of the federal government, and thus did not meet the definition of "dependent Indian communities." *Id.* At 955. Since the lands did not qualify as dependent Indian communities, they did not meet the definition of Indian country and the Native Village of Venetie Tribal Government was not authorized to tax non-members. Of course, if land were taken in trust by the Secretary, such trust land then would qualify as Indian country and an Alaskan tribe would have all the powers that pertain within Indian country. We invite comment on the continued validity of the Associate Solicitor's opinion and issues raised by the petition noticed at 60 FR 1956 (1995) in light of the Supreme Court's ruling in the *Venetie* case.

The proposed regulations would make no change in the current regulations and would continue the bar against taking Native land in Alaska in trust. However, that bar would be subject to review pending the report of the Rural Governance Commission, or

Congressional action clarifying that ANSCA lands are Indian country.

*Mandatory Acceptance of Title*

The implementation of specific statutes containing congressional mandates to acquire title to land in trust through our administrative process has not always been well-understood. To provide more clarity, the proposed rule includes new language that specifically identifies the types of acquisitions we consider "mandatory," and sets out the process by which we will acquire title.

The proposed regulation clarifies that an acquisition of title is "mandatory" if Congress has removed all discretion in determining whether to accept title to a particular tract of land. Situations in which all discretion has been removed include those situations in which Congress dictates that the Secretary "shall" acquire title to a parcel of land which is specifically identified by legal description, or to land which is purchased with certain, specified funds. In contrast, a statute which merely directs that the Secretary "shall" accept title to unidentified land within some broader geographic boundary, e.g. within certain named counties, still allows for some discretion. Hence we do not view acquisitions under such a statute as "mandatory" for the purposes of this regulation. By definition, mandatory acceptances of title rely on statutory authority which preempts the discretionary authority granted to the Secretary by the IRA. The Department will evaluate each statute on a case-by-case basis to determine whether it requires a mandatory acceptance of trust title.

The process for completing a mandatory acceptance of title is relatively simple. A tribe must submit an application that includes the identification of the federal statute which mandates the acquisition of title and include the same sort of title insurance information required for discretionary acquisition applications. Because of the mandatory character of such acquisitions, the regulation does not require compliance with the National Environmental Policy Act (NEPA). However, we strongly advise applicants, for their own protection, to conduct the same type of environmental assessment generally done under NEPA prior to acquisition of the property, or at least prior to submitting an application to have the property taken into trust.

As a final matter, we note the distinction between mandatory acquisitions where Congress directs the Secretary to complete the administrative process of accepting trust title, and

"legislative transfers of title," where Congress directly transfers land into trust status on behalf of tribes or individual Indians. In the latter type of title transfer, Congress has removed the need for any administrative action to effectuate the title transfer.

*Tribal Land Acquisition Areas for Tribes Without Reservations*

There are a few tribes which do not benefit from the basic rights and opportunities inherent in having a reservation. For the most part, these are tribes recently restored to federal recognition by a federal statute which does not specifically designate a reservation, or they are tribes that have obtained federal recognition through the administrative Federal Acknowledgment Process, which as a matter of course does not provide for the designation of a reservation.

Federal policy for many decades has viewed the existence of a tribal land base as integral to the cultural, political, and economic well-being of a tribe. For example, most federal programs for Indians are in one way or another tied to the tribal land base. Because of the overwhelming importance of the tribal land base, and because the new regulations make it less burdensome for tribes to take land into trust on (as opposed to off-) reservation, we are proposing in these regulations an alternative mechanism by which reservation-less tribes may benefit from the on-reservation acquisition provisions to create a homeland.

The alternative mechanism is the use of a "Tribal Land Acquisition Area." A Tribal Land Acquisition Area is a geographic boundary designated by a reservation-less tribe within which the tribe plans to acquire land within a specified period of time under the more lenient on-reservation provisions of the proposed rule. In other words, the Tribal Land Acquisition Area would create a geographic boundary within which individual parcels would be treated as on-reservation for the purposes of acquiring trust title under these regulations.

Because establishment of a Tribal Land Acquisition Area will affect local non-Indian governments, we will require that the concerns of local non-Indian governmental entities be addressed before the Secretary will approve the creation of the Tribal Land Acquisition Area boundaries. For that reason, an application for Secretarial approval of a Tribal Land Acquisition Area requires submission of information similar to that required in applications for off-reservation acquisitions. However, because we view the need for

AR00359

a homeland as fundamental, we will accord greater weight to the application of a reservation-less tribe, particularly in situations in which the tribe benefits from a federal statute directing the Secretary to acquire some land base for the tribe.

However, while off-reservation land located within a Tribal Land Acquisition Area may be treated as on-reservation land for acquisition purposes, such lands legally cannot be treated as on-reservation for the purposes of IGRA. In other words, title to land which is inside a Tribal Land Acquisition Area cannot be taken into trust for the purpose of gaming unless and until the requirements of section 20 of IGRA have been satisfied.

Part 151 of Title 25, Chapter I of the Code of Federal Regulations is proposed to be amended for the reasons set out below:

1. The authority for part 151 is revised to include the False Statements Accountability Act of 1996, 18 U.S.C. 1001.

2. Section 151.1 *Purpose and Scope*, is retitled as *What is the purpose of this part?*, and is reformatted and simplified.

3. Section 151.2 *Definitions*, is retitled as *How are key terms defined in this part?*, and is revised to update some of the definitions of terms used in this part and to include new terms used in this part. The definitions in this section apply only to this part.

4. Section 151.3 *Land acquisition policy*, has been deleted, although some of the substantive portions of the current § 151.3 have been incorporated into other parts of the proposed rule. A new § 151.3 is added entitled *To what types of transactions do these regulations apply?* The new § 151.3 incorporates some of the information that is in the current § 151.1.

5. Section 151.4 *Acquisitions in trust of lands owned in fee by an Indian*, is deleted because it is unnecessary given the rest of the proposed changes to this regulation. A new § 151.4 entitled *How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?* is added to explain how to apply to have land taken into trust.

6. Section 151.5 *Trust acquisitions in Oklahoma under Section 5 of the I.R.A.*, is deleted because it is unnecessary. A new § 151.5 entitled *How do we process the request?* is added to provide more clarity about how we review requests to take land into trust.

7. Section 151.6 *Exchanges* is deleted because it is no longer necessary given the other sections of the part. A new § 151.6, entitled *How do we*

proceed after making a decision on the request?* is added.

8. Section 151.7 *Acquisition of fractional interests*, is renumbered and retitled as § 151.8, *Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?*, is reformatted to include acquisitions of "undivided" interest under the Indian Land Consolidation Act, and is revised for clarity. "Undivided fractional" is substituted for the word "fractional" to clarify that the "fractional" interest being acquired is not a geographically separate parcel of land. A new § 151.7 is added, *When does land attain trust status?* to provide clarification as to how land technically attains trust status after we have decided to take it into trust.

9. Section 151.8 *Tribal consent for nonmember acquisitions* is renumbered and retitled as § 151.11 *Can an individual Indian or a tribe acquire land inside a reservation inside or an approved Tribal Land Acquisition Area of another tribe?* and is revised for clarity.

10. Section 151.9 *Requests for approval of acquisitions* is renumbered and retitled as § 151.4 *How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?* A new § 151.9, *What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?* is added.

11. Section 151.10 *On-reservation acquisitions*, is renumbered, retitled, and has been separated for clarity as § 151.5 *How do we process the application?*, § 151.9 *What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?*, and § 151.10, *What criteria will we use to evaluate requests involving land inside a reservation or inside an approved Tribal Land Acquisition Area?* The new § 151.10 is revised to establish a uniform, basic, nationwide, "minimum standard" set of criteria for the decision maker to consider in the evaluation of an application for an on-reservation trust acquisition. The requirement to furnish title evidence is transferred from the current § 151.13 to this section to incorporate title evidence as part of a complete application request.

12. Section 151.11 *Off-reservation acquisitions*, is renumbered, retitled, and has been separated for clarity as § 151.5 *How do we process a request?*, § 151.12 *What information must be provided in an application involving land outside a reservation and outside a Tribal Land Acquisition Area?*, and

§ 151.14 *What criteria will we use to evaluate a request involving land outside a reservation and outside a Tribal Land Acquisition Area?* The requirement to furnish title evidence is transferred from the current § 151.13 to this section to incorporate title evidence as part of a complete application request. In addition, a new § 151.11, *Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Indian Land Acquisition Area of another tribe?*, is added, replacing the current § 151.8.

13. Section 151.12 *Action on requests* has been separated for clarity and is included as part of § 151.6 *How do we proceed after making a decision on the request?* A new § 151.12, *What information must be provided in a request involving land outside a reservation and outside a Tribal Land Acquisition Area?*, is added.

14. Section 151.13 *Title examination*, is renumbered, reorganized, and revised for clarity. The requirement to furnish title evidence is transferred from this section and incorporated in the new §§ 151.9 and 151.12 as part of a complete application request. Section (b), governing situations in which the title to the land has any liens, encumbrances, or infirmities, has been integrated into § 151.6(c)(1). A new § 151.13, entitled *Can an individual Indian acquire land outside his or her own reservation?*, has been added to clarify the Secretary's policy regarding the acquisition of off-reservation lands by an individual Indian.

15. Section 151.14 *Formalization of acceptance* is renumbered and retitled as § 151.7 *When does the land attain trust status?* A new § 151.14, entitled *What criteria will we use to evaluate a request involving land outside a reservation or outside a Tribal Land Acquisition Area?*, is added to establish a uniform, basic, nationwide, "minimum standard" set of criteria for the decision maker to consider in the evaluation of an application for an off-reservation trust acquisition.

16. Section 151.15 *Information collection*, is renumbered and retitled as § 151.27 *Do information collections under this part have Office of Management and Budget approval?* Paragraph (a) is revised to include the new information collection requirements. A new § 151.15 entitled *What information must be provided in a request to process a mandatory transfer of title into trust status, and how will we process the request?* has been added to clarify the information needed to process mandatory acquisitions.

**17580**    Federal Register / Vol. 64, No. 69 / Monday, April 12, 1999 / Proposed Rules

17. A new § 151.16 entitled *Can our determination that a transfer of title into trust status is mandatory be appealed?* is added for clarity.

18. A new § 151.17 entitled *What is a Tribal Land Acquisition Area?* has been added to clarify how a Tribal Land Acquisition Area can be used by tribes without reservations to benefit from the on-reservation provisions of this regulation.

19. A new § 151.18 entitled *What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?* has been added to describe what information must be submitted in the request.

20. A new § 151.19 entitled *How is a tribal request for Secretarial approval processed?* is added to describe how we will process the request for Secretarial approval of the Tribal Acquisition Area.

21. A new § 151.20 entitled *What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?* has been added to set out the criteria the Secretary will use to evaluate a Tribal Land Acquisition Area.

22. A new § 151.21 entitled *Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?* is added for clarity.

23. A new § 151.22 entitled *If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?* is added for clarity.

24. A new § 151.23 entitled *If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?* is added for clarity.

25. A new § 151.24 entitled *Can a Tribal Land Acquisition Area be modified after approval?* has been added to state that a Tribal Land Acquisition Area can be modified after approval by submitting a request for Secretarial approval of the modifications in compliance with the criteria in this part.

26. A new § 151.25 entitled *What is the penalty for making false statements in connection with a request that we place land in trust?* has been added to notify applicants that they are subject to prosecution for knowingly and willfully making false statements on an application.

27. A new § 151.26 entitled *What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?* has been added to notify contracted or compacted tribes that documents created in the application process are permanent federal records.

28. A new § 151.27 entitled *Do information collections under this Part have Office of Management and Budget approval?* is added for clarity.

**Clarity of this regulation.**

Executive Order 12866 requires each agency to write regulations that are easy to understand. We invite your comments on how to make this rule easier to understand, including answers to questions such as the following: (1) Are the requirements in the rule clearly stated? (2) Does the rule contain technical language or jargon that interferes with its clarity? (3) Does the format of the rule (grouping and order of sections, use of questions as headings, paragraphing, etc.) aid or reduce its clarity? (4) Would the rule be easier to understand if it were divided into more (but shorter) sections? (A "section" appears in bold type and is preceded by the symbol "§" and a numbered heading; for example, § 151.1 What is the purpose of this part?) (5) Is the description of the rule in the Supplementary Information section of the preamble helpful in understanding the proposed rule? What else could we do to make the rule easier to understand?

