*Comments*

Several comments suggested that the final rule should be expanded to include not just reservation-less tribes but also Indian tribes which do not have trust land or which have a trust land base of which is incapable of being developed to create a homeland and strive for tribal self-determination and economic self-sufficiency. The comments were accepted and the definition of a TLAA at § 151.17 is amended to include Indian tribes that have no trust land or have trust land the character of which renders it incapable of being developed to take advantage of the TLAA. A new § 151.18 was added to make more clear what tribes are eligible to apply for a TLAA. One comment suggested that existing tribal consolidation areas approved pursuant to the current acquisition regulation should be grand-fathered and treated as a TLAA while another comment suggested that the rule should clarify whether or not tribes with existing approved tribal consolidation areas must reapply under the final rule for a TLAA. While this final rule eliminates the ability of tribes to obtain tribal consolidation areas as provided under the existing regulation, this rule provides an alternative mechanism in the form of a TLAA. Tribal consolidation areas approved under the existing regulation will remain in force and effect for the purposes for which they were approved, but such tribal consolidation areas are not deemed to constitute a TLAA under these regulations. In the event a tribe wants to amend or modify an existing approved tribal consolidation area to include the provisions of a TLAA, the proposed amendment or modification must be reviewed under the requirements of approval for a TLAA under the final rule. One comment suggested that TLAA receive congressional approval. We believe that the Secretary has the authority, and indeed the responsibility to prescribe procedures to fulfill the purposes of the IRA.

There were comments expressing the views that tribes should not be required to submit documentation that was different from that required for discretionary acquisitions; information documenting the history of the tribe, and information about the tribe; such as taxes, revenues and services; or other information that was viewed as impractical, unwarranted, or imposes a financial burden or is not readily available. We believe the information required under the final rule is reasonable, necessary, relevant to the decision making process and not burdensome upon the applicant as it may be readily obtained from existing sources. Further, the information is consistent with the kinds of information requested by applicants seeking off-reservation acquisitions. One comment suggested that the rule should clarify the requirements for notifying other governmental entities. We believe the rule provides sufficient notice requirements. One comment suggested that the 50-mile radius for notice be re-evaluated. The comment was rejected because the defined radius is considered a reasonable area that could be impacted by a trust acquisition and will provide sufficient notice to others.

There were a few comments concerning the 10 year term for an approved TLAA. The comments suggested that 10 years was an insufficient amount of time to acquire lands within the TLAA due the requirements for completing and securing approval to an acquisition. The comments were accepted and § 151.17 is amended to provide for a 25-year term for a TLAA.

There were several comments concerning the establishment of criteria or standards for evaluating requests for the approval of a TLAA. We believe that the regulation provides clear criteria for the Secretary to use in determining whether to approve a tribe's request for a TLAA. The criteria used for approving a TLAA is separate and distinct from the criteria and standards used to evaluate an on-or off-reservation acquisition request. Once a TLAA is approved by the Secretary, the on-reservation criteria will be used to determine whether to accept the title to land in trust. One comment suggested that a formal appeal process should be established when a request for a TLAA is denied. Section 151.6(a) sets out the process for the appeal of a decision under this part. One comment suggested that tribal trust land should be equivalent to reservation status. The comment was rejected because it was not within the scope of this rule and is governed by principles of Indian law. One comment suggested that the rule should clearly define a streamlined process for modification of approved tribal consolidation areas. The comment was rejected because the final rule establishes the criteria

AR00593

for the TLAA and eliminates the process to obtain a tribal consolidation area. Approved tribal consolidation areas, however, may form the basis for the development of a TLAA.

**Subpart F--False Statements, Record-Keeping, Information Collection**

*Summary of Subpart*

This subpart describes the penalties for making false statements pertaining to a request. This subpart also describes the record keeping and reporting requirements under this part as well as the information collection requirements.

*Comments*

One comment received suggested that Indian tribes should not be penalized for making false statements and another comment suggested the penalty for false statements should also apply to non-Indians. The first comment was rejected, and the second deemed already addressed because the False Statements Accountability Act of 1996 (18 U.S.C. 1001) applies to all statements submitted in connection with a trust title acquisition whether such statements are made by the applicant or interested parties. Section 151.27 was amended to clarify who owns the records associated with this part and a new § 151.28 was added to clarify how records associated with this part will be preserved.

*Clarity of This Regulation*

Executive Order 12866 requires each agency to write regulations that are easy to understand. This regulation has been written in a question and answer format, arranged in a manner to make it easier to follow, with technical language or jargon eliminated to make it is easier to understand.

*Regulatory Planning and Review (Executive Order 12866)*

In accordance with the criteria in Executive Order 12866, this rule is not a significant regulatory action and is not **[*3457]** subject to review by the Office of Management and Budget.

(a) The amendments to this rule basically conform to the policies and practices that currently guide the Department's decision making on land into trust applications. The rule does not have an annual effect of $ 100 million or more on the economy. It does not adversely affect in a material way the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities. This rule simply identifies a "minimum standard" of criteria and requirements to be considered in the exercise of the Secretary's discretion to place lands in trust for individual Indians and tribes.

Looking at the overall picture of how much land we have taken into trust historically, the annual number of requests to place lands in trust has been small. Based on the BIA's Annual Report of Indian Lands for 1996, only 35 States have Indian lands, four of which have fewer than 1,000 acres of Indian lands. The 1996 report indicated that there were 6,941 total applications (fee-to-trust; trust-to-trust; restricted-to-restricted; restricted-to-trust) involving 212,000 acres cumulatively, *i.e.,* the average amount of land involved in an application was only about 30 acres. Based on the annual caseload report for FY 1996, the total dollar amount Tribes and individual Indians paid for acquisitions of land in trust is $ 19,420,303.81. The *trust-to-trust, restricted-fee-to-restricted fee,* and *restricted fee-to-trust* land acquisitions do not impact local and state governments because these lands are not presently subject to state or local jurisdiction or taxation. Some States and local governments may have a decrease in revenues derived from taxes from the Secretary's determination to accept title to land in trust. However, the loss in annual revenues for State and local jurisdictions is only be a fraction of the value of the land involved. Moreover, some tribes may choose to offset this loss by making

AR00594

Case 1:06-cv-01405-RWR     Document 21-15     Filed 02/08/2008     Page 3 of 63

payments in lieu of taxes, or supplying services to the local communities. Finally, any losses or gains to State or local tax rolls would be spread over several states and many local governments. Thus, overall, the net changes in tax revenues due to this rule are minimal, and do not significantly affect State or local governments.

(b) This rule does not create a serious inconsistency or otherwise interfere with an action taken or planned by another Federal agency. Actions taken by this rule affect tribal or individual Indian land titles. The Department of the Interior, Bureau of Indian Affairs is the only governmental agency that makes the determination whether to take land into trust.

(c) This rule does not alter the budgetary effects or entitlement, grants, user fees, or loan programs or the rights or obligations of their recipients. This rule sets out the criteria and procedures the Secretary uses in determining whether to accept title of certain Indian lands to the United States, as trustee, for the benefit of an individual Indian or a tribe.

(d) OMB has determined that this rule does not raise novel legal or policy issues and is therefore not subject to review under Executive Order 12866.

*Regulatory Flexibility Act*

The Department of the Interior certifies that this regulation does not have a significant economic effect on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). A Regulatory Flexibility analysis is not required. See our initial analysis above *item 1(a) under Regulatory Planning and Review*. The effect on small entities is minimal.

*Small Business Regulatory Enforcement Fairness Act (SBREFA)*

This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. See the initial analysis above, item 1(a) under Regulatory Planning and Review. This rule:

(a) Does not have an annual effect on the economy of $ 100 million or more. An economic analysis is not required.

(b) Does not cause a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions. Actions under this rule only affect title to tribal or individual Indian owned lands.

(c) Does not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises. Actions under this rule only affect title to tribal or individual Indian owned lands.

*Unfunded Mandates Reform Act*

In accordance with the Unfunded Mandates Reform Act (2 U.S.C. 1531 *et seq.*):

(a) The rule does not significantly or uniquely affect small governments, or the private sector. A Small Government Agency Plan is not required. Additional expenses may be incurred by the requesting tribe or individual Indian to provide information to the Secretary. Tribes or an individual Indian provide information in order to receive a benefit.

(b) This rule does not produce a federal mandate of a $ 100 million or greater in any year. The overall effect of this rule is likely not to be significant to the State, local, or tribal governments or the private sector.

*Takings (Executive Order 12630)*

AR00595

With respect to Executive Order 12630, the rule does not have significant takings implications. A takings implication assessment is not required because actions under this rule do not constitute a taking. Tribes or individual Indians are voluntarily transferring title to the United States for their own benefit.

*Federalism (Executive Order 13123)*

With respect to Executive Order 13123, the rule does not have significant federalism implications to warrant the preparation of a Federalism Assessment. The local tax base may be affected. Actions in this rule apply only to a relatively small amount of land. Due to the loss of tax revenue, the relationship between the State and local governments with tribes and/or the Federal Government may be affected. However, the loss of revenue overall is likely to be minimal and the vast majority of the land to be acquired will likely be within the boundaries of reservations where there is already a measure of Indian sovereignty. Therefore, the effects are "insignificant" within the meaning of Executive Order 13123.

*Civil Justice Reform (Executive Order 12988)*

With respect to Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of sections 3(a) and 3 (b)(2) of the order. This rule contains no drafting errors or ambiguity and is written to minimize litigation, provides clear standards, simplifies procedures, reduces burden, and is clearly written. These regulations do not preempt any statute. They do supersede the current land acquisition regulations and the current procedure for establishing Indian Land Consolidation Areas. They would not be retroactive with respect to any land already taken into trust, but would apply to applications that are determined not be complete at the time of final publication of this rule.

*Paperwork Reduction Act*

This regulation requires an information collection from ten or more **[\*3458]** parties and a submission under the Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*). The information collection requirements in §§ 151.9, 151.12, 151.15, 151.19, and 151.28 under 44 U.S.C. 3501 *et seq.* were submitted to the Office of Management and Budget (OMB) for approval. We will publish a notice in the **Federal Register** when OMB approves this collection. This information is required from Indian tribes and individual Indians who wish to convey land into trust status.

Information is collected from Indian tribes and individuals to support their request to the Secretary to acquire title to land in trust for their benefit. The Secretary uses the information to evaluate the request and forms the basis of a decision to accept or deny a request for the taking of title to land in trust.

The total average annual burden hours for the collection of information for the above specified sections of the regulation is broken down as follows.

| Citation 25 CFR 151 | Information | Average number of hours | Average number per year | Annual burden hours |
|---|---|---|---|---|
| 151.9 for on- | Applicant must submit: (a) Copy of authority; | 16 | 850 | 13,600 |

AR00596

| | | | | |
|---|---|---|---|---|
| | (b) Explanation of reservation need; | | | |
| | (c) Explanation of ownership status (tribe); | | | |
| | (d) Explanation of ownership status (individual); | | | |
| | (e) Title evidence | | | |
| | (f) Documentation for NEPA--tribe and individual | 40 | 120 | 4,800 |
| | (f) Documentation for NEPA--tiering | 20 | 200 | 4,000 |
| 151.12 for off-reservation acquisitions | Applicant must submit: | 56 | 150 | 8,400 |
| | (a) Copy of authority; | | | |
| | (b) Explanation of need; | | | |
| | (c) Description of proposed use; | | | |
| | (d) Description of location of land; | | | |
| | (e) Description of effect on state & political subdivisions; | | | |
| | (f) Description of jurisdictional issues; | | | |
| | (g) Title evidence | | | |
| | (h) Documentation for NEPA--tribe provides documentation | 40 | 150 | 6,000 |
| 151.15 for Mandatory acquisitions | Applicant must submit: | .5 | 69 | 35 |
| | (a) Copy of authority; | | | |
| | (b) Title evidence; | | | |
| | (c) Additional information upon request | | | |
| 151.19 for Tribal Land Acquisition Areas (TLAA) | Applicant must submit: | 96 | 325 | 31,200 |
| | (a) Copy of authority; | | | |
| | (b) Copy of tribal documents to establish TLAA; | | | |

AR00597

```
(c) Summary of
purposes
and goals;
(d) Summary of
tribe's
history;
(e) Description of
TLAA;
(f) Location of
rights
of way;
(g) Description of
effect on state and
political
subdivisions;
(h) Description of
jurisdictional and
land
use issues
```

We invite the public to provide any comments concerning the accuracy of the burden estimate and any suggestions for reducing the burden. Submit comments to the Bureau of Indian Affairs, Director, Office of Trust Responsibilities, 1849 C Street, NW., MS-4513-MIB, Washington, DC 20240.

The collection of information is voluntary in order for an Indian tribe or individual to obtain a benefit, acquiring title to land in trust. None of the solicited information is confidential. However, if the applicant submits an application that contains financial information, it is covered by the Privacy Act.

A Federal agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act*

This rule does not constitute a major Federal action significantly affecting the quality of the human environment. A detailed statement under the National Environmental Policy Act of 1969 is not required because this rule is of an administrative, technical, and procedural nature.

*Government-to-Government Relationship With Tribes*

In accordance with the President's memorandum of May 14, 1998, "Consultation and Coordination with Indian Tribal Governments" (FR Vol. 63, No. 96, Pages 27655-27657) and 512 DM 2, we evaluated any potential effects upon Federally recognized Indian tribes and have determined that there are no potential adverse effects. No action is taken under this rule unless a tribe or an individual Indian voluntarily requests that the United States place land in trust for their benefit. Tribes were asked for comments prior to publication as a final regulation of this rule and their comments were considered prior to publication.

## List of Subjects in 25 CFR Part 151

Indians-lands, Reporting and recordkeeping requirements.

Accordingly, the Bureau of Indian Affairs is revising 25 CFR part 151 to read as follows:

AR00598

## PART 151--ACQUISITION OF TITLE TO LAND IN TRUST

### Subpart A--Purpose, Definitions, General

Sec.

151.1 What is the purpose of this part?

151.2 How are key terms defined in this part?

151.3 To what types of transactions does this part apply?

151.4 How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?

151.5 How does BIA process a request?

151.6 How does BIA proceed after making a decision on a request?

151.7 When does the land attain trust status?

151.8 Will BIA accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

### Subpart B--Discretionary Acquisitions of Title On-Reservation

151.9 What information must be provided in a request involving land inside a **[*3459]** reservation or inside an approved Tribal Land Acquisition Area?

151.10 What criteria will BIA use to evaluate a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?

151.11 Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

### Subpart C--Discretionary Acquisitions of Title Off-Reservation

151.12 What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

151.13 Can an individual Indian acquire land outside his or her own reservation?

151.14 What criteria will BIA use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

### Subpart D--Mandatory Acquisitions of Title

151.15 What information must be provided in a request to process a mandatory transfer of title into trust status, and how will BIA process the request?

