

# STATE OF ALASKA

TONY KNOWLES, GOVERNOR

## DEPARTMENT OF LAW

*OFFICE OF THE ATTORNEY GENERAL*

P.O. BOX 110300
JUNEAU, ALASKA 99811-0300
PHONE:   (907) 465-3600
FAX:     (907) 465-2075

June 14, 2001

The Honorable Gale Norton
Secretary of the Interior
Department of the Interior
1849 C Street, N.W., Run 6151
Washington, D.C.  20240

> Re:   Comments of the State of Alaska concerning applicability to Alaska of published rule on Acquisition of Title to Land in Trust; Federal Register Notice 66 Fed. Reg. 19,403 (April 16, 2001)

Dear Secretary Norton:

On January 16, 2001, the Department of the Interior published a Final Rule governing the acquisition of title to land in trust for Indians.  66 Fed. Reg. 3452.  The effective date of these new regulations has been postponed to August 13, 2001.  66 Fed. Reg. 19,403 (April 16, 2001).  This letter is in response to the April 16, 2001, notice in the Federal Register seeking comments on the Final Rule published January 16, 2001.

In accordance with a long-standing view of the law, the Final Rule is not currently applicable to Alaska; however, the comments published with the Final Rule state that the current prohibition should remain in place for three years during which time the Department will reconsider its position.

The State of Alaska submits these comments in opposition to any change in the prohibition to taking land in trust in Alaska for your consideration as you review the regulations as a whole.  Rather than repeat our earlier comments, a copy of the State's 1999 comments on the proposed rule is enclosed.  *See* Attachment 1.

The Department has consistently, and we believe correctly, taken the position that Congress' plainly expressed intent in the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601 *et seq.,* to preclude a reservation system or lengthy wardship or trusteeship in Alaska, prohibits the Secretary from acquiring land in trust in



03-C32LH



6/18/1

printed on recycled paper b y C.D

AR00656

Alaska, except for the benefit of the Annette Islands Reserve.[1]  In a 1978 opinion, the Associate Solicitor for Indian Affairs concluded that the substantive provisions, legislative history and policy directives of ANCSA precluded taking land into trust in Alaska.  The opinion states:  "[t]he intent of Congress to permanently remove all Native lands in Alaska from trust status is unmistakable."  *See* Attachment 2, p. 1.  This view was buttressed by Congress' repeal in 1976 of the Secretary's authority to designate land in Alaska as reservations or reserve tracts for schools, hospitals and the like for Alaska Natives.  *See* section 704(a) of the Federal Land Policy and Management Act of 1976 (FLPMA), 90 Stat. 2743, 2792.  Congress has not acted to repudiate that intent.

In a short memorandum issued the same day the Final Rule was published, then Solicitor John Leshy rescinded the 1978 opinion, based on his "substantial doubt about the validity of" its conclusion.  *See* Attachment 3.  In reaching this conclusion, the former Solicitor relies on the failure of Congress to repeal section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465, which authorizes the Secretary to take land in trust for Indians and tribes in general (and is the authority for the new regulations).  He ignores or discounts both of Congress' more recent enactments, ANCSA and § 704(a) of FLPMA which, as noted above, specifically repealed the Secretary's authority to set aside reservations and other lands in Alaska.

Even prior to the 1978 opinion, a 1976 letter to Senator Stevens from Kent Frizzell, Under Secretary of Interior,  stated that the Department's responsibilities as trustee for former trust lands in Alaska could only be restored through legislation.  *See* Attachment 4.  In 1980, a Solicitor's opinion again adopted the view that ANCSA clearly eschews any notion of federal trust responsibility for land, even former reservation land in tribal ownership, transferred pursuant to ANCSA.  *See* Attachment 5.  It would be wholly inconsistent with Congress' purposes in ANCSA to allow the Secretary to take land in trust for Alaska tribes.

The Supreme Court's decision in *Alaska v. Native Village of Venetie Tribal Government,* 522 U.S. 520 (1998), reinforced that conclusion.  The Supreme Court recognized that "[i]n enacting ANCSA, Congress sought to end the sort of federal supervision over Indian affairs that had previously marked federal Indian policy."  *Id.* at 523-24.  To amend the regulations to authorize the acquisition of trust land in Alaska after ANCSA and *Venetie* would contravene Congress' intent, the rules of statutory construction, and the Court's decision.

In ANCSA, Congress expressly extinguished all claims based on aboriginal use or Native use and occupancy of land under any statute or treaty of the United States.

---

[1]     The Annette Islands Reserve, or Metlakatla, was set aside for emigrants from British Columbia, Canada.  Because they had no aboriginal claims to Alaska, they were not included in ANCSA.

COPY

The Honorable Gale Norton                                        June 14, 2001
Secretary of the Interior                                              Page 3

43 U.S.C. § 1603(c). This provision of ANCSA would be undermined by the establishment of Tribal Land Acquisition Areas (TLAAs) within Alaska that may be approved after taking into consideration the aboriginal and historical use of such lands by Alaska Natives. *See 66 Fed. Reg.* at 3464 (25 CFR §§ 151.19(e)(2) and 151.19(e)(5)). A decision to take ANCSA lands into trust would ignore *Venetie*, which held that Congress neither intended ANCSA lands to be set apart for Alaska Natives as such nor intended ANCSA lands to be subjected to the superintendence of the federal government. *Venetie*, 522 U.S. at 532-34.

        A plain view of the laws applicable in Alaska compels the conclusion that the prohibition on acquiring title to land in trust in Alaska, except for Metlakatla, should be sustained. We urge you to reinstate the 1978 Solicitor's Opinion and lay this issue to rest.

                            Sincerely,

                            Bruce M. Botelho
                            Attorney General

BMB:kh


Enclosures:  Attachments 1-5 (via mail)

# COPY

AR00658

**ACTION:** Interpretive rule.

**SUMMARY:** For the reasons provided in the memorandum set forth below, the Attorney General has determined that assisting suicide is not a "legitimate medical purpose" within the meaning of 21 CFR 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the Controlled Substances Act. Such conduct by a physician registered to dispense controlled substances may "render his registration . . . inconsistent with the public interest" and therefore subject to possible suspension or revocation under 21 U.S.C. 824(a)(4). The Attorney General's conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted. The Attorney General recognizes, however, that pain management is a legitimate medical purpose justifying a physician's dispensing of controlled substances. Finally, the Attorney General's determination makes no change in the current standards and practices of the DEA in any State other than Oregon.

**EFFECTIVE DATE:** November 9, 2001.

**FOR FURTHER INFORMATION CONTACT:** Patricia Good, Chief, Liaison and Policy Section, Office of Diversion Control, Drug Enforcement Administration, Washington, D.C. 20537, telephone 202–307–7297.

**SUPPLEMENTARY INFORMATION:** The text of the Attorney General's memorandum follows:

Memorandum for Asa Hutchinson, Administrator, The Drug Enforcement Administration

From: John Ashcroft, Attorney General

Subject: *Dispensing of Controlled Substances to Assist Suicide*

As you are aware, the Supreme Court reaffirmed last term that the application of federal law regulating controlled substances is uniform throughout the United States and may not be nullified by the legislative decisions of individual States. See *United States* v. *Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001). In light of this decision, questions have been raised about the validity of an Attorney General letter dated June 5, 1998, which overruled an earlier Drug Enforcement Administration (DEA) determination that narcotics and other dangerous drugs controlled by federal law may not be dispensed consistently with the Controlled Substances Act, 21 U.S.C. 801– 971 (1994 & Supp. II 1996) (CSA), to assist suicide in the United States. Upon review of the *Oakland Cannabis* decision and other relevant authorities, I have concluded that the DEA's original reading of the CSA—that controlled substances may not be dispensed to assist suicide—was correct. I therefore

advise you that the original DEA determination is reinstated and should be implemented as set forth in greater detail below.

The attached Office of Legal Counsel opinion, entitled *"Whether Physician-Assisted Suicide Serves a "Legitimate Medical Purpose" Under The Drug Enforcement Administration's Regulations Implementing the Controlled Substances Act"* (June 27, 2001) ("OLC Opinion") (attached) sets forth the legal basis for my decision.

1. *Determination on Use of Federally Controlled Substances to Assist Suicide.* For the reasons set forth in the OLC Opinion, I hereby determine that assisting suicide is not a "legitimate medical purpose" within the meaning of 21 CFR § 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the CSA. Such conduct by a physician registered to dispense controlled substances may "render his registration * * * inconsistent with the public interest" and therefore subject to possible suspension or revocation under 21 U.S.C. 824(a)(4). This conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted.

I hereby direct the DEA, effective upon publication of this memorandum in the Federal Register, to enforce and apply this determination, notwithstanding anything to the contrary in the June 5, 1998, Attorney General's letter.

2. *Use of Controlled Substances to Manage Pain Promoted.* Pain management, rather than assisted suicide, has long been recognized as a legitimate medical purpose justifying physicians' dispensing of controlled substances. There are important medical, ethical, and legal distinctions between intentionally causing a patient's death and providing sufficient dosages of pain medication necessary to eliminate or alleviate pain.

3. *No Change in Current DEA Policies and Enforcement Practices Outside Oregon.* The reinstated determination makes no change in the current standards and practices of the DEA in any State other than Oregon. Former Attorney General Janet Reno's June 5, 1998, letter relating to this matter emphasized that action to revoke the DEA registration of a physician who uses federally controlled substances to assist a suicide "may well be warranted * * * where a physician assists in a suicide in a state that has not authorized the practice under any conditions." The reinstated determination does not portend any increase in investigative activity or other change from the manner in which the DEA presently enforces this policy outside of Oregon.

4. *Enforcement in Oregon.* Under 3 Oregon Revised Statutes (O.R.S.) § 127.855 (1999), an attending physician who writes a prescription for medication to end the life of a qualified patient must document the medication prescribed. Under 3 O.R.S. § 127.865(1)(b) (1999), the State of Oregon's Health Division must require any health care provider upon dispensing medication

pursuant to the Death with Dignity Act to file a copy of the dispensing record with the Division. Those records should contain the information necessary to determine whether those holding DEA registrations who assist suicides in accordance with Oregon law are prescribing federally controlled substances for that purpose in violation of the CSA as construed by this Memorandum and the attached OLC Opinion.

The Department has the authority to take appropriate measures to obtain copies of any such reports or records sent to the Oregon State Registrar. See 21 U.S.C. 876. When inspection of these documents discloses prohibited prescription of controlled substances to assist suicide following the effective date of this memorandum, then appropriate administrative action may be taken in accordance with 21 CFR §§ 1316.41 to 1316.68 (2001).

Thus, it should be possible to identify the cases in which federally controlled substances are used to assist suicide in Oregon in compliance with Oregon law by obtaining reports from the Oregon State Registrar without having to review patient medical records or otherwise investigate doctors. Accordingly, implementation of this directive in Oregon should not change the DEA's current practices with regard to enforcing the CSA so as materially to increase monitoring or investigation of physicians or other health care providers or to increase review of physicians' prescribing patterns of controlled substances used for pain relief.

5. *Distribution.* Please ensure that this Memorandum and the OLC opinion on which it is based are promptly distributed to appropriate DEA personnel, especially those with authority over the enforcement of the CSA in Oregon.

**Attachment**

Note: The attachment containing the Office of Legal Counsel opinion dated June 27, 2001, does not appear in the Federal Register. It is available from the Drug Enforcement Administration at the address listed in FOR FURTHER INFORMATION CONTACT.

Dated: November 6, 2001.

**John Ashcroft,**

*Attorney General.*

[FR Doc. 01–28358 Filed 11–7–01; 12:43 pm]

BILLING CODE 4410–09–P

---

# DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

## 25 CFR Part 151

## Acquisition of Title to Land in Trust

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Withdrawal of final rule.

**SUMMARY:** This action withdraws the final rule published in the **Federal Register** on January 16, 2001, entitled "Acquisition of Title to Land in Trust."

**Federal Register** / Vol. 66, No. 218 / Friday, November 9, 2001 / Rules and Regulations    56669

**DATES:** The Acquisition to Title to Land in Trust rule, amending 25 CFR part 151, published in the **Federal Register** on January 16, 2001 (66 FR 3452), delayed by a document published February 5, 2001 (66 FR 8899), corrected by documents published February 20, 2001 (66 FR 10815) and June 13, 2001 (66 FR 31976), delayed by documents published April 16, 2001 (66 FR 19403) and August 13, 2001 (66 FR 42415), is withdrawn as of November 9, 2001.

**FOR FURTHER INFORMATION CONTACT:** Larry E. Scrivner, Deputy Director, Office of Trust Responsibilities, MS 4513 MIB, 1849 C Street, NW., Washington, DC 20240; telephone 202/208–5831.

**SUPPLEMENTARY INFORMATION:** This action withdraws in whole the rule entitled "Acquisition of Title to Land in Trust," published in the **Federal Register** on January 16, 2001, at 66 FR 3452, delayed by a notice published February 5, 2001 (66 FR 8899), corrected by notices published February 20, 2001 (66 FR 10815) and June 13, 2001 (66 FR 31976), delayed by notices published April 16, 2001 (66 FR 19403) and August 13, 2001 (66 FR 42415), and which received further comments through a notice published on August 13, 2001 (66 FR 42474).

On August 13, 2001, the Department of the Interior (Department) requested public comment on whether the final rule entitled "Acquisition of Title to Land in Trust" should be withdrawn and a further rule proposed to better address the public's continued concerns regarding the Department's procedures for taking land into trust for federally-recognized Indian tribes. The comment period closed on September 12, 2001, and the Department received a total of 139 submissions. Of the submissions received, 93 were from Indian tribes, 18 were from state and local governments and federally elected officials, and 28 other interested groups and individuals.

In its August 13, 2001, notice, the Department requested comments on specific areas of concern in the final rule. These areas of concern included individual applications for land into trust for housing or home site purposes; the requirement of land use plans for off-reservation acquisitions and as part of the designation of a Tribal Land Acquisition Area (TLAA); clarifying the standards contained in the final rule; the availability of applications for review and the use of technology to facilitate review of trust acquisition applications. Collectively, the comments received contained various opposing views about the identified issues of concern. For example,

comments stated that the Department should withdraw the final rule in whole, withdraw the final rule in part, amend the final rule to include certain provisions, or make the final rule effective immediately.

