TABLE 1.—U.S. EXPORTS OF POULTRY AND PORK PRODUCTS TO SLOVAKIA, 1994–2000

| Calendar year | Quantity (tons) | Value | Average price per ton |
|---|---|---|---|
| Poultry: | | | |
| 1994 | 283 | $354,000 | $1250.88 |
| 1995 | 22 | 20,000 | 909.09 |
| 1996 | 0 | 0.00 | NA. |
| 1997 | 0 | 0.00 | NA. |
| 1998 | 68 | 68,000 | 1000.00 |
| 1999 | 24 | 14,000 | 583.30 |
| 2000 | 69 | 55,000 | 797.10 |
| Pork: | | | |
| 1994 | 38 | 39,480 | 1038.95 |
| 1995 | 0 | 0.00 | NA. |
| 1996 | 0 | 0.00 | NA. |
| 1997 | 0 | 0.00 | NA. |
| 1998 | 0 | 0.00 | NA. |
| 1999 | 0 | 0.00 | NA. |
| 2000 | 0 | 0.00 | NA. |

**Effect on Small Entities**

The Administrator, FSIS, has made an initial determination that this proposed rule will not have a significant impact on a substantial number of small entities, as defined by the Regulatory Flexibility Act (5 U.S.C. 601 et seq.). This proposed rule would add Slovakia to the list of countries eligible to export meat and meat products to the United States. Currently, only one establishment in Slovakia has applied for USDA Meat Plant Certification for Export. This establishment plans to export approximately 520 tons of non-heat treated shelf stable meat products and non-shelf stable cooked meat products to the United States per year. The volume of trade stimulated by this rule would be very small, and, as previously mentioned, is not likely to have much of an effect on supply and prices. Therefore, this proposed rule is not expected to have a significant impact on small domestic entities that produce these types of products.

**Paperwork Requirements**

No new paperwork requirements are associated with this proposed rule. A foreign country that wants to export meat products to the United States is required to provide information to FSIS to certify that its inspection system provides standards equivalent to those of the United States and that the legal authority for the system and its implementing regulations are equivalent to those of the United States before it may start exporting such product to the United States. FSIS collects this information one time only. FSIS gave Slovakia questionnaires asking for detailed information about the country's inspection practices and procedures to assist the country in organizing its materials. This information collection

was approved under OMB number 0583–0094. This proposed rule contains no other paperwork requirements.

**Public Notification and Request for Data**

FSIS requests information regarding the impact of this proposed rule on minorities, women, and persons with disabilities, including information on the number of minority-owned meat and poultry establishments, the makeup of establishment workforces, and the communities served by official establishments. Public involvement in all segments of rulemaking and policy development are important. Consequently, in an effort to better ensure that minorities, women, and persons with disabilities are aware of this proposed rule and are informed about the mechanism for providing their comments, FSIS will announce it and provide copies of this Federal Register publication in the FSIS Constituent Update. FSIS provides a weekly FSIS Constituent Update, which is communicated via fax to over 300 organizations and individuals. In addition, the update is available on line through the FSIS web page located at http://frwebgate.access.gpo.gov/cgi-bin/leaving.cgi?from=leavingFR.html&log=linklog&to=http://www.fsis.usda.gov. The update is used to provide information regarding FSIS policies, procedures, regulations, Federal Register notices, FSIS public meetings, recalls, and any other types of information that could affect or would be of interest to our constituents/stakeholders. The constituent fax list consists of industry, trade, and farm groups, consumer interest groups, allied health professionals, scientific professionals, and other individuals that have requested to be included. Through

these various channels, FSIS is able to provide information to a much broader, more diverse audience. For more information and to be added to the constituent fax list, fax your request to the Congressional and Public Affairs Office, at (202) 720–5704.

**List of Subjects in 9 CFR Part 327**

Imports, Meat and meat products.

For the reasons set out in the preamble, FSIS is proposing to amend 9 CFR part 327 as follows:

**PART 327—IMPORTED PRODUCTS**

1. The authority citation for part 327 continues to read as follows:

Authority: 21 U.S.C. 601–695; 7 CFR 2.18, 2.53.

§ 327.2  [Amended]

2. Section 327.2 is amended by adding "Slovakia" in alphabetical order to the list of countries in paragraph (b).

Done at Washington, DC, on: August 7, 2001.

Thomas J. Billy,
Administrator.
[FR Doc. 01–20098 Filed 8–10–01; 8:45 am]
BILLING CODE 3410-DM-P

**DEPARTMENT OF THE INTERIOR**

**Bureau of Indian Affairs**

**25 CFR Part 151**

**Acquisition of Title to Land in Trust**

AGENCY: Bureau of Indian Affairs
ACTION: Notice of proposed withdrawal of final rule; request for comments

SUMMARY: This action seeks public comment on whether the Final Rule entitled "Acquisition of Title to Land in

AR00744

scheduled using a multi-disciplinary team to evaluate all aspects of the country's inspection program, including laboratories and individual establishments within the country.

## Evaluation of the Slovakian Inspection System

In response to a request from Slovakia for approval to export meat and meat products to the United States, FSIS conducted a review of the Slovakian meat inspection system to determine if it is equivalent to the U.S. meat inspection system. First, FSIS compared Slovakia's meat inspection laws and regulations with U.S. requirements. The study concluded that the requirements contained in Slovakia's meat inspection laws and regulations are equivalent to those mandated by the FMIA and its implementing regulations. FSIS then conducted an on-site review of the Slovakian meat inspection system in operation. The FSIS review team concluded that Slovakia's implementation of meat processing standards and procedures is equivalent to that of the United States, and that Slovakia's official residue control laboratory is fully capable of testing meat products.

If this proposal is adopted by FSIS, meat products exported to the United States from Slovakia will be reinspected at the ports-of-entry for transportation damage, labeling, proper certification, general condition, and accurate count. Other types of inspection will also be conducted, including examining the product for defects and performing laboratory analyses to detect chemical residues in the product or to determine whether the product is microbiologically contaminated.

Products that pass reinspection will be stamped with the official mark of inspection and allowed to enter U.S. commerce. If they do not meet U.S. requirements, they will be stamped ''U.S. Refused Entry'' and re-exported, destroyed, or converted to animal food.

Accordingly, FSIS is proposing to amend section 327 of the meat inspection regulations to add Slovakia as a country from which meat and meat products may be eligible for export to the United States. As a country eligible to export meat and meat products to the United States, the government of Slovakia will certify to FSIS those establishments that intend to export such products to the United States and that operate according to U.S. requirements. FSIS will verify that

establishments certified by the Slovakia government are meeting the U.S. requirements. This verification will be done through on-site reviews of the establishments while they are in operation.

Although a foreign country may be listed as eligible to export meat and meat products, products from that country must also comply with other U.S. requirements, including the restrictions under title 9, part 94 of the Animal and Plant Health Inspection Service's regulations that relate to the importation of meat and meat products from foreign countries into the United States.

## Executive Order 12988

This proposed rule has been reviewed under Executive Order 12988, Civil Justice Reform. States and local jurisdictions are preempted by the Federal Meat Inspection Act (FMIA) from imposing any marking, labeling, packaging, or ingredient requirements on federally inspected meat or meat products that are in addition to, or different than, those imposed under the FMIA. States and local jurisdictions may, however, exercise concurrent jurisdiction over meat and meat products that are outside official establishments for the purpose of preventing the distribution of meat and meat products that are misbranded or adulterated under the FMIA, or, in the case of imported articles, that are not at such an establishment, after their entry into the United States. This proposed rule is not intended to have retroactive effect. If this proposed rule is adopted, administrative proceedings will not be required before parties may file suit in court challenging this rule. However, the administrative procedures specified in 9 CFR 306.5 must be exhausted prior to any judicial challenge of the application of the provisions of this proposed rule, if the challenge involves any decision of an FSIS employee relating to inspection services provided under the FMIA.

## Executive Order 12866 and Regulatory Flexibility Act

This proposed rule has been reviewed under Executive Order 12866. It has been determined to be not significant for purposes of Executive Order 12866 and therefore, has not been reviewed by the Office of Management and Budget (OMB).

Currently, there is only one establishment in Slovakia that has

applied for USDA Meat Plant Certification for Export. This establishment would export non-heat treated shelf stable meat products, such as sausages and salami, and non-shelf stable cooked meat products, such as pasteurized hams and specialty cured, cooked, and smoked meat products. U.S. imports from this establishment are expected to total 520 tons per year.

U.S. firms currently export no meat products and only a small amount of poultry products to Slovakia. Table 1 reports U.S. exports of poultry and pork products to Slovakia from 1994 to 2000. Poultry exports were highest in 1994, before declining and eventually falling to zero in 1996. Poultry exports reappeared again in 1998, but again at relatively low levels.

Table 1 also reports U.S. exports of pork products to Slovakia. Between 1994 and 2000, U.S. firms exported pork products to Slovakia only once, in 1994. Since then, the U.S. has not had any exports of meat products to Slovakia.

If this proposal is issued as a final rule, it could begin to reopen trade between the United States and Slovakia. During much of the mid-1990's, many emerging democratic nations faced substantial economic obstacles. Listing Slovakia as a country eligible to export meat and meat products to the United States could begin the process of reacquainting Slovakia with U.S. firms.

Expected benefits from this type of proposed rule would generally accrue to consumers in the form of lower prices. However, the volume of trade stimulated by this proposal is likely to be so small as to have little effect on supply and farm-level prices for livestock. Apart from any change in prices, U.S. consumers may still benefit from an increased choice of meat products in the marketplace.

The costs of this proposed rule will accrue primarily to producers in the form of greater competition from Slovakia. However, as mentioned in the preceding paragraph, the volume of trade stimulated by this rule would be very small and is likely to have little effect on supply and farm-level prices. Nonetheless, it is possible that U.S. firms that produce products that would compete with Slovakian imports could face short-run difficulties. However, in the long run, it is expected that such firms would adjust their product mix in order to compete effectively.

Trust" should be withdrawn and a further rule proposed to better address the public's continued concerns regarding the Department's procedures for taking land into trust for federally-recognized Indian tribes.

**DATES:** Comments regarding this rulemaking should be received by September 12, 2001.

**ADDRESSES:** Comments regarding this action should be submitted to: Terry Virden, Director, Office of Trust Responsibilities, MS 4513 MIB, 1849 C Street, NW, Washington, DC 20240.

**FOR FURTHER INFORMATION CONTACT:** Terry Virden, Office of Trust Responsibilities, MX 4513 MIB, 1849 C Street, NW, Washington, DC 20240; telephone 202/208–5831.

**SUPPLEMENTARY INFORMATION:** The rule entitled "Acquisition of Title to Land in Trust" was published in the **Federal Register** on January 16, 2001, and its effective date was extended by a Notice published in the **Federal Register** on April 16, 2001. This effective date of this rule has been further extended to November 10, 2001, by action taken today in this issue of the **Federal Register.**

During the comment period first extending the effective date of this rule (April 16–June 15, 2001), the Department received 192 submissions from a variety of Indian tribes, state and local governments, and other interested groups and individuals. The comments articulated a variety of opposing views. For example, comments stated that the final rule should be revoked, amended in part only, changed in specific ways or made immediately effective. Even though many comments suggested amending only certain parts of the final rule, the Department finds that it may be impracticable and inefficient to repeal only part of the final rule. While the Department continues to review these comments during a further extension of the effective date, as published in today's issue of the **Federal Register,** the Department is seeking comments on whether to withdraw the final rule and propose a new rule that would better speak to the ongoing concerns of the public regarding the Department's procedures for taking land into trust for federally-recognized tribes.

