Memorandum

To:        Carol Russell
           POB

From:      Attorney, Branch of Tribal Government and Alaska
           Division of Indian Affairs

Subject:   Indian Country in Alaska:  The Legal Background of
           Alaska v. Native Village of Venetie Tribal Government,
           101 F.3d 1286 (9th Cir. 1996), and a Review of the
           Current Status of the Regulations Prohibiting the
           Acquisition by the Secretary of Land in Trust for
           Alaska Natives

## INTRODUCTION

This memorandum provides a portion of the response to the request
by a staffer in Senator Stevens' office for information about the
potential fiscal impact of the Ninth Circuit's finding of Indian
country in Alaska.  Alaska v. Native Village of Venetie Tribal
Government, 101 F.3d 1286 (9th Cir. 1996).  The scope of this
memorandum is this decision and the current regulations
concerning the taking of lands in trust in Alaska.  Other offices
are addressing the programmatic aspects of the Stevens request.

## INDIAN COUNTRY

The meaning of Indian country evolved over time until Congress in
1948 defined it for application in the criminal context.
18 U.S.C. § 1151.  This definition is also used for civil
jurisdiction.  DeCoteau v. District County Court, 420 U.S. 425,
427 n.2 (1975).

> [T]he term "Indian country", as used in this chapter,
> means (a) all land within the limits of any Indian
> reservation under the jurisdiction of the United States
> government, notwithstanding the issuance of any patent,
> and, including rights-of-way running through the
> reservation, (b) all dependent Indian communities
> within the borders of the United States whether within
> the original or subsequently acquired territory
> thereof, and whether within or without the limits of a
> state, and (c) all Indian allotments, the Indian titles

to which have not been extinguished, including rights-of-way running through the same.[1]

Subsequent caselaw in the contiguous forty-eight states has continued to refine this definition in a variety of applications, but the general absence of reservations in Alaska led many to believe that Indian country in Alaska did not exist beyond the Annette Island Reservation.  In its decision in <u>Alaska v. Native Village of Venetie Tribal Government</u>, 101 F.3d 1286 (9th Cir. 1996) (<u>Venetie</u>), the Ninth Circuit held that this belief was not correct.

THE VENETIE DECISION

The issue presented to the Ninth Circuit in <u>Venetie</u> was whether the Village of Venetie's Tribal Government had the authority to collect a tribal "business gross receipts" tax from an out-of-town building contractor who came to the village to construct a school under a contract paid for by the State of Alaska.  The resolution of this issue turned on whether the village was a "dependent Indian community" within the definition of Indian country set out in 18 U.S.C. § 1151.  The district court ruled that the village could not impose the tax because it did not satisfy the district court's reformulation of the Ninth Circuit's six criteria for finding a dependent Indian community.[2]

---

1    Under 18 U.S.C. § 1151, Native allotments are Indian country, and some might be considered to lie within the boundaries of a dependent Indian community.  However, the extent of tribal governmental jurisdiction over them arguably could be analyzed under the terms of the allotment statute, regulations, and 18 U.S.C. § 1151(c) caselaw.

2    The <u>Venetie</u> case had been remanded previously to the district court by the Ninth Circuit for consideration in light of Court of Appeals' opinion in <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384 (9th Cir. 1988), which set out the Circuit's six-factor test for determining a dependent Indian community.  The six factors articulated by the Ninth Circuit in its first <u>Venetie</u> decision include:
(1) the nature of the area;
(2) the relationship of the area's inhabitants to Indian tribes and the federal government;
(3) the established practice of government agencies towards the area;
(4) the degree of federal ownership of and control over the area;
(5) the degree of cohesiveness of the area's inhabitants; and
(6) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.

2

AR00792

country, it stated that these requirements should be construed

broadly as it had previously ordered in its 1988 decision in the same case. <u>Alaska v. Native Village of Venetie</u>, 856 F.2d 1384 (9th Cir. 1988). Reversing the district court, the Ninth Circuit ruled that the Alaska Native Claims Settlement Act (ANCSA) did not extinguish Indian country in Alaska. "In sum, we hold that ANCSA neither eliminated a federal set aside for Alaska Natives, as such, nor terminated federal superintendence over Alaska Natives. As a result, Indian country may still exist in Alaska." <u>Venetie</u> at 1299-1300.

Applying its six factor test to the specific factual situation presented, the Ninth Circuit held that the land in question was federally set aside for Indians as such, and that the Native Village of Venetie remained under federal superintendence even if not under its dominance. <u>Venetie</u> at 1300-02. Based on these findings, the Ninth Circuit concluded that Venetie is a dependent Indian community, that the land in question is Indian country, and that the tribe therefore has the power to impose its tax within such territory. The Ninth Circuit remanded the case to the district court "to determine whether Venetie has the power to impose a tax upon a private party where the State of Alaska will ultimately pay the obligation." <u>Venetie</u> at 1302-03.

After the Ninth Circuit's decision was announced, the appellee State of Alaska petitioned the Ninth Circuit for rehearing, with a suggestion for rehearing <u>en banc</u>. The Ninth Circuit rejected that petition on January 6, 1996. The State has since announced its intention to submit a petition for writ of <u>certiorari</u> to the United States Supreme Court and calculates that its petition is due on April 7, 1997, under the Supreme Court's rules. Venetie's opposition will be due 30 days later. On January 23, 1997, the Ninth Circuit granted the State's motion to stay issuance of the mandate in the <u>Venetie</u> case pending the Supreme Court's final disposition of the case.

The narrowest reading of the <u>Venetie</u> decision would limit the holding to the unique circumstances of the Native Villages of Venetie and Arctic Village. These villages collectively constitute the only tribal government which has obtained title to its former reserve through a voluntary transfer of the land from both Native village corporations. However, it seems unlikely that future courts interpreting the decision will limit the holding to ANCSA lands voluntarily transferred by a village corporation to a tribe, since there is nothing in the language of

---

<u>Venetie</u>, <u>id.</u>, 856 F.2d at 1391.

AR00793

the opinion to suggest that the court relied upon these facts in reaching its decision.

## TRUST LANDS IN ALASKA

Although the Ninth Circuit found that the land at issue in Venetie was Indian country even though it had not been taken in trust, courts may find it easier to determine that trust land is a dependent Indian community and thus Indian country under 18 U.S.C. § 1151. However, unlike the situation in the contiguous forty-eight states, the land acquisition regulations located at 25 C.F.R. § 151.1, adopted in 1980, do not permit the acquisition of land in trust by the Secretary for Alaska Natives and tribes. This regulation is based on a memorandum dated September 15, 1978, "Trust Land for the Natives of Venetie and Arctic Village," in which Associate Solicitor for Indian Affairs Thomas Frederick concluded that ANCSA was a plain expression of Congress' intent that there should be no more Indian trust lands established in Alaska after the land claims settlement. See ANCSA § 2, 43 U.S.C. § 1601.