**Regulatory Planning and Review (E.O. 12866)**

In accordance with the criteria in Executive Order 12866, this rule is not a significant regulatory action and is not subject to review by the Office of Management and Budget.

(a) The proposed amendments to this rule basically conform to the policies and practices that currently guide the Department's decision making on land into trust applications. Hence, we do not anticipate that this regulation will have a significant effect on the net amount of land taken into trust. The rule will not have an annual effect of $100 million or more on the economy. It will not adversely affect in a material way the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. This rule simply identifies a "minimum standard" of criteria and requirements to be considered in the exercise of the Secretary's discretion to place lands in trust for individual Indians and tribes.

Looking at the overall picture of how much land we have taken into trust historically, the annual number of requests to place lands in trust has been small. Based on the BIA's Annual Report of Indian Lands for 1996, only 35 States have Indian lands, four of which have fewer than 1,000 acres of Indian lands. The 1996 report indicated that there were 6,941 total applications involving 212,000 acres cumulatively,

i.e., the average amount of land involved in an application was only about 30 acres. Based on the annual caseload report for FY 1996, the total dollar amount Indians paid for acquisitions of land in trust is $19,420,303.81, less than 20% of $100 million. Some States and local governments may have a decrease in revenues derived from taxes. However, the loss in annual revenues for State and local jurisdictions will only be a fraction of the value of the land involved. Moreover, some tribes may choose to offset this loss by making payments in lieu of taxes, or supplying services to the local communities. In addition, the proposed rule would alter the final disposition of only a portion of the applications. Finally, any losses or gains to State or local tax rolls would be spread over several states. Thus, overall, the net changes in tax rolls due to this rule will be minimal, and will not significantly affect State or local governments.

(b) This rule will not create a serious inconsistency or otherwise interfere with an action taken or planned by another Federal agency. Actions taken by this rule will affect tribal or individual Indian land titles. The Department of the Interior, Bureau of Indian Affairs is the only governmental agency that makes the determination whether to take land into trust.

(c) This rule does not alter the budgetary effects or entitlement, grants, user fees, or loan programs or the rights or obligations of their recipients. This rule sets out the criteria and procedures the Secretary uses in determining whether to accept title of certain Indian lands to the United States, as trustee, for the benefit of an individual Indian or a tribe.

(d) This rule does not raise novel legal or policy issues. This rule is of an administrative, technical, and procedural nature. The land acquisition regulations have been in effect since 1980. We are proposing to amend them in order to clarify procedures and requirements.

**Regulatory Flexibility Act**

The Department of the Interior certifies that this regulation will not have a significant economic effect on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). A Regulatory Flexibility analysis is not required. See our initial analysis above item 1(a) under Regulatory Planning and Review. The effect on small entities will be minimal.

(a) It does not have an annual effect on the economy of $100 million or

AR00361

more. As stated above, the effect on the economy will be minimal.

(b) It does not result in a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. Actions taken by this rule will only affect title to tribal or individual Indian owned lands. While it may affect revenues collected by State or local jurisdictions, the effect as noted above, should be minimal.

(c) It does not result in significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises. As stated above, actions under this rule will only affect title to tribal or individual Indian owned lands. This rule is of an administrative, technical, and procedural nature.

## Small Business Regulatory Enforcement Fairness Act (SBREFA)

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. See the initial analysis above, item 1(a) under Regulatory Planning and Review. This rule:

(a) Does not have an annual effect on the economy of $100 million or more. An economic analysis is not required.

(b) Will not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. Actions under this rule will only affect title to tribal or individual Indian owned lands.

(c) Does not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises. Actions under this rule will only affect title to tribal or individual Indian owned lands.

## Unfunded Mandates Reform Act

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*):

(a) The rule will not significantly or uniquely affect small governments, or the private sector. A Small Government Agency Plan is not required. Additional expenses may be incurred by the requesting tribe or individual Indian to provide information to the Secretary. Tribes or an individual Indian provide information in order to receive a benefit.

(b) This rule will not produce a federal mandate of a $100 million or greater in any year. The overall effect of this rule will be negligible to the State,

local, or tribal governments or the private sector. See our analysis under Regulatory Planning and Review.

### Takings (E.O. 12630)

With respect to Executive Order 12630, the rule does not have significant takings implications. A takings implication assessment is not required because actions under this rule do not constitute a taking. Tribes or individual Indians are voluntarily transferring title to the United States for their own benefit.

### Federalism (E.O. 13083)

With respect to Executive Order 13083, the rule does not have significant federalism implications to warrant the preparation of a Federalism Assessment. The local tax base may be affected. However, this rule should not affect the relationship between State and Federal governments because actions in this rule apply only to a relatively small amount of land. Due to the loss of tax revenue, the relationship between the State and local governments with tribes and/or the Federal Government may be affected. However, because the loss of revenue is minimal and most of the land to be acquired will be within the boundaries of reservations where there is already a measure of tribal sovereignty, the effects are "insignificant" within the meaning of E. O. 13083. See the analysis under the Regulatory Planning and Review section.

### Civil Justice Reform (E.O. 12988)

With respect to Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3(b)(2) of the Order. This rule contains no drafting errors or ambiguity and is written to minimize litigation, provides clear standards, simplifies procedures, reduces burden, and is clearly written. These regulations do not preempt any statute. They do supersede the current land acquisition regulations and the current procedure for establishing Indian Land Consolidation Areas. They would not be retroactive with respect to any land already taken into trust, but would apply to pending applications.

### Paperwork Reduction Act

This regulation does require an information collection from ten or more parties and a submission under the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*). The information collection requirements in §§ 151.4; 151.9; 151.12, 151.15, 151.18, and 151.26 under 44 U.S.C. 3501 *et seq.* have been submitted

to the Office of Management and Budget for approval and assigned clearance number 1076–xxxx. This information is required from Indian tribes and individual Indians who wish to convey land into trust status.

The burden associated with these requests is presented in a table in the ADDRESSES section of the preamble, and public comments are requested on these collections.

### National Environmental Policy Act

This rule does not constitute a major Federal action significantly affecting the quality of the human environment. A detailed statement under the National Environmental Policy Act of 1969 is not required because this rule is of an administrative, technical, and procedural nature.

### Government-to-Government Relationship With Tribes

In accordance with the President's memorandum of May 14, 1998, "Consultation and Coordination with Indian Tribal Governments" (FR Vol. 63, No. 96, Pages 27655–27657) and 512 DM 2, we have evaluated any potential effects upon Federally recognized Indian tribes and have determined that there are no potential adverse effects. No action is taken under this rule unless a tribe or an individual Indian voluntarily requests that the United States place land in trust for their benefit. Tribes will be asked for comments prior to publication as a final regulation of this rule and their comments will be considered prior to publication.

### List of Subjects in 25 CFR Part 151

Indians—lands.

For the reasons set out in the preamble, we are proposing to revise Part 151 in Chapter I of Title 25, of the Code of Federal Regulations so that it will read as follows:

## PART 151—ACQUISITION OF TITLE TO LAND IN TRUST

**Subpart A—Purpose, Definitions, General**

Sec.
151.1   What is the purpose of this part?
151.2   How are key terms defined in this part?
151.3   To what types of transactions does this part apply?
151.4   How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?
151.5   How do we process a request?
151.6   How do we proceed after making a decision on a request?
151.7   When does the land attain trust status?

AR00362

**17582**    Federal Register / Vol. 64, No. 69 / Monday, April 12, 1999 / Proposed Rules

151.8  Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

**Subpart B—Discretionary Acquisitions of Title On-Reservation**

151.9  What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?
151.10  What criteria will we use to evaluate a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?
151.11  Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

**Subpart C—Mandatory Acceptance of Title Off-Reservation**

151.12  What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?
151.13  Can an individual Indian acquire land outside his or her own reservation?
151.14  What criteria will we use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

**Subpart D—Mandatory Acquisitions of Title**

151.15  What information must be provided in a request to process a mandatory transfer of title into trust status, and how will we process the request?
151.16  Can our determination that a transfer of title into trust status is mandatory be appealed?

**Subpart E—Tribal Land Acquisition Areas**

151.17  What is a Tribal Land Acquisition Area?
151.18  What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?
151.19  How is a tribal request for Secretarial approval processed?
151.20  What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?
151.21  Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?
151.22  If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?
151.23  If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?
151.24  Can a Tribal Land Acquisition Area be modified after approval?

**Subpart F—False Statements, Recordkeeping, Information Collection**

151.25  What is the penalty for making false statements in connection with a request that we place land in trust?
151.26  What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?
151.27  Do information collections under this part have Office of Management and Budget approval?

**AUTHORITY:** R.S. 161; 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended; 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 18 U.S.C. 1001; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 467, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d–10, 1466, 1495, and other authorizing acts.

**Subpart A—Purpose, Definitions, General**

**§ 151.1  What is the purpose of this part?**

The purpose of this part is to describe the authorities, policies, and procedures that we use to decide whether to accept title to land in the name of the United States to be held in trust for the benefit of an individual Indian or a tribe.

**§ 151.2  How are key terms defined in this part?**

*Alienation* means a conveyance or transfer of title to property.
*Bureau* means the Bureau of Indian Affairs within the Department of the Interior.
*Discretionary acquisitions of title* means those acquisitions of trust title which we are authorized, but are not required, to accept administratively.
*Encumbrance* means a limitation on the title of property, such as a claim, lien, easement, charge, or restriction of any kind.
*Fee simple land* means title to land is absolute and clear of any condition or restriction, and with unconditional power of disposition.
*Host tribe* means the tribe having jurisdiction over the land being acquired.
*Individual Indian* means a person who:
(1) Is a member of a federally recognized tribe; or
(2) Was physically residing on a federally recognized Indian reservation as of June 1, 1934, and is a descendant of an enrolled member of a federally recognized tribe; or
(3) Possesses a total of one-half degree or more Indian blood of a federally recognized tribe.
*Land* means real property or any title interest therein, as defined by the statute that authorizes the land acquisition.
*Legislative transfer of title* means the direct transfer of title to land into trust status for the benefit of an individual Indian or Indian tribe by Congress through legislation. The regulations in this part do not apply to legislative transfers of title.

*Mandatory acceptance of title* means a conveyance of trust title which Congress has required the Secretary to accept if certain specified conditions over which the Secretary has no control are met.
*Reservation* means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in the final tribal treaty, agreement, Executive Order, federal statute, Secretarial Order, or judicial determination, except that in the State of Oklahoma, "reservation" means that area of land constituting the former reservation of the tribe. "Former reservation" means lands that are within the jurisdictional area of an Oklahoma Indian tribe and that are within the boundaries of the last reservation established by treaty, Executive Orders, or Secretarial Orders.
*Restricted fee land* means land for which an individual Indian or a tribe holds fee simple title subject to limitations or restrictions against alienation or encumbrance as set forth in the title and/or by operation of law.
*Secretary* means the Secretary of the Interior or an authorized representative.
*Tribal Land Acquisition Area* means a geographic boundary designated by a tribe that does not have a reservation, within which the tribe plans to acquire land over a specified period of time.
*Tribe* means any Indian tribe, nation, band, pueblo, town, community, rancheria, colony, or other group of Indians, which is recognized by the Secretary as eligible for the special programs and services provided by the Bureau of Indian Affairs, and listed in the **Federal Register** under Pub. L. 103–454, Act of Nov. 2, 1994 (108 Stat. 4791; 25 U.S.C. 479a (1994)).
*Trust land* means land, or an interest therein, for which the United States holds fee title in trust for the benefit of an individual Indian or a tribe.
*Undivided fractional interest* means that the interest of co-owners is in the entire property and that such interest is indistinguishable. The interest has not been divided out from the whole parcel. (Example: If you own ¼ interest in 160 acres, you do not own 40 acres. You own ¼ of the whole 160 acres because your ¼ interest has not been divided out from the whole 160 acres.)
*We* means the Secretary of the Interior or an authorized representative.