151.16 Can our determination that a transfer of title into trust status is mandatory be appealed?

### Subpart E--Tribal Land Acquisition Areas

151.17 What is a Tribal Land Acquisition Area?

AR00599

151.18 What tribes are eligible to apply for approval of a Tribal Land Acquisition Area?

151.19 What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?

151.20 How is a tribal request for Secretarial approval processed?

151.21 What criteria will BIA use to decide whether to approve a proposed Tribal Land Acquisition Area?

151.22 Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?

151.23 If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?

151.24 If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?

151.25 Can a Tribal Land Acquisition Area be modified after approval?

**Subpart F--False Statements, Recordkeeping, Information Collection**

151.26 What is the penalty for making false statements in connection with a request that BIA place land in trust?

151.27 Who owns the records associated with this part?

151.28 How must a record associated with this part be preserved?

**Authority:** R.S. 161: 5 U.S.C. 301. Interpret or apply 46 Stat. 1106, as amended; 46 Stat. 1471, as amended; 48 Stat. 985, as amended; 49 Stat. 1967, as amended, 53 Stat. 1129; 63 Stat. 605; 69 Stat. 392, as amended; 70 Stat. 290, as amended; 70 Stat. 626; 75 Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat. 747; 82 Stat. 174, as amended; 82 Stat. 884; 84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86 Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat. 81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207; 18 U.S.C. 1001; 25 U.S.C. 2, 9, 409a, 450h, 451, 464, 465, 467, 487, 488, 489, 501, 502, 573, 574, 576, 608, 608a, 610, 610a, 622, 624, 640d-10, 1466, 1495, and other authorizing acts.

**Subpart A--Purpose, Definitions, General**

**§ 151.1 -- What is the purpose of this part?**

The purpose of this part is to describe the authorities, policies, and procedures that we use to decide whether to accept title to land in the name of the United States to be held in trust for the benefit of an individual Indian or a tribe.

**§ 151.2 -- How are key terms defined in this part?**

*Alienation* means a conveyance or transfer of title to property.

*Bureau* means the Bureau of Indian Affairs within the Department of the Interior.

*Complete Application* means an application that contains all the documentation, analysis and information required by § 151.5(f).

AR00600

*Discretionary acquisitions of title* means those acquisitions of trust title which Congress has authorized, but not required us to accept administratively.

*Encumbrance* means a limitation on the title of property, such as a claim, lien, easement, charge, or restriction of any kind.

*Fee simple land* means land held absolute and clear of any condition or restriction, and where the owner has unconditional power of disposition.

*Governing tribe* means the tribe having governmental jurisdiction over the land being acquired.

*Individual Indian* means a person who:

(1) Is a member of a federally recognized tribe; or

(2) Was physically residing on a federally recognized Indian reservation as of June 1, 1934, and is a descendant of an enrolled member of a federally recognized tribe; or

(3) Possesses a total of one-half degree or more Indian blood of a federally recognized tribe.

*Land* means real property or any title interest therein, as defined by the statute that authorizes the land acquisition.

*Legislative transfer of title* means the direct transfer of title to land into trust status for the benefit of an individual Indian or Indian tribe by Congress through legislation. The regulations in this part do not apply to legislative transfers of title.

*Mandatory acceptance of title* means a conveyance of trust title which Congress has required the Secretary to accept if certain specified conditions over which the Secretary has no control are met.

*Reservation* means, for purposes of this part, that area of land which has been set aside or which has been acknowledged as having been set aside by the United States for the use of the tribe, the exterior boundaries of which are more particularly defined in a final treaty, Federal agreement, Executive or secretarial order, Executive or secretarial proclamation, United States patent, Federal statute, or final judicial or administrative determination, provided that:

(1) In the State of Oklahoma, *reservation* means that area of land constituting the former reservation of the tribe. *Former reservation* means lands that are within the jurisdictional area of an Oklahoma Indian tribe and are within the boundaries of the last reservation established by final treaty, Federal agreement, Executive or secretarial order, Executive or secretarial proclamation, United States patent, Federal statute, or final judicial or administrative determination; and

(2) For Pueblo Indian tribes in the State of New Mexico, *reservation* means lands within the exterior boundaries of lands granted or confirmed to the Pueblo as reported by the Pueblo Lands Board under section 2 of the Act of June 7, 1924, ch. 331, 43 Stat. 636, notwithstanding any finding of extinguishment of title, plus any other lands reserved, set aside, or held in trust by the United States for the use of the Pueblo or its members.

*Restricted fee land* means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations in the conveyance instrument pursuant to federal law.

*Secretary* means the Secretary of the Interior or an authorized representative.

AR00601

*Tribal Land Acquisition Area (TLAA)* means an area of land approved by the Secretary and designated by a tribe that

(1) Does not have a reservation; or

(2) Does not have trust land; or

(3) *Has a trust land base which is incapable of being developed in a manner that promotes tribal self-determination, economic development and Indian housing, and within which the tribe plans to acquire land over a specified period of time.*

*Tribe* means any Indian tribe, nation, band, pueblo, town, community, rancheria, colony, or other group of Indians, which is recognized by the Secretary as eligible for the special *programs and services provided by the* **[\*3460]** *Bureau of Indian Affairs, and listed in the* **Federal Register** under Public Law 103-454, act of Nov. 2, 1994 (108 Stat. 4791; 25 U.S.C. 479a (1994)).

*Trust land* means land, or an interest therein, for which the United States holds fee title in trust for the benefit of an individual Indian or a tribe.

*Undivided fractional interest* means an interest of co-owners which is in the entire property, that is not divided out from the whole parcel. (Example: If you own 1/4 interest in 160 acres, you do not own 40 acres. You own 1/4 interest in the whole 160 acres because your 1/4 interest has not been divided out from the whole 160 acres.)

*We/Us/Our* means the Secretary of the Interior or an authorized representative.

### § 151.3 -- To what types of transactions does this part apply?

(a) Except as provided in paragraphs (b) and (c) of this section, this part applies to all fee simple land-to-trust, fee simple land-to-restricted fee or land exchanges involving fee simple land.

(b) This part does not apply to the following transactions:

(1) Trust-to-trust;

(2) Restricted-fee to restricted-fee;

(3) Transfer of title to trust and restricted land through inheritance, devise or escheat;

(4) Legislative transfer of title into trust status; or

(5) Federal agency transfers of title.

(c) We will not accept title to land in trust in the State of Alaska, except for the Metlakatla Indian Community of the Annette Island reserve of Alaska or its members.

### § 151.4 -- How does an individual Indian or a tribe apply to have title to land conveyed to the United States in trust?

Individual Indians and tribes must send us a written request asking that we accept title and place the land into trust.

(a) The request must:

(1) Identify the applicant (including the applicant's tribal affiliation);

AR00602

(2) Include the legal description of the land to be acquired; and

(3) Include all information which shows that the proposed acquisition meets the applicable requirements in this regulation.

(b) The request does not need to be in any special form. However, we strongly urge the applicant to address each section of this part that is relevant to the type of acquisition (e.g., on- or off-reservation, discretionary or mandatory), in the order it appears here. Constructing the request in this way will enable us to review the request more efficiently.

(c) We may also ask for additional information to aid us in reaching a decision.

### § 151.5 -- How does BIA process the request?

(a) After we receive the request, we will notify the State, county, and municipal governments having regulatory jurisdiction over the land. We will send all notices under this section by certified mail, return receipt requested. The notice will contain the information described in paragraph (a)(1) or (a)(2) of this section, as appropriate.

(1) If the request is for on-reservation lands or lands inside an approved TLAA, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) State the proposed use of the land; and

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 30 days from date of receipt of the notice on the proposed acquisition.

(2) If the request is for land outside a reservation and outside a TLAA, the notice we send under this section will:

(i) Include the name of the applicant;

(ii) Describe the lands proposed to be taken in trust;

(iii) Describe the proposed use of the land; and

(iv) Invite the State and local governments from the State in which the land is located to comment in writing within 60 days from the date of receipt of notice on the acquisition's potential effects on the State and local governments, including on their regulatory jurisdiction, real property taxes, and special assessments.

(b) After the comment period has ended, we will send to the applicant copies of any comments made by State and local governments on the applicant's request. We will give the applicant a reasonable time in which to reply to the comments.

(c) Subject to restrictions on disclosure required by the Freedom of Information Act (5 U.S.C. 552), the Privacy Act (5 U.S.C. 552a), and the Trade Secrets Act (18 U.S.C. 1905) the request will be available for review at the local BIA agency or area office having administrative jurisdiction over the land.

(d) We will consider all the documentation that the applicant submits.

AR00603

(e) A complete application consists of the following:

(1) The applicant's request that the land be taken into trust, as follows:

(i) If the applicant is an Indian tribe, the written request must be a properly prepared and executed tribal resolution requesting trust status, or

(ii) If the applicant is an individual Indian, the written request must be a signed letter requesting trust status.

(2) Documentation that the applicant has addressed all the applicable information requirements in this section;

(3) A map depicting the location of the land to be acquired, and either:

(i) A legal description of the land, including a statement of the estate being acquired, e.g. all surface and mineral rights, surface rights only, surface rights and a portion of the mineral rights, etc., or

(ii) A survey if the land cannot be described by an aliquot legal description. The survey must be completed by a land surveyor registered in the State in which the land is located when the land being acquired is fee simple land,

(4) Hazardous level I survey,

(5) Environmental documentation,

(6) Title evidence,

(7) Impact notification letters, including all associated responses,

(8) Statement from the applicant that any existing rights of way, easements or encumbrances will not interfere with applicant's intended use of the land, and

(9) Any additional information we have requested, in writing, if warranted by the specific application.

(f) After BIA is in possession of a complete application, we will:

(1) Notify the applicant, in writing, that the application is complete,

(2) Issue a decision on an application within 120 working days after issuance of the notice of a complete application.

### § 151.6 -- How does BIA proceed after making a decision on a request?

(a) Within 120 days of our having a complete application package, we will send the applicant a certified letter describing our decision to accept or deny a request. We will also send a copy of the decision letter to everyone (including State and local governments) who sent us written comments on the request. The notice to interested parties will explain that they have a right to appeal our decision under part 2 of this title.

(b) If our decision is to deny the request, we will take no further action.

(c) If our decision is to approve the request, after the exhaustion of administrative remedies, we will:

AR00604

(1) Complete a preliminary title examination. For both discretionary and **[*3461]** mandatory acquisitions, after we examine the title evidence, we will notify the applicant of any liens, encumbrances, or infirmities. If the liens, encumbrances, or infirmities make title to the land unmarketable, we will require the applicant to eliminate the liens, encumbrances, or infirmities before we act on the application.

(2) Publish in the **Federal Register**, or in a newspaper of general circulation serving the affected area, a notice of the decision to take land into trust under this part. The notice will state that we have made a final decision to take land in trust and that we will accept title in the name of the United States no sooner than 30 days after the notice is published;

(3) Respond to any judicial appeals that may be filed; and

(4) After sufficient opportunity for judicial relief has been provided, accept trust title to the land by issuing or approving an appropriate instrument of conveyance. If we determine to accept trust title to land in a case before all judicial remedies have been exhausted, we will give the party/parties opposing the acquisition at least five days notice before we take any action.

## § 151.7 -- When does land attain trust status?

After the Secretary has published a notice of intent to take the land into trust pursuant to § 151.6(c)(2), the time period for appeal has run, and all title objections have been cleared, we will approve or issue the appropriate instrument of conveyance. Only after these steps have been completed will the land attain trust status. The approved deed will then be recorded in the county where located, title evidence will be updated, a final title opinion will be issued and the deed will be recorded in the appropriate Bureau of Indian Affairs Land Titles and Records Office under part 150 of this chapter.

## § 151.8 -- Will BIA accept and hold in trust an undivided fractional interest in land for an individual Indian or a tribe?

We will not accept and hold in trust for an individual Indian or a tribe an undivided fractional interest in land, except under one of the following conditions:

(a) The individual Indian or tribe already owns an undivided fractional restricted or trust interest in the land, and is acquiring the additional interest(s) to consolidate ownership.

(b) The individual Indian or tribe acquires the undivided fractional interest as the result of a gift under § 152.25(d) of this chapter and the conveyance does not result in further fractionation of interest in the land.

(c) The individual Indian or tribe is acquiring fee simple interest and there are existing undivided fractional trust or restricted interests in the same land.

(d) The individual Indian or tribe offers and agrees to purchase the remaining undivided fractional trust or restricted interest in the land, at not less than fair market value.

(e) A specific statute grants the individual Indian or tribe the right to purchase an undivided fractional interest in trust or restricted land without offering to purchase all interests.

(f) The owner(s) of a majority of the interests of the remaining undivided trust or restricted fractional interest agree in writing that the individual Indian or tribe may acquire the interest.

(g) A tribe acquires an undivided fractional interest in trust or restricted land under the Indian Land Consolidation Act, 25 U.S.C. 2201 *et seq.*, under one of the following conditions:

AR00605

(1) The land is inside the tribe's reservation, or inside an approved Tribal Land Consolidation Area, or is otherwise subject to the tribe's jurisdiction, and

(2) The tribe acquires the land:

(i) At not less than the fair market value; and

(ii) With the written consent of a majority of the owners of the remaining undivided fractional trust or restricted interest of this land;

(h) The tribe acquires, at not less than the fair market value, part or all of the undivided fractional interests in a parcel of trust or restricted land within the tribe's reservation, or subject to the tribe's jurisdiction and:

(1) Over 50 percent of the owners of the undivided fractional interests consent in writing to the acquisition; or

(2) An individual Indian makes an offer under paragraph (e) of this section;

(i) An individual Indian:

(1) Already owns an undivided fractional interest in the land;

(2) Offers to match a tribal offer to purchase under paragraph (d) of this section; and

(3) Has used and possessed the land for at least 3 years preceding the tribe's offer to purchase.

**Subpart Part B--Discretionary Acquisitions of Title On-Reservation**

### § 151.9 -- What information must be provided in a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land inside a reservation boundary or to land inside an approved TLAA must include:

(a) A complete description, or a copy, of the federal statute that authorizes the United States to accept the land in trust and any limitations contained in the authority.

(b) An explanation of why the individual Indian or tribe needs land to be in trust and how the land will be used.

(c) If the applicant is a tribe, an explanation of whether the tribe:

(1) Already owns an undivided fractional trust or restricted interest in the land; and

(2) Maintains jurisdiction over the land.

(d) If the applicant is an individual Indian, an explanation of:

(1) Whether the applicant already owns an undivided fractional trust or restricted interest in the land;

(2) The amount of land that the applicant already owns and the status of the land (fee, restricted, or trust); and

AR00606

Get a Document - by Citation - 66 FR 3452
Page 22 of 55
Case 1:06-cv-01405-RWR    Document 21-15    Filed 02/08/2008    Page 15 of 63

(3) Whether the applicant needs assistance in handling real estate affairs. For example, tell us if the applicant is a minor or has been declared legally incompetent.

(e) Title insurance or an abstract of title that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U. S. Department of Justice. Copies of the standards are available from the U.S. Department of Justice, Environmental and Natural Resources Division, Land Acquisition Section, Room 6136, 601 Pennsylvania Avenue NW., Washington, DC 20004.