The Department sought comments about prioritizing individual applications for land into trust for housing or home site purposes under a *new proposed rule* expediting applications containing five (5) acres of land or less for individual housing needs. Comments were received both supporting the individual applications for Indian housing priority and opposing the individual applications for Indian housing priority. Comments also noted that identifying housing or home site applications as acquisitions containing five (5) acres of land or less for the purpose of meeting individual housing needs was of little benefit to tribal housing issues/needs. Another area the Department sought comments on was the advisability of requiring tribes to submit land use plans for off-reservation acquisitions and for the designation of TLAA. The Department considered requiring that tribes submit land use plans for off-reservation acquisitions and requiring that the applications contain a land use plan for the TLAAs, which the Secretary would approve as part of her review and approval. Comments received opposed the requirement for submission of a land use plan in an application for off-reservation acquisitions noting that the final rule already requires the submission of enormous amounts of information concerning the use of the land. Comments, while not specifically solicited, strongly opposed the establishment of TLAAs.

The Department also solicited comments on clarifying the standards that will be used by the Secretary to determine whether to approve an application and defining the burdens of proof required for the applicant and those opposing a trust application. The Department noted in its proposed withdrawal notice that it was considering new regulatory language that for on-reservation acquisitions, a tribe or individual must show by substantial evidence that the acquisition facilitates tribal self-determination, economic development, Indian housing, land consolidation, or natural resource protection. The Department further considered requiring that opponents of on-reservation trust acquisitions show by clear evidence that the acquisition will result in severe negative impact to the environment or severe harm to the local government. For off-reservation acquisitions, the Department considered

requiring that tribes show by substantial evidence that the acquisition is necessary to facilitate tribal self-determination, economic development, Indian housing, land consolidation, or natural resources protection, and the tribe be further required to show that no demonstrable harm to the local community is realized. The Department also considered requiring that opponents of off-reservation acquisitions show by clear evidence that the acquisitions will result in significant harm to the local community or severe negative impacts to the environment. Some commenters indicated confusion or lack of understanding of the criteria set out in the final rule. Comments received stated that the standards were not fair in that the "substantial evidence" burden of proof for the applicant is a lesser standard than the "clear evidence" requirement for the opponent of the application. Comments also stated that the existing standards are fair and provide sufficient criteria for a decision and need not be further amended. Additional comments stated that standards were burdensome and could not be met by an applicant.

In addition, comments were requested addressing the time-frames established for comment by the state and local communities and the uses of computer technology. Comments were split on the amount of time to allow for review, some commenters stating that the final rule allowed sufficient time to review applications and other requesting even more time than the additional 30 days the final rule allowed to review applications. Comments addressing the use of computer technology and the Internet *were generally in support of* using such tools to expedite review of applications and the decision-making process.

The Department finds that it is impracticable and inefficient to repeal only part of the final rule as the Bureau of Indian Affairs needs clear direction and standards to process land into trust applications. Considering the variety of comments received, the Department has decided to withdraw the final rule in whole to address these specific areas of concern in a new rule. Consistent with Departmental policy to consult with federally-recognized Indian tribes on proposed Federal actions that impact Indian tribes, the Department will conduct consultation with Indian tribes on the following areas in its efforts to promulgate a new rule: applications for housing or home site purposes to meet individual housing needs; the requirement of land use plans; the standards of review used in reaching a determination of whether to accept land

AR00660

into trust; the availability of applications for review; and the use of computer technology prior to the proposal of a new Acquisition of Title to Land in Trust rule.

The Department has determined that the withdrawal of the final rule entitled "Acquisition to Title to Land in Trust" must be effective immediately in order to prevent its becoming effective upon the expiration of the notice of delay as published on August 13, 2001, (66 FR 42415), and to allow for the current 25 CFR Part 151 to remain in effect during the pendency of the development of a new rulemaking addressing this matter. The Department, therefore, shows good cause for the immediate effective date of this rule in accordance with 5 U.S.C. 553(d).

Dated: November 5, 2001.

**Neal A. McCaleb,**
*Assistant Secretary—Indian Affairs.*
[FR Doc. 01–28222 Filed 11–8–01; 8:45 am]
BILLING CODE 4310–02–P

---

**DEPARTMENT OF AGRICULTURE**

**Forest Service**

**36 CFR Part 242**

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**50 CFR Part 100**

**Subsistence Management Regulations for Public Lands in Alaska, Subpart D; Temporary Closure of Seasons and Changes in Harvest Limits for Moose in Unit 22 and Deer in Unit 8**

**AGENCIES:** Forest Service, USDA; Fish and Wildlife Service, Interior.

**ACTION:** Temporary closure of seasons and changes in harvest limits.

**SUMMARY:** This provides notice of the Federal Subsistence Board's temporary closure and changes in harvest limits to protect moose populations in Unit 22(B), (D), and (E), and to help the recovery of deer populations in Unit 8. These regulatory adjustments and the closures provide an exception to the Subsistence Management Regulations for Public Lands in Alaska, published in the **Federal Register** on June 25, 2001. Those regulations established seasons, harvest limits, methods, and means relating to the taking of wildlife for subsistence uses during the 2001–2002 regulatory year.

**DATES:** The original emergency actions were effective August 1, 2001 through

September 29, 2001. The extension of the emergency actions (temporary closure and changes to harvest limits) will be effective September 30, 2001 through March 31, 2002.

**FOR FURTHER INFORMATION CONTACT:** Thomas H. Boyd, Office of Subsistence Management, U.S. Fish and Wildlife Service, telephone (907) 786–3888. For questions specific to National Forest System lands, contact Ken Thompson, Subsistence Program Manager, USDA—Forest Service, Alaska Region, telephone (907) 786–3592.

**SUPPLEMENTARY INFORMATION:**

**Background**

Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA) (16 U.S.C. 3111–3126) requires that the Secretary of the Interior and the Secretary of Agriculture (Secretaries) implement a joint program to grant a preference for subsistence uses of fish and wildlife resources on public lands in Alaska, unless the State of Alaska enacts and implements laws of general applicability that are consistent with ANILCA and that provide for the subsistence definition, preference, and participation specified in Sections 803, 804, and 805 of ANILCA. In December 1989, the Alaska Supreme Court ruled that the rural preference in the State subsistence statute violated the Alaska Constitution and, therefore, negated State compliance with ANILCA.

The Department of the Interior and the Department of Agriculture (Departments) assumed, on July 1, 1990, responsibility for implementation of Title VIII of ANILCA on public lands. The Departments administer title VIII through regulations at title 50, part 100 and title 36, part 242 of the Code of Federal Regulations (CFR). Consistent with Subparts A, B, and C of these regulations, as revised January 8, 1999, (64 FR 1276), the Departments established a Federal Subsistence Board to administer the Federal Subsistence Management Program. The Board's composition includes a Chair appointed by the Secretary of the Interior with concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; the Alaska Regional Director, National Park Service; the Alaska State Director, Bureau of Land Management; the Alaska Regional Director, Bureau of Indian Affairs; and the Alaska Regional Forester, USDA Forest Service. Through the Board, these agencies participate in the development of regulations for Subparts A, B, and C, which establish the program structure and determine

which Alaska residents are eligible to take specific species for subsistence uses, and the annual Subpart D regulations, which establish seasons, harvest limits, and methods and means for subsistence take of species in specific areas. Subpart D regulations for the 2001–2002 wildlife seasons, harvest limits, and methods and means were published on June 25, 2001, (66 FR 33744) Because this rule relates to public lands managed by an agency or agencies in both the Departments of Agriculture and the Interior, identical closures and adjustments would apply to 36 CFR part 242 and 50 CFR part 100.

The Alaska Department of Fish and Game (ADF&G), under the direction of the Alaska Board of Game (BOG), manages the general harvest and State subsistence harvest on all lands and waters throughout Alaska. However, on Federal lands and waters, the Federal Subsistence Board implements a subsistence priority for rural residents as provided by Title VIII of ANILCA. In providing this priority, the Board may, when necessary, preempt State harvest regulations for fish or wildlife on Federal lands and waters.

The temporary changes for early closure of seasons and changes in harvest limits is necessary to protect declining moose populations on the Seward Peninsula, and to help deer populations on Kodiak Island and adjacent islands to continue recovery following severe winter mortality that took place during the winter of 1998–99. This temporary change is authorized and in accordance with 50 CFR 100.19(e) and 36 CFR 242.19(e).

*Unit 22 Moose*

Moose populations in Unit 22 have declined in recent years from an overall population that ranged from 7,000 to 10,000 during the late 1980s to recent estimates of 5,000 to 7,000 animals. The declines are thought to be a result of winter mortality and lower calf survival.

The Federal subsistence moose harvest in Unit 22(D) for that portion within the Kuzitrin drainage was restricted to antlered bulls by the Federal Subsistence Board in 1998 due to the declining local moose population and heavy hunting pressure. As a result of a continuing regional trend in declining moose populations, the Federal Subsistence Board, in 2000, also restricted the harvest in Unit 22(B) to bulls only.

On July 13, 2001 the Alaska Department of Fish and Game using their emergency authority, shortened, but did not close, moose hunting seasons in four portions of Unit 22: Unit 22(B) west of the Darby Mountains, Unit

AR00661



**Craig Tribal Association**
**PO Box 828**
**Craig AK 99921**
**Phone: 907-826-3996**
**Fax: 907-826-3997**
**Email: cgtribe@aptalaska.net**



The Honorable Gale A. Norton, Secretary of Interior
Attn: Terry Virden
MS4513-MIB
1849 C Street, NW
Washington, DC 20240

RE:  Comments on Final Regulations on Acquisition of Title to Land in Trust

Dear Secretary Norton:

I write on behalf of the Craig Community Association to urge you to make effective the final regulations regarding Indian trust land acquisitions, as published in the Federal Register on January 16, 2001.

The regulations should be made effective because they advance three fundamental principles. First, the regulations carry out the purposes of the Indian Reorganization Act and recognize the critical role that land restoration must play in the fostering tribal self-sufficiency. Second, the final regulations implement clear standards for taking lands into trust, which provide guidance to the Department in the exercise of its authority, and ensure basic fairness to all parties in connection with the trust application process. Third, the final regulations facilitate fair consideration of appropriate factors and a timely decision on trust land applications.

The issue of land into trust has been given full and fair consideration by the Department and further delay would be unfair and unwarranted. The process of revisiting the trust land acquisition regulations has been ongoing for years. The Department, as well as the tribes, states and local governments, shares an interest in seeing the process come to an end. There needs to be certainty regarding the procedures and standards for taking land into trust. The final rule provides a fair process that will facilitate informed and timely decision making under meaningful standards. It is time for the Department to move forward and make the final rule effective.

As Secretary of Interior, you have a trust responsibility to Indian tribes, and we believe that the Department of Interior has an obligation to further that relationship by removing obstacles to tribal self-government and self-determination. Moving forward with the final regulations will further that objective.

**RECEIVED**

JUN 1 5 2001

TRUST RESPONSIBILITIES

**COPY**

*Logged  4/30/01*

RECEIVED
6/18/1

AR00662

We urge you though make the final regulations on trust land acquisitions effective as soon as possible. Thank you for your consideration of this matter of great importance to us, and to Indian tribes nationwide.

Sincerely,

Millie A. Stevens
President, Craig Community Association

**COPY**



**Craig Tribal Association**
**PO Box 828**
**Craig AK 99921**
**Phone: 907-826-3996**
**Fax: 907-826-3997**
**Email: cgtribe@aptalaska.net**

# Fax

| | | | |
|---|---|---|---|
| **To:** Terry Virden | | **From:** LaVonne Garvey | |
| **Fax:** 202-219-1255 | | **Date:** 6/15/01 | |
| **Phone:** | | **Pages:** 3 | |
| **Re:** | | **CC:** | |

☐ Urgent  ☐ For Review  ☐ Please Comment  ☐ Please Reply  ☐ Please Recycle

**•Comments:**

Comments on land to Trust Regs.
Have a great Weekend ☺

**RECEIVED**

JUN 1 5 2001

TRUST RESPONSIBILITIES

# COPY

AR00664

LAW OFFICES

# SONOSKY, CHAMBERS, SACHSE, ENDRESON & PERRY

1250 EYE STREET, N.W., SUITE 1000
WASHINGTON, DC 20005
(202) 682-0240
FACSIMILE (202) 682-0249

MARVIN J. SONOSKY (1909-1997)
HARRY R. SACHSE
REID PEYTON CHAMBERS
WILLIAM R. PERRY
LLOYD BENTON MILLER (AK)
DOUGLAS B.L. ENDRESON
DONALD J. SIMON
MYRA M. MUNSON (AK)*
ANNE D. NOTO
KAY E. MAASSEN GOUWENS (AK)*
MARY J. PAVEL
DAVID C. MIELKE
JAMES E. GLAZE

COLIN C. HAMPSON
NACOLE D. HESLEP (AK)*
JAMES T. MEGGESTO
JOHN P. LOWNDES (AK)
HILARY C. TOMPKINS (NM)*
ELIZABETH L. RODKE (NM)*
ANGELINA OKUDA-JACOBS (WI)*

OF COUNSEL
ARTHUR LAZARUS, JR. P.C.
ROGER W. DUBROCK (AK)*
MATTHEW S. JAFFE

*NOT ADMITTED IN D.C.

June 15, 2001

**BY HAND**

Terry Virden
Director
Office of Trust Responsibilities
MS 4513-MIB
1849 C Street, N.W.
Washington, D.C. 20240



RECEIVED

JUN 1 5 2001

TRUST RESPONSIBILITIES

Re: Comments on Final Rule on Acquisition of Title To Land in Trust

Dear Mr. Virden:

We write on behalf of our tribal clients[1] to urge the Department to make effective the final rule on the Acquisition of Title to Land in Trust, as published in the Federal Register on January 16, 2001, 66 Fed. Reg. 3452.[2]

That rule, which was the result of a lengthy and comprehensive decisionmaking process by the Department, provides a balanced approach to taking land into trust. The rule at once assures that all interested viewpoints are heard and considered, while at the same time preserving the purpose of Congress in enacting Section 5 of the Indian Reorganization Act ("IRA") – to authorize the

---

[1] These comments are submitted on behalf of the Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation, Chitimacha Tribe of Louisiana, Ho-Chunk Nation, Lac du Flambeau Band of Lake Superior Chippewa, Pueblo of Isleta, Pueblo of Sandia, Pueblo of San Juan, Pueblo of Zia, St. Croix Chippewa Indians of Wisconsin, and Standing Rock Sioux Tribe.