Comments that are being reviewed concern several areas of the final rule. One area of concern is individual applications for lands into trust for housing or home site purposes. The Department is considering the advisability of expediting and prioritizing these types of applications under a new proposed rule. Applications for housing or home site

purposes could be identified as acquisitions containing five (5) acres of land or less for the purpose of meeting individual housing needs. Another area of concern has been land use issues on off-reservation acquisitions and land use issues with the designation of Tribal Land Acquisition Areas (TLAA). In applications for off-reservation acquisitions, the Department is considering the advisability of requiring that tribes submit land use plans for the parcel to be acquired. The Secretary would approve those land use plans as part of her review of the application. In addition, when a tribe submits an application to the Secretary for approval of a TLAA, the Department is considering the advisability of requiring that the application contain a land use plan for the TLAA which the Secretary would approve as part of her review and approval of the TLAA designation.

Several comments focused on the lack of standards contained in the final rule. The Department is considering clarifying the standards that will be used by the Secretary to determine whether to approve an application and defining the burdens of proof that the applicant and those opposing a trust application have to the application. For on-reservation acquisitions, the Department is considering requiring a tribe or individual to show by substantial evidence that the acquisition facilitates tribal self-determination, economic development, Indian housing, land consolidation, or natural resources protection. The Department is further considering requiring opponents of on-reservation trust acquisitions to show by clear evidence that the acquisition will result in severe negative impact to the environment or severe harm to the local government. For off-reservation acquisitions, the Department is considering requiring that tribes show by substantial evidence that the acquisition is necessary to facilitate tribal self-determination, economic development, Indian housing, land consolidation, or natural resources protection; and the tribe be further required to show that no demonstrable harm to the local community is realized. The Department is considering requiring that opponents of off-reservation acquisitions show by clear evidence that the acquisition will result in significant harm to the local community or severe negative impacts to the environment.

Another area of concern has been the availability of applications for review. The Department is considering changing the length of time that states and local communities have to comment on the application. Currently, for on-reservation acquisitions, the final rule

provides state and local communities 30 days to comment on an application. The Department is considering allowing state and local communities 60 days to comment on on-reservation acquisitions. For off-reservation acquisitions, the final rule currently provides that state and local communities have 60 days to comment on an application. The Department is considering allowing the state and local communities 90 days to comment on off-reservation applications. The additional 30 days to review applications will provide state and local governments adequate time to review the application at the local Bureau of Indian Affairs (BIA) agency or regional office. The Department is also interested in using technology to make the review of applications easier and more efficient. Any comments on how the Internet or computer technology might facilitate review of trust acquisition applications would be helpful.

Considering the range of comments already received and reviewed, the Department takes this action to seek comment on whether the final rule should be withdrawn for the best interests of the constituencies served by the rule.

Dated: August 8, 2001.

Neal A. McCaleb,

*Assistant Secretary—Indian Affairs.*

[FR Doc. 01–20254 Filed 8–10–01; 8:45 am]

**BILLING CODE 4310–02–P**

---

# DEPARTMENT OF DEFENSE

## Department of the Army, Corps of Engineers

### 33 CFR Part 334

### Naval Restricted Area, Naval Air Station Whidbey Island, Washington

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Notice of proposed rulemaking and request for written comments.

**SUMMARY:** The Corps of Engineers is proposing to establish a new restricted area in the waters of Crescent Harbor, Saratoga Passage, adjacent to Naval Air Station Whidbey Island near Oak Harbor, Washington. Under this proposal, there would be no permanent, around-the-clock restrictions on use of the area. Restrictions would be intermittent and temporary, and only apply when naval training exercises are signaled as in progress. Prior to the commencement of an exercise, the Navy would conduct an air or surface reconnaissance of the area to ensure the

Case 1:06-cv-01405-RWR    Document 21-18    Filed 02/08/2008    Page 4 of 38

area is clear. Vessels underway and laying a course through the area would not be interfered with, but such vessels would not be allowed to delay their progress. Vessels anchored in, or nearing the restricted area during the conduct of an exercise, would be contacted by a Navy patrol boat and advised to depart or steer clear. Exercises would only occur when all vessels and persons were clear of the area. The purpose of this proposal is to ensure public safety and the Navy's ability to conduct training exercises without interference.

**DATES:** Comments must be submitted on or before September 12, 2001.

**ADDRESSES:** U.S. Army Corps of Engineers, ATTN: CECW–OR, 20 Massachusetts Avenue, NW., Washington DC 20314–1000.

**FOR FURTHER INFORMATION CONTACT:** Mr. Frank Torbett, Headquarters Regulatory Branch at (202) 761–4618 or Mr. Jack Kennedy, Corps Seattle District, at (206) 764–6907.

**SUPPLEMENTARY INFORMATION:** Pursuant to its authorities in Section 7 of the Rivers and Harbors Act of 1917 (40 Stat. 266; 33 U.S.C. 1) and Chapter XIX of the Army Appropriation Act of 1919 (40 Stat. 892; 33 U.S.C. 3) the Corps proposes to amend the regulations in 33 CFR part 334 by adding a new Section 334.1218 which would establish a new naval restricted area in the waters of Crescent Harbor, Saratoga Passage, adjacent to Naval Air Station Whidbey Island, near Oak Harbor, Island County, Washington.

The restrictions proposed in this request would be intermittent, infrequent, and of short duration. According to the Navy, a review of their operations and restricted areas indicated the need for an additional restricted area in Crescent Harbor, a waterbody used by Explosive Ordinance Disposal Units for training exercises for many years without incident or complaint. The restricted area is required for safety purposes. The exercises in question take place about once a month and require only a very temporary closure of the waterway. A typical training cycle takes approximately one hour. Besides Explosive Ordinance Disposal exercises, the Navy envisions invoking the restrictions during naval training exercises involving activities like aerial minesweeping, underwater object locating, and air-sea rescue.

**Procedural Requirements**

*a. Review Under Executive Order 12866*

This proposed rule is issued with respect to a military function of the Defense Department and the provisions of Executive Order 12866 do not apply.

*b. Review Under the Regulatory Flexibility Act*

This proposed rule has been reviewed under the Regulatory Flexibility Act (Public Law 96–354), which requires the preparation of a regulatory flexibility analysis for any regulation that will have a significant economic impact on a substantial number of small entities (*i.e.*, small businesses and small governments). The Corps expects that the economic impact of the establishment of this restricted area would have no impact on the public, no anticipated navigational hazard or interference with existing waterway traffic, and accordingly, certifies that this proposal, if adopted, will have no significant economic impact on small entities.

*c. Review Under the National Environmental Policy Act*

The Seattle District has prepared a preliminary Environmental Assessment (EA) for this action. The preliminary EA concluded that this action will not have a significant impact on the human environment. After receipt and analysis of comments from this **Federal Register** posting and the Seattle District's concurrent Public Notice, the Corps will prepare a final environmental document detailing the scale of impacts this action will have upon the human environment. The environmental assessment may be reviewed at the District Office listed at the end of **FOR FURTHER INFORMATION CONTACT**, above.

*d. Unfunded Mandates Act*

This proposed rule does not impose an enforceable duty among the private sector and, therefore, is not a Federal private sector mandate and is not subject to the requirements of Section 202 or 205 of the Unfunded Mandates Act. We have also found under Section 203 of the Act that small governments will not be significantly and uniquely affected by this rulemaking.

**List of Subjects in 33 CFR Part 334**

Danger Zones, Marine Safety, Restricted Areas, Waterways.

For the reasons set out in the preamble, we propose to amend 33 CFR Part 334 to read as follows:

**PART 334—DANGER ZONE AND RESTRICTED AREA REGULATIONS**

1. The authority citation for Part 334 continues to read as follows:

**Authority:** 40 Stat. 266 (33 U.S.C. 1) and 40 Stat. 892 (33 U.S.C. 3).

2. Add new section 334.1218 to read as follows:

**§ 334.1218    Crescent Harbor, Naval Air Station Whidbey Island, Oak Harbor, WA; Naval Restricted Area.**

(a) *The area.* The area is drawn from the Polnell Point Light (48°16′22″ N, 122°33′32″ W) west-southwest to a point in central Crescent Harbor (48°16′00″ N, 122°36′00″ W) and then due north to a point along Crescent Harbor's northern shoreline on Whidbey Island (48°17′55″ N, 122°36′00″ W).

(b) *The regulations.* (1) Restrictions would be intermittent, and only apply when naval training exercises are in progress.

(2) Prior to the commencement of an exercise, the Navy would conduct an air or surface reconnaissance of the area to ensure the area is clear. Vessels underway and laying a course through the area would not be interfered with, but such vessels would not be allowed to delay their progress. Vessels anchored in, or nearing the restricted area during the conduct of an exercise, will be contacted by a Navy patrol boat and advised to depart or steer clear.

(3) Exercises would only occur when all vessels and persons are clear of the area. When exercises are in progress, use of the area will be indicated by the presence of a red "Bravo" flag flying from the patrol boat and/or a buoy to be placed at the Southwest corner of the restricted area (latitude 48°16′00″ N, longitude 122°36′00″W).

(4) During training exercises while the red "Bravo" flag is flying from a patrol boat and/or the marker buoy, no vessel, watercraft, or person shall enter or remain within the designated restricted area. Upon completion of an exercise, the red "Bravo" flag will be struck and restrictions will cease to apply.

(c) *Enforcement.* The regulations in this section shall be enforced by the Commander, Navy Region Northwest, and such agencies and persons as he/she shall designate.

Dated: July 30, 2001.

**Charles M. Hess,**

*Chief, Operations Division, Directorate of Civil Works*

[FR Doc. 01–20230 Filed 8–10–01; 8:45 am]

**BILLING CODE 3710–GB–P**

**ACTION:** Interpretive rule.

**SUMMARY:** For the reasons provided in the memorandum set forth below, the Attorney General has determined that assisting suicide is not a "legitimate medical purpose" within the meaning of 21 CFR 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the Controlled Substances Act. Such conduct by a physician registered to dispense controlled substances may "render his registration . . . inconsistent with the public interest" and therefore subject to possible suspension or revocation under 21 U.S.C. 824(a)(4). The Attorney General's conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted. The Attorney General recognizes, however, that pain management is a legitimate medical purpose justifying a physician's dispensing of controlled substances. Finally, the Attorney General's determination makes no change in the current standards and practices of the DEA in any State other than Oregon.

**EFFECTIVE DATE:** November 9, 2001.

**FOR FURTHER INFORMATION CONTACT:** Patricia Good, Chief, Liaison and Policy Section, Office of Diversion Control, Drug Enforcement Administration, Washington, D.C. 20537, telephone 202–307–7297.

**SUPPLEMENTARY INFORMATION:** The text of the Attorney General's memorandum follows:

Memorandum for Asa Hutchinson, Administrator, The Drug Enforcement Administration

From: John Ashcroft, Attorney General

Subject: *Dispensing of Controlled Substances to Assist Suicide*

As you are aware, the Supreme Court reaffirmed last term that the application of federal law regulating controlled substances is uniform throughout the United States and may not be nullified by the legislative decisions of individual States. See *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001). In light of this decision, questions have been raised about the validity of an Attorney General letter dated June 5, 1998, which overruled an earlier Drug Enforcement Administration (DEA) determination that narcotics and other dangerous drugs controlled by federal law may not be dispensed consistently with the Controlled Substances Act, 21 U.S.C. 801–971 (1994 & Supp. II 1996) (CSA), to assist suicide in the United States. Upon review of the *Oakland Cannabis* decision and other relevant authorities, I have concluded that the DEA's original reading of the CSA—that controlled substances may not be dispensed to assist suicide—was correct. I therefore

advise you that the original DEA determination is reinstated and should be implemented as set forth in greater detail below.

The attached Office of Legal Counsel opinion, entitled *"Whether Physician-Assisted Suicide Serves a "Legitimate Medical Purpose" Under The Drug Enforcement Administration's Regulations Implementing the Controlled Substances Act"* (June 27, 2001) ("OLC Opinion") (attached) sets forth the legal basis for my decision.