The 1978 Frederick memorandum addressed the question of whether ANCSA precludes the Secretary from restoring to trust status former Venetie Reserve land, held in fee by Alaska Natives. In concluding that the Secretary did not have the authority to effect this restoration, the former Associate Solicitor found that the repeal in the Federal Land Policy and Management Act (FLPMA) of the Secretary's authority to proclaim reservations in Alaska, in tandem with the revocation of Native reservations by ANCSA, implicitly revoked the Secretary's authority to take tribal land in trust. Based on the Frederick analysis, the Department has since declined all requests to take land in trust for Alaska Natives or tribes.

In October 1994, several Alaska Villages (Chilkoot Indian Association, Native Village of Larsen Bay, Kenaitze Indian Tribe) represented by the Native American Rights Fund (NARF) submitted a petition requesting that the Department undertake a rulemaking to change the existing regulation 25 C.F.R. § 151.1. This regulation prohibits the acquisition of land in trust status in Alaska for Alaska Natives and tribes (except for the Metlakatla Indian Community of the Annette Island Reservation). The statute authorizing trust land acquisitions, 25 U.S.C. § 465, contains no such limitations.

The petitioners requested that the regulations be changed to allow the Secretary to exercise his discretion to acquire land in trust for Alaska Natives. The petitioners did not ask for any particular lands to be taken in trust. The Department subsequently published a Notice in the Federal Register that it had received the petition and requested comments on it by March 6, 1995. The Bureau of Indian Affairs (BIA) received

4

AR00794

comments from the Kipnuk Traditional Council and from the law firm of Sonosky, Chambers, Sachse, Miller, Munson & Clocksin, both supporting the regulatory change. Based on these events, the Assistant Secretary--Indian Affairs requested the Office of the Solicitor to evaluate the proposed change to the regulations. No additional actions have been undertaken concerning the petition.

In the request for a change to the regulations, the petitioners asserted that the reasoning of the 1978 memorandum is unpersuasive for the following reasons:

In 1936, Congress made most key provisions of the IRA, 25 U.S.C. §§ 461-497, applicable in Alaska, notwithstanding the limited number of reservations in Alaska. 25 U.S.C. § 473a. Among those provisions applicable in Alaska is one permitting the United States to take lands in trust. 25 U.S.C. § 465, as amended. Through FLPMA, Congress repealed 25 U.S.C. §§ 496 and 497 which authorized the Secretary to designate tracts of land in Alaska as Indian reservations and to reserve tracts of land in Alaska for schools, hospitals, and other uses for Indians, Eskimos, and Aleuts. 90 Stat. 2792. The petitioners argued that since Congress left 25 U.S.C. § 465 intact, it chose to distinguish between the authority to proclaim reservations and the acquisition of trust land. Petitioners also argued that in many statutes and regulations, the definition of "reservation" includes Alaska Native village communities for purpose of providing federal programs and services to tribal governments.

Petitioners criticized the Frederick finding of an implicit revocation of the Secretary's authority to take tribal land in trust. They asserted that a fundamental principle of Indian law prohibits extinguishment of tribal rights except by a "clear and plain" expression of Congressional intent. See, e.g., Hualapai Indians, United States ex rel. v. Santa Fe Pacific R.R., 314 U.S. 339, 353 (1941). In addition, the petitioners cited numerous examples of the government protecting tribal lands, consistent with the retention of rights possessed by Alaska tribes after the passage of ANCSA. Finally, Alaska Natives asserted in their petition that 25 C.F.R. § 151.1 is subject to challenge as exceeding the scope of Secretarial authority, claiming that it conflicts with IRA sections 465 and 473a, which make section 465 applicable in Alaska.

AR00795

bcc:  BIA Tribal Services
      Regional Solicitor, Anchorage
      DIA RF
      SAshton RF

document name   s:\ia\wp\tg&a\alaska\tg.gen\indctry\venfisca.rep

March 6, 1997

AR00796

389] From: LAURI ADAMS 3/6/97 8:17AM (3711 bytes: 1 ln)
To: ROGER HUDSON
Subject: Re[5]: Venetie and trust lands memo
------------------------------- Forwarded -------------------------------
From: Carol Russell at ~iospob 3/6/97 10:53AM (3536 bytes: 1 ln)
Priority: Urgent
To: SANDRA ASHTON at ~DOI/SOL_HQ, LAURI ADAMS at ~DOI/SOL_AK
Receipt Requested
cc: SCOTT KEEP at ~DOI/SOL_HQ
Subject: Re[5]: Venetie and trust lands memo
------------------------------- Message Contents -------------------------------
Here are comments from John Trezise on the draft you sent me yesterday  can you
please address them when you prepare the final version?  thanks.

on page 2 we should not say that VEnetie "altered that belief" we should say
that in Venetie the 9th circuit held that belief was incorrect.

 we should not be so clear in speclating about the impact of the decision on
claims of other villages.

on taking land into trust, we may want to say that the regs currently forbid
this, that a petition has been filed, but that it hasnt been acted on.

we should elaborate on why Tom Frederick is wrong.

Thanks, Carol

Subject: Re[4]: Venetie and trust lands memo
From:    SANDRA ASHTON at ~DOI/SOL_HQ
Date:    3/5/97  5:20 PM

I have read the first draft and have one comment:   we also need to address the
question of what programs we would potentially have to provide in alaska if
there is Indian country in Alaska.

        Carol,

        Deb Maddox was going to do the part of the report concerned
        with what BIA presently does in Alaska.  It was my
        understanding from our meeting on Feb 27 that SOL was to
        discuss only the legal aspects - Venetie and trust lands.

        In any event, we probably currently support many of the
        programs that we would support if Venetie is upheld and
        there is determined to be Indian country in Alaska.  We
        expect that Venetie will actually have little impact on law
        enforcement because Alaska is a PL 280 state.

        Further, most BIA programs in Alaska presently are NOT
        conditioned on being on or near a reservation (=Indian
        country).  Hence, the existence of Indian country will have
        little impact in such areas as tribal government, tribal
        courts, and IHS services.  Hunting and fishing regulation
        and taking land in trust are complex legal matters still
        under evaluation.  Venetie would have no immediate impact
        here.

AR00797

Sandy and Scott

---

Subject: Re[2]: Venetie and trust lands memo
From:    SANDRA ASHTON at ~DOI/SOL_HQ
Date:    3/5/97  4:07 PM

    I've was out of the office yesterday, so haven't looked at
it yet.  Roger is in a hearing today tomorrow etc., so it
will just be me.  I will get to your revised draft later
today, but please don't send it out before I do.  I will
send you a message after I've read it.  Thanks much.  Lauri

Lauri,

Carol has a revised draft, based on Roger's comments, which
I also sent you.  She needs our final today, but is waiting
on word from me that indeed it IS final!