**§ 151.3  To what types of transactions does this part apply?**

(a) Except as provided in paragraphs (b) and (c) of this section, this part

**17582**    Federal Register / Vol. 64, No. 69 / Monday, April 12, 1999 / Proposed Rules

151.8   Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

**Subpart B—Discretionary Acquisitions of Title On-Reservation**

151.9   What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?
151.10   What criteria will we use to evaluate a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?
151.11   Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

**Subpart C—Mandatory Acceptance of Title Off-Reservation**

151.12   What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?
151.13   Can an individual Indian acquire land outside his or her own reservation?
151.14   What criteria will we use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

**Subpart D—Mandatory Acquisitions of Title**

151.15   What information must be provided in a request to process a mandatory transfer of title into trust status, and how will we process the request?
151.16   Can our determination that a transfer of title into trust status is mandatory be appealed?

**Subpart E—Tribal Land Acquisition Areas**

151.17   What is a Tribal Land Acquisition Area?
151.18   What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?
151.19   How is a tribal request for Secretarial approval processed?
151.20   What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?
151.21   Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?
151.22   If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?
151.23   If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?
151.24   Can a Tribal Land Acquisition Area be modified after approval?

**Subpart F—False Statements, Recordkeeping, Information Collection**

151.25   What is the penalty for making false statements in connection with a request that we place land in trust?
151.26   What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?
151.27   Do information collections under this part have Office of Management and Budget approval?

**AUTHORITY:** R.S. 161: 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended; 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 18 U.S.C. 1001; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 467, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d–10, 1466, 1495, and other authorizing acts.

**Subpart A—Purpose, Definitions, General**

**§ 151.1   What is the purpose of this part?**

The purpose of this part is to describe the authorities, policies, and procedures that we use to decide whether to accept title to land in the name of the United States to be held in trust for the benefit of an individual Indian or a tribe.

**§ 151.2   How are key terms defined in this part?**

*Alienation* means a conveyance or transfer of title to property.

*Bureau* means the Bureau of Indian Affairs within the Department of the Interior.

*Discretionary acquisitions of title* means those acquisitions of trust title which we are authorized, but are not required, to accept administratively.

*Encumbrance* means a limitation on the title of property, such as a claim, lien, easement, charge, or restriction of any kind.

*Fee simple land* means title to land is absolute and clear of any condition or restriction, and with unconditional power of disposition.

*Host tribe* means the tribe having jurisdiction over the land being acquired.

*Individual Indian* means a person who:

(1) Is a member of a federally recognized tribe; or
(2) Was physically residing on a federally recognized Indian reservation as of June 1, 1934, and is a descendant of an enrolled member of a federally recognized tribe; or
(3) Possesses a total of one-half degree or more Indian blood of a federally recognized tribe.

*Land* means real property or any title interest therein, as defined by the statute that authorizes the land acquisition.

*Legislative transfer of title* means the direct transfer of title to land into trust status for the benefit of an individual Indian or Indian tribe by Congress through legislation. The regulations in this part do not apply to legislative transfers of title.

*Mandatory acceptance of title* means a conveyance of trust title which Congress has required the Secretary to accept if certain specified conditions over which the Secretary has no control are met.

*Reservation* means that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in the final tribal treaty, agreement, Executive Order, federal statute, Secretarial Order, or judicial determination, except that in the State of Oklahoma, "reservation" means that area of land constituting the former reservation of the tribe. "Former reservation" means lands that are within the jurisdictional area of an Oklahoma Indian tribe and that are within the boundaries of the last reservation established by treaty, Executive Orders, or Secretarial Orders.

*Restricted fee land* means land for which an individual Indian or a tribe holds fee simple title subject to limitations or restrictions against alienation or encumbrance as set forth in the title and/or by operation of law.

*Secretary* means the Secretary of the Interior or an authorized representative.

*Tribal Land Acquisition Area* means a geographic boundary designated by a tribe that does not have a reservation, within which the tribe plans to acquire land over a specified period of time.

*Tribe* means any Indian tribe, nation, band, pueblo, town, community, rancheria, colony, or other group of Indians, which is recognized by the Secretary as eligible for the special programs and services provided by the Bureau of Indian Affairs, and listed in the Federal Register under Pub. L. 103–454, Act of Nov. 2, 1994 (108 Stat. 4791; 25 U.S.C. 479a (1994)).

*Trust land* means land, or an interest therein, for which the United States holds fee title in trust for the benefit of an individual Indian or a tribe.

*Undivided fractional interest* means that the interest of co-owners is in the entire property and that such interest is indistinguishable. The interest has not been divided out from the whole parcel. (Example: If you own ¼ interest in 160 acres, you do not own 40 acres. You own ¼ of the whole 160 acres because your ¼ interest has not been divided out from the whole 160 acres.)

*We* means the Secretary of the Interior or an authorized representative.

**§ 151.3   To what types of transactions does this part apply?**

(a) Except as provided in paragraphs (b) and (c) of this section, this part

AR00364

Federal Register / Vol. 64, No. 69 / Monday, April 12, 1999 / Proposed Rules    17583

applies to all fee simple land-to-trust, restricted fee land-to-trust, trust-to-trust, and land exchange transactions.

(b) This part does not apply to the following transactions:

(1) Fee to restricted fee or restricted fee to restricted fee;

(2) The transfer of title of trust land through inheritance or escheat; or

(3) The Legislative transfer of title into trust status.

(c) We will not accept title to land in trust in the State of Alaska, except for the Metlakatla Indian Community of the Annette Island Reserve of Alaska or its members.

## § 151.4  How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?

Individual Indians and tribes must send us a written request asking that we accept title and place the land into trust.

(a) The request must:

(1) Identify the applicant (including the applicant's tribal affiliation);

(2) Include the legal description of the land to be acquired; and

(3) Include all information which shows that the proposed acquisition meets the applicable requirements in this section.

(b) The request does not need to be in any special form. However, we strongly urge the applicant to address each section of this part that is relevant to the type of acquisition (e.g., on- or off-reservation, discretionary or mandatory), in the order it appears here. Constructing the request in this way will enable us to review the request more efficiently.

(c) We may also ask for additional information to aid us in reaching a decision.

## § 151.5  How do we process the request?

(a) After we receive the request, we will notify the State, county, and municipal governments having regulatory jurisdiction over the land. We will send all notices under this section by certified mail, return receipt requested. The notice will contain the information described in paragraph (a)(1) or (a)(2) of this section, as appropriate.

(1) If the request is for on-reservation lands or lands inside an approved Tribal Land Acquisition Area, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) State the proposed use of the land; and

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 30 days on the proposed acquisition.

(2) If the request is for land outside a reservation and outside a Tribal Land Acquisition Area, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) Describe the proposed use of the land; and

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 60 days on the acquisition's potential effects on the State and local governments, including on their regulatory jurisdiction, real property taxes, and special assessments.

(b) After the comment period has ended, we will send to the applicant copies of any comments made by State or local governments on the applicant's request. We will give the applicant a reasonable time in which to reply to the comments.

(c) Subject to restrictions on disclosure required by the Freedom of Information Act (5 U.S.C. 552), the Privacy Act (5 U.S.C. 552a), and the Trade Secrets Act (18 U.S.C. 1905) the request will be available for review at the local BIA agency or area office having administrative jurisdiction over the land.

(d) We will consider all the documentation that the applicant submits.

## § 151.6  How do we proceed after making a decision on the request?

(a) We will send the applicant a certified letter describing our decision to accept or deny a request. We will also send a copy of the decision letter to everyone (including State and local governments) who sent us written comments on the request. The notice to interested parties will explain that they have a right to appeal our decision under part 2 of this title.

(b) If our decision is to deny the request, we will take no further action.

(c) If our decision is to approve the request, after the exhaustion of administrative remedies we will:

(1) Complete a preliminary title examination. For both discretionary and mandatory acquisitions, after we examine the title evidence, we will notify the applicant of any liens, encumbrances, or infirmities. If the liens, encumbrances, or infirmities make title to the land unmarketable, we will require the applicant to eliminate the liens, encumbrances, or infirmities before we act on the application.

(2) Publish in the Federal Register, or in a newspaper of general circulation serving the affected area, a notice of the decision to take land into trust under this part. The notice will state that we have made a final decision to take land in trust and that we will accept title in the name of the United States no sooner than 30 days after the notice is published;

(3) Act on any judicial appeals that may be filed; and

(4) After the exhaustion of judicial remedies, accept trust title to the land by issuing or approving an appropriate instrument of conveyance.

## § 151.7  When does land attain trust status?

After the Secretary has published notice of intent to take the land into trust pursuant to § 151.6 (c)(2), the time period for appeal has run, all appeals rights have been exhausted, and all title objections have been cleared, we will approve or issue the appropriate instrument of conveyance. Only after these steps have been completed will the land attain trust status. The approved deed will then be recorded in the county where located, title evidence will be updated, a final title opinion will be issued and the deed will be recorded in the appropriate Bureau of Indian Affairs title plant under part 150 of this chapter.

## § 151.8  Will we accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

We will not accept and hold in trust for an individual Indian or a tribe an undivided fractional interest in land, except under one of the following conditions:

(a) The individual Indian or tribe already owns an undivided fractional restricted or trust interest in the land, and is acquiring the additional interest(s) to consolidate ownership.

(b) The individual Indian or tribe acquires the undivided fractional interest as the result of a gift under § 152.25(d) of this chapter and the conveyance does not result in further fractionation of interest in the land.

(c) The individual Indian or tribe is acquiring interest in fee and there are existing undivided fractional trust or restricted interests in the same land.

(d) The individual Indian or tribe offers and agrees to purchase the remaining undivided fractional trust or restricted interest in the land, at not less than fair market value.

(e) A specific statute grants the individual Indian or tribe the right to purchase an undivided fractional interest in trust or restricted land without offering to purchase all interests.

(f) A majority of the owners of the remaining undivided trust or restricted fractional interest agree in writing that the individual Indian or tribe may acquire the interest.

(g) Under the Indian Land Consolidation Act, 25 U.S.C. 2201 *et seq.*, a tribe may acquire an undivided fractional interest in trust or restricted land under these conditions:

(1) The land is inside the tribe's reservation, or inside an approved Tribal Land Consolidation Area, or is otherwise subject to the tribe's jurisdiction, and

(2) The tribe acquires the land:

(i) At not less than the fair market value; and

(ii) With the written consent of a majority of the owners of the remaining undivided fractional trust or restricted interest of this land.

(h) The tribe acquires, at not less than the fair market value, part or all of the undivided fractional interests in a parcel of trust or restricted land within the tribe's reservation, or subject to the tribe's jurisdiction and:

(1) Over 50 percent of the owners of the undivided fractional interests consent in writing to the acquisition; or

(2) An individual Indian makes an offer under paragraph (e) of this section.

(i) An individual Indian:

(1) Already owns an undivided fractional interest in the land;

(2) Offers to match a tribal offer to purchase under paragraph (d) of this section; and

(3) Has used and possessed the land for at least 3 years preceding the tribe's offer to purchase.

## Subpart Part B—Discretionary Acquisitions of Title On-Reservation

### § 151.9  What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land inside a reservation boundary or to land inside an approved Tribal Land Acquisition Area must include:

(a) A complete description, or a copy, of the federal statute that authorizes the United States to accept the land in trust and any limitations contained in the authority.

(b) An explanation of why the individual Indian or tribe needs land to be in trust and how the land will be used. This explanation is a crucial factor in determining if the request should be approved.

(c) If the applicant is a tribe, an explanation of whether the tribe:

(1) Already owns an undivided fractional trust or restricted interest in the land; and

(2) Maintains jurisdiction over the land.

(d) If the applicant is an individual Indian, an explanation of:

(1) Whether the applicant already owns an undivided fractional trust or restricted interest in the land;

(2) The amount of land that the applicant already owns and the status of the land (fee, restricted, or trust); and

(3) Whether the applicant needs assistance in handling real estate affairs. For example, tell us if the applicant is a minor or has been declared legally incompetent.

(e) Title insurance or an abstract of title that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States*, issued by the U. S. Department of Justice.