(f) Documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, write to the Department of the Interior, Bureau of Indian Affairs, 1849 C Street, NW., Mail Stop: 4513-MIB, Washington, DC 20240). Include a record of consultation with appropriate authorities regarding environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

### § 151.10 -- What criteria will BIA use to evaluate a request involving land inside a reservation or inside an approved Tribal Land Acquisition Area?

Upon receipt of the information required under § 151.9 and upon a determination that the application is complete:  **[*3462]**

(a) We will approve the application and accept title to land in trust inside a reservation or inside an approved TLAA if we determine that the application facilitates tribal self-determination, economic development, Indian housing, land consolidation or natural resources protection; except that

(b) Notwithstanding a determination in paragraph (a) of this section, we may not approve the application and accept transfer of title into trust for land inside a reservation or inside an approved TLAA if the approval of the acquisition will result in severe negative impact to the environment or severe harm to the local government. Evidence of such harm must be clear and demonstrable and supported in the record.

### § 151.11 -- Can an individual Indian or a tribe acquire land inside a reservation or inside an approved Tribal Land Acquisition Area of another tribe?

An individual Indian or a tribe, including individual Indians and tribes in Oklahoma, may acquire land in trust on another tribe's reservation, or inside another tribe's approved TLAA, if the recognized tribe's governing body consents in writing. No consent is required if:

(a) An individual Indian or tribe already owns an undivided fractional trust or restricted interest in the parcel of land to be acquired; or

(b) The proposed acquisition is inside a reservation or an approved TLAA that is shared by two or more tribes, and the acquisition is for one of these tribes, or one of these tribes' members.

### Subpart C--Discretionary Acquisitions of Title Off-Reservation

### § 151.12 -- What information must be provided in a request involving land outside a reservation or outside a Tribal Land Acquisition Area?

A request from an individual Indian or a tribe asking that the United States accept title to land outside a reservation boundary and outside an approved TLAA, must include:

(a) A complete description, or a copy of, the statutory authority that authorizes the United

AR00607

States to accept land in trust and any limitations contained in the authority;

(b) An explanation of the need of the individual Indian or tribe for land in trust and how the land will be used. This explanation is a crucial factor in determining if the request should be approved. The request must explain:

(1) Why the present land base is not appropriate or adequate for the activity contemplated in the request;

(2) Why the applicant needs the land to be in trust for the proposed use; and

(3) How trust status will benefit the applicant's economic and/or social conditions.

(c) A description of how the applicant will use the land. This description must include an explanation of:

(1) The past uses of the land;

(2) The present use of the land;

(3) The anticipated future uses of the land;

(4) The cultural or historical interest in the land;

(5) The objectives that the individual Indian or tribe hopes to attain; and

(6) If the acquisition is for housing:

(i) The projected number of units to be built; and

(ii) The number of members who will benefit.

(7) If the applicant is acquiring the land for business purposes, the tribe must provide a business plan that specifies the anticipated economic benefits of the proposed use.

(d) As complete a description as is possible of the following:

(1) The location of the land relative to State boundaries;

(2) The distance of the land from the boundaries of the tribe's reservation;

(3) The distance of the land from the Bureau's nearest agency or area office;

(4) The location of roads and rights-of-way that provide access to the land; and

(5) The location of land in relation to the tribe's other trust lands.

(e) A description of the effect on the State and its political subdivisions of removing the land from tax rolls. Describe any measures the applicant will take to reduce these effects. The description of effects must include an explanation of:

(1) The amount of annual taxes currently assessed by the local government(s);

(2) The amount of annual revenue lost from special assessments to the local government(s), if any;

(3) The amount of annual revenue lost from mineral receipts to the local government(s), if

AR00608

any; and

(4) The local government's ability to provide public safety services for the land.

(f) A description of any jurisdictional and land use infrastructure issues that might arise. The description must address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land;

(ii) Any proposed use conflicts with current zoning; and

(iii) Any tribal zoning ordinances.

(2) Law enforcement and cross-deputizing, including:

(i) Who currently provides law enforcement services for the land;

(ii) If the applicant is a tribe, whether the tribe already has its own law enforcement;

(iii) Who will supply law enforcement if the land is approved for trust status; and

(iv) Any additional resources required to provide adequate law enforcement and how they will be funded.

(3) Safety factors, including:

(i) Who supplies fire protection service for the land;

(ii) Who supplies emergency medical service for the land; and

(iii) Whether the land is in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) A description of existing access to the land;

(ii) Description and quantification of increased traffic in the area anticipated from the proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) The land is served by a city sewage system;

(ii) The land is served by an some other type of sewage system that is adequate to meet applicable standards;

(iii) Trash pickup service or another method of trash disposal is available for the land;

(iv) The city or another facility supplies services to the land;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

AR00609

(vi) Whether the applicant tribe has water rights to the available water supply.

(6) Utilities, including:

(i) Whether a city or a rural electric company supplies electricity to the land; and

(ii) The source of heating for any structures located on or to be located on the land, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there are any cooperative agreements or voluntary actions intended to address jurisdictional and land use conflicts.

(8) Whether the applicant has made any provisions to compensate the State or local governments for revenue lost because of the removal of the land from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

(g) Whether there is title evidence that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U.S. Department of Justice. The evidence will be examined to determine if the **[\*3463]** applicant has marketable title. Copies of the standards are available from the U.S. Department of Justice, Environmental and Natural Resources Division, Land Acquisition Section, Room 6136, 601 Pennsylvania Avenue NW., Washington, DC 20004.

(h) The documentation that we need to comply with 516 DM 6, Appendix 4, National Environmental Policy Act (NEPA) Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations. (For copies of these directives, write to the Department of Interior, Bureau of Indian Affairs, 1849 C Street, NW., Mail Stop: 4513-MIB, Washington, DC 20240). Include a record of consultation with appropriate authorities regarding environmental, endangered species, water quality, fish and wildlife, wetlands, transportation, air quality, cultural, historical value, hazardous waste, and toxic material issues.

(i) If the request is for an individual Indian, documentation demonstrating that the applicant's request meets one of the criteria described in § 151.13.

## § 151.13 -- Can an individual Indian acquire land outside his or her own reservation?

Except as provided in paragraphs (a) and (b) of this section, we will not accept title to land in trust outside an individual Indian's reservation. We may approve acquisitions of land outside an individual Indian's reservation if:

(a) The individual Indian already owns an undivided fractional trust or restricted interest in the property being acquired; or

(b) The individual Indian has sold trust or restricted interest in land and the money received from the sale is reinvested in other land selected and purchased with these funds, or the individual Indian is purchasing land with funds obtained as a result of a sale of trust or restricted land under 25 U.S.C. 409a.

## § 151.14 -- What criteria will BIA use to evaluate a request involving land outside a reservation or outside an approved Tribal Land Acquisition Area?

Upon receipt of the information required under § 151.12 and upon a determination that the application is complete:

(a) We will approve the application to accept land into trust outside a reservation or outside an

AR00610

approved TLAA only if the application shows that the acquisition is necessary to:

(1) Facilitate tribal self-determination, economic development, Indian housing, land consolidation or natural resource protection; and

(2) We determine that the acquisition provides meaningful benefits to the Tribe that outweigh any demonstrable harm to the local community.

(b) Notwithstanding a determination in paragraph (a) of this section that the acquisition is necessary to facilitate tribal self-determination and that the benefits of the acquisition to the tribe outweigh any harm to the local community, we may disapprove an application to accept land into trust outside a reservation or outside an approved TLAA if the acquisition will result in:

(1) Severe negative impacts to the environment, or

(2) Significant harm to the local community. Evidence of such harm must be clear and demonstrable and supported in the application record; or

(3) The inability of the Bureau of Indian Affairs to adequately handle the additional law enforcement and other responsibilities that would result from the acquisition of the land into trust status.

(c) When making a determination under paragraph (a) or (b) of this section to approve or deny an application, we will consider the location of the land relative to the state boundaries, and its distance from the boundaries of the tribe's reservation and whether that distance is reasonable based on the following:

(1) If the land is in a different state than the tribe's reservation, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny

(2) As the distance between the tribe's reservation or approved TLAA and the land to be acquired increases, the tribe's justification of anticipated benefits from the acquisition will be subject to greater scrutiny

(3) As the distance between the tribe's reservation or approved TLAA and the land to be acquired increases, the concerns raised by the state and local governments will be given greater weight.

## Subpart D--Mandatory Acceptance of Title

### § 151.15 -- What information must be provided in a request to process a mandatory transfer of title into trust status, and how will BIA process the request?

(a) To help us determine whether we are mandated by legislation to accept trust title to a specific tract of land, we require submission of the following documentation:

(1) A complete description, or a copy of, the statutory authority that directs the Secretary to place the land in trust, and any limitations contained in that authority;

(2) Title insurance or an abstract of title that meets the *Standards for the Preparation of Title Evidence in Land Acquisitions by the United States,* issued by the U. S. Department of Justice (copies are available from the U.S. Department of Justice, Environmental and Natural Resources Division, Land Acquisition Section, Room 6136, 601 Pennsylvania Avenue NW., Washington, DC 20004); and

(3) Any additional information that we may request.

AR00611

(b) If we determine that the transfer of title into trust status is mandatory, we will publish that determination along with a notice of intent to take the land in trust in the **Federal Register** or in a newspaper of general circulation serving the affected area.

### § 151.16 -- Can our determination that a transfer of title into trust status is mandatory be appealed?

The Department's determination that a transfer of title into trust status is or is not mandatory may be appealed according to requirements set forth in part 2 of this title.

### Subpart E--Tribal Land Acquisition Areas

### § 151.17 -- What is a Tribal Land Acquisition Area?

A TLAA is an area of land approved by the Secretary and designated by a tribe within which the tribe plans to acquire land over a 25-year period of time. If the Secretary approves the TLAA under this part, the tribe can acquire parcels of land within the TLAA during that 25-year period under the on-reservation provisions of this part.

### § 151.18 -- What tribes are eligible to apply for approval of a Tribal Land Acquisition Area?

Tribes which may apply for approval of a TLAA are those tribes which:

(a) Do not have a reservation,

(b) Do not have trust land, or

(c) Have a trust land base which is incapable of being developed in a manner that promotes tribal self-determination, economic development and/or Indian housing.

### § 151.19 -- What must be included in a request for Secretarial approval of a Tribal Land Acquisition Area?

A request for Secretarial approval of a TLAA must be made in writing, although we do not require that it take any special form. However, we strongly urge the applicant to address each applicable section of this part in the order it appears here. Constructing the **[*3464]** application in this way will help us review the request more efficiently. To be complete, a request for Secretarial approval of a TLAA must identify the applicant tribe, and must include:

(a) A complete description, or a copy, of the federal statute(s) that authorize the Secretary to accept land in trust on behalf of the tribe, and any limitations contained in that authority.

(b) Copies of tribal documents relating to the establishment of the TLAA and the acquisition of land within it, including:

(1) A copy of the tribe's constitution and by-laws, corporate charter, resolution, or excerpts from those documents that identify and grant tribal officials the authority to acquire tribal lands on behalf of the tribe;

(2) A copy of a tribal resolution designating the TLAA, including a legal description of the lands located within it; and (3)

(3) A copy of a tribal resolution requesting that the Secretary approve the proposed TLAA.

(c) A narrative summary that describes the purposes and goals for acquiring lands in trust

AR00612

within the TLAA, including general information about whether the lands are to be used for residential, governmental, educational, economic development, or other purposes.

(d) A narrative of the tribe's history that explains:

(1) When the tribe was federally recognized, and whether it was through legislation, treaty, or the Bureau of Indian Affairs' Federal Acknowledgment Process; and

(2) If applicable, how the tribe became dispossessed of its former reservation lands.

(e) A description of the TLAA, including:

(1) A legal description of the lands within the TLAA;

(2) Information about whether the lands are within the tribe's former reservation or aboriginal homelands;

(3) Information about whether the lands are Federal lands, State lands, or private lands;

(4) Information about whether the lands overlap with another tribe's jurisdictional area;

(5) Information about the significance of the land to the tribe, including whether the land has any particular historical, cultural, religious, or other value to the tribe; and

(6) Information about the distance of the TLAA from the Bureau's nearest agency or area office.

(f) A description of the location of roads and rights-of-way, or of additional rights-of-way that may be needed to provide access to lands located within the TLAA.

(g) A description of the reasonably anticipated overall effect on the State and its political subdivisions of removing lands located within the TLAA from tax rolls, and a description of any measures the applicant will take to reduce these effects. The description of effects must include an explanation of:

(1) The amount of annual taxes currently assessed by the local governments for lands located within the TLAA;

(2) The amount of annual revenue which would be lost from special assessments to the local governments, if any;

(3) The amount of annual revenue lost from mineral receipts to the local governments, if any; and

(4) The local governments' ability to provide public safety services for lands located within the TLAA.

(h) A description of any overall jurisdictional and land use infrastructure issues that might arise if the lands within the TLAA is taken into trust. The description must address each of the following issues.

(1) Zoning, including:

(i) The current zoning of the land;

(ii) Any proposed use conflicts with current zoning; and

AR00613

(iii) Applicable tribal zoning ordinances.

(2) Law enforcement and cross-deputizing, including:

(i) Who currently provides law enforcement services for the land;

(ii) Whether the tribe already has its own law enforcement;

(iii) Who will supply law enforcement if the land is approved for trust status; and

(iv) Whether additional resources would be needed to provide adequate law enforcement.

(3) Safety factors, including:

(i) Who supplies fire protection service for lands located within the TLAA;

(ii) Who supplies emergency medical service for lands located within the TLAA; and

(iii) Information about whether lands located within the TLAA are in a flood area or flood control area.

(4) Traffic, roads, and streets, including:

(i) A description of current access to the land;

(ii) Describes and quantifies anticipated increased traffic in the area from proposed use; and

(iii) A description of whether existing roads and streets are adequate to handle any anticipated increase in traffic caused by the proposed use.

(5) Sanitation, including whether:

(i) The lands located within the TLAA are on a city sewage system;

(ii) The lands located within the TLAA are served by an adequate sewage system that meets applicable standards;

(iii) Trash pickup service or another method of trash disposal is available for lands located within the TLAA;

(iv) The city or another facility supplies sanitation services to the lands located within the Tribe Land Acquisition Area;

(v) There is an adequate water supply for the proposed use and any future anticipated uses; and

(vi) Whether the tribe has water rights to the available water supply.

(6) Utilities, including:

(i) Whether a city or a rural electric company supplies electricity to lands located within the TLAA; and

(ii) The source of heating for lands located within the TLAA, such as: natural gas, propane, oil, coal, wood, electric, or solar.

(7) Whether there exist any cooperative agreements or voluntary actions intended to address

AR00614

jurisdictional and land use conflicts.