[2] These comments are submitted in response to the notice published by the Department seeking comments on "whether the final rule should be amended in whole or in part or withdrawn in whole or in part." 66 Fed. Reg. 19403 (April 16, 2001). These comments support making the final rule effective, and accordingly oppose amending or withdrawing that rule.

WASHINGTON, DC    ANCHORAGE, ALASKA    JUNEAU, ALASKA    SANDIEGO, CALIFORNIA    ALBUQUERQUE, NEW MEXICO

Logged 6/18/01

AR00665

Terry Virden
June 15, 2001
Page 2

Secretary to approve trust land restoration as a means of revitalizing the tribes, which were devastated by the historic loss of their lands. The rule provides a measured way to address this important need – providing full and fair participatory procedures and well-defined standards to guide the Secretary's decisionmaking.

The rule should be made effective, because in significant respects it advances three fundamental principles.

**First, the rule carries out the purposes of the IRA, which recognized the critical role land restoration must play in the fostering tribal self-sufficiency.** Congress in the IRA intended the Secretary to take land into trust to help tribes which had lost so much under the former federal policy of allotment. The rule would advance this purpose, by providing a mechanism for taking land into trust on-reservation and off-reservation, consistent with the principle of the IRA that tribes must have lands that can be used effectively to improve the conditions of their people.

**Second, the final rule implements clear standards for taking lands into trust.** This is an issue as to which all interested parties share an interest. All parties benefit from knowing the standards the Department will use in evaluating trust land requests. One of the key virtues of the final rule is the clarity of its standards – which provide guidance to the Department in the exercise of its authority, and ensure basic fairness to interested parties in connection with the trust application process.

**Third, the final rule facilitates fair consideration of appropriate factors and a timely decision on trust land applications.** The final rule contains a process to address the interests of all parties. It specifies the issues that must be addressed in connection with the trust land process, and assures that the viewpoints of state and local governments are heard and given due consideration. At the same time, the rule requires the Department to act upon completed trust land applications within a specified time, thus addressing one of the greatest frustrations of tribes under the current regulations -- the failure of the Department to act in a timely manner. In short, the rule provides a process that is fair, which will facilitate informed and timely decisionmaking.

The final rule represents the considered determination of the Department, based on a full review of the positions of all concerned. The Department published the rule in proposed form on April 12, 1999, and received hundreds of substantive comments, from tribes, states, local governments and others. The resulting final rule achieved a reasonable balancing of viewpoints, which is reflected in the fact that neither the tribes nor the states received all they wanted in the final rule. In sum, the final rule provides a means for the Department to implement its authority under Section 5 of the IRA consistent with the law, utilizing fair procedures and meaningful standards. It is time for the Department to move forward and make the final rule effective.

We have organized our comments to address a number of points. First, we discuss the text and history of the IRA – which provides the legal basis for the final rule. The IRA was broadly framed to advance tribal self-sufficiency – and this thrust must be carried forward in the rule. Second,

AR00666

Terry Virden
June 15, 2001
Page 3

we discuss why taking land into trust is so vitally important to tribes today. Our intent here is to reflect the breadth of tribal interests in lands that are reflected in trust land applications. Third, we address the specifics of the final rule, and why it should be made effective. We cover both the virtues of the final rule, and, from our standpoint, its limitations. Fourth, we assess various legal arguments raised by opponents of the final rule, and why those arguments should be rejected. And finally, we suggest a process for improving the trust land process, once the final rule is in place, by establishing a framework of additional dialogue on that process.

## I.    The intent of the IRA is the basis for the rule.

The final rule implements Section 5 of the IRA, and accordingly must be informed by, and give effect to, the language and purposes of the IRA. The IRA was a landmark measure, designed to stop the terrible decline of tribal life in the United States caused by the allotment policy, and to replace allotment with a policy fostering an increased measure of tribal self-government and self-sufficiency. In the context of land, this meant calling a halt to the breakup of tribal landholdings, and providing a mechanism (including that provided in Section 5) to help restore some of the land lost by tribes to trust status. The premise of the IRA was that the federal government, through the allotment policy, was largely responsible for the abiding poverty and despair throughout Indian country, and that only by enabling tribal governments to become self-governing on economically sustainable lands, could the life of the Indians be significantly improved. While the IRA had many facets, the restoration of land was central to its vision of increased tribal self-sufficiency.

The long history of Indian land losses is well known. From the very first days of the Republic, Indian tribes gave up large areas of land to the United States, which in return assumed the duty of protecting the tribes in those retained. See Board of County Comm'rs v. Seber, 318 U.S. 705, 715 (1943). But despite the government's trust obligation to protect Indian landholdings, tribes continued to suffer devastating land losses at the Government's hands. This was particularly so during the Indian allotment era, when over two-thirds of tribal lands passed out of Indian ownership, leaving thousands of Indian people homeless and the remainder living on the poorest of their former lands. Between 1887, when the General Allotment Act was enacted, and 1934, Indian land holdings were reduced by 90 million acres, leaving but 48 million acres in Indian hands. Allotment further reduced the value of Indian lands by at least 85 percent, with the most valuable land passing into non-Indian ownership. To Grant Indians Living Under Federal Tutelage the Freedom to Organize for Purposes of Local Self-Government and Economic Enterprise: Hearing on S. 2755 Before the Senate Comm. on Indian Affairs, 73rd Cong., 2d Sess., 30-31 (1934) (hereafter "Senate Hearings") (testimony of Commissioner of Indian Affairs John Collier). The destruction of tribal economies, institutions, culture and communities followed directly from the decimation of the tribal land base.

Congress was aware of these problems and fully intended to reverse these tribal land losses when it enacted the Indian Reorganization Act, 25 U.S.C. §§461-479. Congressman Howard, the Chairman of the House Committee on Indian Affairs and co-sponsor of the bill that was enacted as the IRA, described the "staggering" losses of Indian lands and condemned prior federal Indian policy as "a form of legalized misappropriation of the Indian estate" for which the United States Government

Terry Virden
June 15, 2001
Page 4

was "morally responsible." 78 Cong. Rec. 11,727-28 (1934). On the floor of the House on the day the bill was passed, he provided a comprehensive explanation of the Act's purposes and its historic context:

> It is no longer necessary to indulge in theoretical arguments for or against the allotment idea. The cold fact of what has happened to the Indians and their lands under that act conclusively proves that allotment was a costly tragedy both to the Indians and to the Government. The Indians themselves were not consulted in the passage of this act, and once it was enacted they feared and opposed it. Allotment was literally forced upon them against their wishes both in the adoption of the act and in its subsequent application to the various reservations.

> The allotment act, so far from being a means of civilizing the Indians, soon became a perfect tool for the capture of Indian lands. As soon as the Indians had begun to receive their unrestricted patents, they flocked in great numbers to the real-estate agents and the land seekers and parted with their deeds for small sums of ready cash. Or if the original allottee had died before his trust period expired and if he had numerous heirs, lineal and collateral, as was usually the case, it became necessary to sell the land in order to partition the estate. As if this method of capturing Indian lands were not working fast enough, the Government adopted the further policy of disposing of the so-called "surplus" lands of the allotted reservations. This act of February 8, 1887 (24 Stat. 388), provided the future means for the opening to sale and entry of so-called "surplus" lands left over after all the individual members of the tribe had received allotments.

> As I have before stated, the figures on the loss of Indian lands out of Indian ownership in the past 47 years are indeed staggering. Whether or not the original area of the Indian lands was excessive, the land was theirs, under titles guaranteed by treaties and law; and when the Government of the United States set up a land policy which, in effect, became a form of legalized misappropriation of the Indian estate, the Government became morally responsible for the damage that has resulted to the Indians from its faithless guardianship. The land seekers who acquired the Indian lands naturally took the best first, so that which remains is in general the least valuable part of the original Indian estate.

> .  .  . The Indians of many tribes have lost practically every square foot of land they owned. Many reservations have in Indian

AR00668

Terry Virden
June 15, 2001
Page 5

> ownership a mere fragment of the original land, and all the remaining
> allotted reservations are badly checkerboarded. This process will
> proceed inexorably on the remaining allotted reservations and, indeed,
> on the unallotted reservations.

78 Cong. Rec. 11,727-28 (1934) (statement of Rep. Howard).[3]

Congress also found that the allotment era policies caused the destruction of tribal institutions and the imposition of unwarranted control by the Bureau of Indian Affairs, as well as massive poverty and despair among Indian people. Congressman Howard explained the impact to the House:

> Although many thousands of Indians are living in tribal status
> on the various reservations, their own native tribal institutions have
> very largely disintegrated or been openly suppressed, and the entire
> management of Indian affairs has been more and more concentrated in
> the hands of the Federal Indian Service. The powers of this Bureau
> over the property, the persons, the daily lives and affairs of the Indians
> have in the past been almost unlimited. It has been an extraordinary
> example of political absolutism in the midst of a free democracy –
> absolutism built up on the most rigid bureaucratic lines, irresponsible
> to the Indians and to the public; shackled by obsolete laws; resistant to
> change, reform, or progress; which, over a century, has handled the
> Indians without understanding or sympathy, which as used methods of
> repression and suppression unparalleled in the modern world outside
> of Czarist Russia and the Belgian Congo.

78 Cong. Rec. 11,729 (1934).

> Indian poverty is reaching an ever lower level. The survey of
> typical Indian income, which I have previously mentioned briefly, was
> made during the past winter on reservations in South Dakota, North

---

[3] Congressman Howard also correctly predicted that Indian lands would continue to be lost as an "inevitable" result of the heirship system. 78 Cong. Rec. 11,728. Commissioner of Indian Affairs John Collier also explained, in hearings held before the House Committee on Indian Affairs in 1934, that these land losses were compounded by secretarial action under which Indians were illegally forced to accept fee patents, following which their lands were quickly mortgaged, taxed, and sold to non-Indians. See Readjustment of Indian Affairs: Hearings on H.R. 7902 before the Committee on Indian Affairs, House of Representatives, 73rd Cong., 2nd Sess. at 52 (1934)(hereafter "House Hearings"). Those losses had not been corrected, id., although they were found illegal by the courts, see United States v. Benewah County, 290 F. 628, 630-32 (9th Cir. 1923).

AR00669

Terry Virden
June 15, 2001
Page 6

> Dakota, California, Kansas, Montana, and Oklahoma. The average
> income of $48 per year mentioned did not include oil and mineral
> royalties paid to a handful of individuals. This per capita income
> includes not only wages and lease rentals, but the market value of
> goods produced or consumed. And this income is higher than it would
> be in normal years, because of unusually favorable employment
> opportunities in the numerous emergency projects under way in the
> Indian country.

> This poverty contributes largely to the excessive death rate
> among the Indians, which, in the case of tuberculosis, a disease closely
> associated with undernourishment, is more than seven times the death
> rate from tuberculosis among the whole population.

78 Cong. Rec. 11,728 (1934).

President Franklin D. Roosevelt, in a statement strongly supporting the IRA, shared these concerns:

> The continued application of the allotment laws, under which
> Indian wards have lost more than two thirds of their reservation lands,
> while the costs of Federal administration of these lands have steadily
> mounted, must be terminated.

> Indians throughout the country have been stirred to a new hope.
> They say they stand at the end of the old trail. Certainly, the figures of
> impoverishment and disease point to their impending extinction, as a
> race, unless basic changes in their conditions of life are effected.

> * * *

> The Wheeler-Howard bill offers the basis for such cooperation.
> It allows the Indian people to take an active and responsible part in the
> solution of their own problems.

> I hope the principles enunciated by the Wheeler-Howard bill
> will be approved by the present session of the Congress.

Letter from President Franklin D. Roosevelt to Burton K. Wheeler, United States Senate (Apr. 28, 1934), reprinted in S. Rep. No. 73-1080 at 4 (1934).

Congress and the President saw the IRA as a means not simply of halting the prior federal policies that had so destroyed Indian communities and Indian economies but reversing the course that

AR00670

Terry Virden
June 15, 2001
Page 7

led to those losses.[4] The IRA is one of the most important pieces of Indian legislation in American history.[5] It made a change in federal Indian policy intended "to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically." Morton v. Mancari, 417 U.S. 535, 542 (1974). By the Act, Congress sought to revitalize and strengthen the institutions of tribal government, see Morton, 417 U.S. at 543, Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 14 n.5 (1987), Fisher v. District Court, 424 U.S. 382, 387 (1976), and "rehabilitate the Indian's economic life and to give him a chance to develop the initiative destroyed by a century of oppression and paternalism" so that a "tribe taking advantage of the Act might generate substantial revenues for the education and the social and economic welfare of its people," Mescalero Apache Tribe v. Jones, 411 U.S. 145, 151-52 (1973) (citations omitted) – principles which have served as the foundation for federal Indian policy in the modern era of Tribal Self-Determination. See California v. Cabazon Band of Mission Indians, 480 U.S. 202, 219 (1987); White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143 & n. 10 (1980).

Restoration of land to tribal ownership was central to the overall purposes of the IRA. Congress consistently recognized that the restoration of tribal land bases by taking land into trust was essential to tribal self-determination. As Congressman Howard succinctly stated during the House consideration of the measure, "[l]and reform and in [sic] a measure home rule for the Indians are the essential and basic features of this bill." 78 Cong. Rec. 11,729 (1934).

The IRA contained a number of provisions to implement land reform. The Act halted allotment, 25 U.S.C. § 461, extended indefinitely the trust status of tribal and Indian land, 25 U.S.C. § 462, and most significantly vested the Secretary of the Interior with broad authority to acquire lands and any interests in lands, in trust for tribes and Indians, "within or without existing reservations,"[6] as well as authority "to proclaim new Indian reservations," 25 U.S.C. § 467. Congress authorized placement of tribal and individual Indian land into trust, based on a finding that fee simple ownership of lands by Indians was inadequate to achieve federal policies for "encouraging the preservation of Indian communities" or providing the Indians "with the benefits intended." United States v. John, 437 U.S. 634, 646 (1978). Congressman Howard described these land reform measures:

Section 5 sets up a land acquisition program to provide land for

---

[4] As the Supreme Court recently noted, the IRA dramatically shifted federal Indian policy. Cass County v. Leech Lake Band, 524 U.S. 103, 108 (1998).

[5] In the view of Felix Cohen, paramount scholar in Indian law, see Squire v. Capoeman, 351 U.S. 1, 8-9 & n. 15 (1956), this act is "equaled in scope and significance only by the legislation of June 30, 1834, and the General Allotment Act of February 8, 1887." Felix S. Cohen, Handbook of Federal Indian Law, 84 (1942 ed.).