1. *Determination on Use of Federally Controlled Substances to Assist Suicide.* For the reasons set forth in the OLC Opinion, I hereby determine that assisting suicide is not a "legitimate medical purpose" within the meaning of 21 CFR § 1306.04 (2001), and that prescribing, dispensing, or administering federally controlled substances to assist suicide violates the CSA. Such conduct by a physician registered to dispense controlled substances may "render his registration * * * inconsistent with the public interest" and therefore subject to possible suspension or revocation under 21 U.S.C. 824(a)(4). This conclusion applies regardless of whether state law authorizes or permits such conduct by practitioners or others and regardless of the condition of the person whose suicide is assisted.

I hereby direct the DEA, effective upon publication of this memorandum in the **Federal Register**, to enforce and apply this determination, notwithstanding anything to the contrary in the June 5, 1998, Attorney General's letter.

2. *Use of Controlled Substances to Manage Pain Promoted.* Pain management, rather than assisted suicide, has long been recognized as a legitimate medical purpose justifying physicians' dispensing of controlled substances. There are important medical, ethical, and legal distinctions between intentionally causing a patient's death and providing sufficient dosages of pain medication necessary to eliminate or alleviate pain.

3. *No Change in Current DEA Policies and Enforcement Practices Outside Oregon.* The reinstated determination makes no change in the current standards and practices of the DEA in any State other than Oregon. Former Attorney General Janet Reno's June 5, 1998, letter relating to this matter emphasized that action to revoke the DEA registration of a physician who uses federally controlled substances to assist a suicide "may well be warranted * * * where a physician assists in a suicide in a state that has not authorized the practice under any conditions." The reinstated determination does not portend any increase in investigative activity or other change from the manner in which the DEA presently enforces this policy outside of Oregon.

4. *Enforcement in Oregon.* Under 3 Oregon Revised Statutes (O.R.S.) § 127.855 (1999), an attending physician who writes a prescription for medication to end the life of a qualified patient must document the medication prescribed. Under 3 O.R.S. § 127.865(1)(b) (1999), the State of Oregon's Health Division must require any health care provider upon dispensing medication

pursuant to the Death with Dignity Act to file a copy of the dispensing record with the Division. Those records should contain the information necessary to determine whether those holding DEA registrations who assist suicides in accordance with Oregon law are prescribing federally controlled substances for that purpose in violation of the CSA as construed by this Memorandum and the attached OLC Opinion.

The Department has the authority to take appropriate measures to obtain copies of any such reports or records sent to the Oregon State Registrar. See 21 U.S.C. 876. When inspection of these documents discloses prohibited prescription of controlled substances to assist suicide following the effective date of this memorandum, then appropriate administrative action may be taken in accordance with 21 CFR §§ 1316.41 to 1316.68 (2001).

Thus, it should be possible to identify the cases in which federally controlled substances are used to assist suicide in Oregon in compliance with Oregon law by obtaining reports from the Oregon State Registrar without having to review patient medical records or otherwise investigate doctors. Accordingly, implementation of this directive in Oregon should not change the DEA's current practices with regard to *enforcing the CSA so as materially to* increase monitoring or investigation of physicians or other health care providers or to increase review of physicians' prescribing patterns of controlled substances used for pain relief.

5. *Distribution.* Please ensure that this Memorandum and the OLC opinion on which it is based are promptly distributed to appropriate DEA personnel, especially those with authority over the enforcement of the CSA in Oregon.

**Attachment**

Note: The attachment containing the Office of Legal Counsel opinion dated June 27, 2001, does not appear in the **Federal Register**. It is available from the Drug Enforcement Administration at the address listed in **FOR FURTHER INFORMATION CONTACT.**

Dated: November 6, 2001.

**John Ashcroft,**

*Attorney General.*

[FR Doc. 01–28358 Filed 11–7–01; 12:43 pm]

**BILLING CODE 4410–09–P**

# DEPARTMENT OF THE INTERIOR

**Bureau of Indian Affairs**

**25 CFR Part 151**

**Acquisition of Title to Land in Trust**

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Withdrawal of final rule.

**SUMMARY:** This action withdraws the final rule published in the **Federal Register** on January 16, 2001, entitled "Acquisition of Title to Land in Trust."

**§ 431.123  [Amended]**

2. In section 431.123, paragraph (a) is amended in the first sentence by removing the phrase "Beginning 24 months after November 4, 1999" and adding in its place the phrase "Beginning June 7, 2002."

[FR Doc. 01–28215 Filed 11–8–01; 8:45 am]

BILLING CODE 6450–01–P

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 71**

[Airspace Docket No. 01–ANM–14]

**Revision of Class E Airspace, Logan, UT**

**AGENCY:** Federal Aviation Administration (FAA), DOT.

**ACTION:** Final rule.

**SUMMARY:** This action revises the Class E airspace at Logan, UT. A newly developed Area Navigation (RNAV) Standard Instrument Approach Procedure (SIAP) and Departure Procedure (DP) to the Logan-Cache Airport made this action necessary. Additional Class E 700-feet and 1,200-feet controlled airspace, above the surface of the earth is required to contain aircraft conducting IFR operations at Logan-Cache Airport. The intended effect of this proposal is to provide adequate controlled airspace for Instrument Flight Rules (IFR) operations at Logan-Cache Airport, Logan, UT.

**EFFECTIVE DATE:** 0901 UTC, December 27, 2001.

**FOR FURTHER INFORMATION CONTACT:** Brian Durham, ANM–520.7, Federal Aviation Administration, Docket No. 00–ANM–14, 1601 Lind Avenue SW., Renton, Washington 98055–4056; telephone number: (425) 227–2527.

**SUPPLEMENTARY INFORMATION:**

**History**

On August 14, 2001, the FAA proposed to amend Title 14 Code of Federal Regulations, part 71 (14 CFR part 71) by revising Class E airspace at Logan, UT, in order to provide a safer IFR environment at Logan-Cache Airport, Logan, UT (66 FR 42619). This amendment provides additional Class E5 700-feet and 1,200-feet controlled airspace at Logan, UT, to contain aircraft executing the RNAV (Global Positioning System) (GPS) RWY 35 and FELDI RNAV DP at Logan-Cache Airport. Interested parties were invited to participate in the rulemaking proceeding by submitting

written comments on the proposal. No comments were received.

**The Rule**

This amendment to Title 14 Code of Federal Regulations, part 71 (14 CFR part 71) revises Class E airspace at Logan, UT, in order to provide adequate controlled airspace for Instrument Flight Rules (IFR) operations at Logan-Cache Airport, Logan, UT. This amendment revises Class E5 airspace at Logan, UT, to enhance safety and efficiency of IFR flight operations in the Logan, UT, terminal area. The FAA establishes Class E airspace where necessary to contain aircraft transitioning between the terminal and en route environments. This rule is designed to provide for the safe and efficient use of the navigable airspace and to promote safe flight operations under Instrument Flight Rules (IFR) at the Logan-Cache Airport and between the terminal and en route transition stages.

The area will be depicted on aeronautical charts for pilot reference. The coordinates for this airspace docket are based on North American Datum 83. Class E airspace areas extending upward from 700 feet or more above the surface of the earth, are published in Paragraph 6005, of FAA Order 7400.9J dated September 1, 2001, and effective September 16, 2001, which is incorporated by reference in 14 CFR 71.1. The Class E airspace designation listed in this document will be published subsequently in the Order.

The FAA has determined that this regulation only involves an established body of technical regulations for which frequent and routine amendments are necessary to keep them operationally current. It, therefore, (1) is not a "significant regulatory action" under Executive Order 12866; (2) is not a "significant rule" under DOT Regulatory Policies and Procedures (44 FR 11034; February 26, 1979); and (3) does not warrant preparation of a Regulatory Evaluation as the anticipated impact is so minimal. Since this is a routine matter that will only affect air traffic procedures and air navigation, it is certified that this rule, will not have a significant economic impact on a substantial number of small entities under the criteria of the Regulatory Flexibility Act.

**List of Subjects in 14 CFR Part 71**

Airspace, Incorporation by reference, Navigation (air).

**Adoption of the Amendment**

In consideration of the foregoing, the Federal Aviation Administration amends 14 CFR part 71 as follows:

**PART 71—DESIGNATION OF CLASS A, CLASS B, CLASS C, CLASS D, AND CLASS E AIRSPACE AREAS; AIRWAYS; ROUTES; AND REPORTING POINTS**

1. The authority citation for 14 CFR part 71 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40113, 40120; E.O. 10854, 24 FR 9565, 3 CFR, 1959–1963 Comp., p. 389.

**§ 71.1  [Amended]**

2. The incorporation by reference in 14 CFR 71.1 of the Federal Aviation Administration Order 7400.9J, Airspace Designations and Reporting Points, dated September 1, 2001, and effective September 16, 2001, is amended as follows:

*Paragraph 6005   Class E airspace areas extending upward from 700 feet or more above the surface of the earth*

\*    \*    \*    \*    \*

**ANM UT E5   Logan, UT [Revised]**

Logan-Cache Airport, UT
(lat. 41°47′16″ N., long. 111°51′10″ W.)

That airspace extending upward from 700 feet above the surface bounded by a line beginning at lat. 42°03′30″ N., long. 112°00′00″ W.; to lat. 42°02′42″ N., long. 111°46′00″ W.; to lat. 41°07′30″ N., long. 111°46′00″ W.; to lat. 41°07′30″ N., long. 111°57′23″ W.; to lat. 41°47′30″ N., long. 112°03′00″ W.; to lat. 42°01′20″ N., long. 112°03′00″ W.; to lat. 42°03′15″ N., long. 112°00′00″ W.; thence to point of origin; and that airspace extending upward from 1,200 feet above the surface bounded on the north by the south edge of V–4, on the east by long. 111°40′33″ W., on the south by the north edge of V–288, on the west by the east edge of V–21; that airspace extending upward from 10,500 feet MSL bounded on the northeast by the southwest edge of V–142, on the west by long. 111°40′33″ W., and on the south by the north edge of V–288, excluding that airspace within the Evanston, WY, Class E airspace area.

\*    \*    \*    \*    \*

Issued in Washington, DC, on November 6, 2001.

**Reginald C. Matthews,**

*Manager, Airspace and Rules Division.*

[FR Doc. 01–28248 Filed 11–8–01; 8:45 am]

BILLING CODE 4910–13–P

**DEPARTMENT OF JUSTICE**

**Office of the Attorney General**

**21 CFR Part 1306**

[AG Order No. 2534–2001]

**Dispensing of Controlled Substances To Assist Suicide**

**AGENCY:** Department of Justice.

**DATES:** The Acquisition to Title to Land in Trust rule, amending 25 CFR part 151, published in the **Federal Register** on January 16, 2001 (66 FR 3452), delayed by a document published February 5, 2001 (66 FR 8899), corrected by documents published February 20, 2001 (66 FR 10815) and June 13, 2001 (66 FR 31976), delayed by documents published April 16, 2001 (66 FR 19403) and August 13, 2001 (66 FR 42415), is withdrawn as of November 9, 2001.

**FOR FURTHER INFORMATION CONTACT:** Larry E. Scrivner, Deputy Director, Office of Trust Responsibilities, MS 4513 MIB, 1849 C Street, NW., Washington, DC 20240; telephone 202/208–5831.

**SUPPLEMENTARY INFORMATION:** This action withdraws in whole the rule entitled "Acquisition of Title to Land in Trust," published in the **Federal Register** on January 16, 2001, at 66 FR 3452, delayed by a notice published February 5, 2001 (66 FR 8899), corrected by notices published February 20, 2001 (66 FR 10815) and June 13, 2001 (66 FR 31976), delayed by notices published April 16, 2001 (66 FR 19403) and August 13, 2001 (66 FR 42415), and which received further comments through a notice published on August 13, 2001 (66 FR 42474).