Thanks,

Sandy

] From: LAURI ADAMS at ~DOI/SOL_AK 3/5/97 6:24PM (1748 bytes: 26 ln)
iority: Urgent
o: SANDRA ASHTON at ~DOI/SOL_HQ, SCOTT KEEP at ~DOI/SOL_HQ
Subject: Re[5]: Venetie and trust lands memo
------------------------------ Message Contents ------------------------------

I have looked at the draft memorandum prepared by Sandy and
have no problems with the Venetie part of it.  I do have a
concern on the trust lands part if the idea here is to
release it as part of the response to Senator Stevens
office's request.  If this is just for internal background
my concern is not so great.

The draft memorandum states pretty strongly that the
Fredericks opinion was wrong (which it may have been, but
that is not my point), and also seems to imply a conclusion
that the NARF petition to change the regulation is
well-founded.  I am not sure we should say all that in a
memorandum which leaves the Solicitor's office, especially
since I did not think that Leshy has yet decided whether the
regulation should be changed (correct me if I am wrong, of
course).

I would think it would be better for now simply to report on
the background of the Fredericks opinion and the adoption of
the regulation and explain what the petitioners have argued.
I would then leave off with a statement that the Department
is still considering the petition and has reached no final
determination yet on whether to revise its regulation.

I apologize for being so late getting back to you on this.
This was the soonest I could look at it.  Lauri

AR00799

] From: SANDRA ASHTON at ~DOI/SOL_HQ 3/5/97 5:20PM (2692 bytes: 53 ln)
iority: Urgent
o: Carol Russell at ~iospob, LAURI ADAMS at ~DOI/SOL_AK
Receipt Requested
cc: SCOTT KEEP, John Trezise at ~iospob
Subject: Re[4]: Venetie and trust lands memo
------------------------------- Message Contents -------------------------------
I have read the first draft and have one comment:   we also need to address the
question of what programs we would potentially have to provide in alaska if
there is Indian country in Alaska.

        Carol,

        Deb Maddox was going to do the part of the report concerned
        with what BIA presently does in Alaska.  It was my
        understanding from our meeting on Feb 27 that SOL was to
        discuss only the legal aspects - Venetie and trust lands.

        In any event, we probably currently support many of the
        programs that we would support if Venetie is upheld and
        there is determined to be Indian country in Alaska.  We
        expect that Venetie will actually have little impact on law
        enforcement because Alaska is a PL 280 state.

        Further, most BIA programs in Alaska presently are NOT
        conditioned on being on or near a reservation (=Indian
        country).  Hence, the existence of Indian country will have
        little impact in such areas as tribal government, tribal
        courts, and IHS services.  Hunting and fishing regulation
        and taking land in trust are complex legal matters still
        under evaluation.  Venetie would have no immediate impact
        here.


        Sandy and Scott


----------------------------------------------------------------------

Subject: Re[2]: Venetie and trust lands memo
From:    SANDRA ASHTON at ~DOI/SOL_HQ
Date:    3/5/97  4:07 PM


        I've was out of the office yesterday, so haven't looked at
        it yet.  Roger is in a hearing today tomorrow etc., so it
        will just be me.  I will get to your revised draft later
        today, but please don't send it out before I do.  I will
        send you a message after I've read it.  Thanks much.  Lauri

        Lauri,

        Carol has a revised draft, based on Roger's comments, which
        I also sent you.  She needs our final today, but is waiting
        on word from me that indeed it IS final!

        Thanks,

        Sandy

AR00800

draft    draft    draft

To:        Carol Russell
           POB

From:      Attorney Advisor
           Division of Indian Affairs
           Office of the Solicitor

Subject:   Indian Country in Alaska:  The Legal
           Background of <u>Alaska v. Native Village of
           Venetie Tribal Government</u>, 101 F.3d 1286
           (9th Cir. 1996), and a Review of the Current
           Status of the Regulations Prohibiting the
           Acquisition by the Secretary of Land in Trust
           for Alaska Natives

The meaning of Indian country evolved over time until Congress in
1948 defined it for application in the criminal context.
18 U.S.C. § 1151.  This definition is also used for civil
jurisdiction.  <u>DeCoteau v. District County Court</u>, 420 U.S. 425,
427 n.2 (1975).

> [T]he term "Indian country", as used in this chapter,
> means (a) all land within the limits of any Indian
> reservation under the jurisdiction of the United States
> government, notwithstanding the issuance of any patent,
> and, including rights-of-way running through the
> reservation, (b) all dependent Indian communities
> within the borders of the United States whether within
> the original or subsequently acquired territory
> thereof, and whether within or without the limits of a
> state, and (c) all Indian allotments, the Indian titles
> to which have not been extinguished, including rights-
> of-way running through through the same.

Subsequent caselaw in the contiguous forty-eight states has
continued to refine this definition in a variety of applications,
but the general absence of reservations in Alaska led many to
believe that Indian country in Alaska did not exist beyond the
Annette Island Reservation.  The Ninth Circuit's decision on
November 20, 1996, in <u>Alaska v. Native Village of Venetie Tribal
Government</u>, 101 F.3d 1286 (9th Cir. 1996) (<u>Venetie</u>), has altered
this belief.

The issue presented to the Ninth Circuit in <u>Venetie</u> was whether
the Village of Venetie's Tribal Government had the authority to

AR00801

draft    draft    draft

collect a tribal "business gross receipts" tax from an out-of-town building contractor who came to the village to construct a school under a contract paid for by the State of Alaska. The resolution of this issue turned on whether the village was a "dependent Indian community" within the definition of Indian country set out in 18 U.S.C. § 1151. The district court ruled that the village could not impose the tax because it did not satisfy the district court's reformulation of the Ninth Circuit's six criteria for finding a dependent Indian community.[1]

Although on appeal the Ninth Circuit agreed with the district court that federal set aside for Indians and federal superintendence were two prerequisites for a finding of Indian country, it stated that these requirements should be construed broadly as it had previously ordered in its 1988 decision in the same case. Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir. 1988). Reversing the district court, the Ninth Circuit ruled that ANCSA did not extinguish Indian country in Alaska. "In sum, we hold that ANCSA neither eliminated a federal set aside for Alaska Natives, as such, nor terminated federal superintendence over Alaska Natives. As a result, Indian country may still exist in Alaska." Venetie at 1299-1300.