(f) Documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, see the Department of Interior, Bureau of Indian Affairs web site at: <http://www.doi.gov/bureau-indian-affairs.html>.) Include a record of consultation with appropriate authorities regarding environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

### § 151.10  What criteria will we use to evaluate requests involving land inside a reservation or inside an approved Tribal Land Acquisition Area?

We will review all information submitted under § 151.9. We may decide to accept trust title to the land if the acquisition meets all of the following criteria:

(a) We determine that the conveyance is necessary to facilitate tribal self-determination, economic development, Indian housing, or land consolidation;

(b) There is legal authority that authorizes us to accept the land in trust;

(c) The request is complete (including all supporting documents);

(d) The request will benefit the economic and/or social condition of the applicant;

(e) There is title insurance or an abstract of title that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States*, issued by the U. S. Department of Justice;

(f) There is information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations, including, a record of coordination with agencies having jurisdiction over cultural, historic, or natural resources; and

(g) We determine after mitigation of effects on the environment, cultural resources, historic resources, and endangered or threatened species, that the conveyance is consistent with applicable environmental, cultural, historic, or natural resources law.

### § 151.11  Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

An individual Indian or a tribe, including individual Indians and tribes in Oklahoma, may acquire land in trust on another tribe's reservation, or inside another tribe's approved Tribal Land Acquisition Area, if the host tribe's governing body consents in writing. No consent is required if:

(a) An individual Indian or tribe already owns an undivided fractional trust or restricted interest in the parcel of land to be acquired; or

(b) The proposed acquisition is inside a reservation or an approved Tribal Land Acquisition Area that is shared by two or more tribes, and the acquisition is for one of these tribes, or one of these tribes' members.

## Subpart C—Discretionary Acquisitions Off-Reservation

### § 151.12  What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land outside a reservation boundary and outside an approved Tribal Land Acquisition Area, must include:

(a) A complete description, or a copy of, the statutory authority that authorizes the United States to accept land in trust and any limitations contained in the authority;

(b) An explanation of the need of the individual Indian or tribe for land in trust and how the land will be used. This explanation is a crucial factor in determining if the request should be approved. The request must explain:

(1) Why the present land base is not appropriate for the activity contemplated in the request;

(2) Why the applicant needs the land in trust for the proposed use; and

(3) How trust status will benefit the applicant's economic and/or social conditions.

(c) A description of how the applicant will use the land. This description must include an explanation of:

(1) The past uses of the land;

(2) The present use of the land;

(3) The anticipated future uses of the land;

(4) The cultural or historical interest in the land;

(5) The objectives that the individual Indian or tribe hopes to attain; and

(6) If the acquisition is for housing:

(i) The projected number of units to be built; and

(ii) The number of members who will benefit.

(7) If the applicant is acquiring the land for business purposes, the tribe must provide a business plan that specifies the anticipated economic benefits of the proposed use.

(d) A description of the following:

(1) The location of the land relative to State boundaries;

(2) The distance of the land from the boundaries of the tribe's reservation;

(3) The distance of the land from the Bureau's agency or area office;

(4) The location of roads and rights-of-way that provide access to the land; and

(5) The location of land in relation to the tribe's other trust lands.

(e) A description of the effect on the State and its political subdivisions of removing the land from tax rolls. Describe any measures the applicant will take to reduce these effects. The description of effects must include an explanation of:

(1) The amount of annual taxes currently assessed by the local governments;

(2) The amount of annual revenue lost from special assessments to the local governments, if any;

(3) The amount of annual revenue lost from mineral receipts to the local governments, if any; and

(4) The local governments' ability to provide public safety services for the land.

(f) A description of any jurisdictional and land use infrastructure issues that might arise. The description must address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land;

(ii) Any proposed use conflicts with current zoning; and

(iii) Any tribal zoning ordinances.

(2) Law enforcement and cross-deputization, including:

(i) Who currently provides law enforcement services for the land;

(ii) Whether the tribe already has its own law enforcement;

(iii) Who will supply law enforcement if the land is approved for trust status; and

(iv) Any additional resources required to provide adequate law enforcement and how they will be funded.

(3) Safety factors, including:

(i) Who supplies fire protection service for the land;

(ii) Who supplies emergency medical service for the land; and

(iii) If the land is in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) Access to the land;

(ii) A description and quantification of anticipated increased traffic in the area from proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) The land is on a city sewage system;

(ii) The land is served by an adequate sewage system that meets applicable standards;

(iii) Trash pickup service or another method of trash disposal is available for the land;

(iv) The city or another facility supplies services to the land;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

(vi) Whether the tribe has water rights to the available water supply.

(6) Utilities, including:

(i) Whether a city or a rural electric company supplies electricity to the land; and

(ii) The source of heating for the land, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there are any cooperative agreements or voluntary actions intended to address jurisdictional and land use conflicts.

(8) Whether the tribe has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

(g) Whether there is title evidence that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U. S. Department of Justice. The evidence will be examined to determine if the applicant has marketable title.

(h) The documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, see the Bureau of Indian Affairs web site at: <http:// www.doi.gov/bureau-indian-affairs.html>.) Include a record of consultation with appropriate authorities regarding environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

(i) If the request is for an individual Indian, documentation demonstrating that the applicant's request meets one of the criteria described in § 151.13.

### § 151.13    Can an individual Indian acquire land outside his or her own reservation?

Except as provided in paragraphs (a) and (b) of this section, we will not accept title to land in trust outside an individual Indian's reservation. We may approve acquisitions of land outside an individual Indian's reservation if:

(a) The individual Indian already owns an undivided fractional trust or restricted interest in the property being acquired; or

(b) The individual Indian has sold trust or restricted interest in land and the money received from the sale is reinvested in other land selected and purchased with these funds, or the individual Indian is purchasing land with funds obtained as a result of a sale of trust or restricted land under 25 U.S.C. 409a.

### § 151.14    What criteria will we use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

We will review all information submitted under section § 151.12. We may decide to place the land in trust if we determine that the application meets all of the following criteria:

(a) We determine that the conveyance is necessary to facilitate tribal self-determination, economic development, Indian housing, or land consolidation;

(b) There is legal authority that authorizes us to accept land in trust;

(c) The request is complete (including all supporting documents);

(d) The acquisition will benefit the tribe's economic and/or social conditions;

(e) There is title evidence that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U. S Department of Justice;

(f) There is information sufficient for compliance with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing

Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations: a record of coordination with agencies having jurisdiction over cultural, historic, and natural resources;

(g) We determine after mitigation of impacts on the environment, cultural resources, historic resources, and endangered or threatened species, that the conveyance is consistent with applicable environmental, cultural and historic resources law, and the Endangered Species Act;

(h) We determine that any adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant from taking the land in trust;

(i) The Bureau of Indian Affairs is equipped to handle the additional responsibilities of this acquisition and has sufficient staff to perform inspections for rights-of-way, leasing, soil conservation, and oil and gas exploration, or any other responsibilities resulting from the acquisition of the land in trust status; and

(j) The location of the land relative to State boundaries, and its distance from the boundaries of the tribe's reservation, is reasonable based in part on the following:

(1) If the land is in a different state than the tribe's reservation, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny.

(2) As the distance between the tribe's reservation or approved Tribal Land Acquisition area and the land to be acquired increases, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny.

(3) As the distance between the tribe's reservation or approved Tribal Land Acquisition Area and the land to be acquired increases, the concerns raised by the state and local governments will be given greater weight.

## Subpart D—Mandatory Acceptance of Title

**§ 151.15   What information must be provided in a request to process a mandatory transfer of title into trust status, and how will we process the request?**

(a) To help us determine whether we are mandated by legislation to accept trust title to a specific tract of land, we require submission of the following documentation:

(1) A complete description, or a copy of, the statutory authority that directs the United States to place the land in trust, and any limitations contained in that authority;

(2) Title insurance or an abstract of title that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U.S. Department of Justice; and

(3) Any additional information that we may request.

(b) If we determine that the transfer of title into trust status is mandatory, we will publish that determination and a notice of intent to take the land in trust in the **Federal Register.**

**§ 151.16   Can our determination that a transfer of title into trust status is mandatory be appealed?**

The Department's determination that a transfer of title into trust status is "mandatory" may be appealed according to requirements set forth in part 2 of this title.

## Subpart E—Tribal Land Acquisition Areas

**§ 151.17   What is a Tribal Land Acquisition Area?**

A Tribal Land Acquisition Area is a geographic boundary designated by a reservation-less tribe within which the tribe plans to acquire land within a 10-year period. If the Secretary approves the Tribal Land Acquisition Area under this part, the reservation-less tribe can acquire parcels of land within the Tribal Land Acquisition Area during that 10-year period under the on-reservation provisions of this part.

**§ 151.18   What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?**

A request for Secretarial approval of a Tribal Land Acquisition Area must be made in writing, although we do not require that it take any special form. However, we strongly urge the applicant to address each applicable section of this part in the order it appears here. Constructing the application in this way will help us review the request more efficiently. To be complete, a request for Secretarial approval of a Tribal Land Acquisition Area must identify the applicant tribe, and must include:

(a) A complete description, or a copy, of the federal statute(s) that authorize the United States to accept land in trust on behalf of the tribe, and any limitations contained in that authority.

(b) Copies of tribal documents relating to the establishment of the Tribal Land Acquisition Area and the acquisition of land within it, including:

(1) A copy of the tribe's constitution and by-laws, corporate charter, resolution, or excerpts from those documents that identify and grant tribal

officials the authority to acquire tribal lands on behalf of the tribe;

(2) A copy of a tribal resolution designating the Tribal Land Acquisition Area, including a legal description of the lands located within it; and

(3) A copy of a tribal resolution requesting that the Secretary approve the proposed Tribal Land Acquisition Area.

(c) A narrative summary that describes the purposes and goals for acquiring lands in trust within the Tribal Land Acquisition Area, including general information about whether the lands are to be used for residential, governmental, educational, economic development, or other purposes.

(d) A narrative of the tribe's history that explains:

(1) When the tribe was federally recognized, and whether it was through legislation, treaty, or the Bureau of Indian Affairs' Federal Acknowledgment Process; and

(2) If applicable, how the tribe became dispossessed of its former reservation lands.

(e) A description of the Tribal Land Acquisition Area, including:

(1) A legal description of the lands within the Tribal Land Acquisition Area;

(2) Information about whether the lands are within the tribe's former reservation or aboriginal homelands;

(3) Information about whether the lands are Federal lands, State lands, or private lands;

(4) Information about whether the lands overlap with another tribe's jurisdictional area;

(5) Information about the significance of the land to the tribe, including whether the land has any particular historical, cultural, religious, or other value to the tribe; and

(6) Information about the distance of the Tribal Land Acquisition Area from the Bureau's nearest agency or area office.

(f) A description of the location of roads and rights-of-way, or of additional rights-of-way that may be needed to provide access to lands located within the Tribal Land Acquisition Area.

(g) A description of the reasonably anticipated overall effect on the State and its political subdivisions of removing lands located within the Tribal Land Acquisition Area from tax rolls, and a description of any measures the applicant will take to reduce these effects. The description of effects must include an explanation of:

(1) The amount of annual taxes currently assessed by the local governments for lands located within the Tribal Land Acquisition Area;

**17588** Federal Register / Vol. 64, No. 69 / Monday, April 12, 1999 / Proposed Rules

has established a strong cultural, historical, and/or legal connection.

(e) The ability of the tribe and the local non-Indian community to adjust to the jurisdictional changes that will occur if the lands within the Tribal Land Consolidation Area are taken into trust, including:

(1) That there are adequate arrangements for provision of police and fire protecion and other emergency response for persons living within the Tribal Land Consolidation Area (whether living on trust or non-trust property);

(2) That there are adequate arrangements for provision of other municipal-type services, such as garbage removal, water, sewage;

(3) That adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant.

**§ 151.21  Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?**

A tribe may include land inside the reservation boundaries or within an approved Tribal Land Acquisition Area of another tribe, if:

(a) The host tribe's governing body consents in writing;

(b) The tribe already owns undivided fractional trust or restricted interests in the tracts of land identified in its Tribal Land Acquisition Area; or

(c) The tracts of land to be included in the plan are inside a reservation or an approved Tribal Land Acquisition area that is shared by two or more tribes, and the plan is for one of these tribes.