(8) Whether the tribe has made any provisions to compensate the State and local governments for revenue lost because of the removal of the lands from the tax rolls. (Include any increases in Title IX funding from the Indian Education Act or Impact Aid funding.)

## § 151.20 -- How is a tribal request for Secretarial approval processed?

When we receive a request for Secretarial approval of a TLAA, we will review the supporting documentation to determine if the request meets the requirements of this part. If the request is complete, we will:

(a) Provide notice of the request for Secretarial approval to the Governor's Office, to appropriate local government officials, and to appropriate officials of tribes located within a 50-mile radius of the boundaries of the proposed TLAA. Recipients of the notice will be provided 60 days from the date of receipt in which to comment on the proposed TLAA and the request supporting it. Other interested parties may also submit comments during the 60-day consultation period.

(b) After the close of the comment period, based on the criteria described in § 151.21, we will decide whether to approve the TLAA. Our decision on whether to approve the TLAA will be communicated in the form of a certified letter to the applicant. We also will provide notice of our decision to interested parties by sending a copy of the decision letter to everyone **[*3465]** (including State and local governments) who sent us written comments on the request for approval.

(c) If we decide not to approve the TLAA, we will take no further action.

(d) If we decide to approve the TLAA, we will:

(1) Publish in the **Federal Register**, or in a newspaper of general circulation serving the affected area, a notice of the decision to approve the TLAA; and

(2) Thereafter, for a period of 25 years, review requests to accept trust title land located within the TLAA as "on-reservation" acquisitions under the applicable on-reservation provisions in this part.

## § 151. 21 -- What criteria will BIA use to decide whether to approve a proposed Tribal Land Acquisition Area?

In general, because tribes without reservations are significantly disadvantaged, both in terms of cultural preservation and in terms of being ineligible for federal land-based programmatic funding and technical assistance, there is a presumption in favor of the tribe's need for at least some trust land. However, in determining whether to approve establishment of a TLAA, we will consider the individual circumstances of each applicant tribe, surrounding community, and affected land base. There are some standard criteria which will help direct our decision-making process. These standard criteria include:

(a) The request must be complete and contain all supporting documents;

(b) The statutory basis upon which the tribe proposes creation of the TLAA. If the tribe is the subject of a statute directing the Secretary to take some unspecified land into trust for the tribe's benefit, the tribe will enjoy a greater presumption in favor of approval of its proposed TLAA. (For example, there is statutory language such as "the Secretary shall take land into trust within the tribe's service area," or "the Secretary shall take land into trust within X and Y counties.")

AR00615

(c) The size of the proposed TLAA in relation to the size of the tribe's membership: we will look for a reasonable connection between the amount of land the tribe wishes to take into trust, and the basic trust needs (housing, health, employment opportunities) of the tribe's membership.

(d) The relationship of the tribe to the lands located within the TLAA: we will give greater weight to a request for approval of a TLAA that encompasses lands to which the tribe has established a strong cultural, historical, and/or legal connection.

(e) The ability of the tribe and the local non-Indian community to adjust to the jurisdictional changes that will occur if the lands within the TLAA are taken into trust, including:

(1) That there are adequate arrangements for provision of police and fire protection and other emergency response for persons living within the TLAA (whether living on trust or non-trust property);

(2) That there are adequate arrangements for provision of other municipal-type services, such as garbage removal, water, sewage;

(3) That adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant.

### § 151.22 -- Can a tribe include in its Tribal Land Acquisition Area land inside another tribe's reservation or Tribal Land Acquisition Area?

A tribe may include land inside the reservation boundaries or within an approved TLAA of another tribe, if:

(a) The tribe's governing body consents in writing;

(b) The tribe already owns undivided fractional trust or restricted interests in the tracts of land identified in its TLAA; or

(c) The tracts of land to be included in the TLAA are inside a reservation or an approved TLAA that is shared by two or more tribes, and the plan is for one of these tribes.

### § 151.23 -- If a Tribal Land Acquisition Area is not approved, is the tribe prohibited from acquiring land within it?

No. However, the tribe will have to apply to have individual parcels taken into trust under the off-reservation provisions of this part.

### § 151.24 -- If a Tribal Land Acquisition Area is approved, does the land taken into trust within it attain reservation status?

No. Lands taken into trust within a TLAA will enjoy "Indian country" status as that term has been defined in relevant federal statutes and case law. However, those lands do not attain "reservation" status by virtue of the TLAA having been approved by the Secretary. Reservation status can only be attained if:

(a) The tribe has applied to the Secretary under 25 U.S.C. 467; or

(b) There is a federal statute specifically designating the land as a reservation.

### § 151.25 -- Can a Tribal Land Acquisition Area be modified after approval?

Yes. However, the changes must be submitted with a request for approval in compliance with

AR00616

the criteria in this part and must be approved by the Secretary.

**Subpart F--False Statements, Recordkeeping, Information Collection**

**§ 151.26 -- What is the penalty for making false statements in connection with a request that BIA place land into trust?**

Anyone who knowingly and willfully makes a false statement in connection with a trust title acquisition request may be subject to criminal prosecution under the False Statements Accountability Act of 1996, 18 U.S.C. 1001.

**§ 151.27 -- Who owns the records associated with this part?**

(a) Records are the property of the United States if they:

(1) Are made or received by a tribe or tribal organization in the conduct of a federal trust function under this part, including the operation of a trust program; and

(2) Evidence the organization, functions, policies, decisions, procedures, operations, or other activities undertaken in the performance of a federal trust function under this part.

(b) Records not covered by paragraph (a) of this section that are made or received by a tribe or tribal organization in the conduct of business with the Department of the Interior under this part are the property of the tribe.

**§ 151.28 -- How must a record associated with this part be preserved?**

(a) Any organization, including tribes and tribal organizations, that have records identified in § 151.26(a) must preserve the records in accordance with approved Departmental records retention procedures under the Federal Records Act, 44 U.S.C. chapters 29, 31, and 33. These records and related records management practices and safeguards required under the Federal Records Act are subject to inspection by the Secretary and the Archivist of the United States.

(b) A tribe or tribal organization should preserve the records identified in § 151.26(b) for the period of time authorized by the Archivist of the United States for similar Department of the Interior records in accordance with 44 U.S.C. chapter 33. If a tribe or tribal organization does not preserve records associated with its conduct of business with the Department of the Interior under this part, it may prevent the tribe or tribal organization from being able to adequately document essential transactions or furnish information necessary to protect its legal and financial rights or those of persons directly affected by its activities.  **[*3466]**

Dated: December 29, 2000.

**Kevin Gover,**

*Assistant Secretary--Indian Affairs.*

[FR Doc. 01-470 Filed 1-12-01; 8:45 am]

BILLING CODE 4310-02-P

.../retrieve?_m=a99d9a36a39a7a99c69e3d6537caf89e&_browseType=TEXTONLY&docnu  01/26/2001

AR00617

About LEXIS-NEXIS | Terms and Conditions

Copyright © 2001 LEXIS-NEXIS Group.  All rights reserved.

AR00618



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

JAN 1 6 2001

Memorandum

To:        Assistant Secretary - Indian Affairs

From:      Solicitor

Subject:   Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian
           Affairs entitled "Trust Land for the Natives of Venetie and Arctic Village"

In the referenced Opinion, the Associate Solicitor for Indian Affairs concluded that the Alaska
Native Claims Settlement Act (ANCSA) precludes the Secretary from taking land in trust for
Alaska Natives except for members of the Metlakatla Indian Community. On April 12, 1999, the
Department published proposed amendments to the regulations found at 25 C.F.R. Part 151,
which govern the Secretary's authority to take land into trust. 64 Fed. Reg. 17574. The
preamble to the proposed rule observed that the regulatory bar to the acquisition of trust lands in
Alaska in the original version of the Part 151 regulations was predicated upon the 1978 Opinion.
It acknowledged that "there is a credible legal argument that ANCSA did not supersede the
Secretary's authority to take land into trust in Alaska" under the Indian Reorganization Act. Id.
at 17577-78. It also noted that the Secretary had been petitioned to undertake a rulemaking to
remove the prohibition on taking land in trust in Alaska. Ibid. See also 60 Fed. Reg. 1956
(1995). The preamble invited comments on these issues.

Comments and legal arguments have been submitted by Alaska Native governments and groups
and by the State of Alaska and two leaders of the Alaska State Legislature on whether the
Associate Solicitor's Opinion accurately states the law. After considering those comments, I
have concluded that there is substantial doubt about the validity of the conclusion reached in the
1978 Opinion. Among other things, the Associate Solicitor found "significant" that in 1976
Congress repealed section 2 of the Indian Reorganization Act (IRA). That section had extended
certain provisions of the IRA to Alaska, and had given the Secretary the authority to designate
certain lands in Alaska as Indian reservations. See 43 U.S.C. § 704(a), 90 Stat. 2743, repealing
49 Stat. 1250, 25 U.S.C. § 496. The 1978 Opinion gave little weight to the fact that Congress
had not repealed section 5 of the IRA, which is the generic authority by which the Secretary
takes Indian land into trust, and which Congress expressly extended to Alaska in 1936. See 25
U.S.C. § 473a. The failure of Congress to repeal that section, when it was repealing others
affecting Indian status in Alaska, five years after Congress enacted the Alaska Native Claims
Settlement Act in 1971, raises a serious question as to whether the authority to take land into
trust in Alaska still exists.

AR00619

The Department has, in its final Part 151 regulations being published today, decided in its sound discretion to continue in place the bar against taking Native land in Alaska into trust (other than Metlakatla). 25 C.F.R. § 151.3(c). The preamble to these regulations expresses the Department's determination to continue this prohibition in place for three years, "during which time the Department will consider the legal and policy issues involved in determining whether the Department ought to remove the prohibition," and to provide notice and an opportunity to comment on any decision to remove it. Because of my substantial doubt about the validity of the conclusion in the 1978 Opinion, and in order to clear the record so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust, I am hereby rescinding the Associate Solicitor's 1978 Opinion.

AR00620



RECEIVED

JAN 16 2001

REG. SOLICITOR



*Office of the Solicitor*
*Division of Indian Affairs*

## TRANSMITTAL SHEET

*Privileged and Confidential*

DATE: Tuesday, January 16, 2001

|  | Office # | Fax # |
|---|---|---|
| To: Lauri Adams, Regional Solicitor | (907)271-4131 | (907)271-4143 |
| Roger Hudson | (907) 271-4131 | (90&)271-4143 |
| From:   Mary Anne Kenworthy | (202)208-3401 | (202)208-3490 |

Pages: 03 (including fax cover)

Subject:       Rescinding the 09-15-78, Opinion of the Associate
Solicitor for the Affairs entitled "Trust Land for the
Natives of Venetie and Arctic Village".

Message:

ROGER, MARY ANNE WILL BE E-MAILING
YOU REGARDING THIS MEMORANDUM.

# United States Department of the Interior

### OFFICE OF THE SOLICITOR
Washington, D.C. 20240

JAN 1 6 2001

Memorandum

To:        Assistant Secretary - Indian Affairs

From:      Solicitor

Subject:   Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian
           Affairs entitled "Trust Land for the Natives of Venetie and Arctic Village"

In the referenced Opinion, the Associate Solicitor for Indian Affairs concluded that the Alaska
Native Claims Settlement Act (ANCSA) precludes the Secretary from taking land in trust for
Alaska Natives except for members of the Metlakatla Indian Community. On April 12, 1999, the
Department published proposed amendments to the regulations found at 25 C.F.R. Part 151,
which govern the Secretary's authority to take land into trust. 64 Fed. Reg. 17574. The
preamble to the proposed rule observed that the regulatory bar to the acquisition of trust lands in
Alaska in the original version of the Part 151 regulations was predicated upon the 1978 Opinion.
It acknowledged that "there is a credible legal argument that ANCSA did not supersede the
Secretary's authority to take land into trust in Alaska" under the Indian Reorganization Act. Id.
at 17577-78. It also noted that the Secretary had been petitioned to undertake a rulemaking to
remove the prohibition on taking land in trust in Alaska. Ibid. See also 60 Fed. Reg. 1956
(1995). The preamble invited comments on these issues.

Comments and legal arguments have been submitted by Alaska Native governments and groups
and by the State of Alaska and two leaders of the Alaska State Legislature on whether the
Associate Solicitor's Opinion accurately states the law. After considering those comments, I
have concluded that there is substantial doubt about the validity of the conclusion reached in the
1978 Opinion. Among other things, the Associate Solicitor found "significant" that in 1976
Congress repealed section 2 of the Indian Reorganization Act (IRA). That section had extended
certain provisions of the IRA to Alaska, and had given the Secretary the authority to designate
certain lands in Alaska as Indian reservations. See 43 U.S.C. § 704(a), 90 Stat. 2743, repealing
49 Stat. 1250, 25 U.S.C. § 496. The 1978 Opinion gave little weight to the fact that Congress
had not repealed section 5 of the IRA, which is the generic authority by which the Secretary
takes Indian land into trust, and which Congress expressly extended to Alaska in 1936. See 25
U.S.C. § 473a. The failure of Congress to repeal that section, when it was repealing others
affecting Indian status in Alaska, five years after Congress enacted the Alaska Native Claims
Settlement Act in 1971, raises a serious question as to whether the authority to take land into
trust in Alaska still exists.

AR00622

The Department has, in its final Part 151 regulations being published today, decided in its sound discretion to continue in place the bar against taking Native land in Alaska into trust (other than Metlakatla). 25 C.F.R. § 151.3(c). The preamble to these regulations expresses the Department's determination to continue this prohibition in place for three years, "during which time the Department will consider the legal and policy issues involved in determining whether the Department ought to remove the prohibition," and to provide notice and an opportunity to comment on any decision to remove it. Because of my substantial doubt about the validity of the conclusion in the 1978 Opinion, and in order to clear the record so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust, I am hereby rescinding the Associate Solicitor's 1978 Opinion.

AR00623

Case 1:06-cv-01405-RWR Document 21-15 Filed 02/08/2008 Page 32 of 63



DATE: ___January 17, 2001___

NUMBER OF PAGES (INCLUDING COVER SHEET): 3

TO: ___ALL REGIONAL DIRECTORS AND REGIONAL REALTY OFFICERS___

LOCATION: VARIOUS

MACHINE PHONE NO.: VARIOUS

REGARDING: Office of the Solicitor Memo dated 1/26/2001 rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian Affairs entitled "Trust Land for the Natives of Venetie and Arctic Village.

FROM: Larry E. Scrivner_____ PHONE NO.: (202) 208-5831

FAX NO.: (202) 219-1255

The attached memo rescinds an Associate Solicitor's opinion of September 15, 1978, dealing with Alaska. Please ensure that all appropriate staff receive a copy of the memorandum. You may also want to furnish your Field or Regional Solicitor's Office with a copy of the memo.