[6] The Secretary's authority to acquire land under this section applies to tribes, without regard to whether they have no land or insufficient lands. This is discussed in section IV.B below.

Terry Virden
June 15, 2001
Page 8

> Indians who have no land or insufficient land, and who can use land
> beneficially. . .

> I have already said that there are more than 100,000 landless
> Indians in America today, and in addition many of the reservations are
> so riddled by alienation that their economic use for Indian grazing is
> impossible. This program would permit the purchase of land for many
> bands and groups of landless Indians and would permit progress
> toward the consolidation of badly checkerboarded Indian reservations,
> as well as provide additional agricultural land to supplement stock
> grazing or forestry operations. Considering the magnitude of the
> losses of Indian land brought about by the past 50 years of incompetent
> Federal guardianship, the purchase program here proposed is indeed
> a very modest restitution; and it is moreover an investment that will
> many times repay itself by taking Indians off the relief and ration rolls.

78 Cong. Rec. 11,730 (1934).

The objective of the IRA's land reform was restitution for the severe damage done to the
Indians as a result of what Congressman Howard termed the United States' "faithless guardianship."
Summarizing "the ultimate goals of the policy embodied in this bill," Congressman Howard
explained:

> It seeks in the long run to build up Indian land holdings until
> there is sufficient land for all Indians who will beneficially use it.

> It seeks the functional and tribal organization of the Indians so
> as to make the Indians the principal agents in their own economic and
> racial salvation . . . .

> * * *

> In carrying out this program, the Indian Service will become
> the adviser of the Indians rather than their ruler. The Federal
> Government will continue its guardianship of the Indians, but the
> guardianship envisaged by the new policy will constantly strengthen
> the Indians, rather than weakening them.

> . . . This Congress, by adopting this bill, can make a partial
> restitution to the Indians for a whole century of wrongs and of broken
> faith, and even more important – for this bill looks not to the past but
> to the future – can release the creative energies of the Indians in order
> that they may learn to take a normal and natural place in the American
> community.

AR00672

Terry Virden
June 15, 2001
Page 9

78 Cong. Rec. 11,732 (1934).

As this history reflects, a primary objective of the IRA was the restoration of lands to tribal ownership as a means of promoting tribal-self determination.[7] The IRA reflected a fundamental shift in federal Indian policy – away from the devastating policy of allotment, in favor of a new policy of promoting the governmental, cultural and economic advancement of tribes, with land acquisition as an important component of the new policy.

**II.      Trust land acquisition is vitally important today.**

This historical perspective -- including both the devastating consequences of tribal land losses and the intent of Congress in the IRA -- provides strong support for taking land into trust for tribes. Despite this, opponents sometimes raise the question -- why should land be taken into trust today? While there are many reasons, one part of the answer is that tribes need trust land today for many of the same reasons they did when the IRA was enacted. In addition, tribes today need lands taken into trust to move toward the goals of tribal self-government and self-sufficiency, which form the core of the Self-Determination policy.

The devastating consequences of allotment on Indian country are unfortunately all too present today. The Department is well aware of this with respect to its own dealings with a range of Indian issues, including the management of Indian trust lands and trust funds – where the problems of fractionated heirship arising from allotment remain essentially intractable.

In a similar manner, the problems for the tribes caused by allotment have by no means been alleviated. While a few tribes have made notable advances, it remains the case that nationwide, Indian tribes today continue to face conditions that are far worse than any other group of Americans. By whatever measure – income, unemployment, housing, crime, welfare dependence, sickness, mortality, or education – the standard of living for Indians is far below what it should be, and far below what all other Americans enjoy. These ongoing deficits in Indian country were underscored by Senator McCain a few years ago:

---

[7] Although the IRA has been in effect for more than 65 years, to date only a small fraction of the lands lost due to allotment have been returned to tribal ownership. 64 Fed. Reg. at 17577 (citing Felix S. Cohen's, Handbook of Federal Indian Law 138 (1982 ed.); BIA's Annual Report for Indian Land, 1996). Indian land losses have continued since passage of the Act. For example, a very substantial amount of Indian trust lands passed out of Indian ownership in the early 1950s, during the Termination Era, when Commissioner of Indian Affairs Dillon Meyer advocated for, and administratively implemented of policy tantamount to illegal "forced fee patents." See Felix S. Cohen, "The Erosion of Indian Rights 1950-1953: A Case Study in Bureaucracy," 62 Yale L.J. 348 (1953). And the legacy of the allotment policy, which has deeply fractionated heirship of trust lands, means that for most tribes, far more Indian land passes out of trust than into trust each year.

AR00673

Terry Virden
June 15, 2001
Page 10

Indian families live below the poverty line at rates nearly three times the national average. Nearly one of every three Native Americans lives below the poverty line. One-half of all Indian children on reservations under the age of 6 are living in poverty.

On average Indian families earn less than two thirds the incomes of non-Indian families. As these statistics indicate, poverty in Indian country is an everyday reality that pervades every aspect of Indian life. In this country we pride ourselves on our ability to provide homes for our loved ones. But in Indian country a good, safe home is a rare commodity.

There are approximately 90,000 Indian families in Indian country who are homeless or underhoused. Nearly one in five Indian homes on the reservation are classified as severely overcrowded. One third are overcrowded. One out of every five Indian homes lacks adequate plumbing facilities. Simple conveniences that the rest of us take for granted remain out of the grasp of many Indian families.

Indians suffer from diabetes at 2 ½ times the national rate. Indian children suffer the awful effects of fetal alcohol syndrome at rates far exceeding the national average. Perhaps most shocking of all, Indian youth between the age of 5 and 14 years of age commit suicide at twice the national rate. The suicide rate for Indians between the ages of 15 and 24 is nearly three times the national rate.

141 Cong. Rec. S11881 (August 8, 1995) (Statement of Sen. McCain). Senator McCain's statement is strikingly reminiscent of Congressman Howard's description of deplorable conditions in Indian country during the debate on the IRA some 60 years earlier. See pages 5-6 above. The fundamental point is that the conditions that gave rise to the IRA and the need for Indian trust land acquisitions are still with us today.

Moreover, taking land into trust not only furthers the unfulfilled purposes of the IRA, but also advances the policy of Self-Determination that has guided every Administration for the last 30 years. Building on the principles articulated in the IRA, the Self-Determination policy seeks to promote local tribal solutions to tribal issues, by giving tribes the option of assuming tribal administration of programs formerly run by the federal government, and by fostering tribal economic self-sufficiency. The Self-Determination policy was an initiative of President Nixon, who outlined the policy in his seminal message to Congress in 1970. As President Nixon stated:

The first Americans – the Indians – are the most deprived and most isolated minority group in our nation....

AR00674

Terry Virden
June 15, 2001
Page 11

This condition is the heritage of centuries of injustice. From the time of their first contact with European settlers, the American Indians have been oppressed and brutalized, deprived of their ancestral lands, and denied the opportunity to control their own destiny....

.... The time has come to break decisively with the past and to create the conditions for a new era in which the Indian future is determined by Indian acts and Indian decisions.

The American Indians – Message from the President of the United States, H. Doc. 91-363, – Cong. Rec. H 6438 (July 8, 1970). *President Nixon's message advanced the principle that tribes should have the opportunity to run their own programs and schools, free from the dictates of the federal bureaucracy.* The message also stressed the importance of economic advancement of tribes, stating that it is "critically important that the federal government support and encourage efforts which help Indians develop their own economic infrastructure." Id. at H 6440.[8]

These goals of tribal governmental self-determination and economic self-sufficiency have been carried forward in the years since President Nixon's Message - and every President since Nixon has reaffirmed the importance of the Self-Determination policy. Moreover, Congress has expressly reinforced the principle that providing a viable tribal land base remains a significant part of current federal Indian policy. Thus, in an effort to address the need of tribes to secure interests in lands that became fractionated through allotment, Congress enacted the Indian Land Consolidation Act in 1983. 25 U.S.C. §§2201 et seq. As part of that Act, Congress provided that the authority of the Secretary to take lands into trust under Section 5 of the IRA applies to "all tribes." 25 U.S.C.§2202. In addition, just this past year, Congress in adopting significant amendments to the Indian Land Consolidation Act, expressed that it is the policy of the United States to

(4) to promote tribal self-sufficiency and self-determination; and (5) to reverse the effects of the allotment policy on Indian tribes.

Public Law 106-462, 114 Stat. 1991, §102. As these provisions reflect, land acquisition remains an important feature of the Self-Determination policy.

Taking land into trust not only furthers the purposes of the IRA and the Self-Determination policy, it also advances important tribal interests. Tribes need land in trust for a wide range of beneficial purposes – the overwhelming majority of which, contrary to popular myth, have nothing to do with gaming. Among other things, tribes seek to have lands taken into trust to protect or promote their historic, cultural, self-government, economic and conservation interests in lands.

---

[8] As Congress expressed in the Indian Self-Determination Act, "the United States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." 25 U.S.C. §450a(b).

AR00675

Terry Virden
June 15, 2001
Page 12

**Historical interest.** Tribes have strong historic ties to certain lands where their ancestors lived and undertook traditional cultural and religious practices, including hunting, fishing and gathering, as well as ceremonial uses. These may be lands where the tribe lived in aboriginal times, or lands that were part of a former reservation. Restoring such lands to trust status is important to preserve the link with the historic past and to assure that the lands are properly acknowledged and preserved as part of the permanent homeland of the Tribe.

**Cultural interest.** Tribes have a strong interest in areas where religious or burial sites are located. Protection of these sites through trust ownership is an important tribal value.

**Self-government interest.** Tribes today carry out a broad range of services for their members in the exercise of the Self-Determination policy. Tribes run schools and health clinics, administer housing for the needy, and provide court, law enforcement and numerous other key governmental services. Much of the land taken into trust for tribes directly furthers these and other Self-Determination functions, by providing appropriate sites for tribal schools and other tribal facilities. Certainly tribes have an important interest in trust ownership of the land where tribal schools, clinics and tribal government offices are located.

**Economic interest.** As noted above, the IRA and the Self-Determination policy both support the acquisition of trust lands to provide a viable land base for tribes. Taking land into trust can provide an opportunity to address the economic needs of the tribes.

**Conservation interest.** Many tribes have a special connection to the lands and natural resources that extends from traditional times. Today, this often manifests itself in tribal efforts to protect their resources from the pressures of outside development. In such instances, taking land into trust provides a mechanism for tribes to protect their lands in the interests of conservation.

The experience of our tribal clients reflects the diversity of tribal purposes in seeking to have land taken into trust. Their trust land applications (pending or under preparation for submission) include lands for consolidating checkerboarded grazing units (Standing Rock Sioux Tribe), providing housing and a Native language center (Ho-Chunk Nation), maintaining Tribal Court and Tribal Planning Department facilities (Chitimacha Tribe), and protecting lands for conservation purposes (Lac du Flambeau Band). Many of the trust land applications of our tribal clients, and other tribes, are not opposed by any party. To the contrary, in many instances, the benefits of having the land taken into trust are recognized by all concerned. For example, the Wisconsin Department of Natural Resources is in the process of transferring 1320 acres of land to the Lac du Flambeau Band to be taken into trust, in large part to enable the Band to manage and protect the lands for conservation purposes.

Trust land acquisition furthers the purpose of the IRA, providing a partial remedy to the historic loss of lands caused by the allotment policy. At the same time, trust land acquisition advances the current policy of Self-Determination, by providing tribes with lands they need for a broad range of beneficial uses. In short, a confluence of historic, legal, and policy considerations supports taking land into trust for tribes today.

Terry Virden
June 15, 2001
Page 13

## III.     The final rule, as published on January 16, 2001, should become effective.

      **A. The structure of the final rule conforms with the intent of the IRA.** The final rule provides a mechanism for taking land into trust, consistent with the thrust of the IRA that trust land acquisition is necessary to remedy the losses suffered by tribes. The new rule addresses on-reservation acquisitions, in part to enable tribes to consolidate their on-reservation lands in economically useful blocks -- one of the purposes stressed in the history of the IRA. The new rule addresses off-reservation acquisitions, consistent with the recognition in the IRA legislative history that many tribes had land losses that left them without viable opportunities on-reservation. And the new rule establishes a mechanism for Tribal Land Acquisition Areas, to provide a means for tribes with the smallest remaining land bases (or no land base at all) to be afforded the benefits of the on-reservation provisions -- reflecting the concerns in the IRA history with those tribes that had lost the most. In short, the rule frames the issue in much the same way the IRA's legislative history describes it – that the adverse impact of allotment was felt by different tribes in various ways, and that land restoration is a central feature for addressing those broad ranging and diverse impacts.

      **B. The standards in the final rule are balanced and reasonable.** One of the most significant features of the final rule is that it provides clear standards regarding the acquisition of lands in trust. Standards are important to ensure basic fairness to all interested parties, by providing notice of the basis on which trust land decisions will be made. Everyone is entitled to know, in advance, the criteria under which their submissions will be evaluated. In addition, standards provide guidance to the Department – to assure that decisions on trust land applications are made in a reasonable and consistent manner. Further, standards provide support for the Secretary's decisionmaking – which will be invaluable in connection with judicial review of the Secretary's decisions.

      The standards contained in the final rule fulfill these purposes. Those standards provide notice to the parties and guidance to the Secretary. Moreover, those standards provide a commonsense approach to trust land acquisition – providing a framework for taking land into trust to advance the purposes of the IRA and Self-Determination, while at the same time providing a basis for declining to take land into trust in appropriate circumstances.

      **1. On-reservation standard.** For on-reservation acquisitions, the final rule provides that if an application to have land taken into trust is complete, the Secretary "will" take the land into trust "if we [the Secretary] determine that the application facilitates tribal self-determination, economic development, Indian housing, land consolidation or natural resource protection..." Section 151.10(a). But the regulations go on to provide that, even if this standard is met, the Secretary "may" not take land into trust if doing so "will result in severe negative impact to the environment or severe harm to local government." Such harm must be "clear and demonstrable and supported in the record." Section 151.10(b).

      This is an eminently reasonable standard. It provides that if a trust land application meets a specified beneficial purpose (purposes which comport with the history of the IRA), then the application will be granted, unless it will do significant harm. As a practical matter this makes sense.