On August 13, 2001, the Department of the Interior (Department) requested public comment on whether the final rule entitled "Acquisition of Title to Land in Trust" should be withdrawn and a further rule proposed to better address the public's continued concerns regarding the Department's procedures for taking land into trust for federally-recognized Indian tribes. The comment period closed on September 12, 2001, and the Department received a total of 139 submissions. Of the submissions received, 93 were from Indian tribes, 18 were from state and local governments and federally elected officials, and 28 other interested groups and individuals.

In its August 13, 2001, notice, the Department requested comments on specific areas of concern in the final rule. These areas of concern included individual applications for land into trust for housing or home site purposes; the requirement of land use plans for off-reservation acquisitions and as part of the designation of a Tribal Land Acquisition Area (TLAA); clarifying the standards contained in the final rule; the availability of applications for review and the use of technology to facilitate review of trust acquisition applications. Collectively, the comments received contained various opposing views about the identified issues of concern. For example,

comments stated that the Department should withdraw the final rule in whole, withdraw the final rule in part, amend the final rule to include certain provisions, or make the final rule effective immediately.

The Department sought comments about prioritizing individual applications for land into trust for housing or home site purposes under a new proposed rule expediting applications containing five (5) acres of land or less for individual housing needs. Comments were received both supporting the individual applications for Indian housing priority and opposing the individual applications for Indian housing priority. Comments also noted that identifying housing or home site applications as acquisitions containing five (5) acres of land or less for the purpose of meeting individual housing needs was of little benefit to tribal housing issues/needs. Another area the Department sought comments on was the advisability of requiring tribes to submit land use plans for off-reservation acquisitions and for the designation of TLAA. The Department considered requiring that tribes submit land use plans for off-reservation acquisitions and requiring that the applications contain a land use plan for the TLAAs, which the Secretary would approve as part of her review and approval. Comments received opposed the requirement for submission of a land use plan in an application for off-reservation acquisitions noting that the final rule already requires the submission of enormous amounts of information concerning the use of the land. Comments, while not specifically solicited, strongly opposed the establishment of TLAAs.

The Department also solicited comments on clarifying the standards that will be used by the Secretary to determine whether to approve an application and defining the burdens of proof required for the applicant and those opposing a trust application. The Department noted in its proposed withdrawal notice that it was considering new regulatory language that for on-reservation acquisitions, a tribe or individual must show by substantial evidence that the acquisition facilitates tribal self-determination, economic development, Indian housing, land consolidation, or natural resource protection. The Department further considered requiring that opponents of on-reservation trust acquisitions show by clear evidence that the acquisition will result in severe negative impact to the environment or severe harm to the local government. For off-reservation acquisitions, the Department considered

requiring that tribes show by substantial evidence that the acquisition is necessary to facilitate tribal self-determination, economic development, Indian housing, land consolidation, or natural resources protection, and the tribe be further required to show that no demonstrable harm to the local community is realized. The Department also considered requiring that opponents of off-reservation acquisitions show by clear evidence that the acquisitions will result in significant harm to the local community or severe negative impacts to the environment. Some commenters indicated confusion or lack of understanding of the criteria set out in the final rule. Comments received stated that the standards were not fair in that the "substantial evidence" burden of proof for the applicant is a lesser standard than the "clear evidence" requirement for the opponent of the application. Comments also stated that the existing standards are fair and provide sufficient criteria for a decision and need not be further amended. Additional comments stated that standards were burdensome and could not be met by an applicant.

In addition, comments were requested addressing the time-frames established for comment by the state and local communities and the uses of computer technology. Comments were split on the amount of time to allow for review, some commenters stating that the final rule allowed sufficient time to review applications and other requesting even more time than the additional 30 days the final rule allowed to review applications. Comments addressing the use of computer technology and the Internet were generally in support of using such tools to expedite review of applications and the decision-making process.

The Department finds that it is impracticable and inefficient to repeal only part of the final rule as the Bureau of Indian Affairs needs clear direction and standards to process land into trust applications. Considering the variety of comments received, the Department has decided to withdraw the final rule in whole to address these specific areas of concern in a new rule. Consistent with Departmental policy to consult with federally-recognized Indian tribes on proposed Federal actions that impact Indian tribes, the Department will conduct consultation with Indian tribes on the following areas in its efforts to promulgate a new rule: applications for housing or home site purposes to meet individual housing needs; the requirement of land use plans; the standards of review used in reaching a determination of whether to accept land

AR00750

into trust; the availability of applications for review; and the use of computer technology prior to the proposal of a new Acquisition of Title to Land in Trust rule.

The Department has determined that the withdrawal of the final rule entitled "Acquisition to Title to Land in Trust" must be effective immediately in order to prevent its becoming effective upon the expiration of the notice of delay as published on August 13, 2001, (66 FR 42415), and to allow for the current 25 CFR Part 151 to remain in effect during the pendency of the development of a new rulemaking addressing this matter. The Department, therefore, shows good cause for the immediate effective date of this rule in accordance with 5 U.S.C. 553(d).

Dated: November 5, 2001.

Neal A. McCaleb,

*Assistant Secretary—Indian Affairs.*

[FR Doc. 01–28222 Filed 11–8–01; 8:45 am]

BILLING CODE 4310–02–P

## DEPARTMENT OF AGRICULTURE

**Forest Service**

**36 CFR Part 242**

## DEPARTMENT OF THE INTERIOR

**Fish and Wildlife Service**

**50 CFR Part 100**

**Subsistence Management Regulations for Public Lands in Alaska, Subpart D; Temporary Closure of Seasons and Changes in Harvest Limits for Moose in Unit 22 and Deer in Unit 8**

**AGENCIES:** Forest Service, USDA; Fish and Wildlife Service, Interior.

**ACTION:** Temporary closure of seasons and changes in harvest limits.

**SUMMARY:** This provides notice of the Federal Subsistence Board's temporary closure and changes in harvest limits to protect moose populations in Unit 22(B), (D), and (E), and to help the recovery of deer populations in Unit 8. These regulatory adjustments and the closures provide an exception to the Subsistence Management Regulations for Public Lands in Alaska, published in the Federal Register on June 25, 2001. Those regulations established seasons, harvest limits, methods, and means relating to the taking of wildlife for subsistence uses during the 2001–2002 regulatory year.

**DATES:** The original emergency actions were effective August 1, 2001 through

September 29, 2001. The extension of the emergency actions (temporary closure and changes to harvest limits) will be effective September 30, 2001 through March 31, 2002.

**FOR FURTHER INFORMATION CONTACT:** Thomas H. Boyd, Office of Subsistence Management, U.S. Fish and Wildlife Service, telephone (907) 786–3888. For questions specific to National Forest System lands, contact Ken Thompson, Subsistence Program Manager, USDA—Forest Service, Alaska Region, telephone (907) 786–3592.

**SUPPLEMENTARY INFORMATION:**

**Background**

Title VIII of the Alaska National Interest Lands Conservation Act (ANILCA) (16 U.S.C. 3111–3126) requires that the Secretary of the Interior and the Secretary of Agriculture (Secretaries) implement a joint program to grant a preference for subsistence uses of fish and wildlife resources on public lands in Alaska, unless the State of Alaska enacts and implements laws of general applicability that are consistent with ANILCA and that provide for the subsistence definition, preference, and participation specified in Sections 803, 804, and 805 of ANILCA. In December 1989, the Alaska Supreme Court ruled that the rural preference in the State subsistence statute violated the Alaska Constitution and, therefore, negated State compliance with ANILCA.

The Department of the Interior and the Department of Agriculture (Departments) assumed, on July 1, 1990, responsibility for implementation of Title VIII of ANILCA on public lands. The Departments administer title VIII through regulations at title 50, part 100 and title 36, part 242 of the Code of Federal Regulations (CFR). Consistent with Subparts A, B, and C of these regulations, as revised January 8, 1999, (64 FR 1276), the Departments established a Federal Subsistence Board to administer the Federal Subsistence Management Program. The Board's composition includes a Chair appointed by the Secretary of the Interior with concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; the Alaska Regional Director, National Park Service; the Alaska State Director, Bureau of Land Management; the Alaska Regional Director, Bureau of Indian Affairs; and the Alaska Regional Forester, USDA Forest Service. Through the Board, these agencies participate in the development of regulations for Subparts A, B, and C, which establish the program structure and determine

which Alaska residents are eligible to take specific species for subsistence uses, and the annual Subpart D regulations, which establish seasons, harvest limits, and methods and means for subsistence take of species in specific areas. Subpart D regulations for the 2001–2002 wildlife seasons, harvest limits, and methods and means were published on June 25, 2001, (66 FR 33744) Because this rule relates to public lands managed by an agency or agencies in both the Departments of Agriculture and the Interior, identical closures and adjustments would apply to 36 CFR part 242 and 50 CFR part 100.

The Alaska Department of Fish and Game (ADF&G), under the direction of the Alaska Board of Game (BOG), manages the general harvest and State subsistence harvest on all lands and waters throughout Alaska. However, on Federal lands and waters, the Federal Subsistence Board implements a subsistence priority for rural residents as provided by Title VIII of ANILCA. In providing this priority, the Board may, when necessary, preempt State harvest regulations for fish or wildlife on Federal lands and waters.

The temporary changes for early closure of seasons and changes in harvest limits is necessary to protect declining moose populations on the Seward Peninsula, and to help deer populations on Kodiak Island and adjacent islands to continue recovery following severe winter mortality that took place during the winter of 1998–99. This temporary change is authorized and in accordance with 50 CFR 100.19(e) and 36 CFR 242.19(e).

*Unit 22 Moose*

Moose populations in Unit 22 have declined in recent years from an overall population that ranged from 7,000 to 10,000 during the late 1980s to recent estimates of 5,000 to 7,000 animals. The declines are thought to be a result of winter mortality and lower calf survival.

The Federal subsistence moose harvest in Unit 22(D) for that portion within the Kuzitrin drainage was restricted to antlered bulls by the Federal Subsistence Board in 1998 due to the declining local moose population and heavy hunting pressure. As a result of a continuing regional trend in declining moose populations, the Federal Subsistence Board, in 2000, also restricted the harvest in Unit 22(B) to bulls only.