Applying its six factor test to the specific factual situation presented, the Ninth Circuit held that the land in question was federally set aside for Indians as such, and that the Native Village of Venetie remained under federal superintendence even if

------

The Venetie case had been remanded previously to the district court by the Ninth Circuit for consideration in light of Court of Appeals' opinion in Alaska v. Native Village of Venetie, 856 F.2d 1384 (9th Cir. 1988), which set out the Circuit's six-factor test for determining a dependent Indian community. The six factors articulated by the Ninth Circuit in its first Venetie decision include:
   (1) the nature of the area;
   (2) the relationship of the area's inhabitants to Indian tribes and the federal government;
   (3) the established practice of government agencies towards the area;
   (4) the degree of federal ownership of and control over the area;
   (5) the degree of cohesiveness of the area's inhabitants; and
   (6) the extent to which the area was set aside for the use, occupancy, and protection of dependent Indian peoples.

Venetie, id., 856 F.2d at 1391.

2

AR00802

draft    draft    draft

not under its dominance. <u>Venetie</u> at 1300-02. Based on these findings, the Ninth Circuit concluded that Venetie is a dependent Indian community, that the land in question is Indian country, and that the tribe therefore has the power to impose its tax within such territory. The Ninth Circuit remanded the case to the district court "to determine whether Venetie has the power to impose a tax upon a private party where the State of Alaska will ultimately pay the obligation." <u>Venetie</u> at 1302-03.

After the Ninth Circuit's decision was announced, the appellee State of Alaska petitioned the Ninth Circuit for rehearing, with a suggestion for rehearing <u>en banc</u>. The Ninth Circuit rejected that petition on January 6, 1996. The State has since announced its intention to submit a petition for writ of <u>certiorari</u> to the United States Supreme Court and calculates that its petition is due on April 7, 1997, under the Supreme Court's rules. Venetie's opposition will be due 30 days later. On January 23, 1997, the Ninth Circuit granted the State's motion to stay issuance of the mandate in the <u>Venetie</u> case pending the Supreme Court's final disposition of the case.

**IS THIS PARAGRAPH NECESSARY FOR THIS BACKGROUND PAPER? The narrowest reading of the <u>Venetie</u> decision would limit the holding to the unique circumstances of the Native Villages of Venetie and Arctic Village. These villages collectively constitute the only tribal government which has obtained title to its former reserve through a voluntary transfer of the land from both Native village corporations. However, it seems unlikely that future courts interpreting the decision will limit the holding to ANCSA lands voluntarily transferred by a village corporation to a tribe. Under 18 U.S.C. § 1151, Native allotments are Indian country, and some might be considered to lie within the boundaries of a dependent Indian community. However, the extent of tribal governmental jurisdiction over them arguably could be analyzed under the terms of the allotment statute, regulations, and 18 U.S.C. § 1151(c) caselaw.**

Under 18 U.S.C. § 1151, Indian lands held in trust by the United States are Indian country. Unlike the situation in the contiguous forty-eight states, the land acquisition regulations located at 25 C.F.R. § 151.1, adopted in 1980, do not permit the acquisition of land in trust for Alaska Natives and tribes. This regulation is based on a memorandum dated September 15, 1978, "Trust Land for the Natives of Venetie and Arctic Village," in which Associate Solicitor for Indian Affairs Thomas Frederick concluded that ANCSA was a plain expression of Congress' intent that there should be no more Indian trust lands established in Alaska after the land claims settlement. <u>See</u> ANCSA § 2, 43 U.S.C. § 1601. Based on the Frederick analysis, the Department

3

AR00803

draft    draft    draft

has since declined all requests to take land in trust for Alaska
Natives or tribes.

In October 1994, several Alaska Villages (Chilkoot Indian
Association, Native Village of Larsen Bay, Kenaitze Indian Tribe)
represented by the Native American Rights Fund (NARF) submitted a
petition requesting that the Department undertake a rulemaking to
change the existing regulation 25 C.F.R. § 151.1.  This
regulation, prohibits the acquisition of land in trust status in
Alaska for Alaska Natives and tribes (except for the Metlakatla
Indian Community of the Annette Island Reservation).  The statute
authorizing trust land acquisitions, 25 U.S.C. § 465, contains no
such limitations.

The petitioners requested that the regulations be changed to
allow the Secretary to exercise his discretion to acquire land in
trust for Alaska Natives.  The Department subsequently published
a Notice in the Federal Register that it had received the
petition and requested comments on it by March 6, 1995.  The
Bureau of Indian Affairs (BIA) received comments from the Kipnuk
Traditional Council and from the law firm of Sonosky, Chambers,
Sachse, Miller, Munson & Clocksin, both supporting the regulatory
change.  Based on these events, the Assistant Secretary--Indian
Affairs requested the Office of the Solicitor to evaluate the
proposed change to the regulations.  The petition does not ask
for any particular lands to be taken in trust.  Rather, it merely
asks that the regulatory bar to such acquisitions be removed.

The 1978 memorandum addressed the question of whether ANCSA
precludes the Secretary from restoring to trust status former
Venetie Reserve land, held in fee by Alaska Natives.  In
concluding that the Secretary did not have the authority to
effect this restoration, the former Associate Solicitor found
that the repeal in the Federal Land Policy and Management Act
(FLPMA) of the Secretary's authority to proclaim reservations in
Alaska, in tandem with the revocation of Native reservations by
ANCSA, implicitly revoked the Secretary's authority to take
tribal land in trust.  The reasoning of the 1978 memorandum is
unpersuasive for the following reasons:

In 1936, Congress made most key provisions of the IRA, 25 U.S.C.
§§ 461-497, applicable in Alaska, notwithstanding the limited
number of reservations in Alaska.  25 U.S.C. § 473a.  Among those
provisions applicable in Alaska is one permitting the United
States to take lands in trust.  25 U.S.C. § 465, as amended.
Through FLPMA, Congress  repealed 25 U.S.C. §§ 496 and 497 which
authorized the Secretary to designate tracts of land in Alaska as
Indian reservations and to reserve tracts of land in Alaska for
schools, hospitals, and other uses for Indians, Eskimos, and

4

AR00804

draft   draft   draft

Aleuts.  90 Stat. 2792.  However, Congress left 25 U.S.C. § 465 intact and chose to distinguish between the authority to proclaim reservations and the acquisition of trust land.

Moreover, a fundamental principle of Indian law prohibits extinguishment of tribal rights except by a "clear and plain" expression of Congressional intent.  <u>Hualapai Indians, United States ex rel. v. Santa Fe Pacific R.R.</u>, 314 U.S. 339, 353 (1941); <u>see also</u> <u>Bryan v. Itasca County</u>, 426 U.S. 373, 383 (1976).  Congress is fully capable of unambiguously repealing statutes when it so chooses.  <u>See, e.g.</u>, <u>Repeal Act Authorizing Secretary of Interior to Create Indian Reservations in Alaska: Hearings on S. 2037 and S.J. Res. 162 Before the Senate Subcomm. of the Committee on Interior and Insular Affairs</u>, 80th Cong., 2d Sess. (1948).  When it chose to repeal one portion of the IRA applicable to Alaska and left the remainder intact, the rules of statutory construction require that we continue to give effect to the remaining provisions of the statute.