**§ 151.22  If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?**

No. However, the tribe will have to apply to have individual parcels taken into trust under the off-reservation provisions of this part.

**§ 151.23  If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?**

No. Lands taken into trust within a Tribal Land Acquisiton Area will enjoy "Indian country" status as that term has been defined in relevant federal statutes and caselaw. However, those lands do not attain "reservation" status by virtue of the Tribal Land Acquisition Area having been approved by the Secretary. Reservation status can only be attained if:

(a) The tribe has applied to the Secretary under 12 U.S.C. 467; or

(b) There is a specific federal statute designating the land as a reservation.

**§ 151.24  Can a Tribal Land Acquisition Area be modified after approval?**

Yes. However, the changes must be submitted with a request for approval in compliance with the criteria in this part and must be approved by the Secretary.

**Subpart F—False Statements, Recordkeeping, Information Collection**

**§ 151.25  What is the penalty for making false statements in connection with a request that we place land into trust?**

Anyone who knowingly and willfully makes a false statement in connection with a trust title acquisition request may be subject to criminal prosecution under the False Statements Accountability Act of 1996, 18 U.S.C. 1001.

**§ 151.26  What recordkeeping and reporting requirements apply to acquisitions of trust title under this part?**

(a) Each document that we hold or that is created in the development of a request asking for land to be placed in trust is a permanent federal case file record. The Bureau of Indian Affairs file will maintain each of the documents in accordance with National Archives and Records Administration requirements.

(b) The Secretary will negotiate with Indian tribes and tribal organizations compacting and contracting under Title I or Title IV of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. 250 et seq., to ensure that such tribes and tribal organizations also maintain each document in a case file in accordance with National Archives and Records Administration rules and requirements, and to ensure that they follow all Bureau reporting requirements concerning this part.

**§ 151.27  Do information collections under this part have Office of Management and Budget approval?**

(a) The information collection requirements contained in §§ 151.4; 151.9; 151.12; 151.15, 151.18, and 151.26 have been approved by the Office of Management and Budget under 44 U.S.C. 3501 et seq. and assigned clearance number 1076-xxxx. It is a requirement of the Paperwork Reduction Act that each respondent to any information collection be notified that an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a current valid OMB control number pursuant to 35 U.S.C. 3506(c)(B)(V); 44 CFR 1320 8(b)(3)(vii). Indian tribes and individuals must submit the information required under these sections to acquire land into trust. We will use the information in making a determination on an application to

take land into trust. The applicant must respond to this request to obtain a benefit.

(b) Public reporting for on-reservation information collection is estimated to average 4 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collected. Public reporting for off-reservation information collection is estimated to average 8 hours per response, including the time for reviewing instructions, gathering and maintaining data, and completing and reviewing the information collected. Comments regarding the burden estimate or any other aspect of this information collection should be sent to the Bureau of Indian Affairs, Information Collection Clearance Officer, 1849 C Street, NW, Washington, DC 20240; and Attention: Desk Officer, for the Department of the Interior, Office of Information and Regulatory Affairs [OMB Control Number 1076-xxxx], Office of Management and Budget, Docket Library, Room 10102, 725 17th Street, NW, Washington, DC 20502.

Dated: April 2, 1999.

**Kevin Gover,**
*Assistant Secretary—Indian Affairs.*
[FR Doc. 99–8851 Filed 4–9–99; 8:45 am]
BILLING CODE 4310–02–P

**DEPARTMENT OF THE TREASURY**

**Bureau of Alcohol, Tobacco and Firearms**

**27 CFR Parts 4, 5 and 7**

**[Notice No. 873; Re: Notice No. 872]**

**RIN 1512–AB89**

**Prohibition of Certain Alcohol Beverage Containers and Standards of Fill for Distilled Spirits and Wine (98R–452P)**

**AGENCY:** Bureau of Alcohol, Tobacco and Firearms (ATF), Department of the Treasury.

**ACTION:** Proposed rule; extension of comment period.

**SUMMARY:** This notice extends the comment period for Notice No. 872, a notice of proposed rulemaking, published in the **Federal Register** on February 9, 1999. ATF has received a request to extend the comment period in order to provide sufficient time for all interested parties to respond to the issues raised in the notice.

**DATES:** Written comments must be received on or before May 10, 1999.

(2) The amount of annual revenue which would be lost from special assessments to the local governments, if any;

(3) The amount of annual revenue lost from mineral receipts to the local governments, if any; and

(4) The local governments' ability to provide public safety services for lands located within the Tribal Land Acquisition Area.

(h) A description of any overall jurisdictional and land use infrastructure issues that might arise if the lands within the Tribal Land Acquisition Area is taken into trust. The description must address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land;

(ii) Any proposed use conflicts with current zoning; and

(iii) Applicable tribal zoning ordinances.

(2) Law enforcement and cross-deputization, including:

(i) Who currently provides law enforcement services for the land;

(ii) Whether the tribe already has its own law enforcement;

(iii) Who will supply law enforcement if the land is approved for trust status; and

(iv) Whether additional resources would be needed to provide adequate law enforcement.

(3) Safety factors, including:

(i) Who supplies fire protection service for lands located within the Tribal Land Acquisition Area;

(ii) Who supplies emergency medical service for lands located within the Tribal Land Acquisition Area; and

(iii) Information about whether lands located within the Tribal Land Acquisition Area are in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) A description of current access to the land;

(ii) A description and quantification of anticipated increased traffic in the area from proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) The lands located within the Tribal Land Acquisition Area are on a city sewage system;

(ii) The lands located within the Tribal Land Acquisition Area are served by an adequate sewage system that meets applicable standards;

(iii) Trash pickup service or another method of trash disposal is available for lands located within the Tribal Land Acquisition Area;

(iv) The city or another facility supplies sanitation services to the lands located within the Tribe Land Acquisition Area;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

(vi) Whether the tribe has water rights to the available water supply.

(6) Utilities, including:

(i) Whether a city or a rural electric company supplies electricity to lands located within the Tribal Land Acquisition Area; and

(ii) The source of heating for lands located within the Tribal Land Acquisition Area, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there exist any cooperative agreements or voluntary actions intended to address jurisdictional and land use conflicts.

(8) Whether the tribe has made any provisions to compensate the State and local governments for revenue lost because of the removal of the lands from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

§ 151.19   How is a tribal request for Secretarial approval processed?

When we receive a request for Secretarial approval of a Tribal Land Acquisition Area, we will review the supporting documentation to determine if the request meets the requirements of this part. If the request is complete, we will:

(a) Provide notice of the request for Secretarial approval to the Governor's Office, to appropriate local government officials, and to appropriate officials of tribes located within a 50-mile radius of the boundaries of the proposed Tribal Land Acquisition Area. Recipients of the notice will be provided 60 days from the date of receipt in which to comment on the proposed Tribal Land Acquisition Area and the request supporting it. Other interested parties may also submit comments during the 60-day consultation period.

(b) After the close of the consultation period, based on the criteria described in § 151.21, we will decide whether to approve the Tribal Land Acquisition Area. Our decision on whether to approve the Tribal Land Acquisition Area will be communicated in the form of a certified letter to the applicant. We also will provide notice of our decision to interested parties by sending a copy of the decision letter to everyone (including State and local governments) who sent us written comments on the request for approval.

(c) If we decide not to approve the Tribal Land Acquisition Area, we will take no further action.

(d) If we decide to approve the Tribal Land Acquisition Area, we will:

(1) Publish in the Federal Register, or in a newspaper of general circulation serving the affected area, a notice of the decision to approve the Tribal Land Acquisition Area; and

(2) Thereafter review requests to accept trust title land located within the Tribal Land Acquisition Area as "on-reservation" acquisitions under the applicable on-reservation provisions in this part.

§ 151.20   What criteria will we use to decide whether to approve a proposed Tribal Land Acquisition Area?

In general, because tribes without reservations are significantly disadvantaged, both in terms of cultural preservation and in terms of being ineligible for federal land-based programmatic funding and technical assistance, there is a presumption in favor of the tribe's need for at least some trust land. However, in determining whether to approve establishment of a Tribal Land Acquisition Area, we will consider the individual circumstances of each applicant tribe, surrounding community, and affected land base. There are some standard criteria which will help direct our decision-making process. These standard criteria include:

(a) The request must be complete and contain all supporting documents;

(b) The statutory basis upon which the tribe proposes creation of the Tribal Land Acquisition Area; if the tribe is the subject of a statute directing the Secretary to take some unspecified land into trust for the tribe's benefit the tribe will enjoy a greater presumption in favor of approval of its proposed Tribal Land Acquisition Area. (For example, there is statutory language such as "the Secretary shall take land into trust within the tribe's service area," or "the Secretary shall take land into trust within X and Y counties.")

(c) The size of the proposed Tribal Land Acquisition Area in relation to the size of the tribe's membership: we will look for a reasonable connection between the amount of land the tribe wishes to take into trust, and the basic trust needs (housing, health, employment opportunities) of the tribe's membership.

(d) The relationship of the tribe to the lands located within the Tribal Land Acquisition Area: we will give greater weight to a request for approval of a Tribal Land Acquisition Area that encompasses lands to which the tribe



# United States Department of the Interior

OFFICE OF THE SECRETARY
1689 C Street, Suite 100
ANCHORAGE, ALASKA 99501-5151



## TELEFAX TRANSMITTAL

REC
MAY 10 1999
REG. SOLICITOR

**Date:  5/10/99**          **No. Pages:  3**

|  | | **Phone Number** | **Telefax Number** |
|---|---|---|---|
| **To:** | **Lauri Adams** | (907) 271-4131 | (907) 271-4143   SD 063 |
|  | **Niles Cesar** | (907) 586-7177 | (907) 586-7252 SD 025 |
| **Attn:** | **Glenda Miller** | (907) 586-7403 | (907) 586-7104 SD 177 |
| **From:** | **Marilyn Heiman**<br>Special Assistant to the Secretary<br>for Alaska | (907) 271-5485 | (907) 271-4102 |

Lauri and Glenda - I'll be phoning you shortly to set up a conference call so that you can brief
Marilyn on the matter of Discretionary Acquisitions in Alaska.

Heather

cc: Veronica Slajer

AR00371

community) the closer the land is to the tribe's reservation. Thus, the stated need for land adjacent to a reservation will be given greater weight in the context of the off-reservation criteria. In addition, tribal applicants wishing to conduct gaming on a parcel adjacent to land which has held reservation status since October 17, 1988 will continue to benefit from the ``contiguity exception'' mandated by Congress in the Indian Gaming Regulatory Act (IGRA) Section 20 requirements. (See 25 U.S.C. 2719(a)(1).)

The IRA land acquisition provisions authorize us to take off-reservation land into trust for the benefit of individual Indians. However, as a matter of general policy, we will approve applications from individual Indians for title to land located outside the boundaries of a reservation only under certain limited circumstances, in our discretion. For example, we will continue to accept title to interests in off-reservation land for the purpose of consolidating fractioned ownership of such land. Additionally, we will continue to accept title to lands purchased with funds obtained as the result of the voluntary sale of non-taxable Indian lands to any State, county, or municipality, or as the result of condemnation of such property by a State, county, or municipality, under 25 U.S.C. 409a.

Off-Reservation Acquisitions and Indian Gaming

If a tribe intends to use off-reservation land for gaming purposes, it must comply with the applicable requirements of Section 20 of the Indian Gaming Regulatory Act, 25 U.S.C. 2719 (IGRA) before gaming may occur on that land. In most cases, compliance with Section 20 of IGRA requires additional consultation with local non-Indian governments, a determination by the Secretary that the acquisition is ``in the best interest of the tribe and not detrimental to the surrounding community,'' and a concurrence in that determination from the Governor of the State in which the land is located. Id.