To All Realty Offices
From Glenda Miller
C C: Roger Hudson

AR00624



# United States Department of the Interior

OFFICE OF THE SOLICITOR
Washington, D.C. 20240

JAN 1 6 2001

Memorandum

To:          Assistant Secretary - Indian Affairs

From:      Solicitor

Subject:   Rescinding the September 15, 1978, Opinion of the Associate Solicitor for Indian
               Affairs entitled "Trust Land for the Natives of Venetie and Arctic Village"

In the referenced Opinion, the Associate Solicitor for Indian Affairs concluded that the Alaska
Native Claims Settlement Act (ANCSA) precludes the Secretary from taking land in trust for
Alaska Natives except for members of the Metlakatla Indian Community. On April 12, 1999, the
Department published proposed amendments to the regulations found at 25 C.F.R. Part 151,
which govern the Secretary's authority to take land into trust. 64 Fed. Reg. 17574. The
preamble to the proposed rule observed that the regulatory bar to the acquisition of trust lands in
Alaska in the original version of the Part 151 regulations was predicated upon the 1978 Opinion.
It acknowledged that "there is a credible legal argument that ANCSA did not supersede the
Secretary's authority to take land into trust in Alaska" under the Indian Reorganization Act. Id.
at 17577-78. It also noted that the Secretary had been petitioned to undertake a rulemaking to
remove the prohibition on taking land in trust in Alaska. Ibid. See also 60 Fed. Reg. 1956
(1995). The preamble invited comments on these issues.

Comments and legal arguments have been submitted by Alaska Native governments and groups
and by the State of Alaska and two leaders of the Alaska State Legislature on whether the
Associate Solicitor's Opinion accurately states the law. After considering those comments, I
have concluded that there is substantial doubt about the validity of the conclusion reached in the
1978 Opinion. Among other things, the Associate Solicitor found "significant" that in 1976
Congress repealed section 2 of the Indian Reorganization Act (IRA). That section had extended
certain provisions of the IRA to Alaska, and had given the Secretary the authority to designate
certain lands in Alaska as Indian reservations. See 43 U.S.C. § 704(a), 90 Stat. 2743, repealing
49 Stat. 1250, 25 U.S.C. § 496. The 1978 Opinion gave little weight to the fact that Congress
had not repealed section 5 of the IRA, which is the generic authority by which the Secretary
takes Indian land into trust, and which Congress expressly extended to Alaska in 1936. See 25
U.S.C. § 473a. The failure of Congress to repeal that section, when it was repealing others
affecting Indian status in Alaska, five years after Congress enacted the Alaska Native Claims
Settlement Act in 1971, raises a serious question as to whether the authority to take land into
trust in Alaska still exists.

JAN-17-2001 WED 09:23 AM    31                    FAX NO. 31                P. 03

01/17/01   09:03 FAX 12025 RWR5    Document 21-15    Filed 02/08/2008    Page 34 of 63
REAL ESTATE SERVICES        →  Juneau Realty      ☒003/003

The Department has, in its final Part 151 regulations being published today, decided in its sound discretion to continue in place the bar against taking Native land in Alaska into trust (other than Metlakatla). 25 C.F.R. § 151.3(c). The preamble to these regulations expresses the Department's determination to continue this prohibition in place for three years, "during which time the Department will consider the legal and policy issues involved in determining whether the Department ought to remove the prohibition," and to provide notice and an opportunity to comment on any decision to remove it. Because of my substantial doubt about the validity of the conclusion in the 1978 Opinion, and in order to clear the record so as not to encumber future discussions over whether the Secretary can, as a matter of law, and should, as a matter of policy, consider taking Native land in Alaska into trust, I am hereby rescinding the Associate Solicitor's 1978 Opinion.

AR00626

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

### 25 CFR Part 151

**RIN 1076–AD90**

### Acquisition of Title to Land in Trust: Delay of Effective Date

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Final rule; delay of effective date.

**SUMMARY:** In accordance with the memorandum of January 20, 2001, from the Assistant to the President and Chief of Staff, entitled "Regulatory Review Plan," 66 FR 7701 (Jan. 24, 2001), this document temporarily delays for 60 days the effective date of the rule entitled Acquisition of Title to Land in Trust, published in the **Federal Register** on January 16, 2001, at 66 FR 3452. That rule concerns procedures used by Indian tribes and individuals to ask the Secretary of the Interior to acquire title to land into trust and criteria used to determine whether to accept land to be held in trust.

**DATES:** The effective date of the Acquisition of Title to Land in Trust rule, amending 25 CFR part 151, published in the **Federal Register** on January 16, 2001, at 66 FR 3452, is delayed for 60 days, from January 16, 2001 to a new effective date of March 17, 2001.

**FOR FURTHER INFORMATION CONTACT:** Terry Virden, Director, Office of Trust Responsibilities, Mail Stop: 4513–MIB, 1849 "C" Street NW., Washington, DC 20240; telephone: 202–208–5831; electronic mail: *TerryVirden@BIA.GOV*

**SUPPLEMENTARY INFORMATION:** The Department's implementation of this action without opportunity for public comment, effective immediately upon publication today in the **Federal Register**, is based on the good cause exceptions in 5 U.S.C. sections 553(b)(3)(B) and 553(d)(3), in that seeking public comment is impractical, unnecessary and contrary to the public interest. The temporary 60-day delay in effective date is necessary to give Department officials the opportunity for further review and consideration of new regulations, consistent with the Assistant to the President's memorandum of January 20, 2001. Given the imminence of the effective date, seeking prior public comment on this temporary delay would have been impractical, as well as contrary to the public interest in the orderly promulgation and implementation of regulations.

Dated: January 31, 2001.
Timothy S. Elliott,
*Acting Deputy Solicitor.*
[FR Doc. 01–2963 Filed 2–2–01; 8:45 am]
**BILLING CODE 4310-02-M**

## DEPARTMENT OF AGRICULTURE

### Forest Service

### 36 CFR Part 294

**RIN 0596–AB77**

### Special Areas; Roadless Area Conservation: Delay of Effective Date

**AGENCY:** Forest Service, Department of Agriculture.

**ACTION:** Final rule; Delay of effective date.

**SUMMARY:** In accordance with the memorandum of January 20, 2001, from the Assistant to the President and Chief of Staff, entitled "Regulatory Review Plan," published in the **Federal Register** on January 24, 2001, this action temporarily delays for 60 days the effective date of the rule entitled Special Areas; Roadless Area Conservation, published in the **Federal Register** on January 12, 2001, 66 FR 3244. That rule concerns the establishment of prohibitions on road construction, road reconstruction, and timber harvesting in inventoried roadless areas on National Forest System lands. To the extent that 5 U.S.C. section 553 applies to this action, it is exempt from notice and comment because it constitutes a rule of procedure under 5 U.S.C. section 553(b)(A). Alternatively, the Department's implementation of this rule without opportunity for public comment, effective immediately upon publication today in the **Federal Register**, is based on the good cause exceptions in 5 U.S.C. section 553(b)(B) and 553(d)(3). Seeking public comment is impracticable, unnecessary and contrary to the public interest. The temporary 60-day delay in effective date is necessary to give Department officials the opportunity for further review and consideration of new regulations, consistent with the Assistant to the President's memorandum of January 20, 2001. Given the imminence of the effective date, seeking prior public comment on this temporary delay would have been impractical, as well as contrary to the public interest in the orderly promulgation and implementation of regulations. The imminence of the effective date is also good cause for making this rule effective immediately upon publication.

**DATES:** The effective date of the Special Areas; Roadless Area Conservation, published in the **Federal Register** on January 12, 2001, at 66 FR 3244, is delayed for 60 days, from March 13, 2001 to a new effective date of May 12, 2001.

**FOR FURTHER INFORMATION CONTACT:** Marian P. Connolly, Regulatory Officer, Department of Agriculture, Forest Service, P.O. Box 96090, Washington, DC 20090–6090, telephone (703) 605–4533.

Dated: January 29, 2001.
Ann M. Veneman,
*Secretary.*
[FR Doc. 01–2869 Filed 2–2–01; 8:45 am]
**BILLING CODE 3410-11-M**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 90

**[PR Docket No. 92–235; FCC 00–439]**

### Replacement of Part 90 by Part 88 To Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them and Examination of Exclusivity and Frequency Assignment Policies of the Private Land Mobile Services

**AGENCY:** Federal Communications Commission.

**ACTION:** Final rule; petitions for reconsideration.

**SUMMARY:** This document disposes of seven petitions for reconsideration or clarification and one comment submitted in response to the Commission's Final rule. The Commission accepts a compromise frequency coordination plan, thus disposing of two petitions and facilitating the frequency coordination process. Petitions seeking other relief are granted, granted in part, dismissed or denied, thereby to provide further protection to safety related communications of Private Land Mobile Radio (PLMR) licensees while still maintaining the spectrum efficiency achieved through the sharing of PLMR frequencies among multiple users.

**DATES:** Effective March 7, 2001 except for §§ 90.35(b)(2)(iii) and 90.175(b)(1) which contain information collection that has not been approved by the Office of Management and Budget (OMB). The Commission will publish a document in the **Federal Register** announcing the effective date of those sections and that paragraph. Written comments by the public on new and/or modified information collections are due April 6,

AR00627

**8900**  Federal Register / Vol. 66, No. 24 / Monday, February 5, 2001 / Rules and Regulations

2001. OMB must submit written comments on the information collection on or before June 5, 2001.

**ADDRESSES:** In addition to filing comments with the Secretary, a copy of any comments on the information collection(s) contained herein should be submitted to Judy Boley, Federal Communications Commission, Room 1—C804, 445 12th Street, SW., Washington, DC 20554, email jboley@fcc.gov.

**FOR FURTHER INFORMATION, CONTACT:** Michael J. Wilhelm, 445 12th Street, SW., Room 4C305, Washington, DC 20554; telephone 202.418.0680; email mwilhelm @ fcc.gov. For further information on the information collection(s) contact Judy Boley, Federal Communications Commission, Room 1–C804, 445 12th Street, SW., Washington, DC 20554, email jboley@fcc.gov.

**SUPPLEMENTARY INFORMATION:** This is a summary of the Commission's *Fifth Memorandum Opinion and Order* (Fifth MO&O) in WT Docket 92–225 released December 29, 2000. The complete text of this *Fifth MO&O* is available for inspection and copying during normal business hours in the FCC Reference Information Center, Courtyard Level, 445 12th Street, SW., Washington, DC 20554; and also is available from the Commission's copying contractor, International Transcription Services (ITS, Inc.) Courtyard Level, 445 12th Street, SW., Washington, DC 20554. The *Fifth MO&O* addressed seven petitions for reconsideration and one comment, all directed to the rules established by the Commission's Second Report and Order (Second R&O) 62 FR 18834 4/17/97 in this proceeding.

1. In petitions for reconsideration, the Forest Industries Telecommunications (FIT) and the Manufacturers Radio Frequency Advisory Council (MRFAC) opposed earlier-adopted rules that gave licensees and applicants for former Power, Petroleum, and Railroad frequencies special treatment in the frequency coordination process whereby licensees are assigned particular radio channels. After the FIT and MRFAC petitions had been filed, the Land Mobile Communications Council (LMCC) filed a comment containing a compromise frequency coordination plan that was satisfactory to LMCC members, including FIT and MRFAC. Accordingly, the Commission adopted the substance of the LMCC plan and devised implementing rule provisions. Additionally, the Commission directed frequency coordinators to reach consensus on the standards to be used to assess co-channel and adjacent channel interference and to report the

results of their consensus findings to the Commission.

2. Although the Commission favors narrowband radio equipment because it conserves valuable spectrum, there are instances in which wideband equipment of particular designs may also be spectrum efficient. In the *Second R&O*, the Commission said that it would consider waiver requests from potential licensees who wanted to use spectrum-efficient wideband equipment. In its petition for reconsideration, MRFAC suggested that evaluation of such waiver requests should be done by frequency coordinators. The Commission disagreed, pointing out that there were *public interest considerations* inherent in such waiver requests and that the Commission is best equipped to evaluate matters related to the public interest.

3. In its petition for reconsideration, Dataradio claimed that a low power channel plan submitted by the LMCC allowed secondary voice transmissions on data channels. It argued that such voice transmissions would result in harmful interference to data transmissions. The Commission dismissed Dataradio's claim as premature because the LMCC plan dealing with reserved data channels had not been accepted by the Commission and thus was not ripe for reconsideration.

4. The Alarm Industry Communications Committee and a law firm filed petitions for clarification asking the Commission to confirm that the *Second R&O* rule that deleted the requirement that low power stations be licensed as mobiles, did not mean that the applications for such stations had to contain geographical coordinates and other information typically required of fixed stations. The Commission confirmed that was the case and reiterated that licensees of such stations can place transmitters anywhere within a defined service area by specifying a central location and a radius extending therefrom.

5. In its petition for reconsideration, UTC claimed that the Commission had failed to provide frequency coordination protection from adjacent channel interference. The Commission stated that UTC was mistaken and that it had been clear in the *Second R&O* that frequency coordinators should take adjacent channel interference into account in the frequency coordination process.

6. The Hewlett Packard Corporation petition for reconsideration requested a negotiated rulemaking or other process to adopt rules that would protect medical telemetry operations. The

Commission denied the petition because, since submission of the petition for reconsideration, other measures to protect medical telemetry had been adopted.

7. In its petition for reconsideration, Com Net Ericsson requested certain modifications or deletions to the Commission's rules regulating trunked operation of radio facilities. The Com Net Ericsson request was dismissed because the Commission had already made the requested changes in connection with a related proceeding.

**Final Regulatory Flexibility Analysis**

8. As required by the Regulatory Flexibility Act, 5 U.S.C. 603 (RFA), an Initial Regulatory Flexibility Analysis (IRFA) was incorporated into the *Notice of Proposed Rule Making* and the *Further Notice of Proposed Rule Making* in PR Docket 92–235.[1] The Commission sought written public comment on the rule making proposals in the *Refarming Notice* and *Further Notice*, including on the respective IRFAs. This present Final Regulatory Flexibility Analysis (Final FRFA) in this *Fifth MO&O* conforms to the RFA.[2]

(1) Need For, and Objectives of This Action

9. Our objective is to increase spectrum efficiency and facilitate the introduction of advanced technologies

---

[1] Replacement of Part 90 by Part 88 to Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them, PR Docket 92–235, *Notice of Proposed Rule Making*, 57 FR 54034 11/16/92, 7 FCC Rcd 8105, 8133 (1992) (*Refarming Notice*). Replacement of Part 90 by Part 88 to Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them and Examination of Exclusivity and Frequency Assignments Policies of the Private Land Mobile Radio Services, PR Docket No. 92–235, *Report and Order and Further Notice of Proposed Rule Making*, 60 FR 37152 7/19/95, 10 FCC Rcd 10076, 10177 (1995) (*Report and Order or Further Notice*). A Final Regulatory Flexibility Analysis was provided in the first *Memorandum Opinion and Order*, Replacement of Part 90 by Part 88 to Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them, PR Docket 92–235, *Memorandum Opinion and Order*, 62 FR 2027 1/15/97, 11 FCC Rcd. 17676, 17718 (1996). An additional Final Regulatory Flexibility Analysis was furnished in connection with the *Second Report and Order*, Replacement of Part 90 by Part 88 to Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them, PR Docket 92–235, *Second Report and Order*, 62 FR 18834 4/17/97, 12 FCC Rcd 14307, 14353 (1997). A Supplemental Final Regulatory Flexibility was provided in the *Second Memorandum Opinion and Order*, Replacement of Part 90 by Part 88 to Revise the Private Land Mobile Radio Services and Modify the Policies Governing Them, PR Docket 92–235, *Second Memorandum Opinion and Order*, 64 FR 36258 7/6/99 14 FCC Rcd. 8642, 8673 (1999).