Terry Virden
June 15, 2001
Page 14

For example, the Standing Rock Sioux Tribe is a tribe with over 10,000 members and a large reservation in North and South Dakota. More than two-thirds of the Tribe's Reservation trust lands were lost to allotment early in this century. Another 56,000 acres – the best remaining lands of the Reservation– were lost when land along the Missouri River was flooded for the Oahe Dam in the late 1950's. Standing Rock is today a relatively poor tribe economically. Its land acquisitions are largely for two purposes – to consolidate land so it can be used in a reasonable manner for grazing purposes, and to provide land for housing for its people. As the new rule indicates, these are positive uses, consistent with the underlying policy of promoting tribal self-determination and economic progress. In these circumstances, it is reasonable for the Secretary to take lands into trust for the tribe, and that is the basic approach taken in the new rule.

At the same time, the new rule suggests that there can be various circumstances where a negative decision would be appropriate on-reservation – such as if a tribe wanted to take land into trust for a toxic waste site, near an endangered species habitat. To support such a determination, an appropriate showing is required by the rule, so that the harm must be demonstrable in the record. But, in the absence of such a showing, it makes sense to take land into trust on-reservation, where doing so will fulfill one of the beneficial purposes identified in the rule.[9]

        **2. Off-reservation standard.** The off-reservation standard is somewhat more complex. As a threshold matter, a tribe seeking to have land taken into trust off-reservation must meet a significant burden of providing documentation addressing a wide range of potential impacts --

---

[9] The National Governors Association submitted comments on the final rule to the Secretary by a letter dated April 9, 2001 (hereafter "NGA letter"). Several state attorneys general submitted comments to the Secretary by a letter dated March 7, 2001 (hereafter "State AG letter"). Both sets of comments argue against the standards in the final rule. They argue that, once a showing is made that a trust land acquisition will meet one of the purposes specified in the rule, it is unfair to require state and local governments to show that the negative impact is "clear and demonstrable and supported in the record." NGA letter, p. 2; State AG letter, p. 8. But we submit that the standard is entirely appropriate. In view of the history of tribal land loss and the purposes of the IRA, which seeks to ameliorate the harsh impacts of that loss, the final rule properly provides that, in the on-reservation context, an application that meets the purposes of the IRA shall be granted. An exception is provided with respect to applications that will do significant harm. But such harm must be real, and demonstrated in the record. Allowing anything less would mean that a trust land acquisition that would advance the purposes of the IRA and benefit the tribe could be defeated based on a negative impact that is illusory or speculative. If that was the case, any trust land application could be defeated by any opposition, even an opposition lacking any factual foundation. Surely Congress did not intend the beneficial purposes of Indian land restoration to be lost based on wholly unsubstantiated concerns. Requiring a showing of negative impact on the record simply means that if a trust land application is to be denied, the denial must be based on established facts. Basic fairness requires no less.

Terry Virden
June 15, 2001
Page 15

regarding jurisdiction, zoning, taxes, utilities and more.[10] Once the Tribe meets that requirement and an application is complete, the final rule provides that the Department "will" accept land into trust off-reservation if 1) the acquisition will "facilitate tribal self-determination, economic development, Indian housing, land consolidation or natural resource protection," and 2) the Department determines that the benefits to the tribe outweigh "any demonstrable harm to the local community." Section 151.14(a). Even if this standard is met, the Department may disapprove an application if it would cause 1) "severe negative impacts to the environment," 2) "significant harm to the local community," shown by "clear" evidence in the record, or 3) the BIA to be unable to fulfill law enforcement or other responsibilities. Section 151.14(b). Beyond this, the final rule provides that the location of an off-reservation parcel is a factor in the Department's determination. If the parcel to be acquired is in a different state than the tribe's reservation, the tribe's justification will be subject to "greater scrutiny." The greater the distance of such a parcel from the tribe's reservation, the more the benefits to the tribe will be subjected to "greater scrutiny." Section 151.14(c)(2). And, the greater the distance of such a parcel from the tribe's reservation, the more the concerns expressed by state and local governments will be "given greater weight." Section 151.14(c)(3).

This standard for off-reservation acquisitions provides a basic balancing test for determining whether to approve trust land applications. Like the on-reservation standard, this standard starts with the basic question – will the application fulfill one of the basic purposes of the tribal self-determination, economic development etc? If so, the issue then shifts to whether the benefits to the tribe are outweighed by harm to others. Under the final rule, a variety of specific matters, including environmental concerns, law enforcement and the distance from the reservation, are part of the consideration. Significantly, the final rule requires that opposition to a trust land application be based on evidence and facts demonstrated in the record. This ensures that the Secretary will determine whether local opposition (if it exists) is based on defined considerations, or is merely a pretext, as sometimes occurs.

Off-reservation acquisitions are important for tribes which historically lost significant amounts of land, and have an insufficient remaining land base. For example, the Chitimacha Tribe of Louisiana once had a larger reservation that was confirmed to the Tribe by President Pierce. Through a series of unlawful transactions, the Tribe lost most of its land, and today is left with only 261 acres on its Reservation. The Chitimacha Tribe currently has pending an application to have a 2.8 acre parcel taken into trust. This parcel is immediately adjacent to the Reservation. The Tribal Courthouse and Tribal Planning Department are located on this parcel – and those uses will continue after the parcel is taken into trust. The local community supports the trust land application. The off-reservation standard in the final rule provides a reasonable way to address this type of situation. The standard calls for a balancing of tribal benefit and harm to others. In the case of the Chitimacha parcel, there is clear benefit to the Tribe which seeks to have key tribal facilities as part of its trust land base, and no one is harmed. While the implementation of the balancing test is not always quite so simple, the standard provides a reasonable framework for the Secretary to make determinations with respect to contested applications as well.

---

[10] We discuss this requirement of the final rule in section III.C below.

AR00679

Terry Virden
June 15, 2001
Page 16

In sum, properly construed – and, in particular, affording due weight to the importance of land to tribes as reflected in the IRA – the standard in the final rule provides a clear and fair basis for addressing land acquisitions off-reservation.

**3. Tribal Land Acquisition Area standard.** The final rule contains a third standard – for the approval of Tribal Land Acquisition Areas. In making its determinations on Tribal Land Acquisition Areas, the BIA will look to a number of factors. Section 151.21. First, if Congress has directed the Secretary to take land into trust for a particular tribe (without directing which parcels of land), that is a factor strengthening the application for approval of a Tribal Land Acquisition Area. Second, there must be a reasonable connection between the amount of land the tribe proposes for a Tribal Land Acquisition Area and the basic needs of the tribe. Third, the connection of the tribe to the lands is a factor. Lands as to which the tribe has a strong cultural, historic or legal connection will be more likely to be granted Tribal Land Acquisition Area status. And fourth, the impact of jurisdictional changes will be considered. This includes matters such as law enforcement, water, sewer and garbage services, as well as the more general notion that the "adverse impacts on local governments and communities are reasonable compared to the benefits flowing to the applicant." Section 151.21(e)(3). Again, if due consideration is given to the tribal interest in land – and the TLAA standard expressly acknowledges the importance of the cultural, historic and legal connection of tribes to the lands under consideration – this standard should produce fair results.[11]

In short, all three standards in the final rule are clear and reasonable, and provide a fair basis for the Secretary's decisionmaking.

---

[11] The State AG letter argues that the Tribal Land Acquisition provision of the rule should be deleted. Their basic argument is that they see no legal authority for the TLAA. State AG letter, p. 9. This concern has no merit. The TLAA provision is plainly based on the same legal authority – Section 5 of the IRA – as the other portions of the rule. The TLAA provision does nothing more than establish a procedure under which certain off-reservation acquisitions will be afforded favorable treatment under the rule. That is, once an area is approved as a TLAA, any acquisition in that area would be considered under the on-reservation procedures, and judged according to the on-reservation standards. Section 151.17. In essence, this provides a measure of administrative convenience – as one determination regarding a TLAA will mean that each parcel acquired within that area could then be treated under the more streamlined on-reservation portion of the rule. The TLAA area serves an important function – as it provides a mechanism for those tribes with the least land to seek to make some coordinated effort to address their land needs. At the same time, the TLAA provision is limited – as it does not apply to all tribes, and it requires a nexus between the tribal population and its location on the one hand and the area of the TLAA on the other. Section 151.21. The procedures and standards for obtaining approval of a TLAA are rigorous -- and include full participation by state and local governments. Sections 151.19 - 151.21. And, the TLAA is limited in effect – as it does not purport to create any reservation status for any tribe. Section 151.24. In short, the TLAA provision is an authorized and beneficial provision, establishing a useful administrative approach for dealing with those tribes which have the least lands. The TLAA provision should be preserved.

Terry Virden
June 15, 2001
Page 17

      **C. The final rule provides a fair process to assure that all interests are considered.** The final rule provides opportunities for all concerned parties to be heard. State and local governments receive notice and an opportunity to comment prior to the Secretary's decision, and may seek judicial review prior to land going into trust. The procedures established in the final rule assure full and fair consideration of all viewpoints.

      In the on-reservation context, an application must cover matters including the tribe's need for the land, intent with respect to use, title information, documentation to comply with NEPA, hazardous substances documentation and more. Section 151.9. Once an application is received, the Department notifies the affected state and local governments, who then have 30 days to comment. After preliminary title work is done, and the package is complete, the Department makes its determination on whether to take the land into trust. The Department then defers its action, and publishes a notice in the federal register – giving any affected party 30 days to seek judicial review of the Department's decision. Section 151.6(c)(2). These procedures are broadly participatory – specifically providing notice and an opportunity to comment to state and local governments, as well as providing for judicial review.

      In the off-reservation context, the process is even more detailed. The final rule requires a tribe seeking to have land taken into trust provide the Department with documentation regarding a wide range of matters, including a) why the tribe needs the land and why its current land base is insufficient, b) how the land has been used and will be used in the future, c) a business plan for proposed economic uses, d) details regarding location in relation to the reservation and other factors, e) the impact of taking land into trust on the local tax rolls, f) zoning issues, g) law enforcement, h) fire and emergency medical services, i) traffic, j) sanitation and trash, k) utilities, l) any existing cooperative agreements, and m) any provisions for the tribe to make payments in lieu of taxes. Section 151.12. Again, notice is provided to affected state and local governments, but in this connection, they are afforded a 60 period to comment[12] and another notice is provided following a determination, to give parties 30 days to seek judicial review, prior to the land actually being taken into trust.

      These requirements assure that all points of view and all issues will be fully considered in connection with each trust land application. State and local governments are full players in the process, and no land may be taken into trust without giving them both an opportunity to comment in detail and an opportunity to seek judicial relief if the Secretary disagrees with their comments.[13]

---

    [12] The process for approval of Tribal Land Acquisition Areas is much like that for particular off-reservation parcels.

    [13] Two basic arguments are raised by the NGA and State Attorneys General regarding the process under the new rule. First, they argue that state and local governments should be entitled to see the full trust land application. NGA letter, p. 3; State AG letter, p. 6. In general, we agree. It is fair to provide affected state and local governments with the full application, to enable them to comment fully. An exception to this would be that documents that are protected from

AR00681

Terry Virden
June 15, 2001
Page 18

**D. The final rule provides a timeline for Department action on trust land applications.** Many tribes have experienced long, frustrating delays in the fee-to-trust process. The new rule includes a deadline designed to make the process move forward more quickly. The rule provides that once an application to have land taken into trust is complete, the BIA shall issue a decision on the application "within 120 working days after issuance of the notice of a complete application." Section 151.5(f)(2). While perhaps more could be done to expedite the trust land acquisition process, this provision does for the first time fix a required deadline. Imposing a deadline on the BIA's decision to accept land into trust is a significant step forward – as all parties are entitled to a decision within a specified period, and undue administrative delay will no longer be the norm.

**E. The final rule takes a balanced approach.** As described above, there is much to recommend the final rule - which overall provides a reasonable framework for taking land into trust for tribes. At the same time, it remains the case that the final rule did not incorporate some of the important points advocated by our clients and other tribes in comments regarding the proposed rule.

**1) Contiguous lands.** In comments to the Department on the proposed rule, our tribal clients strongly supported treating contiguous lands in the same manner as on-reservation lands. Consolidating tribal landholdings, through the trust acquisition of contiguous lands, makes sense from the standpoint of the IRA's purpose of promoting the economic revitalization of the tribes. For

---

disclosure under existing law, such as the Freedom of Information Act, should be withheld. This would protect matters such as confidential business plans, the disclosure of which could have an adverse economic impact. While we agree with the general principle of disclosure in this context, we do not think any change in the rule is needed to accomplish that. Nothing in the rule prevents such disclosure, and this issue could be dealt with by the Department through its implementation of the rule – by providing appropriate instructions to BIA officials involved in the process.

The second argument they raise in this connection is that there should be a different decisionmaker on trust land applications. NGA letter, p. 3; State AG letter, p. 6. The notion they seek to advance is that the Department has a conflict of interest because it serves as trustee for the tribes, and so, they contend, can not act fairly in connection with trust land applications. By this argument, the NGA and the State Attorneys General seek to turn the federal government's relationship with the tribes on its head. It is certainly the case that the federal government has a special obligation to Indian tribes – arising out of treaties, statutes, a course of dealings, and court decisions. That trust obligation requires the Secretary (and other federal officials) to comply with the highest fiduciary standards in fulfilling her duties to the tribes. The idea that the trust responsibility somehow disables the Secretary from acting is contrary to the basic notion of the trust responsibility. If the Secretary was required to stand aside, that would be tantamount to ending the trust responsibility. Absent an express directive from Congress, there is simply no basis for making such a fundamental change in the trust responsibility in connection with the final rule.

Terry Virden
June 15, 2001
Page 19

many tribes -- particularly those that have only limited land bases today -- the only viable option for restoring a tribal homeland in a practical manner is through the acquisition of contiguous lands. Despite the importance of contiguous lands to the restoration efforts of many tribes – and despite the fact that the current regulations provide for contiguous lands to be treated in the same manner as on-reservation lands – the final rule provides less favorable treatment to contiguous lands.

**2) Alaska tribes**. Our tribal clients urged the Department to support the right of Alaska tribes to participate to the same extent as other tribes, in the trust land process. Although the preamble indicates that the Department will revisit this matter over the next three years, the final rule itself does not apply the trust land process to Alaska tribes.