On July 13, 2001 the Alaska Department of Fish and Game using their emergency authority, shortened, but did not close, moose hunting seasons in four portions of Unit 22: Unit 22(B) west of the Darby Mountains; Unit

# United States Department of the Interior

OFFICE OF THE SOLICITOR
1849 C STREET N.W.
WASHINGTON, DC 20240

## NOV 3 0 2007

TO:        Heather Kendall & Andrew Harrington

RE:        Aliachak v. DOI

FROM:    David Moran, SOL – DIA

Enclosed is the informal administrative record that has been compiled to this date. As agreed, the informal record is being provided for informational and discussion purposes only and is not intended to constitute the formal and/or complete administrative record in the matter referenced above. Further, please note that in the event additional documents relevant to this case are located copies of the same will be provided to you. Finally, attached you find a preliminary draft privileged document log. As is the case with the informal record, this log is being provided for informational and discussion purposes only and is not intended to constitute the formal privileged document log in the matter referenced above. If you have any questions or need additional information, please feel free to contact me at 202-208-3358.

cc: Dan Steele

# United States Department of the Interior

OFFICE OF THE SOLICITOR

1849 C STREET N.W.
WASHINGTON, DC 20240

NOV 3 0 2007

TO:        Heather Kendall & Andrew Harrington

RE:        Aliachak v. DOI

FROM:    David Moran, SOL – DIA

Enclosed is the informal administrative record that has been compiled to this date.  As
agreed, the informal record is being provided for informational and discussion purposes
only and is not intended to constitute the formal and/or complete administrative record in
the matter referenced above.  Further, please note that in the event additional documents
relevant to this case are located copies of the same will be provided to you.  Finally,
attached you find a preliminary draft privileged document log.  As is the case with the
informal record, this log is being provided for informational and discussion purposes only
and is not intended to constitute the formal privileged document log in the matter
referenced above.  If you have any questions or need additional information, please feel
free to contact me at 202-208-3358.

cc: Dan Steele

AR00753

## AKIACHAK NATIVE COMMUNITY v. DEPARTMENT OF THE INTERIOR

### PRELIMINARY DRAFT PRIVILEGED DOCUMENT LOG
**(For Discussions Purposes Only)**

| Date | Document |
|------|----------|
| 9/14/95 | E-mail from Robert Anderson to John Leshy re: Alaska gaming lawsuit |
| 9/15/95 | E-mail from John Leshy to Lauri Adams re: Venetie appeal |
| 1/29/96 | E-mail from Lauri Adams to Roger Hudson re: Trust land acquisitions |
| 4/4/96 | Note from Wayne Nordwall to Bob Anderson re: Amendment to land acquisition regulations |
| 5/9/96 | Letter from Lynn Peterson to Robert Bundy re: Acquisition of trust land on behalf of Indians |
| 2/18/97 | Memorandum from Lauri Adams to John Leshy re: Impact and implications of 9th Circuit's decision in *Venetie* |
| 3/4/97 | E-mail from Roger Hudson to Lauri Adams re: Sandy's memo re taking land into trust |
| 5/6/97 | Memorandum from Sandra Ashton to Carol Russel re: Indian Country in Alaska |
| 7/18/97 | E-mail from Scott Keep to Sandra Ashton re: If DOI takes land into trust |
| 7/26 – 8/18/97 | Working drafts of a proposed memorandum from the Solicitor to the Secretary re: Acquisition of land in trust for Alaska natives and tribes |
| 8/13/97 | E-mail from Roger Hudson to John Leshy re: Proposed edits of 8/12/97 draft of Alaska trust lands memo |
| 8/15/97 | E-mail from Roger Hudson to John Leshy re: Comments on Alaska trust lands memo rec'd 8/15/97 |
| 8/18/97 | E-mail from Roger Hudson to John Leshy re: Alaska trust lands memo – latest version(s?) |
| 8/18/97 | E-mail from John Leshy to Sandra Ashton re: Alaska lands edits to draft |
| 8/18/97 | E-mail from Bob Anderson to Heather Sibbison re: Alaska trust lands |

1

AR00754

## AKIACHAK NATIVE COMMUNITY v. DEPARTMENT OF THE INTERIOR

### PRELIMINARY DRAFT PRIVILEGED DOCUMENT LOG
### (For Discussions Purposes Only)

| | |
|---|---|
| 4/2/99 | E-mail from Roger Hudson to Dennis Hopewell re: Proposed regs on taking land in trust |
| 5/18/99 | E-mail from Roger Hudson to Marilyn Heiman re: Draft revisions to 25 CFR part 151 |
| 2/26/99 | Working draft of proposed rule, 25 CFR part 151 |
| 8/16/00 | Fax cover sheet in connection with transmission of documents re: Acceptance of land in trust in Alaska |
| 8/17/00 | E-mail from Roger Hudson to John Leshy re: A "Heads Up" regarding taking land in trust in Alaska |
| 12/21/00 | E-mail from Roger Hudson to Laurie Adams re: Taking land in trust in Alaska; Final rule revising CFR part 151 |
| 1/26/00 | E-mail from Lauri Adams to Roger Hudson re: Taking lands in trust in Alaska |
| 1/05/01 | E-mail from Mary Anne Kenworthy to Roger Hudson re: Par 151 regs re taking land in trust in Alaska |
| 4/25/01 | E-mail from Roger Hudson to Mary Anne Kenworthy re: Taking land in trust in Alaska |
| 4/25/01 | E-mail from Scott Keep to Mary Anne Kenworthy re: Taking land in trust in Alaska |
| 2/05/02 | E-mail from Mary Anne Kenworthy to Phil Hogan re: Lands in trust in AK |

2

AR00755

**Date:** Friday, January 4, 2008 2:38 PM

**From:** Steele, Daniel (ENRD) <Daniel.Steele@usdoj.gov>

**To:** kdmoran@cox.net

**Subject:** FW: Record in Akiachak/Kavairlook

---

```
Dave, attached find Andy's self explanatory e-mail.    Dan

-----Original Message-----
From: Steele, Daniel (ENRD)
Sent: Monday, December 31, 2007 9:39 AM
To: 'Andy Harrington'
Cc: Heather Kendall-Miller; Denise Bakewell
Subject: RE: Record in Akiachak/Kavairlook

Thanks for bringing these to my attention.  I'll pass this along to
David for an early decision.    Dan

-----Original Message-----
From: Andy Harrington [aharrington@alsc-law.org]
Sent: Friday, December 28, 2007 9:39 PM
To: Steele, Daniel (ENRD)
Cc: Heather Kendall-Miller; Denise Bakewell
Subject: Record in Akiachak/Kavairlook

Dear Dan,

Below is a list of materials contained in the folders that we think
probably
do not need to be included in the record.  This may save some time in
assembling, scanning etc., and simplify some of the tasks for Dave.

The following documents we think are irrelevant and could be excluded:


            Date        Folder  Position    Item

      12/20/1985
      1
      4
      Memo from Asst Sec to all Area Directors re lands not within
exterior
borders of reservation

       2/6/1986
       1
       5
       Press Release re off-reservation lands & gaming

       3/26/1987
       1
       6
       Memo from Asst Sec to all Area Directors re lands associated w
gaming

       11/10/1988
       1
       7
       Briefing Paper - whether Asst Sec should approve all off-res land
```

AR00756

acquisitions & acqs for gaming

    11/18/1988
    1
    8
    Memo from Actng Asst Sec to all Area Directors - delegating
approval
authority to area directors

    5/17/1991
    1
    10
    Memo from Asst Sec (Brown) to all Area Directors - interim guidance
re
off-reservation acqs

    4/1/1987
    1
    21
    25 CFR Part 151 "Attachment No. 1"

    Undated (1990?)
    1
    31
    Excerpt from IBIA decision squibs from 1990

    Undated
    2
    7,12
    Departmental Manual Part 602 ch. 2 (5 pages; duplicate copies of
page
602DM6.2J)

    3/18/1980
    2
    9,11
    Department Manual Part 516 ch. 6 (4 pages) (2 copies)

    11/16/1994
    2
    7
    Changes to Departmental Manual 516 DM 6 App 4 re NEPA (4 pp) (2
copies)

    4/1/1997
    2
    10
    Copy of Part 151, land acquisitions (2 copies)


The following are published opinions or statutes which, even if
relevant, we
can exclude:


    8/16/1985
    1
    32
    Florida v Dept Int., 768 F.2d 1248 (2 copies in folder 1)

    7/25/1989
    1
    33

AR00757

City of Eagle Butte v. Aberdeen Area Director, 17 IBIA 192

  Undated
1
22
25 USC 465 "Attachment No. 3"

  Undated
1
26
25 USC 467 "New Indian Reservation": "Attachment No. 8"

  5/1/1936
2
13
Session Law, extending IRA to Alaska

  5/7/1997
3
3a
McAlpine v. US, 112 F.3d 1429 (10th Cir. 1997) (2 copies, folders 3
and
4)

  10/15/1996
4
5
US S Ct  vacation of judgment in SD v. USDI (2 copies, folders 2
and 4)

  11/7/1995
4
6
SD v. US Dept Interior, 69 F.2d 878 (8th Cir. 1995) (2 copies,
folders
2 and 4)

  9/25/2000
4
7
Connecticut v. Blumenthal, 228 F.3d 82 (2d Cir. 2000)

  1/25/1991
1
11
Jack & Shirley Baker v. Muskogee Area Director, 98 ID 5

Finally, the following are relevant and should be included, but there
are
duplicate copies:

  1/5/1995
3
3c
Fed Reg publication of request for comments re Alaska prohibition
(folders 1 & 3)

  11/9/2001
3
3d

AR00758

Fed Reg publication of withdrawal of final rule (folders 1 & 3)


We're not necessarily objecting to inclusion of these items in the record if
you and Dave think there's some reason to have them; we just think it'll be
easier for you and us and the court if these aren't clogging up the record.
If some item does turn out to be crucial as the case advances, whoever
thinks it's important could move to supplement.

Hope your holidays are going well!

Andy Harrington, Executive Director
Alaska Legal Services Corporation
1648 South Cushman, Suite 300
Fairbanks AK 99701
907-452-5181
Fax 907-456-6359

Please visit our legal help website at www.alaskalawhelp.org

---

AR00759

Bureau of Indian Affairs, Interior                    § 151.1

Sec.
151.8  Tribal consent for nonmember acqui-
    sitions.
151.9  Requests for approval of acquisitions.
151.10  Factors to be considered in evaluat-
    ing requests.
151.11  Action on requests.
151.12  Title examination.
151.13  Formalization of acceptance.

AUTHORITY: R.S. 161; 5 U.S.C. 301. Inter-
pret or apply 46 Stat. 1106, as amended; 46
stat. 1471, as amended; 48 stat. 985, as
amended; 49 Stat. 1967, as amended; 53 Stat.
1129; 63 Stat. 605; 69 Stat. 392, as amended;
70 Stat. 290, as amended; 70 stat. 626; 75
Stat. 505; 77 Stat. 349; 78 Stat. 389; 78 Stat.
747; 82 Stat. 174, as amended; 82 Stat. 884;
84 Stat. 120; 84 Stat. 1874; 86 Stat. 216; 86
Stat. 530; 86 Stat. 744; 88 Stat. 78; 88 Stat.
81; 88 Stat. 1716; 88 Stat. 2203; 88 Stat. 2207;
25 U.S.C. 409a, 450h, 451, 464, 465, 487, 488,
489, 501, 502, 573, 574, 576, 608, 608a, 610,
610a, 622, 624, 640d-10, 1466, and 1495, and
other authorizing acts.

SOURCE: 45 FR 62036, Sept. 18, 1980,
unless otherwise noted. Redesignated at 47
FR 13327, Mar. 30, 1982.

CROSS-REFERENCE: For regulations pertain-
ing to: The inheritance of interests in trust
or restricted land, see Parts 15, 16, and 17 of
this title and 43 CFR Part 4; the purchase
of lands under the BIA Loan Guaranty, In-
surance and Interest Subsidy program, see
Part 103 of this title; the exchange and par-
tition of trust or restricted lands, see Part
152 of this title; land acquisitions authorized
by the Indian Self-Determination and Edu-
cation Assistance Act, see Parts 272 and 276
of this title; the acquisition of allotments on
the public domain or in national forests, see
43 CFR Part 2530; the acquisition of Native
allotments and Native townsite lots in
Alaska, see 43 CFR 2561 and 2564; the ac-
quisition of lands by Indians with funds bor-
rowed from the Farmers Home Administra-
tion, see 7 CFR 1823 Subpart N, the acquisi-
tion of land by purchase or exchange for
members of the Osage Tribe not having cer-
tificates of competency, see §§ 117.8 and
158.54 of this title.

## PART 151—LAND ACQUISITIONS

Sec.
151.1  Purpose and scope.
151.2  Definitions.
151.3  Land acquisition policy.
151.4  Acquisitions in trust of lands owned
    in fee by an Indian.
151.5  Trust acquisitions in Oklahoma
    under Section 5 of the I.R.A.
151.6  Exchanges.
151.7  Acquisition of fractional interests.

§ 151.1  Purpose and scope.

These regulations set forth the au-
thorities, policy, and procedures gov-
erning the acquisition of land by the
United States in trust status for indi-
vidual Indians and tribes. Acquisition
of land by individual Indians and
tribes in fee simple status is not cov-
ered by these regulations even though
such land may, by operation of law, be
held in restricted status following ac-
quisition. Acquisition of land in trust

373

§ 151.2

status by inheritance or escheat is not covered by these regulations. These regulations do not cover the acquisition of land in trust status in the State of Alaska, except acquisitions for the Metlakatla Indian Community of the Annette Island Reserve or it members.