Thus, 25 C.F.R. § 151.1 arguably exceeds the scope of Secretarial authority, since it conflicts with IRA sections 465 and 473a, which makes section 465 applicable in Alaska.

document name  s:\ia\wp\tg&a\alaska\tg.gen\indctry\venfisca.rep

March 3, 1997

AR00805

[534] From: SCOTT KEEP at ~DOI/SOL_HQ 7/18/97 6:44PM (1846 bytes: 1 ln)
To: SANDRA ASHTON, DAVE WATTS, ROBERT BAUM, LAURI ADAMS at ~DOI/SOL_AK,
   ROGER HUDSON at ~DOI/SOL_AK, PAUL SMYTH, BARRY ROTH
Subject: Re: if doi takes land into trust
------------------------------- Message Contents -------------------------------
      does bia incur costs of administering, which then the tribe
can then request be provided to them in a 638 contract or a
self gov afa?

      Of course, BIA incurs responsibilities which cost
money to fulfil and which the village can then 638-contract
to preform.  However, when BIA gets a request to have land
taken in trust, it considers among other things whether it
can adequately manage the responsibility of having the land
in trust.  If it decides it can not manage the additional
responsibilities, it does not accept the land in trust.
it seems like something is wrong with creating an obligation
for doi to pay them for administering in trust their land,

      which they just gave back to us, or am i missing
something?  I believe your are missing a great deal.
Fundamental to the post-IRA Indian policy is the realization
that an adequate land base is essential for tribe/villages
to function as tribes/villages.  The U.S. policy believes
supports tribes functioning as tribes.  Tribes provide a
valuable unit of local government.  As a result the U.S.
policies for the last 1/2+ century have supported restoring
or consolidating the Indian land base. ~skeep~

AR00806



**United States Department of the Interior**

OFFICE OF THE SOLICITOR
ALASKA REGION

4230 University Drive
Suite 300
Anchorage, Alaska 99508-4626



BIA.AK.0034

July 28, 1997

MEMORANDUM                    TRANSMITTED AS E-MAIL ATTACHMENT

TO:        John Leshy, Solicitor

FROM:      Roger L. Hudson, Attorney
           Office of the Regional Solicitor, Alaska

SUBJECT:   7/26-27 "leshy edits" of draft memorandum on Alaska
           Native trust land acquisitions


      Generally, I think the chronological historic approach to the
analysis which you utilized is the clearest and most helpful. I
just have a few "nit-picks" and general observations:

1. I think the statement near the bottom of page 3, that Congress's
failure to act to make 25 U.S.C. § 465 inapplicable to Alaska was
"deliberate," is a little stronger than what the evidence supports.
… agree with the general conclusion that the statute still applies,
because Congress has not demonstrably or impliedly repealed it, but
I doubt that such legislative action or inaction was a consciously
considered choice.  In looking at the FLPMA legislative history, I
saw nothing alluding to this issue at all.  Given the very large
number of statutes that were dealt with in FLPMA §§ 702-706 in
1976, I think it's entirely plausible that both I.R.A. §§ 5 and 7,
25 U.S.C. §§ 465 and 467, made applicable to Alaska by the May 1,
1936 enactment of 25 U.S.C. § 473a, were simply over-looked in
FLPMA.   This seems particularly likely in view of the fact that
FLPMA repeals § 2 of the 1936 Alaska IRA, 25 U.S.C. § 496, but
leaves untouched § 467, even though both are authorities for the
creation of reservations in Alaska.  I don't think we need to say
what Congress intended; just what it did, or didn't do.

2. Along the same lines of reading the legislative mind, we might
want to briefly mention something about the post-FLPMA legislative
record.  After the 1971 ANCSA set up a time-table for a 20 year
transition to unqualified fee simple status for Native corporation
lands, Congress came back twice, in 1980 and 1987, to first extend
and then make permanent the tax immunity of undeveloped ANCSA
corporate lands, and then to provide protection against creditors
as well.  ANILCA § 904, and 43 U.S.C. § 1636(d).  Assuming that we
might face a State challenge to our new legal interpretation, or
revision of the regulations, or to a specific future acceptance of
land in trust, it would be nice to be able to point to the fact

John Leshy, Solicitor
7/26-27 "leshy edits" of draft memorandum
July 28, 1997 - Page 2

that we considered all the evidence.  The State might argue that if
Congress thought that authority to take land in trust was still on
the books, it wouldn't have felt it was necessary to go back and
provide additional protections by way of amendments to ANCSA.  I
don't think this is a particularly strong argument, but we might
want to consider explicitly setting it up and then knocking it
down.  The companion argument would be that the provisions for land
banks and settlement trusts are indicative of the lack of
continuing Secretarial authority to do a plain vanilla acquisition
of ANCSA corporate lands in trust under 25 U.S.C. § 465.

3. Even if we're making no reference to the <u>Venetie</u> case in this
memorandum, we might want to be fairly above-board about the Indian
country implications of taking land in trust, if they are of major
concern.  After all, Secretary Ickes reportedly argued for the 1936
Alaska IRA amendments, confirming the applicability of 25 U.S.C. §§
465 and 467, on the basis <u>inter alia</u> that reservations would
establish geographical limits of Native governmental jurisdiction.
<u>See</u> Case, <u>Alaska Natives and American Laws</u> (1984), at 100.  (We
might want to add this citation to footnote 3 as well.)

4. In the category of nit-picking, the characterization of former
25 U.S.C. § 497 as part of the Act of May 1, 1936, in footnote 2,
and at the top of page 4, is erroneous.  That authority for
reservation of tracts for schools, hospitals, etc. was enacted two
years later, on May 31, 1938, 52 Stat. 593.

5. In the first full paragraph on page 4, why do we only reference
25 U.S.C. § 465, and not § 467?  Are we implying that § 467 was
repealed in FLPMA by implication, but §465 was not?  If not,
doesn't our general approach suggest that there is still
reservation creation authority on the books, as well as trust
acquisition authority?  Shouldn't we state our position, one way or
the other?  These issues are raised in your footnote 4.  I agree
they should be addressed in order to fortify our position against
a foreseeable State challenge.

6. I think it's useful to allude to the Sansonetti opinion's
reference to the Fredericks opinion, and I agree with your proposed
observation on that subject at page 5 of the draft.

7. Looking a little ways down the line, towards the presumed
regulatory action, I basically think the observation as to the
necessity of a regulatory amendment, at the top of page 5, is fine.
But as a Devil's advocate, I would point out that the existing 25
C.F.R. § 151.1 does not explicitly prohibit taking land in Alaska
in trust; it just says that the Part 151 regulations don't apply.
Arguably, the Secretary could take land in trust on the strength of
the statute alone, without amending the regs.  He would just not
have his own regs to guide him.  However, I see no advantage to

John Leshy, Solicitor
7/26-27 "leshy edits" of draft memorandum
July 28, 1997 - Page 3

such an interpretation.  We want both the public process of an amendment to the regulations, and the useful substantive guidance that the regs afford, as we step off this cliff.