If a tribe applies under these regulations to have title acquired in trust for a non-gaming purpose, and then at a later date decides that it would like to conduct gaming on that parcel, it will be authorized to engage in such gaming only if it complies with the requirements of Section 20 of IGRA. In other words, to game on a parcel of trust land acquired after October 17, 1988 (i.e., the date of passage of IGRA), the tribe must submit to the same Section 20 analysis and obtain the same gubernatorial consent as would have been required if the parcel were originally taken into trust for the purpose of gaming.

Discretionary Acquisitions in Alaska

Both the current and the proposed regulations bar the acquisition of trust title in land in Alaska, unless an application for such acquisition is presented by the Metlakatla Indian Community or one of its members. (The lands of the Metlakatla Indian Community comprise the only Native land in Alaska currently designated as a ``reservation'' by the federal government.) The regulatory bar to acquisition of title in trust in Alaska in the original version of these regulations was predicated on an opinion of the Associate Solicitor, Indian Affairs (``Trust Land for the Natives of Venetie

[[Page 17578]]

and Arctic Village,'' September 15, 1978), which concluded that the Alaska Native Claims Settlement Act (ANCSA) precluded the Secretary from taking land into trust for Natives in Alaska (again, except for Metlakatla).
Although that opinion has not been withdrawn or overruled, we

AR00372

recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into **trust** in Alaska under the IRA (see relevant IRA provision at 25 U.S.C. 473a). See also the Petition of Chilkoot Indian Association, Native Village of Larsen Bay, and Kenaitze Indian Tribe, requesting the Department to undertake a rulemaking to remove the prohibition on taking land in **trust** in Alaska (60 FR 1956 (1995). However, even if it were held that the Secretary retained authority to take land in **trust** in Alaska, whether to exercise that authority remains in the sound discretion of the Secretary.

In recent years blue-ribbon commissions and working groups (such as the State of Alaska's Rural Governance Commission) have been formed to address various related issues concerning tribal governments and Native lands in Alaska and to address such issues in the wake of the decision in Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 118 S. Ct. 948 (1998). In that decision, the court held that former Native Corporation lands owned in fee simple by the Native Village of Venetie Tribal Government were not validly set apart for the use of Indians as such, nor were they under the superintendence of the federal government, and thus did not meet the definition of ``dependent Indian communities.'' Id. At 955. Since the lands did not qualify as dependent Indian communities, they did not meet the definition of Indian country and the Native Village of Venetie Tribal Government was not authorized to tax non-members. Of course, if land were taken in **trust** by the Secretary, such **trust** land then would qualify as Indian country and an Alaskan tribe would have all the powers that pertain within Indian country. We invite comment on the continued validity of the Associate Solicitor's opinion and issues raised by the petition noticed at 60 FR 1956 (1995) in light of the Supreme Court's ruling in the Venetie case.

The proposed **regulations** would make no change in the current **regulations** and would continue the bar against taking Native land in Alaska in **trust**. However, that bar would be subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that ANSCA lands are Indian country.

Mandatory Acceptance of Title

The implementation of specific statutes containing congressional mandates to acquire title to land in **trust** through our administrative process has not always been well-understood. To provide more clarity, the proposed rule includes new language that specifically identifies the types of acquisitions we consider ``mandatory,'' and sets out the process by which we will acquire title.

The proposed regulation clarifies that an acquisition of title is ``mandatory'' if Congress has removed all discretion in determining whether to accept title to a particular tract of land. Situations in which all discretion has been removed include those situations in which Congress dictates that the Secretary ``shall'' acquire title to a parcel of land which is specifically identified by legal description, or to land which is purchased with certain, specified funds. In contrast, a statute which merely directs that the Secretary ``shall'' accept title to unidentified land within some broader geographic boundary, e.g. within certain named counties, still allows for some discretion. Hence we do not view acquisitions under such a statute as ``mandatory'' for the purposes of this regulation. By definition, mandatory acceptances of title rely on statutory authority which preempts the discretionary authority granted to the Secretary by the IRA. The Department will evaluate each statute on a case-by-case basis to determine whether it requires a mandatory acceptance of **trust** title.

The process for completing a mandatory acceptance of title is relatively simple. A tribe must submit an application that includes the identification of the federal statute which mandates the acquisition of

AR00373



# *Alaska Inter-Tribal Council*

B-425

431 W. 7th Avenue, Suite 201, Anchorage, Alaska 99501
Telephone 907/563-9334 · Fax 907/563-9337 · Toll Free: 1-888-560-AITC

May 10, 1999

Kevin Gover, Assistant Secretary of Indian Affairs
U.S. Department of Interior – Bureau of Indian Affairs
1849 C Street, N.W. MS 4647
Washington, DC 20240



RECEIVED
MAY 1 7 1999
TRUST RESPONSIBILITIES

**Re: Opposition to Proposed Rule on 25 CFR Part 151**
     **Acquisition of Title to Land in Trust**

Dear Assistant Secretary Gover:

The Alaska Inter-Tribal Council (AI-TC), a statewide tribal organization with a membership of 176 tribal governments in Alaska, oppose the proposed rule to 25 CFR Part 151, Acquisition of Title to Land in Trust.

First, the proposed regulations makes no changes in the current regulations which bar taking Native lands into trust in Alaska. It further states that this bar would be subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that Alaska Native Claims Settlement Act (ANCSA) lands are Indian country. Alaska's tribes stand by the government to government relationship that exists between the Federal Government and tribes. The Rural Governance Commission, an organization formed by the Governor of Alaska to examine options to empower rural governing bodies, will give recommendations to the Governor. Alaska's tribes have been experiencing very hostile treatment from the Alaska State Legislature over the past two years. Bills that have a detrimental effect on our children's education, our tribe's power to conduct meetings in their Native language, and the power to deliver essential city services at the village level, is a reality in Alaska. AI-TC strongly believes tribes should be able to put their lands into trust, if that is their desire. It should not be dictated by outcomes of a state -sanctioned commission. Furthermore, we believe that ANCSA should be amended to allow this an option under section 14 (C)3, where lands could be transferred to tribes instead of municipalities.

Secondly, the proposed rule requires tribes wishing to take off-reservation land into trust to submit a substantial amount of information about how the proposed acquisition would impact the surrounding non-Indian community, and how the tribe would address that impact. Contrary to the need for this detail is unnecessary, inefficient, and cost ineffective. Furthermore, tribes should not be put through a bureaucratic process that allows for municipalities, boroughs, and counties for their input. Putting lands into trust by a tribe is a treaty relationship between the United States of America and the tribes, not any other government **RECEIVED**

*AUT* 1 8 2000


**CAET**
Advocating for Tribal Governments across Alaska

MAY 1 3 1999

**10**



**425**

Assistant Secretary Kevin Gover
Comments on Proposed Rule for 25 CFR 151
May 10, 1999
Page 2

We appreciate the opportunity to comment on this proposed rule. We believe the ruling is unfair and makes it more difficult for tribes to have the Federal Government carry out their responsibility to this country's First Nations.

Sincerely,

ALASKA INTER-TRIBAL COUNCIL
Mike Williams, Chairman

Deborah Vo
Executive Director

AR00375



B.44

## NATIVE VILLAGE OF EKLUTNA

June 16, 1999

Mr. Kevin Gover
Assistant Secretary
U.S. Department of Interior
BIA- Office of Trust Responsibilities
1849 "C" Street, N. W.
MS-4513 - MIB
Washington D.C. 20240

Re: NVE comments concerning 25 CFR 151 - Acquisition of title to land in trust.

Dear Mr. Gover,

Thank You for allowing us to comment on this important issues facing all Native Americans.

*The Eklutna tribe is a federally recognized tribe listed under the name of "Eklutna Native Village."* Before ANCSA land claims settlement all land s within the Anchorage bowl were lands owned by our tribe. After land claims we retained 92,126 acre's of land and gave title to them lands to an ANCSA corporation to manage for us. Today "Property tax" by the state and municipality threatens to take the village core area due to private ownership called 14 ( C ), (1), violating the trust responsibilities of the government. Changes to the laws governing "Indian land," we say Indian land because regardless of what powers that be wish happened in the natural laws that be it didn't actually happen. "I'm Indian I lived for centuries on this land, I stand on this Land; ie; "Indian Country," nothing any human writes, be they Supreme court judge, 9th circuit court judge and/or congressman will change that fact. That's natural law.

We need "Acquisition of title to trust land," to apply to Alaska also.

Again Thank You for allowing us to respond.

Sincerely,
NATIVE VILLAGE OF EKLUTNA
*Lee Stephan*
Lee Stephan
**Chief Executive Officer.**

RECEIVED
JUN 2 2 1999
TRUST RESPONSIBILITIES

RECEIVED
MAY 1 8 2001
CAET



4

26339 Eklutna Village Rd. • Chugiak, Alaska 99567 • (907) 688-6020 • Fax (907) 688-6021 JUN 2 1 1999

AR00376

44

MEETING TO DISCUSS
## PROPOSED REGULATIONS 25 CFR 151 - ACQUISITION OF TITLE TO LAND IN TRUST

*RED LION'S SACRAMENTO INN - SACRAMENTO CALIFORNIA*
*JUNE 29, 1999*

## TUESDAY JUNE 29

| | |
|---|---|
| 8:30 - 8:45 AM | Welcome - Introductions<br>*Mr. Terry Virden, Director Office of Trust Responsibilities*<br><br>Ms. Heather Sibbison - Special Assistant - Office of the Secretary<br>Mr. Kevin Gover - Assistant Secretary - Indian Affairs<br>Ms. Hilda A. Manuel - Deputy Commissioner of Indian Affairs |
| 8:45 - 9:30 AM | Overview of the proposed 25 CFR 151 Land Acquisition Regulations<br>*Ms. Heather Sibbison - Special Assistant -Office of the Secretary* |
| 9:30 - 9:45 AM | BREAK |
| 9:45 - 11:00 AM | Tribal comments and questions.<br>**Subparts   A - Purpose, Definitions, General<br>              B - Discretionary Acquisitions of Title On-Reservation** |
| 11:00 - 12:00 AM | Tribal comments and questions.<br>**Subparts   C - Mandatory Acceptance of Title Off-Reservation<br>              D - Mandatory Acquisitions of Title** |
| 12:00 - 1:15 PM | LUNCH |
| 1:15 - 3:00 PM | Tribal comments and questions.<br>**Subparts   E - Tribal Land Acquisition Areas<br>              F - False Statements, Recordkeeping, Information Collection** |
| 3:00 - 3:15 PM | BREAK |
| 3:15 - 4:00 PM | Tribal Closing Comments |
| 4:00 PM | Closing Comments<br>*Mr. Terry Virden, Director Office of Trust Responsibilities* |

AR00377

44

## MEETING TO DISCUSS
## PROPOSED REGULATIONS 25 CFR 151 - ACQUISITION OF TITLE TO LAND IN TRUST

*SHERATON MESA HOTEL, MESA ARIZONA*
*JUNE 30, 1999*

### WEDNESDAY JUNE 30

| | |
|---|---|
| 8:00 - 8:30 AM | Registration |
| 8:30 - 8:45 AM | Welcome - Introductions<br>*Mr. Terry Virden, Director Office of Trust Responsibilities*<br><br>Ms. Heather Sibbison - Special Assistant - Office of the Secretary<br>Mr. Kevin Gover - Assistant Secretary - Indian Affairs<br>Ms. Hilda A. Manuel - Deputy Commissioner of Indian Affairs |
| 8:45 - 9:30 AM | Overview of the proposed 25 CFR 151 Land Acquisition Regulations<br>*Ms. Heather Sibbison - Special Assistant -Office of the Secretary* |
| 9:30 - 9:45 AM | BREAK |
| 9:45 - 10:00 AM | Tribal, State, and Local Representatives Panel |
| 10:00 - 11:00 AM | Comments and questions.<br>**Subparts   A - Purpose, Definitions, General**<br>**B - Discretionary Acquisitions of Title On-Reservation** |
| 11:00 - 12:00 AM | Comments and questions.<br>**Subparts   C - Mandatory Acceptance of Title Off-Reservation**<br>**D - Mandatory Acquisitions of Title** |
| 12:00 - 1:15 PM | LUNCH |
| 1:15 - 3:00 PM | Comments and questions.<br>**Subparts   E - Tribal Land Acquisition Areas**<br>**F - False Statements, Recordkeeping, Information Collection** |
| 3:00 - 3:15 PM | BREAK |
| 3:15 - 4:00 PM | Closing Comments |
| 4:00 PM | Closing Comments<br>*Mr. Terry Virden, Director Office of Trust Responsibilities* |

AR00378

44

# BUREAU OF INDIAN AFFAIRS - OFFICE OF TRUST RESPONSIBILITIES

## COMMENT FORM

## 25 CFR 151 - ACQUISITION OF TITLE TO LAND IN TRUST

Indicate the Subpart and Section you are commenting on:

| | |
|---|---|
| _____ | Subpart A – Purpose, Definitions, General |
| _____ | Subpart B – Discretionary Acquisitions of Title On-Reservation |
| _____ | Subpart C – Mandatory Acceptance of Title Off-Reservation |
| _____ | Subpart D – Mandatory Acquisitions of Title |
| _____ | Subpart E – Tribal Land Acquisition Areas |
| _____ | Subpart F – False Statements, Recordkeeping, Information Collection |

COMMENT - Subpart _____   Section _____   Page Number ____ ____

_____

_____

_____

_____

_____

_____

_____

**RECOMMENDATION:**   _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____    _____

Name                                                      Date

_____

Tribal Organization

You may submit this form to Bureau staff at either meeting or mail to: BIA - OFFICE OF TRUST RESPONSIBILITIES,
1849 C STREET, N.W., MS-4513-MIB, WASHINGTON, D.C. 20240 OR FAX TO (202) 219-1065.