[2] *See* 5 U.S.C. 603. The RFA, *see* 5 U.S.C. 601 *et seq.*, has been amended by the Contract With America Advancement Act of 1996, Public Law 104–121, 110 Stat. 847 (1996) (CWAAA). Title II of the CWAAA is The Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA).

# Proposed Rules

Federal Register

Vol. 66, No. 73

Monday, April 16, 2001

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

### 25 CFR Part 151

### Acquisition of Title to Land in Trust; Delay of Effective Date

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Delay of effective date of final rule; request for comments.

**SUMMARY:** This action temporarily delays for 120 days the effective date of the rule titled "Acquisition of Title to Land in Trust," that we published in the **Federal Register** on January 16, 2001. We are extending the comment period in order to seek comments on whether the final rule should be amended in whole or in part or withdrawn in whole or in part.

**DATES:** The effective date of the Acquisition of Title to Land Trust rule, amending 25 CFR Part 151, published in the **Federal Register** of Tuesday, February 20, 2001, at 68 FR 10815, is delayed from April 16, 2001, to August 13, 2001. Comments must be received by June 15, 2001.

**ADDRESSES:** Submit comments on whether the final rule should be amended in whole or in part or withdrawn in whole or in part to: Terry Virden, Director, Office of Trust Responsibilities, MS 4513–MIB, 1849 C Street NW., Washington, DC 20240. You can also submit comments by electronic mail to: TerryVirden@bia.gov.

**FOR FURTHER INFORMATION CONTACT:** Terry Virden, Director, Office of Trust Responsibilities, Mail Stop: 4513–MIB, 1849 "C" Street NW., Washington, DC 20240; telephone 202–208–5831; electronic mail: TerryVirden@bia.gov.

**SUPPLEMENTARY INFORMATION:** This action temporarily delays for 120 days the effective date of the rule entitled "Acquisition of Title to Land in Trust," published in the **Federal Register** on January 16, 2001, at 66 FR 3452. On February 5, 2001, the Department

published an extension of the effective date of the amended rule from January 16, 2001, to March 17, 2001. 66 FR 8899. On February 20, 2001, the Department published a correction to the rule published on February 5th and corrected the delay effective date to April 16, 2001. 66 FR 10815. This document now extends the effective date of the final rule from April 16, 2001, an additional 120 days, to a new effective date of August 13, 2001, in order to seek comments on whether the final rule should be amended in whole or in part or withdrawn in whole or in part.

During the extension of the effective date of the final rule to April 16, the Department reviewed the rule and decided it should solicit public comments on whether to amend the rule in whole or in part or to withdraw the final rule in whole or in part. During this 120-day delay of the effective date of the final rule, the Department will seek comments for 60 days on whether the final rule should be withdrawn in whole or in part or amended in whole or in part. At the end of the 120 days, the Department will evaluate the comments received and make a determination on whether to amend the rule in whole or in part or to withdraw the final rule in whole or in part. Given the imminence of the effective date of the final rule, seeking prior public comment on this temporary delay would have been impractical, as well as contrary to the public interest in the orderly promulgation and implementation of regulations.

To the extend that 5 U.S.C. section 553 applies to this action, this extension of the comment period is exempt from notice and comment because it constitutes a rule of procedure under 5 U.S.C. section 553(b)(A). Alternatively, the Department's extension of the comment period without opportunity for public comment is based upon the good cause exceptions in 5 U.S.C. sections 553(b)(3)(B) and 553(d)(3), in that seeking public comment on the extension of the effective date is impractical, unnecessary and contrary to the public interest.

Dated: April 11, 2001.

James McDivitt,

*Deputy Assistant Secretary—Indian Affairs (Management).*

[FR Doc. 01–9382 Filed 4–13–01; 8:45 am]

**BILLING CODE 4310–02–M**

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 258

**[FR–6964–9]**

### Project XL Site-Specific Rulemaking for Buncombe County Landfill, Alexander, Buncombe County, North Carolina

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Proposed rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is today proposing a site-specific rule to implement a project under the Project XL program, an EPA initiative to allow regulated entities to achieve better environmental results at decreased costs. Project XL ("eXcellence and Leadership") was announced on March 16, 1995 as a central part of the National Performance Review and EPA's efforts to reinvent environmental protection. Today's proposal would provide regulatory flexibility under the Resource Conservation and Recovery Act (RCRA), as amended, for the Buncombe County Solid Waste Management Facility, Alexander, Buncombe County, North Carolina ("Buncombe County").

Buncombe County, the State of North Carolina, and EPA signed a Final Project Agreement (FPA) for a project under EPA's Project XL to use certain bioreactor techniques at its municipal solid waste landfill (MSWLF), specifically, the recirculation of landfill leachate, with the possible addition of water, to accelerate the biodegradation of landfill waste, to decrease the time it takes for the waste to reach stabilization in the landfill, and to promote recovery of landfill gas. The principal objective of this XL project is to demonstrate that leachate can safely be recirculated over a liner that differs from the liner prescribed in EPA MSWLF regulations. To implement this project, Buncombe County will need relief from certain regulatory requirements in EPA regulations which set forth the design and operating criteria for MSWLFs.

Under existing regulations, leachate recirculation in Cells 1 and 2 is authorized because those cells were constructed using the prescribed composite liner. The proposed rule to allow leachate recirculation over an alternative liner would apply to

4/16/01
#12

# COMMENTS ON THE SECRETARY'S PROPOSED RULE
## FOR 25 C.F.R. Part 151, "ACQUISITION OF TITLE TO LAND IN TRUST" at 69 FED. REG. 17574 (April 12, 1999)

On Behalf Of:

ALASKA INTER-TRIBAL COUNCIL
CHILKOOT INDIAN ASSOCIATION
NATIVE VILLAGE OF LARSEN BAY
KENAITZE INDIAN TRIBE
NATIVE VILLAGE OF TULUKSAK
RurAL CAP
NATIVE VILLAGE OF FT. YUKON

Submitted to: OFFICE OF TRUST RESPONSIBILITIES
Bureau of Indian Affairs
1849 C Street, NW, MS-4513-MIB
Washington, D.C. 20240

Dated: _____6-8-01_____

# COPY

AR00630

## I.    INTRODUCTION

These comments are offered in response to the Secretary's extension of the comment period on the final rule to seek comment on whether the rule should be amended in whole or in part or withdrawn in whole or in part. For the reasons given below, we urge the Secretary to amend to final rule in part to apply to Alaska Native tribes.

## II.    DISCRETIONARY ACQUISITIONS IN ALASKA

In 1995, the Chilkoot Indian Association, Native Village of Larsen Bay and Kenaitze Indian Tribe filed a petition setting forth the legal arguments supporting the Secretary's statutory authority to take lands into trust following the passage of the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1601 *et seq.* (ANCSA), and requesting that the Secretary revise 25 C.F.R. § 151.1 to comply with the IRA. (60 Fed. Reg. 1956 (1995). No final action on the petition has occurred to date although the final rule proposes to continue the regulatory bar to acquisition of title in trust in Alaska "subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that ANCSA lands are Indian country." 60 Fed. Reg. at 17578.

Comment:    The final rule does not give an explanation for failing to take action on the Chilkoot *et al.* petition and does not respond to the legal arguments contained therein except to note that "we recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA." Despite this acknowledgment of legal authority, the proposed rule maintains the regulatory bar to acquisition of title in trust in Alaska and solicits comment on the continued validity of the Associate Solicitor's opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) ("Fredericks opinion"), in light of the United States Supreme Court's ruling in *Alaska v. Venetie*, 522 U.S. 520 (1998).

The legal basis for Secretarial authority to take lands into trust in Alaska as set forth in the Chilkoot *et al.* petition remains valid today. As we explained there, the Fredericks opinion incorrectly concluded that it would be an abuse of Secretarial discretion to take tribal land into trust following the passage of ANCSA. That opinion is not well founded since ANCSA did not repeal the Secretary's authority to take land into trust under the IRA, 25 U.S.C. § 465.

The IRA amendments of May 1, 1936 c. 254, 49 Stat. 1250 expanded the application of the IRA's various provisions to the Territory of Alaska. Although Section 2 of the IRA, which gave the Secretary authority to designate certain lands in Alaska as

Comments on Acquisition of Title to Land in Trust
Page 2



Indian reservations was repealed by Congress in 1976, section 465, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a of the IRA, was not repealed. The Fredericks opinion makes no distinction between "reservation" lands and "trust" lands[1], but simply assumes that Congress impliedly repealed the Secretary's authority with respect to both types of land tenure with the passage of ANCSA.

      To the contrary, Congress has passed no legislation that has repealed or in any way affected the right conferred to Alaska Native tribes by Section 473a of the IRA. Congress has only strengthened the protections afforded tribes by amending the IRA to prohibit promulgation of any "regulation" or "decision or determination" "that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 476 (f) & (g). The final rule violates this statutory prohibition by denying Alaska's federally recognized tribes an equal status with federally recognized tribes in the continental United States. This differing treatment is inconsistent with the Secretary's prior pronouncement that Alaska tribes are entitled to the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

      The legal underpinnings for Secretarial authority to acquire lands in trust for Alaska tribes has not been changed, altered or undermined by the Supreme Court's decision in *Alaska v. Venetie*, 522 U.S. 520 (1998). In *Venetie*, the Court addressed the question of whether Venetie's former ANCSA lands met the test for Indian country under 15 U.S.C. 1151(b). The Court held that ANCSA lands do not satisfy requirements for "Indian country" status because such lands were not set aside for Indians as such (since they were conveyed to corporations), and because ANCSA lands lack any restriction on alienability, the requisite federal superintendence over the land was missing. The Court rejected the proposition advanced by the State that no Indian country existed in Alaska, and instead held that "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of 1151(b) or if it constitutes 'allotments' under § 1151(c)." 522 U.S. at n.2. The Court did not address the question of whether the Secretary retains authority under the IRA to place lands into trust in Alaska. Since the statutory basis for the Secretary's authority remains in tact, neither the Fredericks opinion nor the *Venetie* opinion can validly be relied upon as bases for precluding Alaska tribes from enjoying the "same protection, immunities, [and] privileges [shared by] other acknowledged

---

[1] The final rule recognizes this distinction as it specifically notes at section 151.23 that lands taken into trust enjoy "Indian country" status but do not attain "reservation" status. This view is clearly at odds with the Fredericks opinion and justifies its withdrawal.

Comments on Acquisition of Title to Land in Trust
Page 3



COPY

tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

      Rather than take final action on the petition's specific request to revise 25 C.F.R. § 151.1 consistent with federal law, the final rule solicits the views of the State of Alaska's Commission on Rural Governance and Empowerment on this topic. In its June 1999 report, the Commission makes a recommendation in *favor* of Indian country and tribal territorial jurisdiction in Alaska:

> The State of Alaska should recognize the potential benefits to the state to further enhance local control and economic opportunities, and not foreclose the option of allowing tribes to transfer their land into federal trust status. Further, the State of Alaska should maintain an objective view of Indian Country issues and not continue its historical view that Indian Country in Alaska is inherently threatening to State sovereignty. The State should also continue to acknowledge that Alaska Natives hold land in federal trust or restricted status in the form of Native townsite lots, Native allotment, a few parcels of trust land and the Annette Island Reserve.

Alaska Commission on Rural Governance and Empowerment, *Final Report to the Governor* 17 (June 1999). The Rural Governance Commission's recommendation echos previous recommendations made by blue-ribbon commissions and working groups. *See, e.g.* Vol. 1, Alaska Native Commission Report at 75-76. This guidance, solicited by the Secretary, further supports lifting the regulatory bar against taking lands into trust in Alaska.

      Lifting the regulatory bar against taking lands into trust in Alaska is also consistent with the diverse array of post-1971 congressional enactments generally referring to ANCSA corporate lands as lands under the territorial jurisdiction of the local tribe. For instance, in the Native American Programs Act of 1974, as amended, 42 U.S.C. § 2991-2992d., Congress addressed Alaska Native village lands as subject to village tribal jurisdiction.[2] The Administration for Native Americans (ANA) annually

---

[2] Under 1990 amendments to that Act, the ANA provides financial assistance to Alaska Native villages to "improv[e] the capability of the governing body of the Indian tribe to regulate environmental quality pursuant to Federal and tribal environmental laws," 42 U.S.C. § 2991b(d)(1), including "development of tribal laws on environmental quality," "enforcement and monitoring of environmental quality laws," and "training and education of [tribal] employees responsible for enforcing or monitoring compliance with environmental quality laws." *Id.* § 2991b(d)(2)(A) – (C). For other programs authorized by the Act, no ANA grant may be awarded

Comments on Acquisition of Title to Land in Trust
Page 4



funds Alaska tribal environmental regulation initiatives, as well as environmental cleanup initiatives on former Defense Department lands. ANA also supports a wide range of other Alaska tribal territorial governance activities, including the development of tribal civil and criminal "codes and tribal court systems" and the strengthening of "village government control of land management, including land protection, through coordination of land use planning with village corporations and cities, if appropriate."[3] In the environmental arena, the Oil Pollution Act of 1990 acknowledges the role Alaska Native villages play as natural resource trustees in the event oil spills affect lands "belonging to, managed by, controlled by, or appertaining to such Indian tribe." 33 U.S.C. §§ 2701(15), 2706(b)(4).

The Comprehensive Environmental Response, Compensation and Liability Act similarly includes Alaska Native villages as tribes that must be treated as states in connection with various environmental regulation activities in Indian country (such as the clean-up of hazardous waste sites and responding to hazardous spills). 42 U.S.C. §§ 9601(36), 9626. And the Clean Air Act puts all tribes exercising "substantial governmental duties and powers" over any "areas within the tribe's jurisdiction," including Alaska Native villages, on an equal footing with states in connection with various initiatives. 42 U.S.C. §§ 7601(d), 7602(r).

Congress has also provided special federal mortgage insurance if the mortgage is executed by an "Alaska Native tribe" and the property is located on "land acquired by Alaska Natives under [ANCSA] or any other land acquired by Alaska Natives pursuant to statute by virtue of their unique status as Alaska Natives." *See* 12 U.S.C. § 1715z-13(a)(1), (i).[4]

---

to any grantee for a "project . . . which is to be carried out on or in an Indian reservation or *Alaska Native village*, unless a plan setting forth the project has been submitted to the governing body of that reservation or village and the plan has not been disapproved by the governing body within thirty days of its submission." *Id.* § 2991f(a) (italics added). The italicized language delineating the territory of a Native village includes Settlement Act lands "under the jurisdiction" of the village. *Id.* § 2992c(2).