**3) Former Reservation and Treaty Rights lands**. Our tribal clients urged the Department to afford special consideration in the trust acquisition process to off-reservation lands as to which the tribe has a special ongoing interest. The tribal connection with lands is typically a strong and enduring one. Tribes have aboriginal homelands which may contain important historical, cultural or religious sites. Some tribes have former reservations, as to which the tribe may have a range of interests. Many tribes have Treaty rights that protect their ongoing right to hunt, fish or gather on particular lands. Some tribes have current Indian communities where tribal members have long lived, but which were not protected by a treaty or formal reservation. In each such situation, the tribe has a heightened interest in the lands in question. Apart from the context of the Tribal Land Acquisition Areas, the final rule does not expressly recognize the importance of certain off-reservation lands to tribes.

**4) The burden of addressing potential issues**. Our tribal clients urged the Department to reduce the undue burden on tribes in connection with the trust land application process in three ways. First, we sought clarification that tribes would not be required to submit information that is clearly not pertinent to a particular application – like information on utility services, where the trust land is to be used as a bison range. Second, we sought language providing that tribes would be required to address the full range of issues – including jurisdiction, land use, zoning, law enforcement, utilities, sanitation and traffic – only to the extent those matters were in controversy in the particular application. Requiring tribes to address issues not in controversy is burdensome and inefficient. Third, we sought to limit the burden on tribes to submit information uniquely in the custody of other parties – like the impact on local governments. The final rule did not accept the tribes' position on these points.

AR00683

Terry Virden
June 15, 2001
Page 20

Despite these not insignificant shortcomings, our tribal clients support making the final rule effective. That is so for several reasons. First, the trust land acquisition issue has been the subject of extensive scrutiny by the Department over the last few years, and it is time for the process to come to a close. Our tribal clients want an end to the existing uncertainty about the applicable standards and procedures, so that the Department can begin to move forward expeditiously with trust land applications. Tribes need certainty regarding the final rule to enable them to plan effectively for their futures with respect to land acquisition. Second, the process leading to these regulations was not only lengthy, but also comprehensive. All sides had a full opportunity to be heard, and the final rule fairly accommodates all viewpoints. While neither side finds the rule entirely satisfactory, the final rule is characterized by balance – between the purposes of the IRA and Self-Determination which support tribal land acquisition, and the right of all parties to have their interests heard and considered in the decisionmaking process. Third, the fundamental priority for our tribal clients is ensuring that the trust land acquisition process moves forward based on the three principles outlined in the introduction to these comments – 1) that the purposes of the IRA are carried out, 2) that there are fair standards, and 3) that there is a reasonable process and fixed timelines for taking land into trust. The final rule advances these principles, as we discuss above. For these reasons, we urge the Department to make the final rule effective.

**IV.    The legal arguments of opponents of the final rule should be rejected.**

We have reviewed many of the comments submitted to the Department during the comment period prior to the issuance of the final rule, as well as comments submitted to the Department after it announced that it was delaying implementation of the final rule. The adverse comments form two basic categories. First, there are comments regarding specific provisions of the final rule. As noted above, the fact that state and local governments – like tribes – did not find every aspect of the final rule to their liking underscores the balance achieved by the final rule. We have addressed a number of the adverse comments in this category above.[14] Second, there are some comments attacking the legal basis for the final rule. We address those arguments next.

**A.    Section 5 of The IRA does not violate the non-delegation doctrine.**

The state attorneys general suggest (without actually arguing) that the Secretary may lack authority to acquire land in trust on the theory that Section 5 of the IRA is an unconstitutional delegation of legislative power, citing South Dakota v. U.S. Dep't of the Interior, 69 F.3d 878 (8th Cir. 1995). State AG letter, p. 2. The nondelegation doctrine argument is without merit for a number of reasons.

---

[14] One comment by the State Attorneys General concerned the relationship between the part 151 rule and section 20 of the Indian Gaming Regulatory Act. State AG letter, pp. 10-11. The letter suggests that it is important that there be an understanding that compliance with the part 151 rule and with section 20 of IGRA are separate matters. We agree with the thrust of that comment. At the same time, in connection with gaming on after-acquired lands, the law already requires compliance with section 20 of IGRA independent of part 151. No change is needed in the final rule to accomplish that result.

AR00684

Terry Virden
June 15, 2001
Page 21

First, the Eighth Circuit's decision in South Dakota was subsequently vacated by the Supreme Court, 519 U.S. 919 (1996) and so has no force or effect. Other courts to consider Section 5 of the IRA have rejected challenges to the Secretary's authority to acquire land under the act, including a challenge based on the nondelegation doctrine. United States v. Roberts, 185 F.3d 1125, 1136-37 (10th Cir. 1999), cert. denied, 529 U.S. 1108 (2000).[15] The Supreme Court, while not directly addressing the nondelegation issue in this context, has relied on the Secretary's authority under Section 5 of the IRA in a manner that would make no sense if the provision was invalid under that doctrine. Mescalero Apache Tribe v. Jones, 411 U.S. 145, 146, 157-58 (1973).

Moreover, the Eighth Circuit's opinion in South Dakota was simply wrong. The controlling precedent, (overlooked by the Eighth Circuit), is the Supreme Court's decision in United States v. Mazurie, 419 U.S. 544 (1975). In Mazurie, the Supreme Court upheld a statute which delegated to Indian tribes the power to prohibit or regulate alcoholic beverages in Indian country, violations of which are enforced by federal criminal law, 18 U.S.C. §§ 1154, 1161. In so holding, the Court considered and rejected an argument that the statute was an invalid delegation of legislative power under Panama Refining Company v. Ryan, 293 U.S. 388 (1935). The Court reasoned that the limitations imposed by the nondelegation doctrine "are . . . less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter," and found that the Indian tribes possessed such independent authority sufficient to support a delegation of Congress' powers under the Indian Commerce Clause. Mazurie, 419 U.S. at 556-58.[16]

Under Mazurie, the nondelegation doctrine has no application to Section 5 of the IRA because the Executive branch has independent constitutional authority in Indian affairs.[17]  Congress has historically delegated to the Secretary broad discretionary authority over matters involving Indians,

---

[15]  See also Chase v. McMasters, 573 F.2d 1011 (8th Cir.), cert. denied, 439 U.S. 965 (1978), (rejecting a city's claim that the Secretary lacked authority to accept land into trust that was already owned by an individual Indian in fee); State of Florida v. United States Dep't of the Interior, 768 F.2d 1248, 1252 (11th Cir. 1985); City of Sault Ste. Marie v. Andrus, 532 F. Supp. 157, 162 (D.D.C. 1980); City of Tacoma v. Andrus, 457 F. Supp. 342, 345-46 (D.D.C. 1978); accord United States v. 29 Acres of Land, 809 F.2d 544, 545 (8th Cir. 1987); Langley v. Edwards, 872 F. Supp. 1531, 1536 n. 5 (W.D.La. 1995).

[16]  The Supreme Court reaffirmed Mazurie in Loving v. United States, 517 U.S. 748, 772 (1996), where the Court noted that the nondelegation doctrine does not apply to statutes which delegate power to an official or entity that "'itself possesses independent authority over the subject matter,'" or where the delegated power is otherwise "interlinked with duties already assigned" to the Executive branch. Loving, 517 U.S. at 772 (quoting Mazurie, 419 U.S. at 556); accord United States v. Curtiss-Wright Export Corp, 299 U.S. 304, 319-322 (1936).

[17]  U.S. Const. art. II, §2, cl. 1-2 (President's treaty and war-making powers); U.S. Const. art. II, § 3 (President's power and duty to "take Care that the Laws be faithfully executed.")  See Morton v. Mancari, 417 U.S. 535, 552 (1974);  Board of County Comm'rs v. Seber, 318 U.S. 705, 715 (1943).

AR00685

Terry Virden
June 15, 2001
Page 22

and this authority has uniformly been upheld by the Supreme Court.[18] The Supreme Court has further recognized that it is the Executive branch, through the Secretary of the Interior, which bears primary responsibility for fulfilling the United States' trust obligations to Indians. United States v. Creek Nation, 295 U.S. 103, 109, 110 (1935); Cramer v. United States, 261 U.S. 219, 227 (1923); Lane v. Pueblo of Santa Rosa, 249 U.S. 110, 113 (1919). The Court has also repeatedly upheld the President's authority to create Indian reservations by Executive order, see Arizona v. California, 373 U.S. 546, 598 (1963); United States v. Midwest Oil Co., 236 U.S. 459, 470 (1915), treating executive order reservations in the same way as those established by treaty, see United States v. Dion, 476 U.S. 734, 745 n. 8 (1986); Antoine v. Washington, 420 U.S. 194, 197-98 (1975); United States v. Pelican, 232 U.S. 444, 445 (1914); Ex parte Wilson, 140 U.S. 575, 576-77 (1891). In sum, Mazurie makes clear that Section 5 of the IRA does not violate the nondelegation doctrine, as it is merely a statute authorizing the Secretary of the Interior - an Executive branch official with broad recognized authority in Indian affairs wholly apart from the IRA - to acquire land for Indians.

Moreover, even in non-Indian cases, the nondelegation doctrine, while not totally moribund, is certainly a narrowly circumscribed doctrine. The Supreme Court has invoked the doctrine only twice in the past century to invalidate federal statutes, both in 1935. Moreover, as it has recently explained, the Court has "since upheld, without exception, delegations under standards phrased in sweeping terms." Loving, 517 U.S. at 771. These have included, for example, statutes in which the only guidance on the exercise of delegated authority is that the actions serve "the public interest." See Whitman v. American Trucking Association, 551 U.S. 457, Slip Op. at 14 (2001).

Thus, even assuming that the nondelegation doctrine applied to an exercise of Executive authority by the Secretary in Indian affairs (a context where it has never been applied apart from the later-vacated South Dakota opinion), it is clear that Section 5 would meet the nondelegation doctrine test. Acquisitions authorized by Section 5 may only occur by "purchase, relinquishment, gift, exchange, or assignment," which Congress directed be made "for the purpose of providing land for Indians ... pursuant to this Act." 25 U.S.C. §465. As noted by the Supreme Court, the purposes of the IRA are "to establish machinery whereby Indian tribes would be able to assume a greater degree of self-government, both politically and economically," Mancari, 417 U.S. at 542; Fisher v. District Court, 424 U.S. 382, 387 (1976), to restore stability to Indian communities, United States v. John, 437 U.S. 634, 645-46 (1978), and to promote Indian economic development. See Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 14 n.5 (1987); Mescalero Apache Tribe, 411 U.S. at 151-52.

Those purposes are further reflected in the IRA's legislative history. As discussed above, Congress knew the history of the Indian land losses, and fully intended to reverse the policy that had produced those losses. In adopting the Act, Congress recognized that tribal self-determination and economic self-sufficiency could not be achieved unless tribes had adequate lands. Thus, Congress in Section 5 was acting, and intended to act, well within its traditional role of according the Secretary broad authority in the field of Indian affairs – in this case power to acquire land for Indians to fulfill

---

[18] See, e.g., 25 U.S.C. §§ 2, 9, 81; Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n., 443 U.S. 658, 691 (1979).

Terry Virden
June 15, 2001
Page 23

the purposes of the IRA. In sum, when examined in the context of the Supreme Court's nondelegation doctrine precedent, it is clear that Section 5 of the IRA (if it falls within the nondelegation doctrine at all) contains an intelligible principle to guide the Secretary's decisionmaking.[19]

      **B.    The IRA does not limit tribal land acquisitions to landless tribes.** Certain of the comments argue that land acquisitions under Section 5 of the IRA should be limited to acquisitions for "landless and virtually landless" Indians, and other very limited purposes. NGA letter, p. 2; State AG letter, pp. 1-5.[20] Such a construction of Section 5 is fundamentally inconsistent with the language of the Act, its broad purposes as reflected in the legislative history, the longstanding administrative construction of Section 5, later Congressional action regarding trust land acquisitions, and all judicial rulings on the subject.

      The language of Section 5 is broad and clear. The Secretary is authorized to acquire "any interest in lands, water rights, or surface rights to lands, within or without existing reservations... for the purpose of providing land for Indians." Title to land acquired under the IRA "shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired..." 25 U.S.C. §476. Nothing in the language of this section, or any other provision of the IRA, limits trust land acquisitions to "landless" Indians. That phrase does not appear in the Act at all – and the NGA and attorney generals' letters tellingly make no reference to the language of the Act in making their argument on this point. The absence of any language in the Act limiting land acquisitions to "landless" Indians is fatal to their argument in this regard.

      Further, portions of the text of Section 5, and related provisions of the IRA, would be rendered meaningless if Section 5 was construed to be limited to "landless" Indians. First, Section 5 addresses not just the purchase but also the "exchange" of lands. Of course, there can be no "exchange" of Indian lands, with respect to an Indian or tribe that is "landless." Second, Section 5 authorizes the acquisition of lands "within or without existing reservations." There can be no trust acquisitions "within" a reservation for a "landless" tribe, since a tribe with an existing reservation is, by definition, not

---

    [19] We note that no statute has ever been held to violate the nondelegation doctrine more than 65 years after it was enacted – or where the consequences of such a holding would be so extreme. Section 5 has been the basis for the various Secretaries, over the course of many years, acquiring lands in trust for many tribes across the country. If, contrary to the weight of precedent and authority discussed above, Section 5 was held to violate the nondelegation doctrine, the validity of those many trust acquisitions might be subject to considerable uncertainty. The Department, we trust, would not wish to construe Section 5 to create such an unsettled situation.

    [20] The State Attorneys General also argue that the purposes of trust land acquisition should be narrowed, although they do not suggest how. State AG letter, p. 5. We suggest that the history of the IRA, described in this section, shows that no such limitation was intended. Rather, section 5 was intended to provide a means for tribes to move toward greater economic self-sufficiency – a purpose that is advanced by the beneficial purposes contained in the final rule.

AR00687

Terry Virden
June 15, 2001
Page 24

"landless." Third, Section 5 provides that the funds authorized under that section shall not be used to purchase lands for the Navajo Indians, outside of the Navajo Reservation, in the event certain legislation concerning Navajo lands, that was pending at the same time as the IRA, was enacted. If Section 5 only applied to "landless" Indians, there would have been no need for this Navajo language -- since the Navajo already had an extensive Reservation land base, and were not "landless." Fourth, in section 7 of the IRA, the Secretary is authorized, with respect to lands acquired under Section 5 or otherwise, to proclaim new reservations "or to add such lands to existing reservations." 25 U.S.C. §467. If Section 5 was limited to acquisitions for "landless" tribes, there could never be an addition of land to an "existing reservation," since no landless tribe would have an existing reservation. As these text-based examples reflect, the authority of the Secretary to acquire land under Section 5 is not limited to "landless" tribes or Indians.