§ 151.2   Definitions.

(a) "Secretary" means the Secretary of the Interior or his authorized representative acting under delegated authority.

(b) "Tribe" means any Indian tribe, band, nation, pueblo, community, rancheria, colony, or other group of Indians, including the Metlakatla Indian Community of the Annette Island Reserve, which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs. For purposes of acquisitions made under the authority of 25 U.S.C. 488 and 489, or other statutory authority which specifically authorizes trust acquisitions for such corporations, "Tribe" also means a corporation chartered under section 17 of the Act of June 18, 1934 (48 Stat. 988; 25 U.S.C. 477) or section 3 of the Act of June 26, 1936 (49 Stat. 1967; 25 U.S.C. 503).

(c) "Individual Indian" means:

(1) Any person who is an enrolled member of a tribe;

(2) Any person who is a descendent of such a member and said descendant was, on June 1, 1934, physically residing on a federally recognized Indian reservation;

(3) Any other person possessing a total of one-half or more degree Indian blood of a tribe;

(4) For purposes of acquisitions outside of the State of Alaska, "Individual Indian" also means a person who meets the qualifications of paragraph (c) (1), (2), or (3) of this section where "Tribe" includes any Alaska Native Village or Alaska Native Group which is recognized by the Secretary as eligible for the special programs and services from the Bureau of Indian Affairs.

(d) "Trust land" or "land in trust status" means land the title to which is held in trust by the United States for an individual Indian or a tribe.

(e) "Restricted land" or "land in restricted status" means land the title to which is held by an individual Indian or a tribe and which can only be alienated or encumbered by the owner with the approval of the Secretary because of limitations contained in the conveyance instrument pursuant to Federal law or because of a Federal law directly imposing such limitations.

(f) Unless another definition is required by the act of Congress authorizing a particular trust acquisition, "Indian reservation" means that area of land over which the tribe is recognized by the United States as having governmental jurisdiction, except that, in the State of Oklahoma or where there has been a final judicial determination that a reservation has been disestablished or diminished, "Indian reservation" means that area of land constituting the former reservation of the tribe as defined by the Secretary.

(g) "Land" means real property or any interest therein.

(h) "Tribal consolidation area" means a specific area of land with respect to which the tribe has prepared, and the Secretary has approved, a plan for the acquisition of land in trust status for the tribe.

§ 151.3   Land acquisition policy.

Land not held in trust or restricted status may only be acquired for an individual Indian or a tribe in trust status when such acquisition is authorized by an act of Congress. No acquisition of land in trust status, including a transfer of land already held in trust or restricted status, shall be valid unless the acquisition is approved by the Secretary.

(a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status (1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; (2) when the tribe already owns an interest in the land or, (3) when the Secretary determines that the acquisition of the land is necessary to facili-

374

AR00761

Bureau of Indian Affairs, Interior                                                                    § 151.10

tate tribal self-determination, econom-
ic development, or Indian housing.

(b) Subject to the provisions con-
tained in the acts of Congress which
authorize land acquisitions or holding
land in trust or restricted status, land
may be acquired for an individual
Indian in trust status (1) when the
land is located within the exterior
boundaries of an Indian reservation,
or adjacent thereto; or, (2) when the
land is already in trust or restricted
status.

§ 151.4  Acquisitions in trust of lands
owned in fee by an Indian.

Unrestricted land owned by an indi-
vidual Indian or a tribe may be con-
veyed into trust status, including a
conveyance to trust for the owner,
subject to the provisions of this part.

§ 151.5  Trust acquisitions in Oklahoma
under Section 5 of the I.R.A.

In addition to acquisitions for tribes
which did not reject the provisions of
the Indian Reorganization Act and
their members, land may be acquired
in trust status for an individual Indian
or a tribe in the State of Oklahoma
under Section 5 of the Act of June 18,
1934 (48 Stat. 985; 25 U.S.C. 465), if
such acquisition comes within the
terms of this part. This authority is in
addition to all other statutory author-
ity for such an acquisition.

§ 151.6  Exchanges.

An individual Indian or tribe may ac-
quire land in trust status by exchange
if the acquisition comes within the
terms of this part. The disposal as-
pects of an exchange are governed by
Part 152 of this title.

§ 151.7  Acquisition of fractional interests.

Acquisition of a fractional land in-
terest by an individual Indian or a
tribe in trust status can be approved
by the Secretary only if:

(a) The buyer already owns a frac-
tional interest in the same parcel of
land; or

(b) The interest being acquired by
the buyer is in fee status; or

(c) The buyer offers to purchase the
remaining undivided trust or restrict-
ed interests in the parcel at not less
than their fair market value; or

(d) There is a specific law which
grants to the particular buyer the
right to purchase an undivided inter-
est or interests in trust or restricted
land without offering to purchase all
of such interests; or

(e) The owner of a majority of the
remaining trust or restricted interests
in the parcel consent in writing to the
acquisition by the buyer.

§ 151.8  Tribal consent for nonmember ac-
quisitions.

An individual Indian or tribe may ac-
quire land in trust status on a reserva-
tion other than its own only when the
governing body of the tribe having ju-
risdiction over such reservation con-
sents in writing to the acquisition; pro-
vided, that such consent shall not be
required if the individual Indian or
the tribe already owns an undivided
trust or restricted interest in the
parcel of land to be acquired.

§ 151.9  Requests for approval of acquisi-
tions.

An individual Indian or tribe desir-
ing to acquire land in trust status may
file a written request for approval of
such acquisition with the Secretary.
The request need not be in any special
form but shall set out the identity of
the parties, a description of the land
to be acquired, and other information
which would show that the acquisition
comes within the terms of this part.

§ 151.10  Factors to be considered in evalu-
ating requests.

In evaluating requests for the acqui-
sition of land in trust status, the Sec-
retary shall consider the following fac-
tors:

(a) The existence of statutory au-
thority for the acquisition and any
limitations contained in such author-
ity;

(b) The need of the individual
Indian or the tribe for additional land;

(c) The purposes for which the land
will be used;

(d) If the land is to be acquired for
an individual Indian, the amount of
trust or restricted land already owned
by or for that individual and the
degree to which he needs assistance in
handling his affairs;

375

AR00762

§ 151.11                                    25 CFR Ch. I (4-1-87 Edition)

(e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;

(f) Jurisdictional problems and potential conflicts of land use which may arise; and

(g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

§ 151.11   Action on requests.

The Secretary shall review all requests and shall promptly notify the applicant in writing of his decision. The Secretary may request any additional information or justification he considers necessary to enable him to reach a decision. If the Secretary determines that the request should be denied, he shall advise the applicant of that fact and the reasons therefor in writing and notify him of the right to appeal pursuant to Part 2 of this title.

§ 151.12   Title examination.

If the Secretary determines that he will approve a request for the acquisition of land from unrestricted fee status to trust status, he shall acquire, or require the applicant to furnish, title evidence meeting the *Standards For The Preparation of Title Evidence In Land Acquisitions by the United States,* issued by the U.S. Department of Justice. After having the title evidence examined, the Secretary shall notify the applicant of any liens, encumbrances, or infirmities which may exist. The Secretary may require the elimination of any such liens, encumbrances, or infirmities prior to taking final approval action on the acquisition and he shall require elimination prior to such approval if the liens, encumbrances, or infirmities make title to the land unmarketable.

§ 151.13   Formalization of acceptance.

Formal acceptance of land in trust status shall be accomplished by the issuance or approval of an instrument of conveyance by the Secretary as is appropriate in the circumstances.

376



Attachment No. 3

25 § 464                            _RA

## § 465.  Acquisition of lands, water rights or surface rights; appropriation; title to lands; tax exemption

The Secretary of the Interior is hereby authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for the purpose of providing land for Indians.

For the acquisition of such lands, interests in lands, water rights, and surface rights, and for expenses incident to such acquisition, there is authorized to be appropriated, out of any funds in the Treasury not otherwise appropriated, a sum not to exceed $2,000,000 in any one fiscal year: *Provided*, That no part of such funds shall be used to acquire additional land outside of the exterior boundaries of Navajo Indian Reservation for the Navajo Indians in Arizona, nor in New Mexico, in the event that legislation to define the exterior boundaries of the Navajo Indian Reservation in New Mexico, and for other purposes, or similar legislation, becomes law.

The unexpended balances of any appropriations made pursuant to this section shall remain available until expended.

Title to any lands or rights acquired pursuant to sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

(June 18, 1934, c. 576, § 5, 48 Stat. 985.)

94

AR00764

*Attachment No. 4*

Attachment

Dear

This agency has under consideration an application for acquisition of land by the United States to be held in trust for the benefit of:

the _____ Tribe, or

_____, a member of the _____ Tribe.

The property is described as follows:



The determination whether to acquire this property in trust will be made in the exercise of discretionary authority which is vested in the Secretary of the Interior.  To assist us in the exercise of that discretion, pursuant to regulations published at 45 Fed. Reg. 62034 (September 18, 1980), 25 CFR §151, we invite your comments on the proposed acquisition.  In particular, information on the following matters is requested:

   (1)  The annual amount of property taxes currently levied on the property.

   (2)  Any special assessments, and amounts thereof, which are currently assessed against the property.

   (3)  Any governmental services which are currently provided to the property by your jurisdiction.

   (4)  If subject to zoning, how the property is currently zoned.

Information and comments should be addressed to this agency, to the attention of the undersigned.  Any comments received within 30 days of the date of this letter will be considered.  A copy of your comments will be made available to_____ (name of applicant).  A determination of whether to acquire the land in trust will be made by the Area Director, _____ Area, Bureau of Indian Affairs, (address).  If you have submitted comments within 30 days of this letter, you will be notified of the Area Director's determination.

                            Sincerely,

CERTIFICATE
OF

# No. 5

## INSPECTION AND POSSESSION

### (Lands other thanFederal building Sites)

I, _____, a _____
of the Department of the Interior, hereby certify that on the
_____ day of _____, 19___ I made a personal examination and
inspection of that certain tract or parcel of land situated in the County
of _____, State of New Mexico, designated as
containing _____ acres. (proposed to be) acquired by _____,
in connection with the _____

project, from _____

1. That I am fully informed as to the boundaries, lines and corners
of said tract; that I found no evidence of any work or labor having been
performed or any materials having been furnished in connection with the
making of any repairs or improvements on said land; and that I made careful
inquiry of the above-named vendor (and of the occupants of said land) and
ascertained that nothing had been done on or about said premises within
the past twelve months that would entitle any person to a lien upon said
premises for work or labor performed or materials furnished.

2. That I also made inquiry of the above-named vendor (and of all
occupants of said land) as to his (their) rights of possession and the
rights of possession of any person or persons known to him (them), and
to show that any person had any rights of possession or other interest in
said premises adverse to the rights of the above-named vendor or the
United States of America.

3. That I was informed by the above-named vendor (and by all other
occupants) that to the best of his (their) knowledge and belief there is
no outstanding unrecorded deed, mortgage, lease, contract, or other instru-
ment adversely affecting the title to said premises.

4. That to the best of my knowledge and belief after actual and
diligent inquiry and physical inspection of said premises there is no
evidence whatever of any vested or accrued water rights for mining, agri-
cultural, manufacturing, or other purposes; nor any ditches or canals
constructed by or being used thereon under authority of the United States
nor any exploration or operations whatever for the development of coal, oil,
gas, or other minerals on said lands; and that there are no possessory
rights now in existence owned or being actively exercised by any third
party under any reservation contained in any patent or patents heretofore
issued by the United States for said land.