8.  One other point to ponder in connection with amending the regulations is whether the existing Part 151 is wholly suitable to the Alaska situation.  I think it was really drafted with the lower 48 situation in mind, where what is typically contemplated is an incremental addition to an existing reservation, rather than a change in land status, perhaps affecting an extensive area, which might chiefly be motivated by the desire to establish tribal governmental jurisdiction.  Of course, we need not address the suitability of the existing regs in the context of issuing your draft opinion, but possible modifications may be worth considering for future action.

9. Although I have no strenuous objection to your draft, and in fact think it constitutes a much better reading of the statutory history than Fredericks', I am not particularly enthusiastic about reversing the policy of not taking land in trust in Alaska.  I don't think the relevant federal agencies in Alaska are adequately prepared or staffed to carry out the Government's "trust responsibilities" on a large scale, and from a political standpoint, the Secretary will be setting himself up to take a lot of political heat from either the Natives or the State every time he is asked to rule on a particular proposed trust acquisition. Perhaps this would be desirable, if taking land in trust really had the potential to significantly clarify the Indian country jurisdictional situation up here (whichever way the Supreme Court rules in <u>Venetie</u>).  But because so much of the land in and around villages is owned by persons and entities other than tribes or ANCSA corporations, the best that could be hoped for would be a swiss cheese jurisdictional pattern in almost every community other than Venetie and the other six villages which received land under ANCSA § 19(b).

Thanks for the opportunity to comment.

Roger L. Hudson

July 30, 1997

MEMORANDUM                                                    BY E-MAIL & FAX

TO:        Sandy Ashton, Attorney
           TG & A, DIA

FROM:      Roger L. Hudson, Attorney
           Office of the Regional Solicitor, Alaska

SUBJECT:   Draft language for Alaska trust land acquisition memo

        Here is a proposed passage, as per John's request, addressing
the arguments based on post-FLPMA ANCSA amendments:

        Although not relied upon by the Associate Solicitor, Indian
Affairs in his 1978 memorandum, there are perhaps additional
arguments which could be marshalled in support of his conclusion
that taking land in trust under authority of 25 U.S.C. § 465 would
be contrary to congressional intent.  For instance, it might be
pointed out that Congress has, on more than one occasion since the
passage of the F.L.P.M.A., enacted special provisions for
protection of the property interests of Alaska Native corporations,
and that these statutory provisions could be viewed as substitutes
for the protections which might otherwise be afforded by the
Secretary taking land in trust.  Specifically, the period of tax
immunity for undeveloped lands was first extended, and then made
permanent, under 43 U.S.C. § 1620(d)(1), as amended by Pub.L. 96-
487, 94 Stat. 2434, and extensive protections against creditor
claims were also added under 43 U.S.C. § 1636(d), Pub.L. 100-241,
101 Stat. 1807.  However, the fact that Congress saw fit to enhance
the protections afforded to undeveloped corporate lands cannot be
convincingly argued to amount to an implied repeal of the authority
for taking land in trust.  To cite only one obvious distinction,
the authority to take land in trust is not limited to undeveloped
ANCSA corporate lands, but could also apply to lands being acquired
on behalf of tribes or Native individuals from any source.

        The same basic reasoning requires rejection of an implied
repeal argument based upon the Land Bank and Settlement Trust
provisions added to the ANCSA as 43 U.S.C. §§ 1629e and 1636.
[add P.L. or Stat. cites]  Although these provisions would also
serve to provide some of the same sorts of protections of ANCSA
corporate lands that might be obtained by taking such lands in
trust, the fact that Congress made these additional options
available to Native corporations is in no way fundamentally
conflicts with the continuing authority of the Secretary to take
land in trust for Native tribes or individuals.  Even with respect
to ANCSA corporate lands, but particularly with respect to lands
acquired from other sources, there is no real or apparent conflict.

AR00810

[162] From: ROGER HUDSON at ~DOI/SOL_AK 7/30/97 9:07AM (39469 bytes: 31 ln, 1 fl )
To: SANDRA ASHTON at ~DOI/SOL_HQ, JOHN LESHY at ~DOI/SOL_HQ
cc: LAURI ADAMS, DERRIL JORDAN at ~DOI/SOL_HQ, SCOTT KEEP at ~DOI/SOL_HQ
Subject: Re[2]: Venetie
----------------------------- Message Contents -----------------------------

Text item 1:

        Thanks for your helpful comments - they're excellent and we
        will try to make the necessary adjustments.  It would be of
        help, further, if you could craft a paragraph and send it
        along ASAP that would raise and reject an argument that
        Congress's extension of tax immunity for undeveloped ANCSA
        lands indicated an assumption that the Secretary no longer
        had the authority to take land in trust; i.e., following up
        your comment in paragraph #2 of your memo.  Thanks.


        Roger,

        I am filling in the blanks that John indicated and will be
        happy to incorporate your paragraph if you get it to me by
        noon your time.  I'll also give it a try based on your
        e-mail.  Then we can give John a consolidated draft. I am
        also trying to incorporate some of your other comments.

        Sandy

Sandy --  I'm going to write up a paragraph on wp 5.1, and try to send
        attached to this e-mail.  But just in case, I'll also fax it
        to you.  Sorry about the mix-up, but I was waiting for the
        draft that your e-mail had said was attached, and that I
        perhaps mistakenly understood you were telling me on
        the phone was on its way to me.  I also apologize that this
        is pretty rough, but not short.  I know you folks can clean
        it up, or decide not to use it at all.    -- Roger

        attachment: wp 5.1 file w/ draft paragraph

AR00811

```
[562] From: SANDRA ASHTON at ~DOI/SOL_HQ 7/29/97 11:45AM (1361 bytes: 1 ln)
Priority: Urgent
To: ROGER HUDSON at ~DOI/SOL_AK
Receipt Requested
cc: LAURI ADAMS at ~DOI/SOL_AK, DERRIL JORDAN, SCOTT KEEP
Subject: Re: Venetie
------------------------------ Message Contents ------------------------------
```

Thanks for your helpful comments - they're excellent and we
will try to make the necessary adjustments.  It would be of
help, further, if you could craft a paragraph and send it
along ASAP that would raise and reject an argument that
Congress's extension of tax immunity for undeveloped ANCSA
lands indicated an assumption that the Secretary no longer
had the authority to take land in trust; i.e., following up
your comment in paragraph #2 of your memo.  Thanks.


Roger,

I am filling in the blanks that John indicated and will be
happy to incorporate your paragraph if you get it to me by
noon your time.  I'll also give it a try based on your
e-mail.  Then we can give John a consolidated draft. I am
also trying to incorporate some of your other comments.