AR00379

*TONY KNOWLES, GOVERNOR*

B-494

# DEPARTMENT OF LAW

*OFFICE OF THE ATTORNEY GENERAL*

P.O. BOX 110300
JUNEAU, ALASKA 99811-0300
PHONE:  (907) 465-3600
FAX:     (907) 465-2075



September 8, 1999

Terry Virden, Director
Office of Trust Responsibilities
Bureau of Indian Affairs
Department of the Interior
MS-4513-MIB
1849 C Street N. W.
Washington, D.C. 20240

VIA FAX TO 202-219-1065
Hard copy to follow

RECEIVED

MAY 1 8 2000

CAET

Re:     Comments of the State of Alaska regarding proposed
regulations retaining the prohibition against the acceptance of
lands in trust in Alaska

Dear  Director Virden:

On April 12, 1999, the Department of the Interior formally solicited
comments regarding proposed regulations that, among other things, would
continue the existing federal policy barring the Secretary of the Interior from
acquiring title to land in Alaska in trust, except for the Metlakatla Indian
Community or its members.  64 Fed. Reg. 17574 – 17578 (1999).  In addition, in
1995, three Alaska tribes filed a petition asking that the regulatory prohibition be
removed.  60 Fed. Reg. 1956 (1995).  The Department requested comments
regarding the continued validity of a 1978 opinion of the Associate Solicitor
holding that the Alaska Native Claims Settlement Act (ANCSA) precluded the
Secretary from taking lands in Alaska (except Metlakatla) into trust. *See* Opinion
of Assoc. Solicitor, *Trust Lands for Natives of Venetie and Arctic Village*, Sept.
15, 1978.   Specifically, the Department requested comments regarding the
continued validity of the Associate Solicitor's opinion and issues raised in the
petition in light of the Supreme Court's recent decision in *Alaska v. Native Village
of Venetie Tribal Gov't*, 522 U.S. 520, 118 S. Ct. 948 (1998). The State of Alaska
respectfully submits the following comments.



**494**

Terry Virden, Director                                    September 8, 1999
Re: Proposed trust land regulations                              Page 2

It is Alaska's view that the Associate Solicitor's Opinion is strongly supported by the law and is correct. The Supreme Court's recent decision in *Venetie* confirms the continued validity of the Associate Solicitor's opinion.

1.     **The Associate Solicitor's opinion correctly concludes that ANCSA prohibits the Secretary from accepting land in trust.**

In his opinion, Associate Solicitor Thomas W. Fredericks observed that in adopting ANCSA, Congress intended to "permanently remove all Native lands in Alaska from trust status." Op. at 1. The Associate Solicitor correctly noted Congress' policy in adopting ANCSA:

> The settlement should be accomplished . . . without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges.

*Id.*, quoting ANCSA, § 2(b). The Associate Solicitor reasoned that the policy goals, substantive provisions and legislative history of ANCSA preclude the restoration of former reservations, reservations that had been extinguished by ANCSA, to trust status. Op. at 2. Finally, the Associate Solicitor concluded that Congress' repeal, by section 704 of the Federal Land Policy and Management Act of 1976, of the Secretary's authority to designate certain lands in Alaska as reservations, confirms congressional intent to prohibit the acquisition of land in trust, notwithstanding the omission of language amending section 5 of the Indian Reorganization Act (IRA).[1]

Alaska agrees with the Associate Solicitor's reasoning and conclusions. Congress' express desire not to create any reservation system or lengthy wardship or trusteeship, to extinguish all reservations in Alaska save one, and to repeal all authority of the Secretary to designate new reservations in Alaska, all belie any intent to preserve the authority of the Secretary to acquire Alaska land in trust. In short, the adoption of regulations permitting the acquisition of title to Indian land in trust in Alaska would contravene the clear intent of Congress in adopting ANCSA, and the Associate Solicitor's opinion is, therefore, well grounded in the law.

---

[1]     In general language applicable nationwide, section 5 of the IRA authorizes the Secretary to acquire title to lands for Indians in trust. 25 U.S.C. § 465.

**494**

Terry Virden, Director                                      September 8, 1999
Re:  Proposed trust land regulations                                    Page 3

2.    **The Supreme Court's** *Venetie* **decision confirms the**
        **validity of the associate solicitor's opinion.**

In *Venetie* the Supreme Court ruled that lands conveyed under
ANCSA to Native groups do not constitute Indian country under the "dependent
Indian community" provision of 18 U.S.C. § 1151.  The Court ruled that the lands
that the tribes received under ANCSA had not been "validly set apart for the use
of the Indians as such, nor are they under the superintendence of the federal
government." 118 S. Ct. at 955.

In reaching this conclusion, the Court reasoned that by revoking all
reservations in Alaska, whether created by legislation or the Executive, Congress
had "departed from its traditional practice of setting aside Indian lands." *Id.*
Perhaps even more significantly, the Court ruled that "ANCSA *ended* federal
supervision over the Tribe's lands," and that Congress had "stated explicitly that
ANCSA's settlement provisions were intended to avoid a lengthy wardship or
trusteeship." *Id.* at 955 – 956 (emphasis added) (internal quotations omitted).

As the Associate Solicitor correctly concluded in 1978, a reading of
section 5 of the IRA in a way that authorizes the Secretary to acquire trust title to
land in Alaska would undermine the fundamental policy goals of ANCSA,
contravene the essential holding in *Venetie*, and permit the Secretary to "undo"
what Congress has already done.  Authorizing the Secretary to acquire lands in
trust is categorically contrary to the congressional policy of *ending* federal
supervision over Native lands in Alaska.

3.    **ANCSA Supercedes Section 5 of the IRA as Applied to**
        **Alaska.**

The claim that the Secretary retains authority to acquire title to lands
in Alaska in trust is incorrect for the following additional reason.  Where a
potential statutory conflict exists, statutes must, nevertheless, be construed to give
effect to the will of Congress. *Negonsott v. Samuels*, 507 U.S. 99, 113 S. Ct. 1119
(1992).  Section 5 of the IRA, as applied to Alaska, was enacted in 1936.  48 Stat.
985.  By contrast, the substantive and policy provisions of ANCSA, enacted in
1971, constitute the most recent congressional directive regarding the status of
Native lands in Alaska.   Furthermore, ANCSA's specific statutory declarations
concerning the treatment of lands in Alaska must control over a potentially
conflicting provision of the IRA that addresses the Secretary's general authority to
take land into trust status. *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 458
F.2d 295 (9th Cir. 1992) (later and more specific statute normally controls over

**494**

Terry Virden, Director                                          September 8, 1999
Re:  Proposed trust land regulations                                       Page 4

earlier more general statute where statutes are inconsistent).  Any other
interpretation would promote the perpetuation of a "wardship" or "trusteeship"
over lands, in clear contravention to the will of Congress specifically and more
recently expressed in ANCSA.

        The foregoing compels the conclusion that ANCSA must be read to
control over a potentially conflicting reading of section 5 of the IRA.  The
adoption of regulations permitting the Secretary to acquire title to land in Alaska
in trust would necessarily be contrary to the essential policy goals and substantive
provisions of ANCSA, Congress' most recent directive regarding the status of
Alaska Native lands.

        Accordingly, the April 12, 1999, proposed regulations correctly
adhere to the Department's longstanding policy against taking  Native land in
Alaska into trust other than for the Metlakatla Indian Community and its members.

                        Very truly yours,

                        Bruce M. Botelho
                        Attorney General

cc:    John Katz

AR00383

# STATE OF ALASKA

## DEPARTMENT OF LAW

*OFFICE OF THE ATTORNEY GENERAL*

P.O. BOX 110300
JUNEAU, ALASKA 99811-0300
PHONE:   (907) 465-3600
FAX:       (907) 465-2075

September 8, 1999

Terry Virden, Director
Office of Trust Responsibilities
Bureau of Indian Affairs
*Department of the Interior*
MS-4513-MIB
1849 C Street N. W.
Washington, D.C. 20240

VIA FAX TO 202-219-1065
Hard copy to follow

> Re:   Comments of the State of Alaska regarding proposed
> regulations retaining the prohibition against the acceptance of
> lands in trust in Alaska

Dear Director Virden:

On April 12, 1999, the Department of the Interior formally solicited comments regarding proposed regulations that, among other things, would continue the existing federal policy barring the Secretary of the Interior from acquiring title to land in Alaska in trust, except for the Metlakatla Indian Community or its members.  64 Fed. Reg. 17574 – 17578 (1999).  In addition, in 1995, three Alaska tribes filed a petition asking that the regulatory prohibition be removed.  60 Fed. Reg. 1956 (1995).  The Department requested comments regarding the continued validity of a 1978 opinion of the Associate Solicitor holding that the Alaska Native Claims Settlement Act (ANCSA) precluded the Secretary from taking lands in Alaska (except Metlakatla) into trust.  *See* Opinion of Assoc. Solicitor, *Trust Lands for Natives of Venetie and Arctic Village*, Sept. 15, 1978.   Specifically, the Department requested comments regarding the continued validity of the Associate Solicitor's opinion and issues raised in the petition in light of the Supreme Court's recent decision in *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 118 S. Ct. 948 (1998). The State of Alaska respectfully submits the following comments.

# COPY

ATTACHMENT __1__

PAGE __1__ OF __4__ PAGES.

03-C32LH



AR00384

Terry Virden, Director                                    September 8, 1999
Re:  Proposed trust land regulations                                Page 2

It is Alaska's view that the Associate Solicitor's Opinion is strongly supported by the law and is correct. The Supreme Court's recent decision in *Venetie* confirms the continued validity of the Associate Solicitor's opinion.

1.     **The Associate Solicitor's opinion correctly concludes that ANCSA prohibits the Secretary from accepting land in trust.**

In his opinion, Associate Solicitor Thomas W. Fredericks observed that in adopting ANCSA, Congress intended to "permanently remove all Native lands in Alaska from trust status." Op. at 1. The Associate Solicitor correctly noted Congress' policy in adopting ANCSA:

> The settlement should be accomplished . . . without creating a reservation system or lengthy wardship or trusteeship, and without adding to the categories of property and institutions enjoying special tax privileges.