[3] *See, e.g.,* Administration for Native Americans; Availability of Financial Assistance, 60 Fed. Reg. 46,598, 46,603 (1995) (a special ANA "Alaska Native Initiative" begun in the early 1980s).

[4]*See also* Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.*, recognizing the jurisdiction of "any Alaska Native village" over child custody matters arising both within and outside the "Indian country" occupied by their villages. 25 U.S.C. § 1903(8). Under § 1918(b)(2), the Act also recognizes the tribal option to reassume the "exclusive" civil adjudicatory jurisdiction over domestic relations matters that is enjoyed by tribes in states not covered by Public Law 280, *Native Village of Venetie v. State of Alaska*, 944 F.2d 548, 555-56

Comments on Acquisition of Title to Land in Trust
Page 5



COPY

Given the above general support, the *"Tribal Land Acquisition Areas for Tribes Without Reservations"* should be modified to accommodate the unique circumstances in Indian land tenure in Alaska created by ANCSA. All of the federally recognized tribes that are listed in ANCSA were found eligible to select lands pursuant to section 1610(b). The tribes were required to select the townships in and surrounding their villages precisely because such lands formed the basis of the tribes' respective aboriginal land claims. Pursuant to section 1607, however, all lands were conveyed in fee to village corporations that were organized "to hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village. . . ." 43 U.S.C. § 1602(j). As a consequence, and for all practical purposes, the shareholders of a village corporation are also enrolled tribal members of a village tribe.

In recent years many village corporations, through action taken by their shareholders, have chosen to convey ANCSA corporate land to the tribal village council (as is the case with petitioner Native Village of Larsen Bay). Former ANCSA land that has been conveyed to a tribe should be entitled to an on-reservation presumption in favor of trust status because such lands have always been held in Indian title (i.e. first in aboriginal title, then by native-owned corporations, then tribal ownership).

Suggestion - The Secretary should modify the final rule in part by lifting the regulatory bar to acquisition of trust lands in Alaska.

> Heather Kendall Miller
> Native American Rights Fund
> 420 L Str., Suite 505
> Anchorage, Ak 99501
> Attorney for Alaska Inter-Tribal Council
> Chilkoot Indian Association
> Native Village of Larsen Bay
> Kenaitze Indian Tribe
> Native Village of Tuluksak
> Native Village of Ft. Yukon

---

(9th Cir. 1991). Exclusive tribal jurisdiction over domestic matters under the Act of course only exists in Indian country. *Id.*

Comments on Acquisition of Title to Land in Trust
Page 6



220

**COMMENTS ON THE SECRETARY'S PROPOSED RULE
FOR 25 C.F.R. Part 151, "ACQUISITION OF TITLE TO LAND IN TRUST"
at 69 FED. REG. 17574 (April 12, 1999)**


On Behalf Of:

ALASKA INTER-TRIBAL COUNCIL
CHILKOOT INDIAN ASSOCIATION
NATIVE VILLAGE OF LARSEN BAY
KENAITZE INDIAN TRIBE
NATIVE VILLAGE OF TULUKSAK
RurAL CAP
NATIVE VILLAGE OF FT. YUKON


Submitted to: OFFICE OF TRUST RESPONSIBILITIES
Bureau of Indian Affairs
1849 C Street, NW, MS-4513-MIB
Washington, D.C. 20240


Dated: 6/8/01


**RECEIVED**

JUN 1 2 2001

TRUST RESPONSIBILITIES


6/13/1

**COPY**

AR00636

## I.    INTRODUCTION

These comments are offered in response to the Secretary's extension of the comment period on the final rule to seek comment on whether the rule should be amended in whole or in part or withdrawn in whole or in part. For the reasons given below, we urge the Secretary to amend to final rule in part to apply to Alaska Native tribes.

## II.    DISCRETIONARY ACQUISITIONS IN ALASKA

In 1995, the Chilkoot Indian Association, Native Village of Larsen Bay and Kenaitze Indian Tribe filed a petition setting forth the legal arguments supporting the Secretary's statutory authority to take lands into trust following the passage of the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. § 1601 *et seq*. (ANCSA), and requesting that the Secretary revise 25 C.F.R. § 151.1 to comply with the IRA. (60 Fed. Reg. 1956 (1995). No final action on the petition has occurred to date although the final rule proposes to continue the regulatory bar to acquisition of title in trust in Alaska "subject to review pending the report of the Rural Governance Commission, or Congressional action clarifying that ANCSA lands are Indian country." 60 Fed. Reg. at 17578.

Comment:    The final rule does not give an explanation for failing to take action on the Chilkoot *et al*. petition and does not respond to the legal arguments contained therein except to note that "we recognize that there is a credible legal argument that ANCSA did not supersede the Secretary's authority to take land into trust in Alaska under the IRA." Despite this acknowledgment of legal authority, the proposed rule maintains the regulatory bar to acquisition of title in trust in Alaska and solicits comment on the continued validity of the Associate Solicitor's opinion ("Trust Land for the Natives of Venetie and Arctic Village," September 15, 1978) ("Fredericks opinion"), in light of the United States Supreme Court's ruling in *Alaska v. Venetie*, 522 U.S. 520 (1998).

The legal basis for Secretarial authority to take lands into trust in Alaska as set forth in the Chilkoot *et al*. petition remains valid today. As we explained there, the Fredericks opinion incorrectly concluded that it would be an abuse of Secretarial discretion to take tribal land into trust following the passage of ANCSA. That opinion is not well founded since ANCSA did not repeal the Secretary's authority to take land into trust under the IRA, 25 U.S.C. § 465.

The IRA amendments of May 1, 1936 c. 254, 49 Stat. 1250 expanded the application of the IRA's various provisions to the Territory of Alaska. Although Section 2 of the IRA, which gave the Secretary authority to designate certain lands in Alaska as

Comments on Acquisition of Title to Land in Trust
Page 2



Indian reservations was repealed by Congress in 1976, section 465, which gave the Secretary authority to take tribal lands into trust pursuant to section 473a of the IRA, was not repealed. The Fredericks opinion makes no distinction between "reservation" lands and "trust" lands[1], but simply assumes that Congress impliedly repealed the Secretary's authority with respect to both types of land tenure with the passage of ANCSA.

To the contrary, Congress has passed no legislation that has repealed or in any way affected the right conferred to Alaska Native tribes by Section 473a of the IRA. Congress has only strengthened the protections afforded tribes by amending the IRA to prohibit promulgation of any "regulation" or "decision or determination" "that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes." 25 U.S.C. § 476 (f) & (g). The final rule violates this statutory prohibition by denying Alaska's federally recognized tribes an equal status with federally recognized tribes in the continental United States. This differing treatment is inconsistent with the Secretary's prior pronouncement that Alaska tribes are entitled to the "same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

The legal underpinnings for Secretarial authority to acquire lands in trust for Alaska tribes has not been changed, altered or undermined by the Supreme Court's decision in *Alaska v. Venetie*, 522 U.S. 520 (1998). In *Venetie*, the Court addressed the question of whether Venetie's former ANCSA lands met the test for Indian country under 15 U.S.C. 1151(b). The Court held that ANCSA lands do not satisfy requirements for "Indian country" status because such lands were not set aside for Indians as such (since they were conveyed to corporations), and because ANCSA lands lack any restriction on alienability, the requisite federal superintendence over the land was missing. The Court rejected the proposition advanced by the State that no Indian country existed in Alaska, and instead held that "[o]ther Indian country exists in Alaska post-ANCSA only if the land in question meets the requirements of a 'dependent Indian communit[y]' under our interpretation of 1151(b) or if it constitutes 'allotments' under § 1151(c)." 522 U.S. at n.2. The Court did not address the question of whether the Secretary retains authority under the IRA to place lands into trust in Alaska. Since the statutory basis for the Secretary's authority remains in tact, neither the Fredericks opinion nor the *Venetie* opinion can validly be relied upon as bases for precluding Alaska tribes from enjoying the

---

[1]   The final rule recognizes this distinction as it specifically notes at section 151.23 that lands taken into trust enjoy "Indian country" status but do not attain "reservation" status. This view is clearly at odds with the Fredericks opinion and justifies its withdrawal.

Comments on Acquisition of Title to Land in Trust
Page 3



"same protection, immunities, [and] privileges [shared by] other acknowledged tribes." 58 Fed. Reg. 54364, 54368 (Oct. 21, 1993).

Rather than take final action on the petition's specific request to revise 25 C.F.R. § 151.1 consistent with federal law, the final rule solicits the views of the State of Alaska's Commission on Rural Governance and Empowerment on this topic. In its June 1999 report, the Commission makes a recommendation in *favor* of Indian country and tribal territorial jurisdiction in Alaska:

> The State of Alaska should recognize the potential benefits to the state to further enhance local control and economic opportunities, and not foreclose the option of allowing tribes to transfer their land into federal trust status. Further, the State of Alaska should maintain an objective view of Indian Country issues and not continue its historical view that Indian Country in Alaska is inherently threatening to State sovereignty. The State should also continue to acknowledge that Alaska Natives hold land in federal trust or restricted status in the form of Native townsite lots, Native allotment, a few parcels of trust land and the Annette Island Reserve.

Alaska Commission on Rural Governance and Empowerment, *Final Report to the Governor* 17 (June 1999). The Rural Governance Commission's recommendation echos previous recommendations made by blue-ribbon commissions and working groups. *See, e.g.* Vol. 1, Alaska Native Commission Report at 75-76. This guidance, solicited by the Secretary, further supports lifting the regulatory bar against taking lands into trust in Alaska.

Lifting the regulatory bar against taking lands into trust in Alaska is also consistent with the diverse array of post-1971 congressional enactments generally referring to ANCSA corporate lands as lands under the territorial jurisdiction of the local tribe. For instance, in the Native American Programs Act of 1974, as amended, 42 U.S.C. § 2991-2992d., Congress addressed Alaska Native village lands as subject to village tribal jurisdiction.[2] The Administration for Native Americans (ANA) annually funds Alaska

---

[2] Under 1990 amendments to that Act, the ANA provides financial assistance to Alaska Native villages to "improv[e] the capability of the governing body of the Indian tribe to regulate environmental quality pursuant to Federal and tribal environmental laws," 42 U.S.C. § 2991b(d)(1), including "development of tribal laws on environmental quality," "enforcement and

Comments on Acquisition of Title to Land in Trust
Page 4



tribal environmental regulation initiatives, as well as environmental cleanup initiatives on former Defense Department lands. ANA also supports a wide range of other Alaska tribal territorial governance activities, including the development of tribal civil and criminal "codes and tribal court systems" and the strengthening of "village government control of land management, including land protection, through coordination of land use planning with village corporations and cities, if appropriate."[3] In the environmental arena, the Oil Pollution Act of 1990 acknowledges the role Alaska Native villages play as natural resource trustees in the event oil spills affect lands "belonging to, managed by, controlled by, or appertaining to such Indian tribe." 33 U.S.C. §§ 2701(15), 2706(b)(4).

The Comprehensive Environmental Response, Compensation and Liability Act similarly includes Alaska Native villages as tribes that must be treated as states in connection with various environmental regulation activities in Indian country (such as the *clean-up of hazardous waste sites and responding to hazardous spills*). 42 U.S.C. §§ 9601(36), 9626. And the Clean Air Act puts all tribes exercising "substantial governmental duties and powers" over any "areas within the tribe's jurisdiction," including Alaska Native villages, on an equal footing with states in connection with various initiatives. 42 U.S.C. §§ 7601(d), 7602(r).

Congress has also provided special federal mortgage insurance if the mortgage is executed by an "Alaska Native tribe" and the property is located on "land acquired by Alaska Natives under [ANCSA] or any other land acquired by Alaska Natives pursuant to statute by virtue of their unique status as Alaska Natives." *See* 12 U.S.C. § 1715z-13(a)(1), (i).[4]

---

monitoring of environmental quality laws," and "training and education of [tribal] employees responsible for enforcing or monitoring compliance with environmental quality laws." *Id.* § 2991b(d)(2)(A) – (C). For other programs authorized by the Act, no ANA grant may be awarded to any grantee for a "project . . . which is to be carried out on or in an Indian reservation or *Alaska Native village*, unless a plan setting forth the project has been submitted to the governing body of that reservation or village and the plan has not been disapproved by the governing body within thirty days of its submission." *Id.* § 2991f(a) (italics added). The italicized language delineating the territory of a Native village includes Settlement Act lands "under the jurisdiction" of the village. *Id.* § 2992c(2).

[3] *See, e.g.,* Administration for Native Americans; Availability of Financial Assistance, 60 Fed. Reg. 46,598, 46,603 (1995) (a special ANA "Alaska Native Initiative" begun in the early 1980s).

[4]*See also* Indian Child Welfare Act of 1978, 25 U.S.C. § 1901 *et seq.*, recognizing the jurisdiction of "any Alaska Native village" over child custody matters arising both within and outside the "Indian country" occupied by their villages. 25 U.S.C. § 1903(8). Under §

Comments on Acquisition of Title to Land in Trust
Page 5



Given the above general support, the "*Tribal Land Acquisition Areas for Tribes Without Reservations*" should be modified to accommodate the unique circumstances in Indian land tenure in Alaska created by ANCSA. All of the federally recognized tribes that are listed in ANCSA were found eligible to select lands pursuant to section 1610(b). The tribes were required to select the townships in and surrounding their villages precisely because such lands formed the basis of the tribes' respective aboriginal land claims. Pursuant to section 1607, however, all lands were conveyed in fee to village corporations that were organized "to hold, invest, manage and/or distribute lands, property, funds, and other rights and assets for and on behalf of a Native village. . . ." 43 U.S.C. § 1602(j). As a consequence, and for all practical purposes, the shareholders of a village corporation are also enrolled tribal members of a village tribe.

In recent years many village corporations, through action taken by their shareholders, have chosen to convey ANCSA corporate land to the tribal village council (as is the case with petitioner Native Village of Larsen Bay). Former ANCSA land that has been conveyed to a tribe should be entitled to an on-reservation presumption in favor of trust status because such lands have always been held in Indian title (i.e. first in aboriginal title, then by native-owned corporations, then tribal ownership).

Suggestion - The Secretary should modify the final rule in part by lifting the regulatory bar to acquisition of trust lands in Alaska.