To be sure, there are some references in the legislative history of the IRA to "landless" Indians, as noted in the letter from the state attorneys general. But those references can not overcome the absence of any text in the Act regarding "landless" Indians, and in any event must be read in context. The legislative history of the IRA focuses on the adverse impacts on the Indian tribes of the allotment policy, and the need to make significant changes to better the lives of the Indians. With respect to land, allotment led to the massive Indian losses, which in turn resulted in two major problems identified in the legislative history – a growing number of totally destitute "landless" Indians, and the lack of viable economic uses for the remaining trust lands. As the Department summarized the land issues in its statement supporting the IRA as introduced:

> Two major problems have developed in the administration of the allotment system. The first is the creation of an ever-increasing class of landless Indians through the alienation and dissipation of their chief capital asset. The second is the break-up of restricted lands into units unfit for economic use.

Senate Hearings, p. 26. These twin themes – helping the landless Indians, and assuring sufficient lands to ameliorate the economic plight of all Indians – were repeated throughout the legislative history. Commissioner of Indian Affairs John Collier, the Department's spokesman on the bill, described in Senate hearings the effects of allotment in these terms:

> It [allotment] has rendered about a hundred thousand Indians totally landless; they have not a scrap of earth that is their own. It has rendered whole tribes totally landless....; and, in addition to that the effect of the law [the General Allotment Act] has been to put the Indian allotted lands into a hopelessly checkerboarded condition. The loss of Indian land, under the act [the General Allotment Act] does not take place at the outer edges of the reservation, but all through it; so that allotted reservations are checkerboarded with white ownership, and in many of them the Indian land is a mere dot amid a white area of white owned land....

AR00688

Terry Virden
June 15, 2001
Page 25

>    In a nutshell, the remaining Indian land under allotment has been
>    put into a condition where it cannot be effectively used...
>
>    This bill takes its origin from the absolute necessity of in some
>    way correcting the trend of the allotment, stopping the loss of the
>    remaining Indian lands, making it possible to bring the remaining lands
>    into usable blocks so that they can be effectively and economically
>    operated. That is the purpose of the bill.

Senate Hearings, pp. 30-31. As this passage reflects, the underlying concern was with both landless
Indians and those who had land but, as a result of allotment, could not make productive use of it.

Congressman Howard, the key House sponsor of the bill, similarly described the land provisions
of the bill as addressing the needs of Indians with and without land. Indeed, in one of the very passages
quoted in the letter from the attorneys general, Congressman Howard states that:

>    Section 5 sets up a land acquisition program to provide land for Indians
>    who have no land or insufficient land....

78 Cong. Rec. 11,730 (1934) (emphasis added). Thus, the IRA was not intended to help only the
landless Indians, while ignoring the plight of those Indians who had some lands, but remained suffering
from the evils of the allotment policy. Rather, Congress intended to address the broader problem of
land loss -- in all of its manifestations.[21] As he summed up the policy of the IRA, Congressman
Howard noted that:

>    The new Indian policy [of the IRA] looks forward not only to security
>    of the Indian lands, but to developing as rapidly as possible Indian use
>    of Indian lands for self-support.

78 Cong. Rec. 11,730 (1934).

On the Senate side, Senator Wheeler, the primary Senate sponsor, clearly stated that the bill
provided for the purchase of land for tribes whose land had been allotted to tribal members:

>    Senator Frazier: For instance, in North Dakota there is the Turtle
>    Mountain Reservation that has over 3,000 Indians in two townships, and
>    there are a number of white farms in there. It has been proposed that

---

[21] For example, just after the passage quoted in the text, Congressman Howard discussed
the need to address consolidation of checkerboarded reservations, and the purchase of additional
land for agriculture, grazing and forestry. Id. All of these purposes pertained to Indians who had
some land, but were impeded by the adverse impacts of allotment, from using those lands in an
economically viable manner.

Terry Virden
June 15, 2001
Page 26

> additional land be bought for those Indians. The Indians that are there
> now, of course, have allotments.... But any new land that would be
> bought [under the IRA] would be held in tribal possession?
>
> The Chairman [Senator Wheeler]. Any new lands that will be bought
> will be held by the tribe. That further provides for it. In other words,
> that would not be bought and given separately to an Indian.

Senate Hearings, p. 238. This colloquy reflects Senator Wheeler's understanding that the IRA provided
for the purchase of land for tribes whose reservations were allotted, where reservation land remained
in allotted status, and had not been totally lost. This same notion of providing lands to meet the needs
of Indians -- whether landless or not -- was reiterated in the Senate Report on the bill, which states that:
"[t]o meet the needs of landless Indians and of Indian individuals and tribes whose landholdings are
insufficient for self-support, section 5 of the bill authorizes the purchase of lands by the Secretary...."
Senate Report No. 1080, 73rd Cong., 2d Sess., p. 2 (1934) (emphasis added).

In short, the references in the legislative history to "landless" Indians were merely a part of a
larger story. Congress was certainly concerned about 100,000 Indians who were totally without lands.
At the same time, Congress was concerned about the broader impact of allotment – which left Indians
on allotted reservations without a viable means of support. It was this notion – that tribes needed lands
to help restore a measure of economic independence – that was at the core of Section 5. The argument
to the contrary – that Section 5, although its text did not say so, was intended to be limited to landless
Indians – is not supported by a fair reading of the legislative history of the Act as a whole.

Given this text and legislative history, not surprisingly the Department itself has never construed
Section 5 as limited to "landless" tribes. To the contrary, the Department has, to our knowledge, always
administered Section 5, consistent with its terms, to apply to tribes with or without existing lands. The
part 151 regulations currently in effect, which were adopted in 1980, reflect this understanding.

Nor has Congress after enactment of the IRA ever suggested that only "landless" tribes were
covered. In fact, in 1983, Congress, as part of the Indian Land Consolidation Act specifically confirmed
that Section 5 applies to "all tribes," including those tribes that had voted to rejected the option of
reorganizing their tribal government under the IRA. 25 U.S.C. §2202. In other words, Congress – after
almost 50 years of the Department consistently administering Section 5 to authorize taking land into
trust for tribes with or without other land – made clear that section 5 applies to "all tribes." Surely if
Section 5 of the IRA was limited to "landless" tribes, Congress in 1983 would not have adopted a
measure indicating that it applied to "all tribes."

Finally, the courts that have looked at this question have uniformly rejected the view that
Section 5 is limited to "landless" tribes. See United States v. 29 Acres of Land, 809 F.2d 544, 545 (8th
Cir, 1987); Chase v. McMasters, 573 F.2d 1011, 1015-16 (8th Cir.), cert. denied, 439 U.S. 965 (1978);
City of Tacoma, Washington v. Andrus, 457 F. Supp. 342, 345 (D.D.C. 1978).

AR00690

Terry Virden
June 15, 2001
Page 27

In short, the argument of the NGA and the state attorneys general – based solely on reading out of context certain passages from the legislative history -- should be rejected. Section 5 authorizes the Secretary to take land in trust for tribes. The text of the IRA does not limit this authority to "landless" tribes -- and the text is controlling. While no more is needed, the purposes of the IRA land provisions – to provide land to address the problems arising from the failed allotment policy, and to enable tribes to move to a measure of economic independence – are advanced by taking land into trust for tribes, whether landless or otherwise. The Department, Congress and the Courts have shared a longstanding, unbroken, common understanding of this point. The final rule incorporates this common understanding and should be preserved.

**C. The IRA does not provide state and local governments with a veto over trust land decisions.** The Department received a number of comments urging a greater role for state and local governments in the trust land acquisition process.    Some of these comments appear to misperceive the nature of the process from a legal standpoint.   That is, taking land into trust for tribes is a matter of federal law, in accordance with which the Department exercises its trust responsibility to tribes.  Nothing in federal law provides state and local governments with a right to veto or impose conditions on  trust land applications.  To the extent the comments submitted by state and local governments suggest otherwise, those comments should be rejected.

The trust land acquisition process is an important aspect of <u>federal</u> Indian policy.  The Indian Commerce Clause vests the federal government with exclusive authority over Indian affairs. As Chief Justice John Marshall explained in the landmark opinion in <u>Worcester v. Georgia</u>, 31 U.S. (6 Pet.) 515 (1832), the Constitution, federal laws and treaties "provide that all intercourse" with the Indians "shall be carried on exclusively by the Government of the Union" and shall be "separated from . . . the States." <u>Id.</u> at 557.  <u>See also</u>, <u>United States v. 43 Gallons of Whiskey</u>, 93 U.S. 188, 194 (1876)("Congress now has the exclusive and absolute power to regulate commerce with the Indian Tribes, a power as broad and as free from restrictions as that to regulate commerce with foreign nations."); <u>United States v. Mazurie</u>, 419 U.S. 544, 555-56 (1975); <u>Delaware Tribal Business Comm. v. Weeks</u>, 430 U.S. 73, 83-84 (1977). Thus, the law is well established that "[w]ith the adoption of the Constitution, Indian relations became the exclusive province of federal law." <u>County of Oneida v. Oneida Indian Nation</u>, 470 U.S. 226, 234 (1985).

The broad grant of federal power in the Indian Commerce Clause also limits state authority. As this Court stated, "'[t]he policy of leaving Indians free from state jurisdiction and control is deeply rooted in the Nation's history.'" <u>McClanahan v. Arizona Tax Comm'r</u>, 411 U.S. 164, 168 (1973) (quoting <u>Rice v. Olson</u>, 324 U.S. 786, 789 (1945)). The protections afforded to tribes under federal law have historically been aimed in large measure at protecting tribes from hostility from their non-Indian neighbors and the states. This was so at the time of the allotment policy. <u>See United States v. Kagama</u>, 118 U.S. 375, 383-84 (1886). And, even in the modern era, "state authorities have not easily accepted the notion that federal law and federal courts must be deemed the controlling considerations in dealing with the Indians." <u>Oneida Indian Nation v. County of Oneida</u>, 414 U.S. 661, 678 (1974). <u>See also, Washington v. Washington State Commercial Passenger Fishing Ass'n</u>, 443 U.S. 658, 696 n. 36 (1979).

Terry Virden
June 15, 2001
Page 28

With this legal framework in mind, the Department is mandated to implement the federal policy of Congress in Section 5 of the IRA – to reverse the wrongs of prior federal policies and to help revitalize tribal self-government by taking land into trust for tribes.

To be sure, in determining how best to implement the policy of the IRA, we agree that the Department should be informed regarding the concerns of state and local governments and others who may be affected by trust land decisions. But the right of state and local governments to be heard must not be confused with a right to control the merits of the Secretary's trust land decisions. For example, various state and local governments have urged that the regulations provide that no land be taken into trust absent an agreement between the tribe and local governments regarding a range of issues suggested by the local governments. This would effectively provide a veto to local governments of all trust land decisions. As this example reflects, the thrust of certain comments is to limit the Secretary's authority over trust land applications, by in effect making it subservient to the unfettered will of state and local governments. Any such approach is simply inconsistent with the Constitutionally grounded role of the federal government over Indian affairs and the specific intent of Congress in Section 5 of the IRA.

The state and local governments may properly be heard on trust land acquisitions. But their concerns cannot change the law or the government's obligations as trustee. The IRA does not say that the Secretary may take land into trust for the tribes only if no one objects or only if there is a consensus on all issues. Rather, the IRA provides a clear policy in favor of taking land into trust as a mechanism for achieving the self-determination goals of the Act and ameliorating the harm done by the federal government in taking so much from the tribes in previous times. That policy of Congress in the IRA (reaffirmed by the Self-Determination policy) – not the current political or other interests of state and local governments – must control.

## V.    A Task Force to facilitate a dialogue on trust land acquisition matters would be beneficial.

The process of revisiting the trust land acquisition regulations has been ongoing for some years. The Department, as well as the tribes, states and local governments, share an interest in seeing the process come to an end. There needs to be certainty regarding the procedures and standards for taking land into trust. For the reasons described above, our tribal clients support making the January 16 final rule effective – to end the long rulemaking process, and to restore certainty in a fair, balanced process.

At the same time, we recognize that in matters of this kind, there is always room for improvement. Trust land acquisition has many components. There are many legal, policy and political issues involved. There are national, regional and local perspectives with respect to these issues. There are also practical considerations concerning implementation of the trust land acquisition process. As we see it, on all of these matters, additional communication could be beneficial – both in terms of seeking a common understanding of the issues, and ultimately finding ways to improve the trust land acquisition process. For this reason, our tribal clients would support, following implementation of the new rule, the creation of a Task Force of Tribes, States, the Department, and other interested parties, to work toward a long term consensus on issues regarding taking land into trust. We urge the Department to facilitate the creation of such a Task Force, once the final rule has become effective.

40613.1

Terry Virden
June 15, 2001
Page 29

## Conclusion

    Our tribal clients urge the Department to make effective the final rule as published on January 16, 2001.

Respectfully submitted,

SONOSKY, CHAMBERS, SACHSE,
    ENDRESON & PERRY

By:    William R. Perry
        Anne D. Noto

40613.1

538216

RECEIVED

01 JUN 15 PH 4:42
OFFICE OF THE
EXECUTIVE SECRETARIAT

# A Communication From the States
## of
## Alabama, Alaska, Arizona, Colorado, Connecticut, Florida, Idaho, Indiana, Kansas, Louisiana, Michigan, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Rhode Island, South Dakota, Utah, Vermont, and Washington

June 15, 2001

RECEIVED

JUN 2 0 2001

TRUST RESPONSIBILITIES

The Honorable Gale Norton
Secretary of the Interior
Department of the Interior
1849 C Street N.W., Rm. 6151
Washington, DC 20240

Re:    **Comments on published rule concerning Acquisition of Title to Land in Trust; Federal Register Notice, 66 Fed. Reg. 19,403 (April 16, 2001)**

Dear Secretary Norton:

This letter is in response to the April 16, 2001, Notice in the Federal Register seeking comments on the final rule published January 16, 2001, 66 Fed. Reg. 3452 ("Notice"), regarding acquisition of title to land in trust for Indian tribes. The Notice temporarily delays the effective date of the final rule and seeks comments on whether the rule should be amended in whole or in part or withdrawn in whole or in part. 66 Fed.Reg. 19,403 (April 16, 2001).