5. That to the best of my knowledge and belief based upon actual
and diligent inquiry made, there is no outstanding right whatsoever in

AR00766

any person to the possession of said premises nor any outstanding right,
title, interest, lien, or estate, existing or being asserted in or to
said premises except such as are disclosed and evidenced by the public
records.

    6. That said premises are now wholly unoccupied and vacant except
for the occupancy of _____
as tenant(s) at will, from whom disclaimer(s) of all right, title, and
interest in and to said premises, executed on the _____ day of _____,
19____, has (have) been obtained.

Dated this _____ day of _____, 19_____

rt _____.

APPROVED:

2

AR00767

Attachment No. 6

CATEGORICAL EXCLUSION CHECKLIST

This checklist may be used in determining whether an individual proposed action which is within a categorical exclusion (DLA 1000.2, Appendix 1 and SIG DN 6, Appendix 4) nevertheless requires the preparation of an EA.

1.  Name and position of person completing this form:


2.  Brief description of proposed action:


3.  Answer the following questions "Yes" or "No."

Is the action one which <u>may</u>:

    (a)  Have significant adverse effects on public health and safety?          _____

    (b)  Adversely affect such unique geographic characteristics as
         historic or cultural resources, park, recreation, or
         refuge lands, wilderness areas, wild or scenic rivers, sole
         or principal drinking water aquifers, prime farmlands, wet-
         lands, floodplains, or ecologically significant or critical
         areas, including those listed on the Department's National
         Register of Natural Landmarks?                                         _____

    (c)  Have highly controversial environmental effects?                       _____

    (d)  Have highly uncertain environmental effects or involve unique
         or unknown environmental risks?                                        _____

    (e)  Establish a precedent for future action or represent a decision
         in principle about a future consideration with significant
         environmental effects?                                                 _____

    (f)  Be related to other actions with individually insignificant
         but cumulatively significant environmental effects?                    _____

    (g)  Adversely affect properties listed or eligible for listing
         in the National Register of Historic Places?                           _____

    (h)  Affect a species listed or proposed to be listed on the List
         of Endangered or Threatened Species?                                   _____

    (i)  Threaten to violate a Federal, State, local, or tribal law or
         requirements imposed for the protection of the environment or
         which require compliance with Executive Order 11988 (Floodplain
         Management), Executive Order 11990 (Protection of Wetlands), or
         the Fish and Wildlife Coordination Act?                                _____

If any question was answered "Yes", an EA is required.


    _____                    _____
          Signature                                      Date


Supp. 1, Release 1, 2/22/8?

AR00768

*Attachment No. 7*

# United States Department of the Interior

**BUREAU OF INDIAN AFFAIRS**
ALBUQUERQUE AREA OFFICE
P.O. BOX 8327
ALBUQUERQUE, NEW MEXICO 87198

IN REPLY REFER TO:
320 - Real Estate
Services

JUN 30 1986

Memorandum

To:       Superintendents, Albuquerque Area
          Attention: Real Property Management

From:     Area Director

Subject:  Land Acquisition Policy - Title Insurance

After working with land acquisition transactions over a number of years
the Field Solicitor, Santa Fe, has recommended and the Area realty staff
have agreed to a land acquisition policy of a strong preference for title
insurance over a title abstract for title evidence. Therefore, please
provide title insurance policies for the Field Solicitor for all land
acquisitions. The Field Solicitor will only review a title abstract for
transactions where there is the absence of a title insurance company to
write a title insurance policy to cover the acquisition in question.

There are several reasons for this preference for a title insurance
policy. A title insurance policy provides better protection for the
tribe and the United States. Transactions with a title insurance policy
proceed a lot faster since the title insurance company has already
reviewed the title records and points out possible areas of concern that
need to be addressed. As you are aware, the title insurance policy
should be written on the prescribed ALTA US FORM.

If you have any questions about this policy, please advise.

Area Director

Attachment No. 8

[

25 § 467

## § 467.   New Indian reservations

The Secretary of the Interior is hereby authorized to proclaim new Indian reservations on lands acquired pursuant to any authority conferred by sections 461, 462, 463, 464, 465, 466 to 470, 471 to 473, 474, 475, 476 to 478, and 479 of this title, or to add such lands to existing reservations: *Provided,* That lands added to existing reservations shall be designated for the exclusive use of Indians entitled by enrollment or by tribal membership to residence at such reservations.

(June 18, 1934, c. 576, § 7, 48 Stat. 986.)

### Cross References

Indian Revolving Loan Fund, funds to be administered as, see section 1461 of this title.

Quitclaim of title to certain lands to Chilkat Indians in order for withdrawal of public lands for selection by village of Klukwan to be effective, see section 1615 of Title 43, Public Lands.

Reservations in New Mexico and Arizona, creation and extension, see sections 211 and 463a to 463c of this title.

Restriction of right of certain Indian tribes to lease lands in accordance with Indian constitution or charter adopted pursuant to this section, see section 396b of this title.

Right-of-way grant, consent of tribal officials, see section 324 of this title.

Territories, colonies, or insular possessions of United States, and certain Indian tribes, application to, see sections 473 and 473a of this title.

AR00770

*Attachment No. 1*

*10.12.8*

TRR 8 - 12 Wis. Winn.                          October 7, 1983

           CERTIFIED MAIL NO. P500 035 463
           RETURN RECEIPT REQUESTED

           Chairman
           Board of Commissioners
           Sauk County
           Baraboo, Wis.  53913

           Dear Chairman:

           The Wisconsin Winnebago Tribe has by Tribal Resolution requested
           that the Secretary of Interior issue a proclamation whereby certain
           tribally-owned trust land located in Sauk County, Wisconsin, be
           made a part of the Wisconsin Winnebago Reservation. This letter
           will serve as a 30-day notice of the proposed proclamation. The
           Office of the Governor of the State of Wisconsin had advised that
           the Governor does not oppose this proclamation.

           The land contains approximately 11.45-acres and is located within
           the SW¼SW¼ of Section 10, Township 12 North, Range 6 East, Town
           of Delton, and is more particularly described by metes and bounds
           on attached Sheet "A."

           The land has for all practical purposes been treated and adminis-
           tered by the United States as reservation land, however, the procla-
           mation will remove any questions as to the availability of federal
           Indian programs on these lands on which availability is contingent
           upon lands being located within the reservation boundary. Further,
           jurisdiction over these lands will be equal to present jurisdiction
           in force on Indian trust lands within the existing boundaries of
           Indian Reservations.

           This land has been held by the United States of America in trust for
           the Wisconsin Winnebago Tribe since June of 1980, and has been
           carried as tax-exempt land since that time.

                               Sincerely,
                               **FRANCIS H. LARSON**

                   **ACTING**      Superintendent

           Encl.

           cc:  Kenneth Funmaker, Chairman, Wisconsin Winnebago Tribe
                Frederic Hatch, Tribal Attorney

bcc:  Minneapolis Area Office, Attn: Realty Officer, CODE 450
      Central Office, Washington, D.C., Attn: Lee Maytubby, CODE 222

RECEIVED
OCT 12 1983
RES- 413 -73

*No. 9*

Real Estate Services
Acquisition and Disposal

Honorable James Alford
Mayor of Sault Ste. Marie
City County Building
Sault Ste. Marie, Michigan  49783

*9/2/83*

Dear Mayor Alford:

The Sault Ste. Marie Tribe of Chippewa Indians has, by tribal resolution,
requested that the Secretary of the Interior issue a proclamation whereby
certain tribally-owned trust land within the city limits of Sault Ste.
Marie, Michigan, will officially be proclaimed an Indian reservation.
This letter serves as a 30-day notice of the impending proclamation.
The original 40-acre reservation was established on December 13, 1974.

The proposed reservation area will consist of approximately 79 (seventy-
nine) acres of tribal trust land.  Pursuant to Section 5 of the Indian
Reorganization Act, the land was taken into trust by execution of
Quitclaim Deeds on December 24, 1976; January 4, 1977; and January 28,
1977.

The major question of law enforcement responsibility on trust lands
within the Sault Ste. Marie Indian Reservation was mutually resolved when,
on June 2, 1983, both the Tribe and yourself signed a Law Enforcement
Assistance Agreement (copy enclosed).  In addition, the Tribe has completed
construction of an Indian Housing Project on the proposed reservation land.

By proclaiming these lands a part of the reservation, tribal members
presently residing on the property may now qualify for certain federal
economic assistance programs previously unavailable to them.  Tribal
jurisdiction over these lands will essentially be identical to that which
exists on tribal trust land lying within other Indian reservations.

Sincerely,

*Azel Kenneth Fredericks*

*Actg* Director, Office of
Trust Responsibilities

AR00772

LAND TITLES & RECORDS OFFICE - ALBUQUERQUE

October 1987

## CHECKLIST FOR DEEDS

After a Deed has been completed pursuant to regulations in 25 CFR 152 and instructions in the Training Manual in Real Property Management, Acquisition and Disposal, it is ready for transmittal to the Land Titles and Records Office for recording.  Prior to mailing, use this checklist covering 10 important portions of a DEED.

I.  ALLOTMENT NUMBER -   This is the allotment number of the land described.

II.  DATE OF DEED -   Date grantor signed.  If all grantors do not sign at the same time, use date the <u>first</u> grantor signs.

It is very important that correct date is entered as there may be a question at a later date whether a subsequently deceased grantor actually signed the deed.

III.  GRANTOR(S) -   Name and Identification Number if the Tribe assigns permanent identification/census numbers, marital status.

Be sure to indicate whether one of the Grantors holds only a life estate and so indicate.

Show tribal affiliation of party or parties of the first part.

IV.  GRANTEE(S) -   From Trust to Unrestricted Status - show only name of Grantee.

From Trust to Trust - Be sure to show, "the United States of America in trust for" Grantee's or Grantees' name(s) and identification/census number(s) if a permanent number.

V.  INTEREST CONVEYED -   All my(our) interest in
or
An undivided _____ interest in

AR00773

2

VI.  DESCRIPTION –

Verify the land description.  Bear in mind
that a misplaced comma can change a land
description.

(a)  A ten-acre parcel is written as
     SW¼NE¼SE¼ (with no spaces or commas).

(b)  Abbreviations to be used in the
     descriptions are:

         Township(s).........T., Tps.
         Range(s)............R., Rs.
         Section(s).........sec., secs. (small "s")

(c)  The name of the meridian should be spelled
     in full.  Each meridian has its own base
     line, therefore the words "and base line"
     are <u>omitted</u>.

A.  Reserva-
    tions

Following the description, list any reservations
which are being made by the grantor(s).  For
example:

(a)  Reserving a Life Estate to the grantor(s).

(b)  Reserving a Life Estate in all minerals.

(c)  Reserving all minerals except coal which
     is reserved to the United States.

There may be reservations which have been cited
prior, if the prior owner owned a 1/1 interest.
For example:

(a)  Subject to mineral reservation to <u>(Name)</u>
     by deed approved on _____.

If applicable, the land being conveyed may be
subject to a right-of-way for ditches or canals.
The following is suggested for this reservation:

(a)  There is reserved a right of way for
     ditches or canals constructed by the
     authority of the United States pursuant
     to the Act of August 30, 1890 (26 Stat.
     391).

AR00774

3

B.  Irriga-
    Lien

If applicable, include the following, if you wish, the name of the Irrigation Project may also be included:

"Subject to a first lien created by the Acts of March 7, 1928 (45 Stat. 210) and July 1, 1932 (47 Stat. 564) in favor of the United States of America for unpaid construction, operation and maintenance costs of the irrigation project."

Encum-
brances

If you wish, valid rights-of-way may be listed separately, OR a sentence stating, "Subject to all valid rights-of-way".

C.  Authority
    for
    transaction

For I.R.A. Reservations, cite the Act of June 18, 1934 (48 Stat. 985).

For Tribes who did not accept I.R.A., there may be other authorities which should be cited.