Sandy

AR00812

[172] From: ROGER HUDSON at ~DOI/SOL_AK 8/13/97 2:14PM (7141 bytes: 117 ln)
To: JOHN LESHY at ~DOI/SOL_HQ
cc: DERRIL JORDAN at ~DOI/SOL_HQ, SCOTT KEEP at ~DOI/SOL_HQ, SANDRA ASHTON at
~DOI/SOL_HQ, LAURI ADAMS, TERRI DEBREWER at ~DOI/SOL_HQ
Subject: proposed edits of 8/12/97 draft of Alaska trust lands memo
----------------------------- Message Contents -----------------------------
I think that each successive draft of this still represents an
improvement over the last. Here are my latest suggestions:

1. Apart from the absence of footnote numbers at the bottom
of the pages, I think the order of the footnotes is itself a
little fouled up. I think footnote 1 is fine, but that
footnote 2 should be cited in the text on page 1, line 9,
following the second sentence and cite to 25 CFR Sec 151.1.
The actual content of footnote 2 should be the second
"below-the-line" paragraph on page 2. (This change would
match up with the existing page 7, line 4, reference to
footnote 2.) Then the footnote cited in the text as 2, on
page 2, line 2, should be renumbered footnote 3, with its
content being the first page 2 below-the-line sentence.
Then, I would either delete the existing page 2, line 17
footnote 3 cite, or else make up some footnote content to go
with it, since I don't see any that's appropriate. (Did we
want to say that a copy of the 1978 opinion is attached or
something like that?) Assuming it is dropped, the rest of
the footnote cites and below-the-line content, beginning
with 4 on page 2, line 19, seems to line up O.K.

2. I would re-work the first sentence on page 3, so that
we're not saying that the breakup of the land base flowered,
as follows: "It aimed at reversing the policy of
assimilation which had come into flower with passage of the
General Allotment (Dawes) [note spelling correction] Act of
1887, 24 Stat. 388, and had led to the breakup
of the Indian land base."

3. Page 3, lines 14-15. I would take the phrase "including
Sec. 5," from the end of the cite, and insert it in the
sentence between "IRA" and "applicable." I would also begin
the following sentence with "Congress thereby" instead of
"Thus, Congress here. . ."

4. In footnote 6, at the bottom of page 3, I would insrt
"also D." between "See" and "Case."

5. In the next-to-the-last line of text on page 4 I would
capitalize "Native." (Also anywhere else it appears
outside a quote.)

6. This is not necessarily a suggestion for a change, but
isn't it true that the proposition for which we cite Morton
v. Mancari at the top of page 5 is inapposite. Aren't we
talking about a subsequent specific (not generic) statute
leaving intact an earlier generic, (not specific) one?

7. I would slightly reword page 5, lines 13-14, for esthetic
reasons, to read: ". . .address, strongly suggests, if it
does not dictate, a conclusion contrary to that reached by

AR00813

the Associate Solicitor."

8. If we are going to use the page 6 "straw man" paragraph, as text or footnote, I would supplement the lines 15-16 citation for the Land Bank to reflect that it was actually first provided for in ANILCA, by changing the wording to: ". . . Land Bank and Settlement Trust provisions, codified at 43 U.S.C. Secs. 1629e and 1636, which were added to ANCSA in 1980 and 1988 by Pub.L. 96-487, 94 Stat. 2371, 2444-47, and Pub.L. 100-241, 101 Stat. 1804-10."

9. In footnote 9, at the bottom of page 6, I would insert the word "repealed" in line 8, between "have" and "only." I would also delete the space between "4" and "(c)" in line 10, and also rework for clarity, so that last part of line 10 would read: "Section 4(c) of S. 2037, the other legislative proposal under consideration at that time, would. . ."

10. Page 7, lines 16-17. I would reorganize the clauses here so that the sentence would read as follows: ". . . it seems to me that if the Secretary wants to move forward to consider taking Alaska lands in trust, the better approach is to proceed through a rulemaking . . ."

11. Page 7, footnote 10 begins with a quote from the 1993 Federal Register publication of the list of recognized tribes. I think we need to provide at the outset some explanation of what we're quoting from, what the significance of the list is, and how it relates to the point we make in the text. I realize some of this can be gleaned from the quote itself, but it just strikes me as a long leap for the reader as presently constituted.

12. The margins on the footnote 12, page 9 quote are messed up.

13. I think we need a concluding paragraph, since the draft just trails off. . . As a first effort I suggest something like:

"In conclusion, it is my opinion that the Secretary does have under existing law the statutory authority and discretion to take land in trust for Alaska Native tribes and individuals. However, it is my recommendation that you not attempt to exercise such discretion with respect to any specific proposed trust acquisition until you have first made appropriate amendments to 25 C.F.R. Part 151."

14. Reading that language over brings up the general second person vs. third person stylistic question. If we're addressing this memo to the Secretary should we be telling him "you" can do this and "you" should do that, or do we speak in the third person about "the Secretary" as if he's not in the room? Consistency might be the only watch-word, and is something my proposed conclusion lacks.

I am also faxing to Scott, in his capacity as word processor extraordinaire, a marked up copy of the 8/12/97 draft, since it might make it a little easier for him to follow my

AR00814

proposed revisions set forth above.

Thanks again for inviting my input.

                    Roger L. Hudson

AR00815

[174] From: ROGER HUDSON at ~DOI/SOL_AK 8/15/97 12:24PM (2251 bytes: 37 ln)
To: JOHN LESHY at ~DOI/SOL_HQ, SCOTT KEEP at ~DOI/SOL_HQ
cc: DERRIL JORDAN at ~DOI/SOL_HQ, LAURI ADAMS, TERRI DEBREWER at ~DOI/SOL_HQ,
  SANDRA ASHTON at ~DOI/SOL_HQ
Subject: comments on draft of Alaska trust lands memo rec'd 8/15/97
------------------------------ Message Contents ------------------------------
                I'm running out of nit-picks, but here's my latest
          contribution:

          1. Page 2, footnote 3, does not have a footnote number at
          the bottom of the page.

          2. Page 3, line 9, insert space after comma and before
          "including." Line 10, change comma after "Alaska" to
          period.

          3. Page 4, move footnote 7 symbol from line 8 up to line 2,
          since the content of the footnote relates to the first
          sentence, not the second or third.

          4. Page 6, line 8, after "example," insert: "by amending the
          original 1971 ANCSA,". Line 20, between "of" and
          "authority," insert: "the 25 U.S.C. Sec. 465." Line 21,
          strike out "held by" and substitute "acquired for."