*Id.*, quoting ANCSA, § 2(b). The Associate Solicitor reasoned that the policy goals, substantive provisions and legislative history of ANCSA preclude the restoration of former reservations, reservations that had been extinguished by ANCSA, to trust status. Op. at 2. Finally, the Associate Solicitor concluded that Congress' repeal, by section 704 of the Federal Land Policy and Management Act of 1976, of the Secretary's authority to designate certain lands in Alaska as reservations, confirms congressional intent to prohibit the acquisition of land in trust, notwithstanding the omission of language amending section 5 of the Indian Reorganization Act (IRA).[1]

Alaska agrees with the Associate Solicitor's reasoning and conclusions. Congress' express desire not to create any reservation system or lengthy wardship or trusteeship, to extinguish all reservations in Alaska save one, and to repeal all authority of the Secretary to designate new reservations in Alaska, all belie any intent to preserve the authority of the Secretary to acquire Alaska land in trust. In short, the adoption of regulations permitting the acquisition of title to Indian land in trust in Alaska would contravene the clear intent of Congress in adopting ANCSA, and the Associate Solicitor's opinion is, therefore, well grounded in the law.

---

[1]     In general language applicable nationwide, section 5 of the IRA authorizes the Secretary to acquire title to lands for Indians in trust. 25 U.S.C. § 465.

COPY

ATTACHMENT ___1___

PAGE __2__ OF __4__ PAGES.

Terry Virden, Director                                   September 8, 1999
Re: Proposed trust land regulations                                  Page 3

2.   **The Supreme Court's _Venetie_ decision confirms the validity of the associate solicitor's opinion.**

In _Venetie_ the Supreme Court ruled that lands conveyed under ANCSA to Native groups do not constitute Indian country under the "dependent Indian community" provision of 18 U.S.C. § 1151. The Court ruled that the lands that the tribes received under ANCSA had not been "validly set apart for the use of the Indians as such, nor are they under the superintendence of the federal government." 118 S. Ct. at 955.

In reaching this conclusion, the Court reasoned that by revoking all reservations in Alaska, whether created by legislation or the Executive, Congress had "departed from its traditional practice of setting aside Indian lands." _Id._ Perhaps even more significantly, the Court ruled that "ANCSA _ended_ federal supervision over the Tribe's lands," and that Congress had "stated explicitly that ANCSA's settlement provisions were intended to avoid a lengthy wardship or trusteeship." _Id._ at 955 – 956 (emphasis added) (internal quotations omitted).

As the Associate Solicitor correctly concluded in 1978, a reading of section 5 of the IRA in a way that authorizes the Secretary to acquire trust title to land in Alaska would undermine the fundamental policy goals of ANCSA, contravene the essential holding in _Venetie_, and permit the Secretary to "undo" what Congress has already done. Authorizing the Secretary to acquire lands in trust is categorically contrary to the congressional policy of _ending_ federal supervision over Native lands in Alaska.

3.   **ANCSA Supercedes Section 5 of the IRA as Applied to Alaska.**

The claim that the Secretary retains authority to acquire title to lands in Alaska in trust is incorrect for the following additional reason. Where a potential statutory conflict exists, statutes must, nevertheless, be construed to give effect to the will of Congress. _Negonsott v. Samuels_, 507 U.S. 99, 113 S. Ct. 1119 (1992). Section 5 of the IRA, as applied to Alaska, was enacted in 1936. 48 Stat. 985. By contrast, the substantive and policy provisions of ANCSA, enacted in 1971, constitute the most recent congressional directive regarding the status of Native lands in Alaska. Furthermore, ANCSA's specific statutory declarations concerning the treatment of lands in Alaska must control over a potentially conflicting provision of the IRA that addresses the Secretary's general authority to take land into trust status. _Hellon & Assocs., Inc. v. Phoenix Resort Corp._, 458 F.2d 295 (9th Cir. 1992) (later and more specific statute normally controls over

**COPY**

ATTACHMENT ___1___

PAGE __3__ OF __4__ PAGES.

AR00386

Terry Virden, Director                              September 8, 1999
Re:  Proposed trust land regulations                        Page 4

earlier more general statute where statutes are inconsistent).  Any other interpretation would promote the perpetuation of a "wardship" or "trusteeship" over lands, in clear contravention to the will of Congress specifically and more recently expressed in ANCSA.

The foregoing compels the conclusion that ANCSA must be read to control over a potentially conflicting reading of section 5 of the IRA.  The adoption of regulations permitting the Secretary to acquire title to land in Alaska in trust would necessarily be contrary to the essential policy goals and substantive provisions of ANCSA, Congress' most recent directive regarding the status of Alaska Native lands.

Accordingly, the April 12, 1999, proposed regulations correctly adhere to the Department's longstanding policy against taking  Native land in Alaska into trust other than for the Metlakatla Indian Community and its members.

Very truly yours,

Bruce M. Botelho
Attorney General

cc:    John Katz

COPY

ATTACHMENT ___I___

PAGE __4__ OF __4__ PAGES.

AR00387



UNITED STATES
DEPARTMENT OF THE INTERIOR
OFFICE OF THE SOLICITOR
WASHINGTON, D.C. 20240

SEP 15 1978

MEMORANDUM

To:        Assistant Secretary--Indian Affairs

From:      Associate Solicitor, Indian Affairs

Subject:   Trust land for the Natives of Venetie and Arctic
           Village

This is in response to the memorandum of the Deputy Assist-
ant Secretary for Administration, dated December 13, 1977,
requesting reconsideration of the position taken by former
Under Secretary Kent Frizzell that the Alaska Native Claims
Settlement Act (ANCSA) precludes the Secretary from restor-
ing land held in fee by Alaska Natives to trust status pur-
suant to Section 5 of the Indian Reorganization Act (IRA).
Our research reaffirms the conclusion of the former Under
Secretary. We further believe that there is no basis for
distinguishing, for purposes of Section 5, former reservation
land patented pursuant to Section 19(b) of ANCSA from any
other land conveyed to Native pursuant to ANCSA.

The intent of Congress to permanently remove all Native lands
in Alaska from trust status is unmistakable. The declaration
of policy states that "the settlement should be accomplished
. . . without creating a reservation system or lengthy ward-
ship or trusteeship, and without adding to the categories of
property and institutions enjoying special tax privileges
. . . ." 43 U.S.C. § 1601(b).

In analyzing the declaration of policy, the Senate Report
stated: "A major purpose of this Committee and the Congress
is to avoid perpetuating in Alaska the reservation and the
trustee system." S. Rep. No. 405, 92th Cong., 1st Sess.
(1971) at 108. This theme was oft repeated in the floor de-
bates. See examples cited in Appendix.

The Natives of Venetie and Arctic Village elected, pursuant
to Section 19(b), to take their former reservation in fee.
They argue that they thereby disassociated themselves from
the settlement legislation and that interpretations based
upon the act as a whole should not apply to them. This
argument misconstrues the nature of Section 19(b). While a
vote to take a former reservation in fee renders the Natives

COPY

ATTACHMENT  2

PAGE  1  OF  8  PAGES.

AR00388

-2-

ineligible for the land and monetary benefits generally
provided for elsewhere in ANCSA, it is incorrect to say that
the vote disassociates them from the settlement.  ANCSA was
a settlement of all Native claims.  It includes Natives on
and off reservations.  This point may be demonstrated by
comparing the treatment of the Metlakatlans of the Annette
Island Reserve with Natives of all other reservations.  The
Metlakatlans are the sole group of Natives not included with-
in the settlement since they are of Canadian origin and thus
have no aboriginal claims to settle.  In contrast to other
reservation Natives, the Metlakatlans have no village corpor-
ation under ANCSA, and their reservation was not revoked.

The option contained in Section 19(b) was not designed to
allow "reservation Natives" to disassociate themselves from
the settlement.  Rather, it was designed to avoid the hard-
ship which would result if these Natives were forced to
select land elsewhere, or a lesser total acreage.  S. Rep.
No. 405, 92d Cong., 1st Sess. (1971) at 159.

The structure and legislative history of Section 19 itself
precludes the restoration of former reservations to trust
status.  Section 19 revokes all reservations (except for
Metlakatla) and directs that the land be conveyed to the
ANCSA village corporation, not to the IRA entities.  It does
not allow Natives to vote for continued trust status.  It
merely allows them to choose between two forms of compensa-
tion in settlement of their claims.  It is clear from
alternatives to Section 19 in earlier proposed settlement
legislation that Congress did not exclude the alternative of
continued trust status by oversight.  Section 22, the coun-
terpart in S. 35 to Section 19, would have allowed the
Metlakatlans the choice between continued trust status and
fee ownership.  Even more telling is the fact that the
Councils of Venetie and Arctic Village proposed an amendment
to Section 15 of H.R. 10193 (an earlier version of Section
19) which would have permitted the retention of trust status.
The proposal was never incorporated into ANCSA.  Resolution
No. 69-3, Combined Councils of the Native Village of Venetie
and Arctic Village Native Council, June 11, 1969.

Also significant is the repeal, in Section 704(a) of the
Federal Land Policy and Management Act of 1976, 90 Stat.
2743, of Section 2 of the Act of May 1, 1936, 49 Stat. 1250,
25 U.S.C. § 496, which extended the provisions of the Indian
Reorganization Act to Alaska and gave the Secretary the
authority to designate certain lands in Alaska as Indian

ATTACHMENT ___2___

PAGE __2__ OF __8__ PAGES.

COPY

AR00389

-3-

reservations. In view of the clear legislative intent and policy expressed in ANCSA's extensive legislative history, it would, in my opinion, be an abuse of the Secretary's discretion to attempt to use Section 5 of the IRA (which, along with SS 1, 7, 8, 15, and 17 of the IRA still apply to Alaska pursuant to the unrepealed portion of the Act of May 1, 1936) to restore the former Venetie Reserve to trust status.

We have reviewed the materials received by the Chief of the Branch of Tribal Government Relations in support of the petition for the restoration of trust status. These materials concern the advisability of a restoration of trust status and set out the provisions of the IRA. There is nothing in these materials which counters our analysis of ANCSA. There is only a vague suggestion in the letter from Donald Wright to former Commissioner of Indian Affairs Thompson, dated August 13, 1976, that the Natives believed that they could retain the reservation in trust when they voted pursuant to Section 19 to take the reservation in fee. Nothing else in the materials supports or belies this suggestion. At any rate, a finding that the Natives were uninformed in no way affects the inability of the Secretary as a matter of law to restore the reservation to trust status. Even assuming the Natives could establish that they were uninformed, or worse, actively misled, it does not follow that the remedy would be to return the land to reservation, trust status. At most, the Natives would be entitled to another vote, such as the opt-in, opt-out election ordered by the court following the establishment of the 13th Region, between fee status and normal ANCSA benefits. The Natives do not seem to be requesting a such second vote, and we are not sure that a second vote would be possible at this time absent a court order.

In conclusion, Congress intended permanently to remove from trust status all Native land in Alaska except allotments and the Annette Island Reserve. Section 19(b) allows the Natives of former reservations to choose between two forms of compensation, but does not allow them to disassociate themselves from the settlement. Finally, even if the Natives could disassociate themselves from the settlement, Section 19 itself and its legislative history preclude the restoration of trust status.

Thomas W. Fredericks

Thomas W. Fredericks

ATTACHMENT  2

PAGE  3  OF  8  PAGES.

COPY

AR00390

-4-

APPENDIX

Statements regarding reservations made during ANCSA Debates

Rep. Ryl: I do not know of any member of the com-
mittee who wanted anything to do with setting
up a reservation system in the State of Alaska
similar to that which we have in the lower 48
states. Our experience with reservations has
just been so tragic and has resulted in such a
futile paternalistic system that we wanted to
avoid that completely. 117 Cong. Rec. 38856
(1971).

Rep. Meeds: Every one of the bills in our committee
and the bills in the other body, all of them,
eschew the reservation or trust concept. For
far too long we in America have been making the
Natives' mistakes for them. 117 Cong. Rec.
38865 (1971).

Sec. McGovern: Those who are concerned about creat-
ing new Indian reservations in Alaska can find
a solution to this problem by assuring an oppor-
tunity for the Natives to secure productive and
promising lands. 117 Cong. Rec. 38444 (1971).

Sen. Gravel: Under the committee bill all reserva-
tions in Alaska are revoked, unless the village
corporations located within the reservation
elect to take fee title to the reservation. If
Natives do elect to take title to the reserva-
tion, they will not participate in the land
selection procedures of the bill nor share in
the monetary settlement. 117 Cong. Rec. 46967
(1971).

# COPY

ATTACHMENT _2_

PAGE _4_ OF _8_ PAGES.