Heather Kendall Miller
Native American Rights Fund
420 L Str., Suite 505
Anchorage, Ak 99501
Attorney for Alaska Inter-Tribal Council
Chilkoot Indian Association
Native Village of Larsen Bay
Kenaitze Indian Tribe

---

1918(b)(2), the Act also recognizes the tribal option to reassume the "exclusive" civil adjudicatory jurisdiction over domestic relations matters that is enjoyed by tribes in states not covered by Public Law 280, *Native Village of Venetie v. State of Alaska*, 944 F.2d 548, 555-56 (9th Cir. 1991). Exclusive tribal jurisdiction over domestic matters under the Act of course only exists in Indian country. *Id.*

Comments on Acquisition of Title to Land in Trust
Page 6

**COPY**

AR00641

Native Village of Tuluksak
Native Village of Ft. Yukon

Comments on Acquisition of Title to Land in Trust
Page 7





COPY

AR00643

# HOBBS, STRAUS, DEAN & WALKER LLP
## ATTORNEYS AT LAW
2120 L STREET, NW, SUITE 700, WASHINGTON, DC 20037
TEL 202.822.8282    FAX 202.296.8834
*www.hsdwlaw.com*

June 13, 2001

Terry Virden
Director
Office of Trust Responsibilities
MS 4513-MIB
1849 C Street, NW
Washington, DC  20240

Dear Mr. Virden:

Pursuant to Federal Register Notice of April 16, 2001 in Vol. 6 No. 73, regarding proposed fee/trust regulations, attached are the comments on behalf of the Native Village of Barrow and Native Village of Akiak.

Sincerely,

HOBBS, STRAUS, DEAN & WALKER, LLP

Hans Walker, Jr.

COPY

RECEIVED

JUN 1 5 2001

TRUST RESPONSIBILITIES

8__ S_ V SIXTH A ENUE, SUITE #1650, PORTLAND, OR 97204  TEL: 503.242.1745  FAX: 503.242.1072
_ECOND FLOOR, __ PARK AVENUE, OKLAHOMA CITY, OK 73102  TEL: 405.602.9425  FAX: 405.602.9426

*Logged 6/13/01*


6/18/1

AR00644

**COMMENTS ON THE SECRETARY'S FINAL REGULATIONS
REGARDING ACQUISITION OF TITLE TO LAND IN TRUST
AS THOSE REGULATIONS PERTAIN TO ALASKA**

**FILED ON BEHALF OF:**

**NATIVE VILLAGE OF BARROW
NATIVE VILLAGE OF AKIAK**

Hans Walker, Jr.
Marsha K. Schmidt, Esq.
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L Street, N.W.,
Suite 700
Washington, D.C. 20037
(202) 822-8282

Date: June 13, 2001



AR00645

## INTRODUCTION

Native Village of Barrow, a federally recognized tribe headquartered in Barrow, Alaska, and the Native Village of Akiak, a federally recognized tribe located in Akiak, Alaska, files these comments on the Secretary's final regulations regarding taking title to land in trust. Specifically, the tribes here address the continued bar on the acquisition of lands in trust by tribes in Alaska.

We appreciate that the Secretary has taken the step to withdraw the 1978 Solicitor's Opinion that prompted the prohibition and we hope that the withdrawal of that Opinion will be maintained by the Department with the final regulations. As is discussed below, the Opinion is seriously flawed and the Department should reconsider the legal basis of its conclusions. If the Secretary has concluded that the 1978 Opinion must be withdrawn, then there is no basis to continue the ban on taking land into trust in Alaska since it is based on flawed reasoning and lacks legal support. Indeed, as is established below, there is no basis to conclude that land cannot be taken into trust in Alaska. Congress has never expressly banned the taking of land into trust in Alaska and the Secretary has no authority to legislate the ban by regulation. Further, if the Secretary believes that it would be an abuse of discretion or would otherwise violate the Alaska Native Claims Settlement Act to acquire land in trust in Alaska, that conclusion should be considered and tested in a court of law instead of unilaterally imposed by the Secretary.

Thus, to the extent that the bar on acquiring title to land in trust in Alaska is continued, we urge that the regulations be amended.



### A. The Policy Barring Trust Acquisitions in Alaska Cannot Be Legally Sustained.

In the comments to the final regulations, the Secretary concludes that it is prudent to withdraw an Opinion of the Associate Solicitor, Indian Affairs dated September 15, 1978 on the ground that the legal reasoning in that Opinion is doubtful. This Opinion serves as the predicate for the policy decision to bar trust acquisitions in Alaska. The Tribes believe that the Secretary's decision to rescind this Opinion is well founded and that it should be maintained.

In that 1978 Opinion, the Associate Solicitor concluded that it would be an abuse of discretion "to attempt to use Section 5 of the IRA" to restore a former reserve to trust status. The Opinion relies chiefly on a conclusion that ANCSA intended to end trust status in Alaska.

The major error in this Opinion is that it treats the terms "trust" and "reservation" as equal. That is, the Opinion concludes that trust status necessarily means reservation status; and since ANCSA's purpose was to end the reservation system in Alaska, it necessarily intended to preclude the "trust" status of land as well. While the Opinion points to language in the legislation and legislative history for support, in fact, it mischaracterizes the language which deals not with trust lands but with reservations. While Congress may have intended "reservations" per se to not exist in Alaska, acquiring land in trust on behalf of villages continues to be an option until Congress expressly provides that Section 5 of the IRA does not apply to Alaska.

### 1.    Reservation v. Trust Status

The Indian Reorganization Act sets forth the current policy by which the U.S. Government deals with Indian tribes. It provides options for the formation of a tribal government as well as the acquisition of land on behalf of tribes.



COPY

AR00647

The IRA expressly distinguishes between acquisition of land into trust status which is accomplished through Section 5, 25 U.S.C. § 465, and the proclamation of land as a reservation, which is authorized by Section 7, 25 U.S.C. § 467. This distinction as legislated by Congress had to mean something and indeed the differences between these two designations are many. First, Section 5 specifies that trust land "shall be exempt from state and local taxation." While this is a legal restriction on the land, the statute does not go so far as to specify that the land is within the governmental authority of an Indian tribe. Tribal governmental authority over trust lands is not automatic and must be established based on an examination of the indicia of governmental power. Similarly, trust lands do not automatically qualify as Indian country. If trust land is not an allotment or a reservation, it must be deemed a dependent Indian community in order to qualify.

A designation of land as "reservation" under Section 7, on the other hand, automatically establishes tribal governmental authority over the land. By definition reservation land constitutes the "geographic component of tribal sovereignty" (White Mountain Apache Tribe v. Bracker, 448 U.S. 324, 335 (1980)) of a tribe and is "Indian country" pursuant to 18 U.S.C § 1151(a).

The Secretary should be well aware of these distinctions and must keep them in mind when formulating a policy in Alaska.

2. Reservation v. Trust in ANCSA

If the distinction outlined above is accurate, and we believe that it is, then the conclusion in the Opinion becomes highly suspect. Assuming arguendo that ANCSA was intended to prohibit the existence of reservations in Alaska, this is a prohibition very different than one

COPY

which prohibits the acquisition of trust land. And there is little evidence that "trust" status was prohibited under the ANCSA.

The evidence cited to in the Opinion relies heavily on ANCSA's references to eliminating the reservation systems in Alaska. But the Opinion often reads the term trust status into ANCSA provisions which are clearly addressing "reservations." For example the Opinion references Section 19 as prohibiting the alternative of "continued trust status." But in fact, Section 19 deals solely with the dispositions of reservations. If Section 19 prohibits anything, it is continued reservation status, but not necessarily trust status. Also significant is the Opinion's reliance upon the repeal under the Federal Lands Policy and Management Act of 25 U.S.C. § 496 which granted the Secretary permission to designate lands in Alaska as reservations. Yet, this repeal was also aimed at "reservations" not trust land.

Indeed, the Opinion cites no express statutory language or legislative history to show Congress intended to prohibit trust land because there is no evidence to that effect. Rather the legislative evidence shows Congress is well aware that Section 5 exists and has taken no steps to prohibit its application in Alaska.

3. The Rules of Statutory Construction Support a Finding that Section 5 Applies.

The Opinion specifically concludes that Section 5 of the IRA has not been repealed as it applies to Alaska. See Opinion, p. 3 ("Section 5 … still appl[ies] to Alaska pursuant to the unrepealed portion of the Act of May 1, 1936.") Despite its unrepealed status, the Opinion concludes it would be an abuse of discretion if the Secretary exercised his authority under Section 5. This is largely based on a conclusion that though Congress has not expressly repealed



COPY

Section 5 they surely must have meant to. The unspoken conclusion is that Section 5 is impliedly repealed.

This conclusion is in itself an abuse of discretion. The Secretary is exercising a legislative function by refusing to enforce or act under a law that has not been repealed. In essence, the Secretary supposes that Congress does not know how to repeal a law which Congress (the Secretary has concluded) obviously intended to make inapplicable to Alaska. Since Congress did not do the job properly, the Secretary has taken it upon himself to make it right.

In fact, Congress does know how to repeal laws as to Alaska Natives. It did so, as the Opinion points out, under the Federal Land Policy and Management Act of 1976, when it repealed 25 U.S.C. § 496. It also did so in the ANCSA when it placed a prohibition on further allotments in Alaska. See 43 U.S.C. § 1617. Thus, Congress has shown its obvious ability to specifically define how land may be acquired in Alaska. It did not exercise its authority as to Section 5. Under the usual rules of statutory construction, where Congress has expressly enacted a repeal of a particular statute, then further repeals by implication are not intended. Sutherland Statutory Construction § 23.11. Congress expressly repealed a portion of the IRA as it applies to Alaska. By failing to repeal any other sections when it has had many opportunities to do so must be interpreted against implied repeals.

Moreover, implied repeals are also looked upon with disfavor and are not found in absence of an irreconcilable conflict in the laws. Sutherland, § 23.09. As is discussed above, there is no conflict between provisions of the ANCSA and the trust acquisition statute, 25 U.S.C. § 465. ANCSA addressed reservations, not trust lands.


COPY

AR00650

Finally, the Secretary's interpretation in effect legislates a repeal of Section 5. This action is arbitrary and capricious and an abuse of discretion. If the statute exists, the Secretary is required to enforce it. As stated by the Supreme Court, "until Congress repeals or amends the [Indian trader] statutes, however, we must give them a 'sweep as broad as [their] language.' " Central Machinery Co. v. Arizona State Tax Commission, 448 U.S. 160, 166 (1980); see also A.K. Management Co. v. San Manuel Band, 789 F.2d 785 (9th Cir. 1986). If the Supreme Court sees fit to give effect to laws that have not been repealed or amended, how can the Secretary do otherwise? There is simply no authority for the Secretary to ignore the continuing applicability of this law in Alaska.

4.    Denying an IRA Tribe the Right to Acquire Land
      Under Section 5 is Inconsistent With the Recognition
      of the Sovereign Powers of the Tribe.

The Secretary has recognized that Alaska Native Villages, including Barrow and Akiak, are federally recognized tribes with sovereign status. The Secretary has also reported to the Secretary of the Treasury that these Villages have specific sovereign powers of taxation, eminent domain and police powers. See Internal Revenue Service Cumulative Bulletin 1983-2, pp. 606, 611. These are powers that by definition require a geographic territory. By denying a tribe the right to acquire land, the Secretary has in effect made the Villages sovereign without a geographic base. Yet, sovereignty necessarily implicates the existence of a territorial components. See New Mexico v. Mescalero Apache Tribe, 462 U.S. 324, 335 n.8 (1981).

In addition, the Secretary has concluded that while IRA tribes in the lower 48 have all available rights under the IRA including Section 5, Alaska Villages are not entitled to all the benefits of the IRA even though many are recognized sovereigns under the IRA. There is no



AR00651

basis in the IRA or the ANCSA to support this inconsistent treatment and it serves as further

evidence of the arbitrary and capricious nature of the Secretary's actions. It also violates 25

U.S.C. § 476(f) which prohibits the Secretary from diminishing the rights of tribes relative to

other federally recognized tribes.

Finally, it is the policy of the United States to encourage the self government of tribes,

even in Alaska. Yet, the ban on taking land into trust hampers the Tribes in Alaska since

governmental powers necessarily require a land base from which to operate. Without a land

base, Alaska tribes cannot take advantage of the benefits of trust status--land that is not subject to

taxation or state regulation and land that can serve as the basis of a tribe's health and welfare

initiatives and economic development. These are substantial equitable reasons why the

regulations should be revised to allow trust status for lands in Alaska.

B.      This Matter Should Be Resolved Judicially.

If the Secretary is correct in his conclusion, he should be willing to defend it. The

Chilkoot Indian Association has petitioned the Secretary to take land into trust. That petition has

never been denied or approved. If the Secretary believes that the regulations are defensible, the

Secretary should deny the petition and permit that decision to be challenged in a court of law.

This would allow final resolution of the matter and give the Government as well as Alaska

Tribes an objective and conclusive delineation of the rights of tribes to acquire lands in trust in

Alaska.



AR00652





**FIRST CLASS MAIL**

LAW OFFICES
HOBBS, STRAUS, DEAN & WALKER, LLP
2120 L STREET, N.W., SUITE 700
WASHINGTON, D.C. 20037

TO:

Terry Virden
Director
Office of Trust Responsibilities
MS 4513-MIB
1849 C Street, NW
Washington, DC  20240



COPY







AR00653



**Akutan Traditional Council**
P. O. Box 89
Akutan, Alaska 99553-0089
(907) 698-2300 / 2301 Fax

The Honorable Gale A. Norton, Secretary of Interior                    June 14, 2001
Attn: Terry Virden
MS 4513-MIB
1849 C. Street, NW
Washington, DC 20240

**RE: Comments in Final Regulations on Acquisition of Title to Land in Trust**

Dear Secretary Norton:

I am writing on behalf of the Akutan Traditional Council to urge you to make effective the final regulations regarding Indian trust land acquisitions, as published in the federal register on January 16, 2001.

The regulations should be made effective because they advance three fundamental principles. First the regulations carry out the purposes of the Indian Reorganization Act and recognize the critical role that land restoration must play in the fostering tribal self-trust which provide guidance to the Department in the exercise of it's authority, and ensure basic fairness to all parties in connection with the trust application process. Third the final regulations facilitate fair consideration of appropriate factors and a timely decision on trust land applications.

The issue of land into trust has been given full and fair consideration by the Department and further delay would be unfair and unwarranted. The process of revisiting the trust land acquisition regulations has been ongoing for years. The Department, as well as the tribes, states and local governments, share an interest in seeing the process come to an end. There needs to be certainty regarding the procedures and standards for taking land into trust. The final rule provides a fair process that will facilitate informed and timely decisionmaking under meaningful standards. It is time for the Department to move forward and make the final rule effective.

As Secretary of Interior, you have a trust responsibility to Indian tribes, and we believe that the Department of Interior has an obligation to further that relationship by removing obstacles to tribal self-government and self-determination. Moving forward with the final regulations will further that objective.

We urge you to make the final regulations on trust land acquisitions effective as soon as possible. Thank you for your consideration of this matter of great importance to us, and to Indian tribes nationwide.

**COPY**

**RECEIVED**

JUN 1 5 2001

TRUST RESPONSIBILITIES

6/15/1

Logged 6/19/01

AR00654

Sincerely,



Alice Tcheripanoff
Administrator

COPY

AR00655