State Attorneys General welcome the opportunity to address this matter. Ultimately, if a rule is adopted, we urge the Department to adopt one which encourages a positive and constructive dialogue between the federal, state and tribal governments, based on consultation, cooperation and communication, one that serves to accommodate the important interests of all the governments involved. States recognize the need for tribes to acquire land within or near their reservations for certain key tribal governmental purposes as set forth by the Congress and do not oppose that interest. However, any process designed to acquire the land should be within the bounds of state and federal law and the Congressional enactments authorizing rules in this area, as well as fair, thorough and fully cognizant of the interests of state and local governments. To that end, we specifically recommend amending the rule in part and withdrawing certain elements of it altogether, as discussed below.

Over twenty Attorneys General set out their detailed comments with regard to the final regulation in a letter dated March 7, 2001. Additionally, the National Association of Attorneys General forwarded comments, dated November 12, 1999, on the rule when it was first proposed. The comments made in those letters are still highly germane and express the serious concerns of the state Attorneys General concerning this rule. For your convenience, we are attaching both sets of earlier comments to this letter. This letter sets forth some general propositions and then suggests specific amendments, roughly in order of their importance to the states.

# COPY



AR00694

The Honorable Gale Norton
June 15, 2001
Page 2

## A.    Need for collaborative problem solving approach

We note at the outset that the rule fails to promote important values of consultation, cooperation and communication with the state and local governments on matters that deeply and significantly affect their sovereignty, jurisdiction, environment and general welfare. These values were highlighted in the November 12, 1999, letter, where the Attorneys General suggested a collaborative problem solving approach, as well as a process for the Department to recognize and follow cooperative agreements between states and tribes regarding acquisition of land in trust. The Attorneys General reaffirm the approach suggested in the November 12, 1999, letter. There we urged a collaborative problem solving approach whenever proposed acquisitions present serious jurisdiction and infrastructure issues or where a State or local community has objected.

We also suggested in that letter that all significant applications should mandate that the Secretary of Interior, upon the request of a political subdivision of the State and early in the decision making process, convene a meeting between tribal representatives and the commentators, cooperatively to address potential adverse impacts. The parties should be required to come together to attempt to work out solutions to identified jurisdictional and infrastructure problems and changes in administration arising from the trust land acquisition. We noted that the United States has long experience with this kind of process in its other areas of negotiated rulemaking, and for the best and long term interests of all the stakeholders, should include it in all trust acquisition applications, where requested by an interested party.

Additionally, we suggested the rule provide for a fast-track approval process for tribes that work out potential differences with potentially affected communities in advance of submission of an application to take lands into trust, whether on or off reservation. Inclusion of such a provision would reduce Bureau of Indian Affairs workload significantly, reduce conflict between tribes and their neighbors and provide a positive incentive for tribes by sharply reducing the often-lengthy review processes which can occur in even relatively simple applications. A simple approach would be to provide that if a tribe submits a consent by the Governor of the state to a taking into trust, together with a copy of an agreement between the tribe and the state addressing and resolving potential jurisdictional issues, the B.I.A. would review the agreement for conformance to its fundamental legal requirements and approve the application within a stated period of time, such as 60 days from the application.

## B.    Need for a third party neutral hearing officer

Also, as a preliminary matter, the Attorneys General urge the secretary to consider integrating into the rule a process whereby a neutral hearing examiner is used to resolve disputed requests, if a collaborative or negotiated effort fails to resolve disputed issues. The Department should invoke such authority as it may have under 25 U.S.C. §§ 2 and 9, and set out a detailed, efficient means of handling such disputes, employing a neutral hearing examiner. As we stated in the March 7, 2001, letter, the institutional advocacy of Superintendents, Regional Directors and the Assistant Secretary of Indian Affairs naturally makes it difficult for those officers to render decisions that will be perceived as neutral and objective. Neutral hearing officers would help to re-establish and preserve public confidence in the process. A neutral hearing examiner would



The Honorable Gale Norton
June 15, 2001
Page 3

have the duty of setting up a hearing to allow the applicant, and the objectors, to set forth evidence on any contested facts. Allowing the testing of all the facts is an indispensable part of this process.

Additionally, in such situations, a hearing officer should be able to evaluate taking a parcel of land into trust on or off reservation. As we noted in our March 7, 2001, letter, the burden of proof and of persuasion should be on the applicant. The applicant should be required to demonstrate that the acquisition is consistent with the purposes of 25 U.S.C. 465, as discussed in our March 7, 2001, letter, and to demonstrate how the acquisition of land in trust will benefit the applicant. The application nonetheless should not be approved if the approval would result in significant (not severe) negative harm to the local government or to the environment. In making this determination, the hearing examiner should be charged with making a comprehensive examination of the ability of the existing units of local government to fulfill their responsibilities on any reduced or remaining tax base. A neutral hearing officer should be aware that the losses from otherwise minor acquisitions of land in trust may create insurmountable burdens for the local unit of government. Similarly, with regard to disputed off-reservation acquisitions, the hearing officer should operate from a rule that provides a rebuttable presumption against acquisition and provides that this presumption may be overcome in very limited circumstances. The Attorneys General believe that, failing a negotiated agreement, a neutral hearing officer will guarantee that state and local interests will be fully and fairly considered.

## C.    Amend standards for evaluating an acquisition

As discussed in the March 7, 2001, letter, the standard for determining whether land should be taken into trust should be revised. Significantly for the states and local governments, the published rule provides in section 151.10 that the Secretary will not accept transfer of title into trust for land inside a reservation or inside an approved TLAA if the approval of the acquisition will result in "severe" negative impact to the environment or "severe" harm to the local government. Evidence of such harm must be clear and demonstrable and supported in the record. § 151.10. For acquisitions off-reservation (or outside a TLAA), the standard is reduced to "significant" harm to the local government, where the harm is supported by the "application record." § 151.14(b).

On the other hand, approval is the course of action for an on-reservation (or inside a TLAA) acquisition if the acquisition "facilitates" any of several open-ended tribal purposes, or, for an off-reservation (or outside a TLAA) acquisition, if it is "necessary" for those purposes and provides "meaningful" benefits that outweigh demonstrable harm to the community. § 151.14(a). Again, we note an imbalance in the standards set forth in the rule. These standards favor acquisition and discount the interests of state and local government. Further, these standards are to be employed by Superintendents, Regional Directors and the Assistant Secretary of Indian Affairs, all of whom have an institutional loyalty and obligation to the tribes under the federal government's trust obligation. This point further emphasizes the need to have a consultative and collaborative process, or one which employs a neutral hearing officer to evaluate the facts.



The Honorable Gale Norton
June 15, 2001
Page 4

The Attorneys General recommend amending these sections to provide more equitable standards for evaluating acquisitions both on and off reservation. Any land removed from a state or local government's jurisdiction, environmental and zoning controls and taxing authority should at a minimum be "necessary" to specific tribal purposes, on or off reservation. Off-reservation acquisitions should require a higher standard, such as "compelling." This preserves the two-tiered approach this rule endeavors to establish - on-reservation acquisitions should be easier to accomplish than off-reservation ones - but not by lowering the necessity standard to a mere" facilitating" of tribal purposes.

Similarly, the standards for evaluating impact on local governments should be amended, as they are onerous and unfair. The Secretary will only be able to hear such evidence from state and local government comments in a 30-day period (for on-reservation acquisitions) and a 60-day period (for off-reservation acquisitions). Obviously, the tribal applicant is unlikely to provide such information. Aside from the inadequate period of time to respond with comments, the standards require clear and demonstrable evidence of a "severe" negative impact to the environment (again, state and local government will be the only likely voice to address this area) and "severe" (on-reservation) or "significant" (off-reservation) harm to the local community. The kind and degree of proof on the two sides of the equation is not the same. In some cases, the tribe need only show a "meaningful benefit." A local unit of government, however, is required to show a "demonstrable harm." This difference in the standard of proof is inequitable.

We recommend amending the rule to provide for different standards to be employed by the Department in evaluating a request. If there is an objection from the state or local government, it should trigger a consultation requirement for the Department to meet with those governments and seek to negotiate a cooperative agreement. If the matter cannot be resolved through a cooperative agreement, the Department or any neutral hearing officer should deny an application for an acquisition, on or off reservation, whenever it finds any "significant" harm to the environment or to a state or local community will occur.

## D.    Withdraw the provision for Tribal Land Acquisition Areas (TLAA)

More concern has been aroused by the provision for a Tribal Land Acquisition Area (TLAA) than any other feature of the rule. The notion that the federal Secretary can designate wide swaths of land as a TLAA with little or no guidance and then use a lower standard to acquire land in trust within the designated area is understandably intimidating to state and local governments. As discussed in the March 7, 2001, letter, the provisions in the rule allowing for a TLAA are not legally authorized. There is no authority in the text of 25 U.S.C. § 465, or elsewhere, for such an entity. We also noted in the March 7 letter that the statutory authorities for land consolidation on reservations do not support the TLAA concept.

Moreover, as we noted in the March 7 letter, the TLAA provision provides vague and limitless standards for the Secretary in agreeing to designate a TLAA, and in doing so, it presents a most serious flaw - - it allows for lower standards of approval comparable to on-reservation acquisitions. It bears repeating here what we said in March:



The Honorable Gale Norton
June 15, 2001
Page 5

> Under the provisions of the final rule, a tribe with a TLAA will never need to
> meet the heightened standard for off-reservation acquisitions. Instead, a tribe may
> simply designate large TLAAs and enjoy the benefits of the relaxed TLAA
> acquisition standard when it chooses to acquire off-reservation lands. We
> respectfully submit that, if legal authority can be discovered to support the TLAA
> idea, trust land acquisitions within such areas be required to proceed as off-
> reservation acquisitions (which they most certainly would be).

Further, the rule, as originally proposed, 64 Fed. Reg. 17574 (April 12, 1999), provided for a
TLAA only for a tribe that was "reservationless" or was, in the words of the legislative history of
the 1934 Indian Reorganization Act, "landless." See March 7, 2001 letter. The now-published
rule removes even that purpose and substitutes a standard whereby a TLAA may be created for a
tribe which does not have a reservation, does not have trust land, or "has a trust land base which
is incapable of being developed in a manner that promotes tribal self-determination, economic
development, and/or Indian housing." That change certainly dooms the provision, in our view.

Furthermore, the expansion of the TLAA concept for any tribe which may indeed have a
reservation or trust land, but which then asserts that it is inadequate for self-determination or
economic development, goes far beyond the original concept of a TLAA. Instead, it sets up a
process for an "on-reservation" acquisition for what is really an "off-reservation" acquisition,
with especially significant implications for the state's environmental controls, land use laws,
jurisdiction, tax revenues, gaming policies and general welfare.

In our November 12, 1999, letter, we also strongly objected to the loose and vague standards to
be employed in creating a TLAA. A TLAA, once created, would have the effect of making any
acquisition within its borders much easier to accomplish, as if it were an on-reservation
acquisition. We also objected to the inadequate and significantly flawed provisions for notice to
the state and local governments and the lack of full consideration of those comments by the
Secretary. Importantly, we noted that the creation of a TLAA is potentially disruptive of state
gaming policies because, under the Indian Gaming Regulatory Act ("IGRA"), the acquisition of
land for gaming purposes for an initial or restored reservation is one of the exceptions from the
general prohibition on gaming on off-reservation lands acquired after the enactment of IGRA in
1988. In such situations, the TLAA concept allows a side-stepping of any significant scrutiny of
potential gaming activities in the designation of a TLAA. When the time comes for the Secretary
to "pick" out a location within the TLAA, the state may find a subsequent acquisition of land in
trust will involve gaming activities, when no meaningful review of the matter by the state and
local governments can occur.

As the TLAA concept is not supported by any statute and the TLAA provisions in the published
rule are highly flawed, the Attorneys General urge the Secretary to withdraw the entire provision
and reference to it throughout the rule.



The Honorable Gale Norton
June 15, 2001
Page 6

### E. Amend the Notice and Comment Requirements

As discussed in both the November 12, 1999, and March 7, 2001, letters, the provisions
providing for notice and opportunity to comment by the state and local governments are
inadequate. For on-reservation lands, the notice will provide scant information from the
application and invite comments within 30 days from the date of receipt; for off-reservation
lands, the comment period is 60 days. We addressed this matter in detail in the November 12,
1999, letter, suggesting in good faith various alternative methods of notifying state and local
governments, recognizing the need to redact religious and sacred site information, and similar
matters, none of which were taken into account in the published rule. (Indeed, the prologue
summary to the published rule does not even account for the states having submitted views on
this issue.)
The rule should be amended to require all information submitted by applicants be sent to the
state and local political subdivisions for all discretionary as well as "mandatory" acquisitions.
Religious and sacred site information should be redacted, of course, to protect the religious rights
of tribes and their members. All other information should be provided, notwithstanding the
FOIA, the Privacy Act, and the Trade Secret Acts, given the recent decision in *Department of
Interior and Bureau of Indian Affairs vs. Klamath Water Users Protective Association*, No. 99-
1871 (March 5, 2001). Although section 151.5 provides that the request will be available for
review in local BIA offices, this is insufficient to provide the interested parties with meaningful
notice. On-reservation acquisitions can present equally difficult transition problems for highly
checkerboarded reservations, and thus may require additional time to evaluate. The matter is
discussed more fully in the November 12, 1999, letter.

Additionally, 30 days is simply an inadequate time for states and local governments to respond to
a brief notice of the application for an on-reservation acquisition. We believe section 151.5
should be amended to allow state and local governments in which the land is located at least 60
days to comment for on-reservation acquisitions. If these interested parties are required to
request the full application and supporting information from the local BIA office, this period
should run from the time the entire application is received.

### F. Additional suggested amendments

As more fully set forth in the November 12, 1999, letter, the following areas in the published rule
deserve amendment. While that letter responded to the proposed rule, the published rule did not
make the changes urged by the Attorneys General.

1. On-reservation applications under section 151.9 should include the same information as off-
reservation applications in section 151.12, particularly as it relates to descriptions of impact on
public safety, land use, fire protection, law enforcement (which may differ between P.L. 280 and
non-P.L. 280 reservations), emergency medical services, flood protection, traffic, sanitation,
water supplies (including impact on the remaining non-Indian community of the tribal taking of
water), utilities and tax collection. If the tribal and local governments develop a cooperative
agreement and resolve these matters before the application, the rule should allow for an
abbreviated on-reservation application. The Department cannot make the presumption that the



**COPY**