VII.  SIGNATURE(S)

Grantor(s) must sign deed.  Signature(s) witnessed.

If Grantor uses an "X", requires two witnesses.

VIII.  ACKNOWLEDGMENT

The jurat or acknowledgment must be in accordance with the State laws in which the land is situated.

The New Mexico Statutes state, "Statute of this state does not require deeds to be acknowledged, except for recordation, and for the protection of the grantee against subsequent purchasers in good faith and without notice".

IX.  APPROVAL

On July 7, 1987, the Bureau of Indian Affairs advised that the Assistant Secretary - Indian Affairs had on February 9, issued a new delega-tion of authority to officials within the BIA.

AR00775

4

For your information 209 DM 8 delegates
authority from the Secretary of the Interior
to the Assistant Secretary - Indian Affairs
and to the Deputy Assistant Secretary -
Indian Affairs.

230 DM 3 delegates the authority of the
Assistant Secretary - Indian Affairs to
the Directors of the Bureau's Area Offices.

Any Redelegation Orders issued by the
Area Director must be in conformity with
10 BIAM 1.11.

Authority to be cited on a deed for each
Area is as follows:

(a)  Albuquerque will show 209 DM 8 and
     230 DM 3.  All deeds must be approved
     by the Area Director.

(b)  Phoenix will show 209 DM 8 and 230 DM 3
     and Redelegation Order No. 3 dated
     February 16, 1972 (the last if applicable.)

(c)  Navajo will show 209 DM 8 and 230 DM 3.
     All deeds must be approved by the Area
     Director.

The citation "10 BIAM 3" will no longer be
shown.  230 DM 3 replaces 10 BIAM 3.

X.  SIGNATURE &
    APPROVAL DATE       The signature of the approving official must be
                        on the deed.

                        The date on which the deed is approved must appear
                        on the deed.  It is preferred that the stamped date
                        appear following the wording, "The within deed is
                        hereby approved:."

                        * * * *

IMPORTANT NOTE TO AGENCIES

Transmit the ORIGINAL deed, with supporting documents, if you wish, to the
Land Titles & Records Office for recording.  The documents will be recorded,
microfilmed and returned to the Sender.

                        * * * *

See EXHIBIT "A" attached.

AR00776

5-3446

I
No. _____

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

## DEED TO RESTRICTED INDIAN LAND

II

THIS INDENTURE, Made and entered into this _____ day of _____ one thousand nine hundred and _____ by and between _____

III

of _____
Indians _____ part_____ of the first part, and     IV _____

of _____, part_____ of the second part:

WITNESSETH, That said part_____ of the first part, for and in consideration of the sum of _____ dollars, in hand paid, the receipt of which is hereby acknowledged, do_____ hereby grant, bargain, sell, and convey unto said part_____ of the second part the following-described real estate and premises situated in _____ County, _____ of _____ on the _____ Indian Reservation, to wit:

V                         VI
                          A
                          B
                          C

together with all the improvements thereon and the appurtenances thereunto belonging.  And the said part_____ of the first part, for _____ and _____ heirs, executors, and administrators, do _____ hereby covenant, promise, and agree to and with the said part_____ of the second part, _____ heirs and assigns, that _____ will forever warrant and defend the said premises against the claim of all persons, claiming or to claim by, through, or under _____ only.

To have and to hold said described premises unto the said part_____ of the second part, _____ heirs, executors, administrators, and assigns, forever.

IN WITNESS WHEREOF, That said part_____ of the first part ha___ hereunto set _____ hand and seal___ the day and year first above written.

WITNESSES:                           VII
VII _____          _____ [SEAL]
_____              _____ [SEAL]
_____              _____ [SEAL]
_____              _____ [SEAL]
_____              _____ [SEAL]

EXHIBIT "A"

AR00777

Acknowledgments must be in accordance with the forms prescribed by the State in which the land is situated.

STATE OF_____ }
COUNTY OF_____ } ss:   *VIII*

BE IT REMEMBERED, That on this _____ day of _____ A. D. 19\_\_\_

before the undersigned, a _____ in and for the County and State

aforesaid, personally appeared _____

to me personally known to be the identical person\_\_\_ who executed the within instrument of writing, and such person\_\_\_ duly acknowledged the execution of the same.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal on the day and year last hereinabove written.

_____
(Title)

UNITED STATES
DEPARTMENT OF THE INTERIOR          My commission expires _____

The within deed is hereby approved:    X
                                       DATE
*IX* AUTHORITY

                                       X

The within deed is recorded in the Bureau of Indian Affairs in Volume \_\_\_\_\_ Page \_\_\_\_\_
Inherited Indian Land Deed Book.

INDIAN LAND DEED

COUNTY OF _____
STATE OF _____
This instrument was filed for record this \_\_\_ day of \_\_\_ 19\_\_ at \_\_\_ o'clock \_\_\_ M., and duly recorded in Book No. \_\_\_ at page \_\_\_

Register of Deeds.

AR00778

*info/*
*refer to refer*

# Challenges to the Constitutionality of § 465

## Judicial Cases

1.  *State of South Dakota v. United States*, (Central District .S.D.) File No 00-3026. Lower Brule Sioux Tribe. (DIA)

    The State, city of Oacoma and Lyman county have sued the United States, once again, over the AS-IA's decision to accept approximately 91 acres in Lyman county into trust for the Tribe. The plaintiffs challenge the decision claiming that 25 U.S.C. § 465 is an unlawful delegation of power; is a violation of the 10th Amendment, IGRA and the APA.

    Answer is due January 18, 2001, and during that period, the BIA is completing an EA for the land transfer.

2.  *Almond v. Babbitt* Civ. No. 00-375 ML (D. Rhode Island.). Narragansett Tribe. (DIA)

    Lawsuit filed by state of Rhode Island and town of Charlestown against the United States over the Regional Director's decision to accept approximately 31 acres into trust for the Narragansett Tribe after the IBIA upheld the RD's decision. 35 IBIA 93 (June 29, 2000). The State challenged the decision under the APA, claimed that the IRA is unconstitutional delegation of power; and violates the 10th and 11th Amendments, the Rhode Island Indian Claims Settlement Act; the CZMA; NEPA; Native American Housing Assistance and Self-Determination Act; and the IGRA.

    Answer is due November 20, 2000. Parties have stipulated that the government will not transfer the parcel into trust unless and until all parties are given 10 days notice.

3.  *City of Lincoln City v. U.S. Department of the Interior*, No. CV99-330AS U.S. District Court, D. Or. Siletz Tribe (Portland NWRO)

    * BIA approved acquisition of 37 acre off-reservation parcel for Siletz Tribe in 1997. Tribe's intended use is commercial housing development. City appealed to IBIA, which affirmed BIA's decision (33 IBIA 102). Under its restoration legislation, Siletz has no "on-reservation" property to acquire for expanding economic development.
    * Briefing on US & tribal motions for summary judgment finished August 2000; oral argument set for 11-27-00.
    * City alleges § 465 is unconstitutional delegation of legislative power; and that the acquisition would violate constitutional right to a republican form of government, the equal footing doctrine, the Tenth Amendment and Oregon's Enabling Act. City is also making APA, NEPA, and CZMA claims.

1

AR00779

4.    *State of Connecticut v. United States*; 228 F.3d 82 (2nd Cir. Sept. 25, 2000).
      Mashantucket Pequot Tribe. (DIA)

      The State and three towns in Connecticut sued the Secretary for his decision to
      accept 165 acres into trust for the Tribe under his discretionary authority under §
      465. The State claimed that the Connecticut Indians Land Claims Settlement Act
      prohibited the Secretary from accepting into trust any lands outside the settlement
      lands. The district court agreed with the State's position and found the
      Secretary's action unlawful. 26 F.Supp.2d 397 (D. Conn. 1998).

      On appeal, the Second Circuit reversed the district court finding that the
      Settlement Act restrictions on acquisitions of land applies only to land purchased
      with settlement funds. The Circuit court remanded the case for further
      proceedings.

5.    *Shivwits Band of Paiute Indians v. State of Utah and Babbitt*, Case No. 2:95CV1025C
      (Central Div. D. Utah)(2000). Shivwits Band of Paiute Indians. (Salt Lake City FO)

      Bureau approved off reservation acquisition for the Band and the property was
      transferred into trust status. In September 1995, BIA approved leases for
      billboards on the acquired property. The State and city of St. George sought to
      stop construction of the billboards and sued the Secretary alleging, among others,
      that § 465 is unconstitutional and that the Secretary violated the regulations at 25
      C.F.R. Part 151. Court found that § 465 is constitutional but held that Bureau's
      failure to complete and EA or EIS for the land acquisition violated NEPA and that
      the acquisition is therefore, invalid. (EA's were completed for the leases,
      however). The court then ordered the NEPA process be undertaken. *Order* dated
      August 11, 2000.


**Judicial Challenges to Other Acquisition Authority**

6.    *Churchill County v. United States*, (D. Nevada) No. CV-N-00-75DWH (RAM)(D.
      Nevada). Fallon Paiute Shoshone Tribe. (DIA)

      County challenged decision to accept parcel into trust under the Fallon Paiute
      Shoshone Tribal Settlement Act as an unconstitutional delegation of authority to
      the Secretary; that the Secretary failed to comply with 25 C.F.R. Part151; and that
      the Secretary acted arbitrarily and capriciously. US filed a motion to dismiss
      based on the mandatory nature of the Settlement Act, briefing was completed in
      August.

2

AR00780

**Administrative Appeals**

7.   State of Oregon v. Acting Northwest Regional Director, No. IBIA 00-40-A
     Interior Board of Indian Appeals.  Cow Creek Band Umpqua Tribe (Portland NWRO)

     * BIA approved acquisition of 35 acre off-reservation parcel for Cow Creek Band of
     Umpqua Tribe in February 2000.  Tribe's intended use is unknown non-gaming
     commercial activity.  State appealed to IBIA.  Under its restoration legislation, Cow
     Creek has no "on-reservation" property to acquire for expanding economic development.
     * Appeal stayed; State and Tribe engaged in settlement discussions.
     * If case does not settle, anticipate that State will raise unconstitutionality claims.

8.   State of Kansas v. Acting Southern Plains Regional Director,
     IBIA 00-86-A  (Filed May 30, 2000)  Prairie Band of Potawatomi Nation. (Tulsa FO)

     Kansas Department of Revenue appealed decision to acquire land into trust for the Prairie
     Band of Potawatomi Nation.  The land is adjacent to the reservation and is considered to
     be on-reservation for purposes of the Tribe's application under 25 C.F.R. 151.10.  It is
     within the tribe's former (larger) reservation as well.  It is currently being used as a Tribal
     Law Enforcement Center constructed in 1998 and this use would continue.  The tribe has
     spent millions of dollars maintaining and improving roads in the vicinity.  The tribe's 13
     officers are cross-deputized as federal officers.  The annual property tax on the land prior
     to construction of the $300,000 center was $7.78, and would be taxed at $3755 after the
     development - except that it would be exempt from tax under state law since it is used for
     public services.

     *Nature of claims and/or summary of arguments*:
     violation of delegation doctrine; violation of Tenth Amendment; violation of equal
     footing doctrine.
     *Procedural posture*: BIA Response Brief Due November 9, 2000.

9.   Lewis County v. Superintendent, Northern Idaho Agency (no docket number)
     BIA Regional Director.  Nez Perce Tribe.  (Portland NWRO)

     * Superintendent approved acquisition of 1,232 acres of on-reservation land for Nez
     Perce Tribe in July 2000.  Property is timbered and Tribe intends to continue existing
     land use.  County has appealed to Regional Director.
     * Regional Director's decision expected in 11-00.
     * County alleges § 465 is unconstitutional delegation of legislative authority; that § 465
     does not authorize acquisitions of tribal owned fee lands; and that reservation was
     disestablished.  County also making APA-like claims.

AR00781