          5. Page 7, line 26. I've always had a nagging feeling that
          we should make a bigger point of the fact that we may not
          actually decide to take much land in trust, in spite of this
          new legal interpretation. I suggest that we punch up this
          paragraph by at least adding a parenthetical summary of the
          holding of the newly cited McAlpine case. My suggested
          wording: "(decision to take land in trust, or not, is
          discretionary, and reviewable under an "arbitrary,
          capricious, or abuse of discretion" standard)."

          6. Page 9, line 12. Spell "trust" with an "r". Capitalize
          "Native." Line 13, spell "recommendation" with an "a".
          Line 15, insert "proposed" between "specific" and "trust,"
          because we want to emphasize the point that the discretion
          may be exercised NOT to take a particular parcel in trust,
          even if requested to do so.

          Are we almost done now?      -- Roger

AR00816

[173] From: ROGER HUDSON at ~DOI/SOL_AK 8/18/97 12:31PM (4355 bytes: 64 ln)
Priority: Urgent
To: JOHN LESHY at ~DOI/SOL_HQ, DERRIL JORDAN at ~DOI/SOL_HQ, SCOTT KEEP at
  ~DOI/SOL_HQ, SANDRA ASHTON at ~DOI/SOL_HQ, LAURI ADAMS
Subject: Alaska trust lands memo - latest version(s?)
------------------------------ Message Contents ------------------------------
    I received two new versions, one from Sandy, and one from
John. They seem substantially the same, except that Sandy's
has added language following the cite to Morton v. Mancari
on page 5, which is fine, and I think helpful, but Sandy's
also has margin problems with the format for the
footnote 11 on page 8, which appear to have been corrected
in the version attached to John's cover memo. Assuming the
final version combines the best of both on these points, I
only have a few additional observations (using page and line
references to Sandy's version):

1. There's an extra space or two at the start of footnote 2.

2. Regarding the questions raised by John about the footnote
8 discussion of 25 U.S.C. Sec. 467, I would NOT say we
should argue or opine that 467, unlike 465, was repealed by
implication. Granted, the implied repeal argument is
stronger because the specific Alaska reservation authority
of Sec. 496 was expressly repealed, but it's still a hard
distinction to make between repeal of 467 and non-repeal of
465, and it would therefore tend to weaken our primary
conclusion as to non-repeal of 465. If we leave the
language as it was (the equivalent of a punt?), or revise
it in an equally ambiguous nonconclusive way, we are
avoiding any signal that we'll be rushing out to create
reservations, which I don't anticipate us doing. If we say
affirmatively that the Secretary still has that authority,
it might be more likely to invite proposals that he exercise
it, which presumably would not be welcomed, and would be
especially likely to invite a State challenge. In this
case, I'm drawn to the idea of leaving something hanging.

3. On page 6, in the paragraph beginning with "It might also
be argued. . .", I think John's added parenthetical in
the first sentence makes the point clearer, but should be
revised in some way, because it seems unfair to take the
1978 opinion's author to task for failing to analyze 1980
and 1988 statutory enactments. Perhaps: "(although the
basis for such argument was not available in 1978)".

4. In the same paragraph, I would insert the word "first" in
line 6 between "Congress" and "extended," because it
clarifies that there were TWO post-ANCSA legislative
modifications. For the same reason, I would revise the cite
to read: "See 43 U.S.C. Sec. 1620(d)(1), as amended and
supplemented by Pub.L. 96-487, 94 Stat. 2434, and Pub.L.
100-241, 101 Stat. 1807."

5. Something got dropped out of the final paragraph on page
9, following the word "any" in line 4. "Particular case" or
"in response to a specific proposal to acquire land in
trust" or some equivalent verbiage should be inserted.

AR00817

6. I'm assuming that the version sent to us incorporates all of my 8/15/97 comments that were deemed worth picking up, but I would just make one more pitch for item 5 from that short list, which was the suggestion that we add a parenthetical summary of the holding of McAlpine v. U.S., near the bottom of page 7, partly because we've done the same thing for the other cited case, and partly because it would further emphasize the discretionary nature of the Secretary's authority.

That's all for now.                    Roger

[564] From: JOHN LESHY at ~DOI/SOL_HQ 8/18/97 1:39PM (60156 bytes: 63 ln, 1 fl)
To: SANDRA ASHTON, TERRI DEBREWER, DERRIL JORDAN, SCOTT KEEP
cc: LAURI ADAMS at ~DOI/SOL_AK, ROGER HUDSON at ~DOI/SOL_AK
Subject: Re:  Alaska lands  edits to draft
-------------------------- Message Contents --------------------------

Text item  1:

         from Sandy:

         The attached document is John's weekend version PLUS the
         incorporation of the suggestions I described below.  I also
         added some hard returns and other cosmetic stuff.

         In thinking about John's comments on footnote 8, I suggest
         we say something along the lines of "This memorandum
         concerns only the taking of land in trust and not the
         authority of the Secretary to create reservations in Alaska.
         Thus, it does not discuss  467."  I don't think that we
         should say 467 was implicitly repealed. We have noted
         earlier that ANCSA did not intend to create "a reservation
         system of wardship," so it really isn't necessary to greatly
         expand this discussion in footnote 8, in my opinion.
            That's about right, but I believe we ought to flag the
         issue a little more clearly, by saying: "Thus, it
         does not discuss the extent to which  467 has continued
         vitality."   Or, change the earlier sentence to:  "... and
         not the extent to which the Secretary may still have
         authority to create reservations in Alaska." ..."
                                        JL
_____ Reply Separator _____
Subject: Re: Alaska lands   cite checks
Author:  SANDRA ASHTON at ~DOI/SOL_HQ
Date:    8/15/97 2:49 PM

         from Sandy:

         per Scott's earlier instruction, I have checked the cites
         and note the following:

         page 5 at the top:  the Tuna cite should be 425 U.S. 164,
         168 (1976) (citations omitted).

         page 5, same paragraph, last cite, Morton v. Mancari.  Roger
         questioned whether MvM was inapposite to the principle for
         which we are citing it.

         After reviewing our memo and MvM, I think MvM works here --
         because the 1936 act said specifically that certain sections
         of the IRA apply in Alaska, and the 1971 ANCSA settled land
         claims without addressing the application of the IRA in
         Alaska.  Further, in FLPMA, Congress specifically repealed
         certain sections of the IRA, but not the ones giving the
         Secretary the authority to acquire land for Indians nor the
         section making the IRA applicable in Alaska.

AR00819

However, I do suggest that we add a parenthetical to the MvM
cite:  (where no clear intention otherwise, a specific
statute will not be nullified by a general one, regardless
of priority of the enactment).  [this paraphrases the
Court's language]

page 6, re US reporter cite for Sweet Home:  Westlaw, even
though it has the US cite, has no page numbers for the text
of the opinion.  I checked in the law library and we don't
have the volume that contains the case, starting on page
687.  So leave as is.

AR00820